## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| JERVOIS TEXAS, LLC, *et al.*,[1] | Case No. 25-90002 (CML) |
| Debtors. | (Joint Administration Requested) |
| | (Emergency Hearing Requested) |

## DECLARATION OF BRIAN MARTIN IN SUPPORT OF
## THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Brian Martin, pursuant to section 1746 of title 27 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am a Senior Managing Director at FTI Consulting, Inc. ("FTI").  On January 6, 2025, FTI was retained as financial advisor for the above-captioned debtors (collectively, the "Debtors," and collectively with their non-Debtor affiliates, the "Company").

2.     I received my B.A. and M.B.A from the University of Notre Dame.  I have more than 16 years of corporate finance experience, the last 12 of which have been spent providing turnaround and restructuring advisory services to a variety of constituencies.  At FTI, I provide restructuring advice to companies, creditors, shareholders, boards, and other interested parties on restructuring transactions both in chapter 11 and on an out-of-court basis.  I also provide liquidity advice, working capital management, performance improvement services, and have provided interim management services.   Many of these engagements have involved multinational

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are:  Jervois Global Limited (N/A), Jervois Suomi Holding Oy (N/A), Jervois Finland Oy (N/A), Jervois Americas LLC (8097), Jervois Japan Inc. (N/A), Formation Holdings US, Inc. (0103), Jervois Mining USA Limited (1323), and Jervois Texas, LLC (9514).  The Debtors' service address is Suite 2.03, 1-11 Gordon Street, Cremorne Melbourne, VIC 3121 Australia.

corporations that operate in various jurisdictions.  I have been involved in a number of chapter 11 cases, including The Hertz Corporation, Claire's Stores, Proterra, Armstrong Energy, Frontier Communications, Quiksilver, Southeastern Grocers, and Sungard AS.

3.　　In my capacity as financial advisor to the Debtors, I am familiar with and knowledgeable about the Debtors' day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of these chapter 11 cases (the "Chapter 11 Cases").  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition, or from my discussions with the Debtors' management, professionals, attorneys, and advisors.  I believe, to the best of my knowledge, that the facts and circumstances set forth herein are true and correct.  If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

4.　　On the date hereof (the "Petition Date"), the Debtors each commenced with the United States Bankruptcy Court for the Southern District of Texas (the "Court") a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  I submit this declaration (this "Declaration") to provide an overview of the Debtors, their businesses, and the Chapter 11 Cases, as well as to support Debtors' chapter 11 petitions and other motions and applications that the Debtors have filed with the Court, including the "first-day pleadings" (the "First Day Pleadings").  I am authorized to submit this Declaration on behalf of the Debtors.

5.　　This Declaration is organized in five sections.  Section I provides an overview of

2

the Restructuring Transactions (as defined below).  Section II provides background information on the Company's corporate history and operations.  Section III offers an overview of the Company's prepetition corporate and capital structure.  Section IV describes the financial and operational circumstances resulting in the Debtors' prepetition restructuring efforts and, ultimately, the filing of these Chapter 11 Cases.  Section V summarizes the relief requested in the First Day Pleadings.

## I.      Overview

6.      The Company is a leading global supplier of advanced manufactured cobalt products, serving customers in the powder metallurgy, battery, and chemical industries.  The Company is an industry leader in responsible sourcing and environmental performance, and provides its customers with a secure and reliable supply of products.  The Debtors' principal asset base is comprised of an operating cobalt facility in Finland, a non-operating cobalt mine in the United States, and a non-operating refinery in Brazil.

7.      As described in greater detail in Section IV herein, the Company began facing challenging market conditions in 2022 and was subsequently impacted across consecutive years due to declining cobalt prices resulting from Chinese oversupply.  The Company is directly exposed to fluctuations in cobalt prices.  During the second quarter of 2023, the Company commenced discussions with third parties with regard to partnership opportunities on a number of its assets.  In September 2023, the Company launched formal processes across multiple assets to solicit potential interest in a sale, partnership opportunities, and any other strategic transactions that would strengthen the Company's balance sheet and provide the Company with necessary liquidity.  Despite an extensive marketing process and significant engagement and due diligence from interested parties, the Company ultimately did not receive any actionable proposals.  In April 2024, faced with upcoming bond interest coupons on its Prepetition ICO

Bonds (as defined herein) and a maturity of its Prepetition JFO Facility (as defined herein) at the end of the year 2024, the Company engaged advisors to explore a potential balance sheet restructuring.  Over the last nine (9) months, the Company has been in extensive discussions with Millstreet Capital Management LLC and/or one or more of its affiliates or designees ("Millstreet" or the "Plan Sponsor"), the Company's key financial stakeholder and funded debt holder,[2] to explore strategic alternatives to address the Company's balance sheet challenges.  To offer the Company breathing room and additional liquidity runway to effectuate a comprehensive restructuring, the Plan Sponsor agreed to certain amendments and temporary waivers of covenant and other requirements under the Prepetition JFO Facility and Prepetition ICO Bonds, as well as the deferral of certain interest payments under the Prepetition ICO Bonds.  Moreover, the Plan Sponsor has provided the Company with two rounds of increased commitments and numerous fundings under a newly created term loan pursuant to the Prepetition JFO Facility.

8.      On December 31, 2024, the Debtors and the Plan Sponsor entered into a Restructuring Support Agreement, which was amended and restated on January 28, 2025 pursuant to an Amended and Restated Restructuring Support Agreement among the Debtors and the Consenting Lenders (including the Plan Sponsor) (as may be amended, supplemented, or otherwise modified from time to time, the "RSA"), a copy of which is attached hereto as **Exhibit A**, which outlines the terms of a holistic balance sheet restructuring and recapitalization transaction, including debtor-in-possession financing to support the Chapter 11 Cases and the Australian Proceedings (as defined below) and financing to be provided on or after the Debtors' emergence for go-forward operations (collectively, and as further detailed in the RSA,

---

[2] As of the Petition Date, Millstreet and PenderFund (collectively, the "Consenting Lenders") are holders of approximately 98% of the Company's outstanding debt, including: (i) 100% of outstanding principal amount of the Company's Prepetition JFO Facility; (ii) 96% of the outstanding principal amount of the Company's Prepetition ICO Bonds; and (iii) 100% of the outstanding principal amount of the Company's Prepetition Convertible Notes.

the "Restructuring Transactions").

9.      In the weeks subsequent to the entry of the RSA, the Debtors have worked to implement the terms of the contemplated restructuring, which is memorialized in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Jervois Texas, LLC and its Debtor Affiliates* (the "Prepackaged Plan") filed contemporaneously herewith.   The Debtors are seeking confirmation of the Prepackaged Plan no later than 40 days from the Petition Date, with emergence from the chapter 11 cases expected by April 30, 2025, simultaneously with the successful completion of a voluntary administration in Australia by Debtor Jervois Global Limited ("JGL") (as well as its Australian subsidiaries) to give full effect to the Restructuring Transactions in Australia (the "Australian Proceedings").

10.      Through the consensual Prepackaged Plan, the Debtors will shed approximately $164 million in funded debt obligations and have support from the Plan Sponsor (and, if applicable, one or more Additional New Money Investors[3]) for $145 million in new equity capital.   The Restructuring Transactions will create a company that is stronger and well-capitalized.

11.      Notably, the Debtors' general unsecured creditors, such as trade vendors, employees, suppliers, and customers, will not be affected by the treatment provided under the Prepackaged Plan.   Except to the extent that any general unsecured creditor agrees to different treatment, the Debtors will continue to pay or dispute each general unsecured claim in the ordinary course of business.   Trade contracts and terms will be maintained, and customer relationships will remain intact.   The Debtors expect operations will continue in the ordinary

---

[3] "Additional New Money Investor" means one or more entities identified by the Plan Sponsor (and reasonably acceptable to the Debtors) that has committed to provide a portion of the New Money Investment (as defined below), in an amount and upon terms and conditions acceptable to the Plan Sponsor (it being understood that such terms and conditions shall be no more favorable to such investor than the terms and conditions applicable to the Plan Sponsor).

course.

### A.     Transaction Overview

12.     The Consenting Lenders have agreed to vote in favor and support confirmation of the Debtors' Prepackaged Plan, as set forth in the RSA.  The Consenting Lenders hold sufficient majorities in Class 3 (any claims arising under, in connection with, or related to the loans outstanding under the Prepetition JFO Facility) and Class 5 (Prepetition Convertible Notes) as well as the requisite majority (in claim amount) in Class 4 (any claims arising under, in connection with, or related to the Prepetition ICO Bonds) needed to confirm the Prepackaged Plan.

13.     As noted above, the Restructuring Transactions will result in a holistic recapitalization transaction that will allow for substantial deleveraging and new capital infusion to right size the Debtors' balance sheet for the benefit of all stakeholders.  The following table illustrates the difference between the Debtors' capital structure as of the Petition Date compared to the capital structure contemplated by the Prepackaged Plan upon emergence from the chapter 11 proceedings:

| Current Funded Debt (Principal Amounts Outstanding) | | Reorganized Funded Debt | |
|---|---|---|---|
| **Prepetition JFO Facility**<br>    Revolving Capital Facility<br>    Delayed Draw Term Loan | $44,105,395.00<br>$24,000,000.00 | **Exit Revolver** | $31,605,395.00[4] |
| **Prepetition ICO Bonds** | $100,000,000.00 | | |
| **Prepetition Convertible Notes** | $27,412,857.41 | | |
| **Total Funded Debt**: | $195,518,252.41 | **Total Funded Debt**: | $31,605,395.00 |

14.     Pursuant to, and subject to the terms of the RSA, the Plan Sponsor has agreed to commit substantial new capital to fund distributions under the Prepackaged Plan and the

---

[4] Upon emergence, approximately $31.6 million of the Prepetition JFO Facility will be outstanding and converted into the Exit Revolver (as defined below), after accounting for a $12.5 million partial pay-down as contemplated in the Prepackaged Plan.

Debtors' go-forward operations post-emergence.  In particular, the Plan Sponsor has committed to provide: (i) a $49 million debtor-in-possession financing in the form of a senior-secured priming facility that amends the existing Prepetition JFO Facility (the "DIP JFO Facility") consisting of (A) a $25 million new money senior-secured priming delayed draw term facility (the "New Money DIP Facility"), and (B) a $24 million roll up facility of the existing prepetition delayed draw term loan (the "Roll-Up Facility"); (ii) on the effective date of the Prepackaged Plan (the "Effective Date"), $90 million of new equity investment (the "New Money Investment") in exchange for approximately 51.1% of the new equity interests to be issued by the Reorganized Debtors, as of the Effective Date, subject to dilution by the management incentive plan; and (iii) after the Effective Date, $55 million, in the aggregate, in one or more equity financings, upon terms and conditions in form and substance acceptable to Reorganized Parent[5] and the Plan Sponsor (in the Plan Sponsor's sole and absolute discretion), which funds, together with a portion of the proceeds of the New Money Investment, will provide new equity to restart the São Miguel Paulista nickel cobalt refinery located in Brazil (the "SMP Refinery"); *provided* that any Additional New Money Investor shall be entitled to participate in its pro rata share of such equity financings upon the same terms and conditions as the Plan Sponsor.  The DIP JFO Facility (including the Roll-Up Facility) will be paid in full with the proceeds of such New Money Investment.  In addition, on the Effective Date, the Debtors' Prepetition JFO Facility will be partially paid down in the amount of $12.5 million, and the remaining outstanding principal amounts (and go-forward commitments) shall be converted into, amended, and continued as a post-Effective Date senior secured revolving credit facility of up to $150

---

[5] The *"Reorganized Parent"* means an Entity, in such form and domiciled in such jurisdiction as shall be determined by the Plan Sponsor, which shall be a newly-created holding Entity that will, pursuant to the transactions contemplated under the Plan (including the Restructuring Steps Memorandum), own 100% of the New Equity Interests in the Reorganized Debtors (directly or indirectly), in either case, in accordance with the New Money Investment Documents.

million in maximum commitments, subject to certain terms and conditions (the "Exit Revolver"), to further support the business following the Debtors' emergence from these Chapter 11 Cases.

15.     Existing equity interests will be discharged, canceled, released, and extinguished and will be of no further force or effect.   Within two days of the confirmation of these Chapter 11 Cases, JGL (and its Australian subsidiaries) intend to each commence the Australian Proceedings, by which voluntary administrators (the "VA Administrator") shall be appointed to each of JGL and its Australian subsidiaries.   Following confirmation of the Prepackaged Plan, the Plan Sponsor will submit a proposal for a deed of company arrangement ("DOCA") to the VA Administrator on terms consistent with the RSA and Prepackaged Plan.   If the DOCA is recommended by the VA Administrator and accepted by the majority of creditors of each of JGL and its Australian subsidiaries, the VA Administrator will implement the DOCA in respect of the Australian entities.   Following the successful completion of the Australian Proceedings, JGL will apply to be delisted from the Australian Securities Exchange ("ASX"), and JGL (and its Australian subsidiaries) will respectively commence a voluntary winding up procedure, pursuant to which the existing ordinary shares of each of JGL and its Australian subsidiaries will be cancelled.

16.     In short, the Prepackaged Plan will recapitalize the Debtors to reduce their debt to a sustainable level and allow them to emerge well-positioned for success as a private company.   I believe that the transactions contemplated and effectuated by the Prepackaged Plan represent the best solution to the financial challenges that the Debtors are facing and will benefit the Debtors' employees, customers, vendors, and other trade creditors.

### B.     Proposed Timeline

17.     Prior to the Petition Date, on January 28, 2025, the Debtors commenced the solicitation of votes on the Prepackaged Plan through the *Disclosure Statement for the Joint*

*Prepackaged Chapter 11 Plan of Jervois Texas, LLV and its Affiliated Debtors* (the "Disclosure Statement").  Consistent with their obligations under the RSA, the Debtors are seeking to emerge from chapter 11 on an expedited basis.

18.     The following table highlights the Debtors' proposed key dates for the Chapter 11 Cases:

| Proposed Confirmation Schedule | |
|---|---|
| Voting Record Date | January 27, 2025 |
| Prepetition Solicitation Commencement Date | January 28, 2025 |
| Mailing of Combined Hearing Notice | Within two (2) business days following entry of the Order, or as soon as reasonably practicable thereafter |
| Plan Supplement Filing Deadline | February 17, 2025 |
| Voting and Opt-Out Deadline | 5:00 p.m. (prevailing Central Time) on February 25, 2025 |
| Proposed Objection Deadline | 5:00 p.m. (prevailing Central Time) on February 28, 2025 |
| Executory Contract and Unexpired Lease Assumption Objection Deadline | 5:00 p.m. (prevailing Central Time) on February 28, 2025 |
| Combined Hearing | March 6, 2025 |

## II.     Company's History and Operations

### A.     Company's Business and Operations

19.     JGL (formerly Jervois Mining Limited) was incorporated on October 25, 1962. Since its inception, the Company has grown to be a leading global Western supplier of responsibly sourced cobalt manufactured products.  The Company is dedicated to long-term sustainability with a reputation for ethical, responsible business practices.

20.     The Company's corporate headquarters is in Melbourne, Victoria, Australia, and the Company has operations primarily in Finland, the United States, and Brazil.  As of the Petition Date, the Debtors employ and retain approximately 230 employees servicing a diverse,

global customer base that spans across strategic and critical industries.

21.     The Company operates today in Finland, with future operating sites in Brazil and the United States.  In the future, the Company hopes to be involved at each level of the cobalt and nickel supply chain, including mining cobalt, refining the raw cobalt and nickel into finished products once the Brazil nickel and cobalt refinery restarts, and continuing to sell advanced manufactured cobalt products from Finland to customers across key markets in the United States, Europe, Japan and South Korea.  Today, the Company is specifically focused on cobalt-based products used for the chemical, catalyst, inorganic pigment, powder metallurgy, and battery industries.  The Company's end products have a wide variety of commercial uses, including in the production of batteries; diamond tools and hard metal applications; livestock feed; in the specialty chemicals sector; and for ceramics.

22.     A series of acquisitions and other strategic transactions over the past decade, including acquisitions of key conversion facilities in Finland and Brazil, resulted in the Company's current business structure.  The Company's cobalt and nickel supply operations are comprised of what the Company deems "core" and "non-core" assets.  The "core" assets include: (i) the mine development in the United States through the Idaho Cobalt Operations ("ICO") owned by Debtor Jervois Mining USA Limited ("Jervois USA"); (ii) the cobalt manufacturing facility in Finland owned by Debtor Jervois Finland Oy ("Jervois Finland"); and (iii) the SMP Refinery owned by non-Debtor Jervois Brasil Metalurgia Ltda.  The "non-core" assets primarily include a mineral exploration and evaluation in Australia predominantly held through non-Debtor Nico Young Pty Ltd.  The Company's global operations additionally include Japanese market sales through Debtor Jervois Japan Inc. and global trading activities through non-Debtor Jervois Switzerland S.A.

i.      ICO

23.     In July 2019, the Company acquired the ICO—located in Lemhi Country, Idaho—which, at the time, was a partially constructed mine site.  Since the acquisition, the Company has completed over $150 million in construction-related activities including: commissioning of the water treatment plant; construction of the underground mine and critical infrastructure; the tailings and waste management facility; a mining camp; and the near-completion of crushing, million, and flotation facilities.  ICO's mineral resource and reserve is the largest and highest grade confirmed cobalt orebody in the United States and, when commissioned, will represent the United States' only primary cobalt mine supply.

24.     In March 2023, the Company decided to suspend final construction of the mine and mineral treatment facilities at ICO primarily due to cyclically low cobalt prices and inflationary impacts on construction costs.

25.     From its acquisition of the mine in 2019, the Company entered into strategic discussions with the United States government, which viewed cobalt as a critical mineral due to its aerospace, defense and energy transition applications.  These discussions resulted in a Department of Defense ("DoD") Defense Production Act Title III award of $15 million for mineral resource drilling and a bankable feasibility study on a domestic cobalt refinery.  The agreed scope with the DoD is expected to be completed during Q1 2025.

ii.     Jervois Finland

26.     In 2021, the Company acquired Debtor Jervois Finland, whose primary assets include: (i) a long-term refining capacity agreement with Umicore N.V. ("Umicore") for the cobalt refinery (operated by Umicore) located in Kokkola, Finland, under which Jervois Finland has contractual rights to toll refined cobalt; (ii) long-term contracts with leading global suppliers of cobalt hydroxide; and (iii) a downstream cobalt products manufacturing facility with an

established marketing platform and long-term global customer base servicing clients in many strategic and critical industries, primarily across Europe, the United States, and Japan.

27.     The Kokkola, Finland site is the one of the world's largest cobalt refinery and conversion operations, and the largest outside of China, and is situated in a regional industrial hub hosting key operations of global chemical, materials, and industrial companies.  The cobalt refinery is a world-class facility, fully equipped with a full suite of production capabilities and onsite R&D and technical support.  The facility itself operates as a highly automated continuous processing plant and maintains high-product quality from its own self-developed production technology.   The refinery will take certain raw material feeds, such as crude hydroxide intermediate products, various cobalt containing by-products, and recycled materials, and use certain refining techniques such as (i) raw material leaching, (ii) solution purification, and/or (iii) solvent extraction to produce the finished products of cobalt chemicals and powders.  The Umicore refinery has a total refined cobalt capacity of approximately 15,000 metric tons, of which the Company has a tolling right to 6,250 metric tons.  Due to weak market conditions, the Company has not operated the full volume capacity of its tolling rights since acquisition.

          iii.     *SMP Refinery*

28.     In July 2022, the Company acquired the SMP Refinery, a nickel and cobalt electrolytic refinery located in São Paulo, Brazil.  The facility is located within the São Paulo city limits with ready access to labor, utilities, and services and is 75 miles from the Port of Santos, the largest container port in Brazil, ensuring it is well placed to serve both domestic and export markets.

29.     Prior to the acquisition by the Company, the SMP Refinery had a long and successful operating history, since 1981, by a leading Brazilian conglomerate.  The SMP Refinery previously produced 'Tocantins' nickel and cobalt products, which were well

established domestically in Brazil and in key Western export markets such as Europe and Japan. In July 2016, the SMP Refinery operations were placed on care and maintenance due to the closure of feed supply from a nickel mine located in Niquelandia, Goias in Brazil.  In September 2020, the Company gained access to the SMP Refinery by entering into a lease arrangement to undertake the restarting of the SMP Refinery, before eventually acquiring the facility.  Since the acquisition, the Company has completed a bankable feasibility study to underpin the restart of commercial operations.  The Company continues to believe the SMP Refinery's economic potential is strong with the Plan Sponsor's recapitalization designed to underpin its restart.

*iv.    Non-Core Assets*

30.    The Company also owns certain "non-core" assets primarily located in Australia, which are generally not part of the core business.  Specifically, non-Debtor Nico Young Pty Ltd owns a nickel and cobalt deposit located approximately 20 miles northwest of Young, New South Wales, Australia.  The deposit comprises two distinct bodies of mineralization held under separate but adjacent exploration licenses.   Both resources are large, shallow, flat-lying structures amenable to low-strip, open-pit mining.  The Company has historically invested $20 million in the Nico Young area under the belief that it is a strategic future source of Western nickel and cobalt.  In 2023, the Company commenced a process to divest all or part of its interest in the Nico Young project but ultimately abandoned such process.

## III.    Company's Prepetition Corporate and Capital Structure

### A.    Corporate Structure

31.    As set forth on the organizational chart attached hereto as **<u>Exhibit B</u>**, JGL wholly owns, directly or indirectly, each of the Debtors.

32.    JGL is an Australian corporation with shares publicly listed on the ASX and the Toronto Venture Stock Exchange ("<u>TVSX</u>")*.*  JGL was first listed on the ASX on December 1,

1980, and was first listed on the TVSX on June 2, 2019.  As of the Petition Date, JGL had approximately 2,702,763,785 shares of common stock issued and outstanding.

**B.      Prepetition Funded Debt**

33.      As of the Petition Date, the Debtors have approximately $195,518,252.41 in total funded debt obligations in the following amounts:

| Funded Debt | Maturity | Outstanding Principal Amount as of January 28, 2025 |
|---|---|---|
| **Prepetition JFO Facility** | | |
| • Revolving Capital Facility | March 31, 2025 | $44,105,395.00 |
| • Delayed Draw Term Loan | March 31, 2025 | $24,000,000.00 |
| **Prepetition ICO Bonds** | July 20, 2026 | $100,000,000.00 |
| **Prepetition Convertible Notes** | | |
| • Tranche 1 | July 2028 | $21,853,556.71 |
| • Tranche 2 | August 2028 | $5,559,300.70 |
| | **Total Funded Debt:** | $195,518,252.41 |

*i.      Prepetition JFO Facility*

34.      Certain of the Debtors are party to that certain *Secured Revolving Credit Facility Agreement*, dated as of October 28, 2021, as amended and restated by that certain Supplemental Deed, dated as of August 4, 2022, as amended and restated by that certain Supplemental Deed, dated as of September 6, 2024, and as amended and restated by that certain Supplemental Deed, dated as of November 26, 2024, and as amended and restated by that certain Supplemental Deed, dated as of December 31, 2024 (as has been and may be further amended, supplemented, or otherwise modified from time to time, the "Prepetition JFO Facility Agreement"), by and among Jervois Suomi Holding Oy and Jervois Finland Oy, as borrowers, Acquiom Agency Services Ltd., as security agent and agent (the "Prepetition JFO Facility Agent"), the guarantors party thereto from time to time, and the lenders party thereto from time to time, which provides for, subject to the terms and conditions set forth therein, (i) up to a $150 million revolving capital

14

facility and (ii) up to a $32 million delayed draw term loan facility (the "Prepetition JFO Facility").

35.     Obligations arising under the Prepetition JFO Facility are secured by liens on and security interests (collectively, the "Prepetition JFO Facility Liens") in all "Charged Property" (as defined in the Prepetition JFO Facility Agreement), including: (i) shares in Jervois Suomi Holding Oy, Jervois Finland Oy, Jervois Japan Inc., Jervois Americas LLC, and any future Japanese direct subsidiary of Jervois Japan Inc.; (ii) certain accounts and receivables and bank accounts of Jervois Finland Oy and Jervois Suomi Holding Oy; (iii) substantially all assets of Jervois Americas LLC and Jervois Texas, LLC; (iv) substantially all assets of JGL; and (v) certain receivables and inventory of Jervois Japan Inc.  The obligations under the Prepetition JFO Facility are also guaranteed by JGL Jervois Suomi Holding Oy, Jervois Finland Oy, Jervois Japan Inc., Jervois Americas LLC, Jervois Texas, LLC, Jervois Mining USA Limited and Formation Holdings, US Inc.  The Prepetition JFO Facility matures on March 31, 2025.

                    *ii.      Prepetition ICO Bonds*

36.     Certain of the Debtors entered into that certain *Bond Terms*, dated July 16, 2021 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Bond Terms"), by and among Jervois Mining USA Limited, as issuer, and Nordic Trustee AS, as bond trustee and security agent (the "Prepetition ICO Bond Trustee"), whereby $100 million of aggregate principal amount of bonds were issued (the "Prepetition ICO Bonds").   The Prepetition ICO Bonds are secured by liens on and security interests (the "Prepetition ICO Bond Liens") in all assets and other properties subject to the Transaction Security (as defined in the Prepetition ICO Bond Terms), including shares of Jervois Mining USA Limited, certain intercompany loans owed to JGL and Formation Holdings US, Inc., and substantially all assets of Jervois Mining USA Limited.  The Prepetition ICO Bonds are also

guaranteed by Jervois Suomi Holding Oy, Jervois Finland Oy, Jervois Japan Inc., Jervois Americas LLC, and Jervois Texas LLC.  The Prepetition ICO Bonds bear interest at a rate of 12.500% per annum, payable on January 20 and July 20 of each year, and mature on July 20, 2026.

### iii.   Prepetition Intercreditor Agreement

37.     The Prepetition JFO Facility Agent and the Prepetition ICO Bond Trustee are party to that certain Deed of Priority, dated as of September 6, 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "Prepetition Intercreditor Agreement"), which sets forth the relative payment and lien priorities and other rights and remedies of the Prepetition JFO Facility Secured Parties, on the one hand, and the Prepetition ICO Bond Secured Parties, on the other hand, with respect to "WCF Priority Collateral" and the "Bond Priority Collateral" (each as defined in the Prepetition Intercreditor Agreement).  Pursuant to the Prepetition Intercreditor Agreement, the parties thereto agreed, among other things: (a) that the Prepetition JFO Facility Liens are senior to the Prepetition ICO Bond Liens on the WCF Priority Collateral, and (b) that the Prepetition ICO Bond Liens are senior to the Prepetition JFO Facility Liens on the Bond Priority Collateral.

### iv.   Prepetition Convertible Notes

38.     JGL entered into that certain *Convertible Note Deed Poll*, dated July 18, 2023 (as amended, restated, supplemented, or otherwise modified from time to time), by and among JGL, as issuer, and the noteholder thereto, pursuant to which the noteholder purchased approximately $25 million of aggregate principal amount of convertible notes, which aggregate principal amount is currently approximately $27.4 million (the "Prepetition Convertible Notes").  The Prepetition Convertible Notes are direct, senior, unconditional, and unsecured.  The Prepetition

Convertible Notes bear interest at a rate of 6.500% per annum, payable quarterly on March 31, June 30, September 30, and December 31 of each year, and mature five (5) years after the issue date of the respective convertible note (*i.e.*, July 2028 and August 2028, respectively).

## IV.   Circumstances Leading to Commencement of These Chapter 11 Cases

### A.   Historically Low Cobalt Prices and Weakened Demand

39.     Beginning in 2022, and continuing throughout 2023 and 2024, the Company faced challenging industry headwinds—namely, the historically low price of cobalt, which has been weighed down in recent years by significant additional supply from Chinese-owned mines in the Democratic Republic of the Congo.  As a cobalt producer, the Company is directly susceptible to the volatile and cyclical nature of the commodity.  For example, a significant portion of Jervois Finland's product sales are based on prices linked to quoted prices for cobalt. Purchases of cobalt hydroxide, which is refined and then processed into a range of cobalt products, are also priced according to a percentage of quoted cobalt metal prices.  As such, any rapid or material adverse movements in the quoted price of cobalt can negatively impact Jervois Finland's sales, costs, and profitability.



40.     In addition, certain cobalt chemical products produced by the Company are sold into specialized end-use markets that have experienced lower than expected demand in recent years, such as the electric vehicle market, along with oil and gas production, general engineering, and construction.  Demand for the Company's products has also weakened due to competition in downstream markets (especially from China) across all powder metallurgy applications.

**B.      Operational Challenges**

41.     As a result of rising interest rates and inflationary impacts on construction and capital costs, the Company made the decision to suspend final construction at the ICO.  In addition, rising energy and consumable costs created further headwinds and resulted in overall increased operating costs for the Company, at a time that coincided with falling sale prices.

**C.      Prepetition Restructuring Efforts**

        *i.      2023 Sale and Marketing Efforts*

42.     In an effort to strengthen the Company's balance sheet and obtain necessary

liquidity, the Company initiated discussions in the second quarter of 2023 with third parties who had expressed interest in its asset base.  During the second quarter of 2023, the Company commenced discussions with third parties with regard to partnership opportunities on a number of its assets.

43.     The Company formally launched a sale and marketing process in September 2023 to solicit potential interest in an equity sale of certain of its assets, partnership opportunities to diffuse holding costs in the United States, or any other strategic transactions with a drive to stabilize its balance sheet.  With the assistance of investment banks, the Company prepared sales materials and engaged with a number of potential strategic counterparties with respect to potential transactions for a number of the Company's businesses.

44.     The Company engaged with a number of third parties regarding a potential investment into each of Jervois Finland, ICO, and the SMP Refinery.  Despite extensive bidder due diligence, including site visits, the Company ultimately did not receive any actionable proposals.

45.     In early 2024, the Company expanded the sale and marketing process to solicit strategic transactions across the Company's business segments, including through a merger or Company sale.  This sale and marketing process continued through late 2024, with funding support from Millstreet to allow other negotiations with third parties, including other stakeholders in the Company, to continue.  Similarly, the Company ultimately did not receive any actionable proposals.

ii.     *2024 Restructuring Efforts*

46.     In April 2024, faced with a coupon payment due in July 2024 under the Prepetition ICO Bonds and an upcoming maturity of its Prepetition JFO Facility at the end of the year, the Debtors engaged Moelis & Company ("Moelis") to explore a potential balance sheet

restructuring in parallel to the ongoing sale and marketing efforts. The Company, with the assistance of Moelis, began engaging in discussions with Millstreet—then majority lender under the Company's Prepetition ICO Bonds and sole lender under the Prepetition Convertible Notes— regarding potential solutions to address the Company's balance sheet issues.

47.     In May 2024, the Debtors engaged Sidley Austin LLP ("Sidley"), as United States and English legal counsel, and King & Wood Mallesons ("KWM"), as Australian legal counsel. On July 26, 2024, Millstreet assumed the debt under the Prepetition JFO Facility Agreement, as a result of which Millstreet became the sole lender under the Prepetition JFO Facility. Since then, Millstreet has provided the Company with significant covenant relief, operational "runway", and other breathing room under both the Prepetition JFO Facility and the Prepetition ICO Bonds, which enabled the Company to continue operating. Among other things, Millstreet (i) temporarily waived and extended waivers of financial covenants and certain other covenants and other requirements under the Prepetition ICO Bonds and the Prepetition JFO Facility; (ii) temporarily waived certain potential cross-defaults under the Prepetition ICO Bonds and the Prepetition JFO Facility; and (iii) deferred the semi-annual interest payments that would have been otherwise due and payable under the Prepetition ICO Bonds on July 20, 2024, and January 20, 2025.

48.     Further, to provide the Company with additional liquidity, on September 6, 2024, the Company and Millstreet agreed to modify the Prepetition JFO Facility to make available to the Company a term loan tranche of $7.5 million, which was subsequently increased to $32 million through additional amendments in September 2024 and November 2024.

**D.     The Restructuring Support Agreement and Commencement of the Chapter 11 Cases**

49.     In early December 2024, the Company and the Plan Sponsor began to discuss a

comprehensive restructuring and take-private transaction that would be effectuated through a chapter 11 process and a sequential Australian Proceedings.  In parallel to these discussions, the Company also continued to evaluate other potential solutions, including discussions with certain shareholders.

50.     With the assistance of advisors, including FTI, the Company and the Plan Sponsor engaged in arms'-length negotiations over the terms of the Restructuring Transactions. Ultimately, on December 31, 2024, the parties agreed on the terms of the Restructuring Transactions embodied in the RSA, as amended and restated on January 28, 2025.  Pursuant to the RSA, the Consenting Lenders have agreed to, among other things:

- commit substantial new capital to the Company, including
  - the $49 million JFO DIP Facility,
  - the $90 million New Money Investment, and
  - an additional $55 million in the aggregate, in one or more equity financings, upon terms and conditions in form and substance acceptable to the Reorganized Parent and the Plan Sponsor (in the Plan Sponsor's sole and absolute discretion), which funds, together with a portion of the proceeds from the New Money Investment, will provide new equity to restart the SMP Refinery;
- vote to accept the Prepackaged Plan;
- provide releases as set forth in the Prepackaged Plan;
- refrain from taking any action that would delay or impede consummation of the Prepackaged Plan; and
- support and effectuate the Restructuring Transactions contemplated by the RSA.

51.     Together, the RSA and the Prepackaged Plan provide a pathway toward a comprehensive restructuring of the Debtors' prepetition obligations, preserve and strengthen the going-concern value of the business, and maximize creditor recoveries, all while minimizing disruption to day-to-day operations and leaving the unsecured creditors unimpaired.  Further, the Debtors anticipate that the above $55 million in post-emergence equity financings will, together

with a portion of the proceeds from the New Money Investment, provide approximately $70 million in new equity to restart the SMP Refinery.  In short, the RSA and Prepackaged Plan are the highest and best transaction available to the Debtors and their estates.

## V.    Evidentiary Summary for First Day Pleadings

52.    Contemporaneously herewith, the Debtors have filed a number of pleadings seeking emergency relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and execute a swift and smooth restructuring. I have reviewed each of the First Day Pleadings and believe that the factual support set forth in each of the First Day Pleadings is correct and accurate to the best of my knowledge, information, and belief.  The First Day Pleadings include the following:

### Administrative and Procedural Motions

- "Joint Administration Motion": *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief*
- "Request for Emergency Consideration": *Debtors' Request for Emergency Consideration of Certain "First Day" Matters*
- "Notice of Designation as Complex Case": *Notice of Designation as Complex Chapter 11 Bankruptcy Case*
- "Claims Agent Retention Application": *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent*
- "Worldwide Stay Motion": *Debtors' Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code; (II) Approving the Related Form and Manner of Notice; and (III) Granting Related Relief*
- "Creditor Matrix Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated List of 30 Largest Unsecured Creditors, and (C) Redact Certain Personal Identifying Information and Commercially Sensitive Business Information; (II) Waiving the Requirement to File a List of Equity Security Holders; and (III) Granting Related Relief*

### Operational Motions

- "<u>Cash Management Motion</u>": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records; (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions; and (III) Granting Related Relief*

- "<u>All Trade Motion</u>": *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Pay Accounts Payable Claims in the Ordinary Course of Business; (II) Granting Administrative Expense Priority to Undisputed Obligations on Account of Outstanding Orders and/or Provision of Services and Authorizing Payment of Such Obligations in the Ordinary Course of Business; and (III) Granting Related Relief*

- "<u>NOL Motion</u>": *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declaration of Worthlessness with Respect to Common Stock and (II) Granting Related Relief*

- "<u>Insurance Motion</u>": *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain the Surety Bond Program; and (II) Granting Related Relief*

- "<u>Employee Wages Motion</u>": *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Employee Benefits and (B) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in the Ordinary Course and (II) Granting Related Relief*

- "<u>Taxes Motion</u>": *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief*

- "<u>Utilities Motion</u>": *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving (A) Objections by Utility Companies and (B) Requests for Additional Adequate Assurances of Payment; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief*

- "<u>Customer Programs Motion</u>": *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief*

- "<u>DIP Motion</u>": *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status;*

23

*(III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief*

53.     I have consulted with the Debtors the Debtors' advisors regarding the relief requested in the First Day Pleadings, and understand each of the First Day Pleadings and the relief requested therein.   To the best of my knowledge and belief, the factual statements contained in each of the First Day Pleadings are true and accurate.   Where applicable, a brief summary of the facts supporting the First Day Pleadings is set forth below.   To the extent any contain additional facts, those facts are incorporated herein by reference.   Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to such terms in the relevant First Day Pleadings.

54.     The operational motions seek authority to, among other things, honor employee-related wages and benefit obligations, ensure the continuation of the Debtors' cash management system, pay all trade claims, and maintain other operations in the ordinary course of business. The operational motions request authority to pay certain prepetition claims.   I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."   However, I believe, based on conversations with the advisors and the Debtors, that the Debtors urgently need the relief requested in the operational motions to continue operations uninterrupted during these cases, and that failure to grant the relief requested in any of the First Day Pleadings may result in immediate and irreparable harm to the Debtors, their businesses, and their estates.   Accordingly, I believe and am advised that emergency consideration of such motions is warranted.

55.     I further believe that the relief requested in the First Day Pleadings is necessary,

in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximize value preservation during the pendency of these Chapter 11 Cases.  Additionally, I believe that (1) the relief requested in each operational motion is critical; (2) unless the relief is granted, the Debtors risk the probability of harm, or, alternatively, loss of economic advantage to the estate which is disproportionate to the amount of the prepetition claim sought to be satisfied; and (3) there is no practical or legal alternative by which the Debtors can deal with the claimants sought to be paid other than by payment of the claim.

56.     Accordingly, for the reasons set forth herein and in each respective First Day Pleading, I believe that the Court should grant the relief requested in each of the First Day Pleadings.

### A.     Joint Administration Motion

57.     Pursuant to the Joint Administration Motion, the Debtors seek joint administration of the Debtors' chapter 11 cases for procedural purposes only.

58.     Given the Debtors' affiliation with one another, joint administration of the chapter 11 cases is warranted and would provide significant administrative convenience without harming the substantive rights of any party in interest.  Joint administration would avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders, thereby saving the Debtors considerable expense and resources.  Furthermore, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets and will spare the U.S. Trustee the time and effort of reviewing duplicative pleadings and papers.  I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes.  It does not seek substantive consolidation of the Debtors'

25

estates.

59.     I therefore believe that joint administration is warranted and that consolidating these Chapter 11 Cases will assist the Debtors in preserving the value of the estate by avoiding duplicative expenses.

### B.     Request for Emergency Consideration

60.     Pursuant to the Request for Emergency Consideration, the Debtors request emergency consideration of the following motions: the Notice of Designation as Complex Case, Claims Agent Retention Application, Creditor Matrix Motion, Worldwide Stay Motion, Taxes Motion, NOL Motion, Utilities Motion, Insurance Motion, All Trade Motion, Customer Programs Motion, Cash Management Motion, DIP Motion, and Solicitation Procedures Motion (each as defined herein).

61.     I believe that failure to approve the relief requested in these respective motions would cause immediate and irreparable harm to the Debtors and their ongoing operations. Further, I believe that based on the complexity of these Chapter 11 Cases and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

### C.     Notice of Designation as Complex Case

62.     Pursuant to the *Notice of Designation as Complex Chapter 11 Bankruptcy Case* (the "Notice of Designation as Complex Case"), the Debtors seek to have these Chapter 11 Cases designated as complex chapter 11 cases.

63.     The proposed counsel for the Debtors believe that these Chapter 11 Cases qualify as complex chapter 11 cases because (i) the Debtors have total debt of more than $10 million, (ii) there are more than 50 parties in interest in this case, and (iii) the claims against the Debtors are publicly traded.  For these reasons, I believe that designation of these Chapter 11 Cases as

complex chapter 11 cases is appropriate and will contribute to the efficient administration of these cases.

       **D.**      **Claims Agent Retention Application**

     64.     Pursuant to the Claims Agent Retention Application, the Debtors seek entry to appoint Stretto, Inc. ("Stretto") as the claims, noticing, and solicitation agent for the Debtors in these Chapter 11 Cases.

     65.     As more fully described in the Claims Agent Retention Application, Stretto will, among other tasks, (i) serve as the noticing agent to mail notices to creditors, equity security holders, and other parties in interest, (ii) provide computerized claims, objection, solicitation, and balloting database services, and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these Chapter 11 Cases, pursuant to the terms and conditions set forth in the Engagement Letter (as defined in the Claims Agent Retention Application).

     66.     Stretto's rates are competitive and reasonable. Stretto has the expertise required in a complex chapter 11 case. Stretto has reviewed the potential parties in interest in these Chapter 11 Cases and believes that neither Stretto, nor any of its professionals, has any materially adverse connection to the Debtors, their creditors, or other relevant parties.

     67.     The Debtors anticipate that there will be numerous parties to be noticed and that many of these parties will file claims. The appointment of Stretto as the claims and noticing agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed Prepackaged Plan, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks. In addition, by appointing Stretto as the claims and noticing agent in these Chapter 11 Cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of

the administrative burden of noticing.  Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

### E.      Worldwide Stay Motion

68.      Pursuant to the Worldwide Stay Motion, the Debtors seek (i) to enforce the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code and (ii) approval of the related form and manner of notice.

69.      As described further herein, the Debtors' product offerings are sourced from vendors both domestically and internationally, and the Debtors rely upon those creditors in order to continue to provide the high level and diverse array of product offerings to their customers. Foreign creditors supply critical goods and services, which are necessary to preserve the value of the Debtors' business, inuring to the benefit of the Debtors' stakeholders and their estates. Without continued support from their non-U.S. suppliers and other commercial counterparties, the Debtors would face severe interruptions to their daily operations.

70.      Non-U.S. creditors operating in various other jurisdictions may be unfamiliar with chapter 11 processes, the scope of a debtor in possession's authority to operate its business, or the importance and implications of the automatic stay.  Because certain of the Debtors' business operations may implicate the law of other jurisdictions, certain of the Debtors' non-U.S. creditors could attempt to seize assets located outside of the United States or take other actions violating the automatic stay.

71.      The Debtors are also party to certain agreements with non-U.S. counterparties who could attempt to take action against the Debtors or their property, such as terminating those agreements upon the commencement of these Chapter 11 Cases pursuant to *ipso facto* provisions, violating sections 362 and 365 of the Bankruptcy Code.  Similarly, governmental units outside the United States may deny, suspend, terminate, or otherwise place conditions upon

certain licenses, permits, franchises, or other similar grants held by a chapter 11 debtor and required for the Debtors' ongoing business operations, violating section 525 of the Bankruptcy Code.

72.    The Debtors seek the relief requested in the Worldwide Stay Motion out of an abundance of caution and to assist them in most effectively informing non-U.S. creditors of the broad protections offered by the Bankruptcy Code.  The Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code but instead to affirm those rights. I therefore believe the relief requested in the Worldwide Stay Motion is necessary to protect against improper actions taken by, and provide clarity for, non-U.S. parties in interest.

### F.    Creditor Matrix Motion

73.    Pursuant to the Creditor Matrix Motion, the Debtors seek (i) authority to (a) file a consolidated creditor matrix, (b) file a consolidated list of 30 largest unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, and (c) redact certain personal identifying information and sensitive business information from the documents filed with the Court in these Chapter 11 Cases and (ii) to waive the requirement to file a list of equity security holders of Debtor JGL.

74.    It is my understanding that Bankruptcy Rule 1007(a) requires each debtor to file a separate mailing matrix, each containing names and addresses of all creditors, including individuals, as well as a separate list of top unsecured creditors for each debtor.  Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors.  Further, because a significant number of creditors may be shared among the Debtors, the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors, rather than file separate top 20 creditor lists for each Debtor.  The Consolidated Top 30

Creditors List will help alleviate administrative burden, costs, and the possibility of duplicative service, as well as assist the efforts to communicate with these creditors.

75.     It is also my understanding that Bankruptcy Rule 1007(a)(3) requires a debtor to file a list of the debtor's equity security holders within 14 days after the petition date and Bankruptcy Rule 2002(d) requires that equity security holders be provided notice of, among other things, the commencement of the bankruptcy case and the confirmation hearing.  The requirements to file a list of, and to provide notice directly to, equity security holders should be waived as to JGL.  JGL's common stock is publicly traded on the ASX and TSVX, with approximately 2,702,763,785 outstanding shares of common stock as of the Petition Date, and cannot be readily traced to specific individual holders.  Jervois Global Limited only maintains a list of its registered equity security holders and therefore must obtain the names and addresses of its beneficial shareholders from a securities agent.  Preparing and submitting such a list with last known addresses for each equity security holder and sending notices to all such parties would create undue expense and administrative burden with limited corresponding benefit to the estates or parties in interest.  The Debtors has or will take several actions to inform its equity security holders of the commencement of these chapter 11 cases.  Jervois Global Limited filed with its petition a list of persons and entities with significant holdings of its outstanding common stock. On or about the date hereof, the Debtors will issue a press release announcing the filing.  As soon as is practicable following the date hereof, the Debtors intend to cause the notices required under Bankruptcy Rule 2002(d) to be served on registered holders of Jervois Global Limited's common stock and published in full in The Financial Times (worldwide edition) and The York Times (national edition).  In light of these actions, the Debtors respectfully request that the requirements to file a list of and to provide notice directly to Jervois Global Limited's equity security holders should be modified

76.     Cause exists to authorize the Debtors to redact certain Personal Data including (a) the home addresses of individual creditors, employees, directors, officers, and individual equity holders of the Debtors and (b) the names, addresses, and other Personal Data of any natural person located in the United Kingdom or a member state of the European Economic Area.   Such redaction is necessary because, respectively, (x) disclosure of home address information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking under 11 U.S.C. § 107(c)(1), and (y) disclosure of names, addresses, and other Personal Data risks violating the UK GDPR and EU GDPR, exposing the Debtors to potential civil liability and significant financial penalties.   Without such relief, the Debtors (a) may be in violation of applicable data privacy law, thereby exposing them to severe monetary penalties that could threaten the Debtors' operations during this sensitive stage of their restructuring, (b) would unnecessarily render individuals more susceptible to identity theft, and (c) could jeopardize the safety of individual creditors, employees, directors, officers, or individual equity holders of the Debtors, who, unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take protective measures.

77.     Cause also exists under section 107(b) to redact sensitive commercial information, including customer lists, business strategies, operational information, contract counterparties, and financial data, of the Debtors because such information could be used to perpetuate identity theft, create other risks to the individuals' safety and welfare or put the Debtors at an unfair competitive advantage at their most sensitive moment, thereby jeopardizing the Restructuring Transactions described herein.   Disclosure of proprietary and commercially sensitive information would likely cause substantial harm to the Debtors and the applicable counterparties and create an unfair advantage for competitors.   If made public, this information

31

could give the Debtors' competitors a significant and unfair advantage and enable them to poach the Debtors' customers in the midst of these Chapter 11 Cases. Any poaching of the Debtors' customers would have a devastating impact on the Debtors' business.

78. Moreover, in this case, cause exists under section 107(b) to redact sensitive commercial information – and specifically, the names and other identifying information relating to the Debtors' customers and key suppliers that provide physical products. The Debtors operate in a competitive cobalt-manufacturing industry where they rely on certain key suppliers to provide physical products, which are then used in the Debtors' cobalt refining and manufacturing. In turn, the Debtors sell their cobalt chemical products to customers across the world.

79. Here, the Debtors have isolated approximately 197 customers and key suppliers (that provide feedstock) out of their approximately 2,700 potential creditors whose identities, if disclosed, would jeopardize the Debtors' reorganization efforts. In the cobalt industry, supply chains—both suppliers of feedstock for processing or conversion facilities—and customers for refined or manufactured product are considered highly commercially sensitive because the knowledge of such parties can lead to key commercial insights for competitors regarding the Debtors' material availability and supply and demand. *Firstly*, competitors would be incentivized to poach the Debtors' customers, if such identities are known. Many of the Debtors' suppliers are also customers (for their recycling business). As the recycling sources are typically customer returns, the identities of such suppliers are extremely sensitive, with industry participants in a constant search for the identities of supply sources of competitor facilities for their commercial teams to target. Recycling sources are the highest value customers of the Debtors, with much commercial sensitivity and risk against disclosure. Such disruption to the business would create an unfair competitive disadvantage for the Debtors at a critical juncture

when the Debtors are seeking to reorganize and maximize value for their estates and all stakeholders. *Secondly*, even just knowing the Debtors' suppliers list can provide outside parties information regarding the Debtors' negotiating position because such parties will be able to know the strength of the Debtors' negotiating position based on, among other things, specific processing capacity of the Debtors' suppliers. Such disclosure would inevitably impact the competitive tension the Debtors have vis-à-vis such supplier, leading to less favorable purchase terms in negotiations. *Finally*, disclosure of the Sensitive Business Information would threaten the continued business relationship between the Debtors, on the one hand, and their customers and key suppliers or otherwise prompt such customers to move their business to competitors as a result of knowing that the Debtors were providing the same services to their customers. In the cobalt industry, customers and suppliers of feedstock rely on the Debtors' confidentiality regarding their business relationship between them. The vast majority of the contracts between the Debtors and their customers and key supplies contain contractual clauses prohibiting public acknowledgement of the existence of a commercial relationship or identification of such customer or supplier. The Debtors' customer list and related customer data are important and valuable assets of the Debtors, and the Debtors maintain their customer list in strict confidence even in the ordinary course (as is industry standard). As such, public dissemination relating to identifying information of the Debtors' customer and key suppliers would be detrimental to the business and create substantial harm to the Debtors.

80.     Based on the foregoing, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

## G.     Cash Management Motion

81.     Pursuant to the Cash Management Motion, the Debtors request authority to

(i) continue operating their cash management system, (ii) honor certain prepetition or postpetition obligations related to the cash management system, (iii) maintain existing business forms in the ordinary course of business, and (iv) continue performing intercompany transactions consistent with historical practice.

82.     In the ordinary course of business, the Debtors operates a complex Cash Management System.  The Debtors uses the Cash Management System to collect, transfer, and disburse funds, and to facilitate cash monitoring, forecasting, and reporting.  The Debtors operates their Cash Management System across the U.S., Canada, and Australia, and conduct certain intercompany transfers with certain non-Debtor subsidiaries of JGL.  Generally, cash in Finland is transferred to Australia, Switzerland, and Japan, and then funds from Australia are disbursed to the U.S. and Brazil.  Cash is transferred from the U.S. to Canada as needed; however, these transfers are rare.  The Debtors' treasury department maintains daily oversight of the Cash Management System and implements cash management controls for accepting, processing, and releasing funds, including in connection with any Intercompany Transactions. The Debtors' accounting department reconciles the Debtors' books and records monthly to ensure that all transfers are accounted for properly.

83.     The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors' to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities across international jurisdictions.  The Debtors estimates that the cash receipts flowing through the Cash Management System in the twelve months prior to the Petition Date averaged approximately $19,000,000 per month.  The Debtors estimate that the prepetition amount owing to the Cash Management Banks in the aggregate is approximately $324,000.

84.     As of the Petition Date, the Cash Management System consists of approximately twenty-six (26) Bank Accounts. The Bank Accounts are maintained at seven (7) financial institutions: U.S. Bank; Danske Bank; Nordea Bank; ANZ; Sumitomo; Western Alliance; and Wells Fargo Bank, N.A.  As of the Petition Date, the Debtors have $10,900,000 in unrestricted cash in the Bank Accounts and have approximately $750,000 in cash that is collateralizing certain lines of credit.[6]

85.     The Debtors incur periodic service charges and other fees in connection with maintaining the Bank Accounts totaling approximately $7,500 per month, in the aggregate.  As of the Petition Date, the Debtors estimate that they owe approximately $7,500 in Bank Fees on account of Bank Accounts maintained by the Debtors.  The Debtors also incur certain fees related to software that facilitate the operation of the Cash Management System and its businesses more broadly.  The Debtors uses MYOB Australia Pty Ltd, SAP SE, and Nomentia Oy to automate cash management functions such as cash positioning and forecasting, bank account administration, and risk management.  The Software Processors play a key role in the Debtors' cash management and accounting processes.  The Debtors' annual spend on account of Software Fees is approximately $316,000.

86.     As part of the Cash Management System, the Debtors maintain several credit-card programs administered by Mastercard Inc. and Visa, Inc.  The Debtors use the credit cards provided pursuant to the Credit Card Programs to fund payments for accounts payable across the enterprise, in addition to travel, fuel costs, and other expenses.  The Debtors also pay certain vendors with the credit cards.  The Debtors' combined monthly average spend under the Credit Card Programs is approximately $40,000.  The Debtors estimate that, as of the petition date, they

---

[6] The Debtors have two letters of credit (a) $690,358 held by the United States Forest Service as a reclamation security deposit and (b) approximately $50,000 held in the AUS Investment Account.

owe prepetition amounts under the Credit Card Programs in the approximate amount of $50,000. However, in some circumstances the Debtors may still owe additional prepetition amounts under the Credit Card Programs where, for example, charges by employees in various locations have not been offset against the balance due to processing delays by merchants, among other factors.

87.     Also integral to the Cash Management System are ordinary course of business Intercompany Transactions that the Debtors engage in between Debtor entities and Non-Debtor Entities, including making payments or providing services for each other's benefit, that result in intercompany receivables and payables.  The Debtors can ascertain, trace, and account for all Intercompany Transactions through their general ledger and enterprise resources planning system, and the Debtors will continue to do so on a postpetition basis.  The Intercompany Transactions primarily fall into two categories: (a) purchase agreements between Debtors or between Debtors and Non-Debtor Entities; and (b) loan agreements between Debtors.  The purchase agreements between Debtors or between Debtors and Non-Debtors include payments for raw materials, customer services, and delivery expenses.  The loan agreements between Debtors operate to satisfy the obligations incurred under such purchase agreements.  Both are an essential component of the Debtors' operations and Cash Management System.  Because there may be Intercompany Claims as a result of these transactions, and in order to ensure that each Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors have requested that all postpetition Intercompany Transactions occurring in the ordinary course of business be accorded administrative expense status.  As a result of such administrative expense status, each entity utilizing the funds flowing through the Cash Management System will continue to bear ultimate repayment responsibility for these ordinary course transactions.

88.     Based on the forgoing, and given the economic and operational scale and complexity of the Debtors' enterprise, I believe that any disruption to the Cash Management

System would be incredibly disruptive to the Debtors' daily business operations and have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders.  To minimize the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, I believe the Debtors should be authorized to continue their existing Cash Management System during the course of these Chapter 11 Cases.

**H.    All Trade Motion**

89.    Pursuant to the All Trade Motion, the Debtors seek (i) authorization to pay the Accounts Payable Claims of vendors, trade counterparties, and other unsecured creditors in the ordinary course of business, (ii) administrative expense priority for undisputed obligations on account of outstanding orders and/or provision of services ordered before the Petition Date, and (iii) authorization to satisfy such obligations in the ordinary course of business.

90.    The Debtors rely on the goods and services provided by their trade, vendor, and other general unsecured claimants in order to continue to supply their customers.  The Debtors receive (i) services necessary for their mining, refining, and manufacturing operations, including for safety and regulatory compliance, repairs and maintenance, shipping and warehouse storage, and production distribution and sales services to customers, and (ii) goods critical for the Debtors' business, including equipment, spare parts, and consumables including chemicals and other materials.

91.    The Debtors incur numerous fixed, liquidated, and undisputed payment obligations in the ordinary course of business related to these goods and services.  In the twelve months preceding the Petition Date, the Debtors incurred approximately $10,270,000 per month in the aggregate on account of the Accounts Payable Claims.  The Debtors estimate that, as of the Petition Date, there is approximately $11,475,000 of accrued and unpaid Accounts Payable Claims.

92.     In general, the Accounts Payable Claims can be categorized as follows:

a.      claims held by foreign vendors based outside of the United States, including but not limited to vendors that provide (i) equipment, parts, and materials for the Debtors' mining, refining, and manufacturing operations, (ii) repair and maintenance services related to the Debtors' operations, or (iii) maintain permits and satisfy other obligations required by regulators, which total approximately $9,400,000 as of the Petition Date;

b.      claims held by domestic common carriers, warehousemen, contractors, and subcontractors that may be capable of asserting liens against the Debtors' property, which total approximately $5,000 as of the Petition Date; and

c.      claims held by all remaining domestic general unsecured creditors that provide supplies and/or services utilized by the Debtors, such as professionals utilized in the ordinary course and not otherwise retained pursuant to a separate order of the Bankruptcy Court, which total approximately $2,070,000 as of the Petition Date.

93.     The Debtors are not seeking to pay these Accounts Payable Claims immediately or in one lump sum; rather, the Debtors intend to pay these amounts as they become due and payable in the ordinary course of the Debtors' business, subject to the respective Payable Agreements of the Accounts Payable Claims.  A significant portion of the Accounts Payable Claims are related to supplies, parts, and maintenance for equipment necessary for successful cobalt and nickel processing operations.  The failure to make payments to cover these costs could result in disruptions in the Debtors' business operations, adversely impact the financial performance of the group, and have lasting negative impacts on their reputation with such vendors and, to the extent there are likely operational and reputational impacts, the Debtors' customers.  In addition, certain of the Accounts Payable Claims are held by parties who may be able to assert liens on account of any unpaid obligations.  The failure to timely pay the Accounts Payable Claims to creditors who may be able to assert liens could unnecessarily disrupt the Debtors' mining, refining, and manufacturing operations.  .

94.     Prior to the Petition Date, and in the ordinary course of business, the Debtors

placed the Outstanding Orders for certain goods.  Certain suppliers (particularly international suppliers) may refuse to ship or transport such goods (or may seek to recall shipments then in transit) with respect to such Outstanding Orders, in the mistaken belief that they would be prepetition general unsecured creditors of the Debtors' estates with respect to such goods, unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders.  Because the Outstanding Orders are administrative expenses of the Debtors' estates, the Debtors are requesting that the Court confirm the administrative expense priority of the Outstanding Orders and authorize the Debtors to pay amounts due on account of the Outstanding Orders in the ordinary course of business, subject to the Approved DIP Budget.

95.     I believe that the relief requested in the All Trade Motion is necessary to avoid unnecessary disruption to their businesses and ensure a timely restructuring process.  I therefore believe, based upon the foregoing, that the relief requested is essential, appropriate, and in the best interests of the Debtors, their creditors and all parties in interest.

**I.      NOL Motion**

96.     Pursuant to the NOL Motion, the Debtors seek (i) approval of procedures related to certain transfers of or declarations of worthlessness with respect to their common stock and (ii) directing that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to, common stock in violations of the procedures be null and void *ab initio*.

97.     The Procedures (as defined and further detailed in the NOL Motion) protect the potential value of the Debtors' carryforwards of NOLs, "net unrealized built-in loss" with respect to assets held by the Debtors, and certain other tax benefits for use during these Chapter 11 Cases and in connection with the reorganization of the Debtors.

98.     The Company estimates that, as of December 31, 2023, Formation Holdings US,

Inc., Jervois Mining USA Limited, and Jervois Americas LLC had approximately $123 million of U.S. federal NOLs and $99 million of state NOLs, as well as significant asset basis.  The Company believes that there is a "net unrealized built-in loss" with respect to assets held by the U.S. Debtors because they estimate that the aggregate adjusted tax basis of all such assets is greater than their aggregate fair market value.  Further, the Company believes the U.S. Debtors have generated additional Tax Attributes in the 2024 tax year and may generate additional Tax Attributes in the 2025 tax year.

99.     These Tax Attributes are potentially of significant value to the Debtors and their estates because the U.S. Debtors may be able to carry forward certain Tax Attributes to offset their future U.S. federal and state taxable income or directly offset U.S. federal and state tax liability in future years.  Such Tax Attributes may also be utilized by the U.S. Debtors to offset any U.S. federal and state taxable income or U.S. federal and state tax liability generated by transactions consummated pursuant to the Plan.  The value of the Tax Attributes will inure to the benefit of all of the Debtors and their stakeholders.

100.     Sections 382 and 383 of the IRC limit the amount of U.S. federal taxable income and U.S. federal tax liability, respectively, that can be offset by a corporation's tax attributes in taxable years (or portions thereof) following an "ownership change."  Generally, an "ownership change" occurs through certain transfers of Beneficial Ownership of Common Stock or certain worthless stock deductions with respect to Beneficial Ownership of Common Stock.  To maximize the use of the Tax Attributes and enhance recoveries for the Debtors' stakeholders, the Debtors seek limited relief that will enable them to closely monitor these certain transfers of Beneficial Ownership of Common Stock and certain worthless stock deductions with respect to Beneficial Ownership of Common Stock so as to be in a position to act expeditiously to prevent such transfers or worthlessness deductions, if necessary, with the purpose of preserving the Tax

Attributes.  Accordingly, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

### J.    Insurance Motion

101.    Pursuant to the Insurance Motion, the Debtors seek authority to (i) maintain their prepetition insurance policies and programs throughout the bankruptcy on an uninterrupted basis, (ii) renew, amend, supplement, extend, or purchase insurance coverage on a postpetition basis in the ordinary course, (iii) pay any premiums or deductibles related to the insurance policies as they come due, and (iv) maintain their surety bond program.

102.    In the ordinary course of business, the Debtors maintain 21 Insurance Policies with 12 Insurance Carriers.  The Insurance Policies provide coverage for, among other things, losses related to the Debtors' business, real property, general liability, directors' and officers' liability, industrial special risks, civil responsibility, worker's compensation, automobile liability, special contingency, including ransom and emergency political repatriation, travel, and cargo.  In addition, certain of the Insurance Policies provide layers of excess liability coverage.

103.    In the ordinary course of business, the Debtors, directly or through brokerage accounts, pay Premiums associated with the Insurance Policies.  The Debtors paid an aggregate amount of approximately $2.51 million in Premiums in 2024, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions.  The Debtors pay the Premiums on various schedules—monthly, annually or otherwise—over the course of the policy period.  Typically, the Insurance Policies at issue are renewed annually at various times throughout the year.  As of the Petition Date, the Debtors believe that they owe $36,000 on account of Premiums for the Insurance Policies.

104.    Certain of the Insurance Policies require the Debtors to pay a Deductible.

Generally, if a claim is made under an Insurance Policy with a Deductible, the Debtors are obligated to pay any defense costs and indemnity payments up to the amount of the Deductible. Carriers are directly responsible for any claim under the applicable Insurance Policy to the extent such claim is in excess of the Deductible.

105.    The Debtors obtain Insurance Policies primarily through one (1) Insurance Broker, Aon Risk Services, and its different subsidiaries in various jurisdictions, as applicable. The Insurance Broker assists the Debtors in obtaining comprehensive insurance coverage and with negotiating the prices and terms and conditions of the Insurance Policies, enabling the Debtors to obtain Insurance Policies on advantageous terms and at competitive rates.   The Insurance Broker collects fees for services rendered as part of the Premiums paid on the Insurance Policies.  The Insurance Broker is paid approximately $280,000 annually in Brokerage Fees related to the Insurance Policies for which it acts as broker.

106.    Certain of the Insurance Policies, including workers' compensation and auto policies, are subject to regular audits, which may result in an adjustment of the premiums owed on account thereof.  Insurance Policy Audits for prepetition premium payments will not conclude until after the Petition Date.  As a result, the aggregate amount of the Debtors' obligations arising from the Insurance Policy Audits, if any, is not known at this time.

107.    Additionally, the Debtors maintain surety bonds in the ordinary course or business to secure their obligations with respect reclamation of mining sites and customs requirements. The Debtors have four (4) surety providers: American Alternative Insurance Company, U.S. Specialty Insurance Company, Danske Bank, and Sumitomo Mitsui Bank.  The two reclamation bonds are with (i) American Alternative Insurance Company in the amount of $14,970,981, and (ii) U.S. Specialty Insurance Company in the amount of $25,137,305.    The Debtors' two Customs Surety Bonds are with Danske Bank in the amount of $207,780, and (iv) Sumitomo

Mitsui Bank in the amount of $854,376 from the aforementioned Sureties.  The Debtors obtain

the Surety Bonds also through Aon Risk Services.  The fees paid to the Surety Broker are

included as part of the Brokerage Fees payable to Aon Risk Services.  As of the Petition Date,

the Debtors have four (4) Surety Bonds totaling approximately $41,171,000, the premiums for

which are approximately $808,000.  The Debtors believe there are no amounts outstanding on

account of the Surety Bonds as of the Petition Date.  To continue business operations during the

reorganization process, the Debtors must be able to provide financial assurance to certain of the

Insurance Carriers.  This requires the Debtors to maintain the Surety Bonds.

108.    The Debtors maintain the Insurance Programs and Surety Bond Program to help

manage and limit the various risks associated with operating their business, which is essential to

the preservation of the value of the Debtors' business and properties.  Additionally, in many

cases, the regulations, laws, and contract provisions that govern the Debtors' commercial

activities require the types of coverage provided for under the Insurance Policies, as well as the

Bankruptcy Code and the operating guidelines issued by the United States Trustee for Region 7.

The Debtors seek authority to maintain the existing Insurance Policies and brokerage accounts,

pay prepetition obligations related thereto, renew, amend, supplement, extend, or purchase new

Insurance Policies, and maintain the Surety Bond Program on a postpetition basis in the ordinary

course of business consistent with past practice and the Approved DIP Budget.  Based on the

foregoing, I believe that the relief requested in the Insurance Motion is in the best interests of the

Debtors, their estates, and all other parties in interest and should be granted in all respects.

### K.    Employee Wages Motion

109.    Pursuant to the Employee Wages Motion, the Debtors seek authority to (i) pay

prepetition wages, salaries, employee benefits, other compensation, and reimbursable expenses

and (ii) continue the post-petition maintenance of any employee benefit programs, policies, and

procedures in the ordinary course of business.

110.    The Debtors' employees are key to their business because the Debtors' employees are highly trained and uniquely well-versed in the industry in which the Debtors operate.  The Debtors' operations are complex and could not be continued without their employees.  Granting the relief requested in the Wages Motion will enable the Debtors to maintain morale, enhance the Debtors' ability to retain and attract their valuable workforce, and otherwise eliminate any personal hardship, including to employees, as a result of these Chapter 11 Cases which, in turn, will maximize value for the benefit of all stakeholders.

111.    The Debtors seek authority to pay, remit, and/or honor the accrued and unpaid Prepetition Employee Obligations set forth below:

| RELIEF SOUGHT | AMOUNT |
|---|---|
| **Prepetition Employee Obligations** | |
| Independent Contractors | $110,000 |
| Unpaid Compensation | $610,000 |
| Withholding Taxes and Obligations[7] | $250,000 |
| Processing Fees | $17,600 |
| Incentive Compensation Programs | N/A |
| Business and Out of Pocket Expenses | $8,000 |
| Director Compensation | $0.00 |
| **Employee Benefit Programs** | |
| Medical Plans | $58,000 |
| COBRA Plans | $80 |
| Dental and Vision Plans | $2,800 |
| Risk and Disability Insurance | $259,000 |
| HSA Program | $300 |
| 401(k) and Retirement Plans | $4,000 |
| Superannuation Plan | $0.00 |
| Jervois Japan Retirement Savings Plan | $10,000 |

---

[7] By the Wages Motion, The Debtors do not seek authority to pay prepetition claims that may be covered by the relief sough in the Taxes Motion.

| Pension Plans and Other Retirement Benefit Plans | $33,000 |
| Workers' Compensation Program | $15,000 |
| Ancillary Benefit Programs | $3,000 |
| **TOTAL** | $1,380,780 |

112.    As of the Petition Date, the Debtors employ and retain approximately 230 employees.   Of these Employees, approximately 115 are Hourly Employees and the remaining approximately 115 are salaried Employees.   Throughout the pendency of these Chapter 11 Cases, the Employees will continue to interface with customers and counterparties, respond to inquiries and concerns regarding the business, ongoing marketing efforts, and administration of these Chapter 11 Cases, and provide services.

113.    In the ordinary course of business, the Debtors pay their Hourly Employees and Salaried Employees according to bi-weekly, semi-monthly, and monthly payment cycles, depending on the Debtor employer.   Hourly Employees and Salaried Employees are paid in arrears or in advance depending on their jurisdiction and pay cycle.   On average, the Debtors' aggregate gross monthly payroll for their Hourly and Salaried Employees is approximately $1,100,000.   The Debtors believe they owe approximately $610,000 to Employees in accrued and unpaid wages and salary for services rendered through the filing of the chapter 11 petitions. All of the Employees' Unpaid Compensation is less than the Priority Limit.

114.    In connection with the wages and salaries paid to Employees, the Debtors are required by federal, state, and local law to withhold certain amounts for federal, state, and local income taxes, garnishments, and withholdings in connection with various employee benefits and other employee programs and to remit the withheld amounts to the appropriate taxing and other governmental authorities.   As part of administering payroll, some of the Withholding Taxes and Obligations are deducted directly from the Debtors' payroll account to remit to the appropriate

45

taxing authorities.  As of the Petition Date, the Debtors estimate that approximately $250,000 remains due and owing on account of the Withholding Taxes and Obligations.

115.    The Debtors utilize Silta Oy, ADP, Inc., BDO International Limited, and PricewaterhouseCoopers LLP as their third-party payroll processors for Employees.  The Debtors fund payroll, and certain other Prepetition Employee Obligations, by direct deposit through an electronic transfer of funds to Employees' bank accounts.  The Debtors estimate that they pay approximately $15,300 every month to the Payroll Processors on account of prepetition payroll processing services.  As of the Petition Date, the Debtors estimate they owe approximately $17,600 on account of Processing Fees.

116.    The Debtors supplement their workforce with various contractors and consultants. These Independent Contractors are necessary for the ongoing operation of the Debtors' business. Among other positions, the Independent Contractors perform various roles including, but not limited to, management services, facilities support, and site operational workers.  The Debtors retain approximately 15 Independent Contractors, all of whom play a critical role in the Debtors' day-to-day operations and, thus, to the preservation of value of the Debtors' estates.  Certain of the Independent Contractors are utilized on a recurring basis, while others are utilized only as needed.  On average, the Debtors pay the Independent Contractors approximately $110,000 per month.  As of the Petition Date, the Debtors estimate that approximately $80,000 remains due and owing to the Independent Contractors, all of which is due and payable within the first thirty (30) days after the Petition Date.

117.    The Debtors maintain programs to motivate, reward, and retain certain of their non-insider Employees.  These Incentive Compensation Programs are essential to the Debtors' ability to both recruit and retain valuable and talented employees by incentivizing Employees to perform at high levels and achieve certain sales and other metrics.  Many of these programs are

non-discretionary and require compensation of covered Employees if and when they achieve the relevant metrics.  Accordingly, covered Employees rely on and anticipate their compensation pursuant to these Incentive Compensation Programs.  The Incentive Compensation Programs can be grouped into three categories:

      a.    <u>Short-term Incentive Plan</u>:  In the ordinary course of business, the Debtors maintain annual incentive-based compensation programs which, reward Eligible Employees with cash-denominated awards.  Eligibility in the STIPs is based on several factors, including, but not limited to, each Employee's position, time worked, and goals assigned and completed.  All payments under the STIPs are discretionary and may be reduced or eliminated.  The Debtors do not anticipate making payments under the STIP during the pendency of these Chapter 11 Cases.

      b.    <u>Long-term Incentive Plan</u>: The Debtors maintain one LTIP, pursuant to which Eligible Employees receive compensation in the form of performance rights to receive shares of JGL on the ASX, subject to certain vesting conditions, including, conditional vesting subject to JGL share price performance relative to peer group and subject to three years continued employment from award.  The performance rights granted to each Eligible Employee are calculated as a percentage of their base salary.  The Debtors do not intend to continue the LTIP and, therefore, are not seeking any relief with respect to the LTIP herein.

      c.    <u>Performance Bonuses</u>: Debtors Jervois Suomi Holding Oy and Jervois Finland maintain one Performance Bonus Plan.  The Performance Bonus Plan is a discretionary program, and Eligible Employee's bonus amounts are set based on their base salary.  The Debtors can increase or decrease the Eligible Employee's performance bonus amount at their discretion.  The Debtors do not anticipate making payments under the STIP during the pendency of these Chapter 11 Cases.

118.    Prior to the Petition Date, and in the ordinary course of business, the Debtors reimbursed Employees for certain Business Expenses incurred in the scope of their employment, including travel, lodging, ground transportation, meals, automobile usage (gas or mileage) and other miscellaneous Business Expenses.  Certain Employees, for the benefit of the Debtors, pay for Business Expenses with the understanding that they will be reimbursed upon the submission of a receipt or claim itemizing expenses in accordance with the Debtors' reimbursement policy.  The Debtors estimate, on average, that approximately $6,800 per month is reimbursed to

Employees on account of Out of Pocket Expenses.  As of the Petition Date, the Debtors estimate that approximately $8,000 remains due and owing on account of Out of Pocket Expenses, the entirety of which is due and payable in the first thirty (30) days of these Chapter 11 Cases. Although the majority of Employees submit their reimbursement requests timely, sometimes submissions are delayed, which may result in Employees submitting requests for prepetition Business Expenses after the Petition Date.  Employees incur Business Expenses on the Debtors' behalf and with the understanding that such expenses will be reimbursed fully.

119.    As of the Petition Date, the Debtors have ten Directors, five of whom are non-Employees.  The non-Employee Directors are paid cash compensation on a quarterly or monthly basis and are entitled to expense reimbursement for all reasonable and documented out-of-pocket business expenses incurred in connection with their duties.  As of the Petition Date, there are no amounts outstanding with respect to the Director Compensation.

120.    In the ordinary course of business, the Debtors offer private health insurance coverage and certain other welfare benefits to Eligible Employees, including but not limited to, medical plans, dental plans, vision plans, life insurance plans, short-term and long-term disability plans, other paid time off, a 401(k) plan, pension plans, and other miscellaneous benefit plans. These Employee Benefit Programs are, in each case, available to all Employees who work the requisite hours per week for a given benefit or who otherwise satisfy the eligibility requirements for any Employee Benefit Program.  As of the Petition Date, the Debtors owe approximately $385,180 on account of the Employee Benefit Programs, all of which are due and payable in the first 45 days of these Chapter 11 Cases.  Specifically, the Debtors estimate that the aggregate amount due and owing under the Employee Benefit Programs are approximately: $320,180 under the Health Insurance; $47,000 on account of the Retirement Plans; $15,000 on account of the Workers' Compensation Program; and $3,000 on account of the Ancillary Benefit Programs.

48

121.    The Debtors' Employees and Independent Contractors are critical to ordinary course operations because a significant portion of the value of the Debtors' business is tied to their workforce.   Without such relief, the Employees and Independent Contractors may face significant financial strain and other hardships.   I therefore believe the relief requested in the Employee Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

**L.       Taxes Motion**

122.    Pursuant to the Taxes Motion, the Debtors seek authority to remit and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are or become payable during these Chapter 11 Cases.

123.    In the ordinary course of business, the Debtors collect, withhold, and incur, sales taxes, use taxes, commercial taxes, business and occupation taxes, income taxes, franchise taxes, and property taxes, as well as interest, penalties, fees, and assessments on account of taxes.   The Debtors pay or remit, as applicable, Taxes and Fees to various Taxing Authorities on a monthly, quarterly, or annual basis depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.   The Debtors generally, but not exclusively, pay and remit Taxes and Fees through checks and electronic transfers that are processed through their banks and other financial institutions or service providers.   From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes or Fees.   The Debtors generally use these credits in the ordinary course of business to offset against future Taxes or Fees or have the amount of such credits refunded to the Debtors.   Additionally, the Debtors may become subject to routine audit investigations on account of tax returns and/or tax obligations in respect of prior years.   Audits may result in additional prepetition Taxes and Fees being assessed against the Debtor.

49

124.    The Debtors estimate that approximately $1,419,000 in Taxes and Fees is outstanding as of the Petition Date.  A summary of the various Taxes and Fees paid by the debtor and the amounts estimated to be outstanding as of the Petition Date, is outlined below:

| Category | Description | Approximate Amount Accrued and Unpaid as of the Petition Date |
|---|---|---|
| Income and Franchise Taxes | Taxes imposed on the Debtors' income in all applicable jurisdictions. | $760,000 |
| Sales, Use, Commercial, and Business and Occupation Taxes | Taxes on goods and/or services that are used/consumed or sold by the Debtors and assessed based on the value of those goods and services. | $9,000 |
| Property Taxes | Taxes and obligations related to real and personal property holdings. | $140,000 |
| Regulatory, Customs, and Other Taxes & Fees | Taxes and Fees related to regulatory assessments, permitting, licensing and other operational fees, and other Taxes and Fees paid to the Taxing Authorities. | $510,000 |
| | TOTAL: | $1,419,000 |

125.    I understand that any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to): (a) the Taxing Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; and (c) in some instances, certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the these Chapter 11 Cases.  Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest,

or both.  In addition, nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.

126.    In sum, failure to pay the Taxes and Fees would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully reorganize.  Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

**M.      Utilities Motion**

127.    Pursuant to the Utilities Motion, the Debtors seek (i) approval of the Debtors' proposed form of adequate assurance of payment to the Debtors' utility providers, (ii) the establishment of procedures for resolving (a) objections by Utility Companies relating to the adequacy of the proposed adequate assurance and (b) requests for additional adequate assurance of payment, and (iii) to prohibit Utility Companies from altering, refusing, or discontinuing service to, or discriminating against the Debtors on account of the commencement of these Chapter 11 Cases or outstanding prepetition invoices.

128.    To operate their business and manage their properties in the ordinary course of business, the Debtors obtain telecommunications, water, energy, propane, power, waste management, sewage, gas, and other services from a number of Utility Companies.  The Debtors utilize Utility Services at their manufacturing, refining, and mining facilities as well as their corporate and field offices.  These locations require continued provision of the Utility Services to operate safely, in the ordinary course, and without disruption.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.  As operators of cobalt chemical and powder production plants in Finland,

and due to the importance of the water treatment facility at its cobalt mine in the United State for environmental compliance, the Debtors are heavily reliant on the Utility Companies, particularly their electricity providers, to continue providing Utility Services.

129.    Historically, the Debtors paid approximately $462,000 per month for Utility Services, calculated based on their monthly average for the twelve (12) -month period prior to the Petition Date.  The Debtors intend to pay both prepetition and postpetition obligations owed to the Utility Companies in a timely manner and anticipate having sufficient funds to do so. Cash on hand and cash generated in the ordinary course of business, as well as anticipated access to available cash collateral, will provide the Debtors with sufficient liquidity to pay the Utility Companies for Utility Services in accordance with past practice.

130.    To provide the Utility Companies with adequate assurance of payment, the Debtors propose to deposit cash in an amount equal to two weeks cost of Utility Services, calculated using the historical average for such payments during the twelve (12) months prior to the Petition Date, into a segregated account for the benefit of the Utility Companies at one of the banks and/or financial institutions at which the Debtors maintain their accounts.  As of the Petition Date, the Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $230,953.  The Adequate Assurance Deposit will be placed into the Utility Deposit Account within fourteen (14) business days after the Petition Date and will be held by the Debtors in the Utility Deposit Account for the benefit of the Utility Companies on the Utility Services List during the pendency of these Chapter 11 Cases.

131.    I believe the continued payment for Utilities Services and the Adequate Assurance Deposit are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued Utility Services.  I believe that it is in the best interests of the Debtors, their estates, and all other parties in interest in these cases

for the Debtors to maintain the Utility Services in the ordinary course of business and provide adequate assurance to ensure uninterrupted service.

### N.    Customer Programs Motion

132.    Pursuant to the Customer Programs Motion, the Debtors seek authorization to (i) maintain and administer their existing Customer Programs and (ii) honor certain related prepetition obligations on a postpetition basis in the ordinary course.

133.    In the ordinary course of business, the Debtors provide their Customers with various programs that are vital to the Debtors' ability to increase sales opportunities, drive revenue generation, and position the Debtors to compete within their markets.   Common with industry practice, the Debtors provide certain incentives, discounts, and accommodations to their Customers to attract and maintain positive customer relationships.   Specifically, the Debtors provide the following Customer Programs: True-Ups, Cash Discount Program, and Satisfaction Assurance Program.

134.    Under the True-Up program, the Debtors initially charge Customers for product shipments of cobalt products based on an estimation of a range of considerations, including weight, latest cobalt, and other input values.   The Customers pay the Debtors for these products based on a provisional invoice underpinned by the Debtors' estimate.   The final cost due by Customer is reconciled and trued up after the shipment of the products based on the actual weight and current market pricing of cobalt as of the time of shipment, or other input value.   If the Customer is shown to have overpaid based on True-Up calculation, the Debtors will apply the difference against any outstanding balance shown in the Customer's account.   Otherwise, the Debtors will make a payment to the Customer for the difference or otherwise provide the Customer a credit to be applied to any future amounts owed by a Customer to the Debtors. Given fluctuation in market pricing and other relevant factors, it is difficult for the Debtors to

estimate the net amount of True-Ups until the final pricing calculations are completed and therefore cannot estimate the current amount owed under the True-Ups.

135.    Under the Cash Discount Program, the Debtors provide a cash discount payment term option if the Customer pays within specified terms from the net invoice.  The Cash Discount Program is extended to certain customers in limited circumstances.  The Cash Discount Program incentivizes Customers to pay on time and is an essential and integral component of the Debtors' commercial relationships with certain Customers.

136.    Finally, under the Satisfaction Assurance Program, the Debtors commit to remedying various inconsistencies or mishaps that may arise in the ordinary course of business including: invoice discrepancies, damaged deliveries, incorrect quantities delivered, chemical impurities, and other order and shipment related.  In general, in the event the Debtors' performance does not meet the required applicable standards, the Debtors agree to replace the defective work product.  Occasionally the product can be re-sold to another Customer at a discounted rate.  Alternatively, the Debtors may agree to provide refunds or credit the Customer for the cost of the defect.  Further, in some instances, the Debtors warrant or guarantee to repair or replace, solely at their cost and expense, any of the Customer's materials and equipment that have been damaged or destroyed as a result of the Debtors' work.  The Debtors do not believe that any prepetition amounts are due and payable under the Satisfaction Assurance Program as of the Petition Date.

137.    Accordingly, the Debtors seek authority to continue the Customer Programs in the ordinary course of business and to perform and honor their prepetition obligations thereunder.  I believe that continuing the Customer Programs and to honor the obligations thereunder is necessary for the Debtors to reassure their customers of the ongoing viability of the Debtors, preserve goodwill, and to maintain critical business relationships.  I therefore believe that

continuing the Customer Related Programs in the ordinary course of the Debtors' business and performing and honoring prepetition obligations arising under such Customer Programs is in the best interests of the Debtors, their estates, and their creditors.

### O.     DIP Motion

138.    As discussed above, over the last nine (9) months, the Company has been in extensive discussions with the Plan Sponsor to explore strategic alternatives to address the Debtors' balance sheet challenges.  To offer the Company breathing room and additional liquidity runway to effectuate a comprehensive restructuring, the Plan Sponsor agreed to certain amendments and temporary waivers of covenant and other requirements under the Prepetition JFO Facility and Prepetition ICO Bonds, as well as the deferral of certain interest payments under the Prepetition ICO Bonds.  Moreover, the Plan Sponsor has provided the Company with two rounds of increased commitments and numerous fundings under a newly created term loan pursuant to the Prepetition JFO Facility.  In total, prior to the Petition Date, Millstreet funded at least $24 million in several rounds of bridge financing, as reflected in delayed-draw term loans under the existing Prepetition JFO Facility, in order to sustain the Debtors' businesses while restructuring negotiations continued.  On December 31, 2024, the Debtors and Plan Sponsor entered into the RSA, as amended and restated on January 25, 2024, which outlines the terms of a holistic balance sheet restructuring and recapitalization transaction, including debtor-in-possession financing to support the Chapter 11 Cases and the Australian Proceedings.  In particular, The Plan Sponsor has committed to provide a $49 million debtor-in-possession financing in the form of a senior-secured priming facility that amends the existing Prepetition JFO Facility consisting of (A) a $25 million new money senior-secured priming delayed draw term facility and (B) a $24 million roll up facility of the existing prepetition delayed draw term loans that were advanced as bridge financing under the Prepetition JFO Facility.

139.     In the weeks leading up to the Petition Date, FTI evaluated the Debtors'
forecasted cash flow and liquidity needs in a chapter 11 scenario to determine the amount of DIP
financing required to operate the Debtors' businesses and pay administrative costs during these
Chapter 11 Cases.   Moreover, FTI has evaluated the quantum of DIP financing required to
consummate the transactions and the Australian Proceedings contemplated by the Restructuring
Support Agreement and Prepackaged Plan agreed to by the Debtors and Millstreet.   Based on this
analysis, the Debtors and their advisors determined that approximately $24 million of new
money financing and access of cash collateral would be required to finance their operations, fund
the Australian Proceedings, and maintain positive liquidity through the course of these
Chapter 11 Cases.

140.     Based on my review of the Debtors' books and records, the Debtors are entering
chapter 11 with approximately $10.9 million of unrestricted cash on hand, and available liquidity
will be exhausted shortly after the Petition Date absent additional financing.   As set forth in the
Approved Budget, the Debtors expect that they will need approximately at least $12.5 million
during the interim period (but potentially up to $17.5 million), and approximately $25 million
through the course of these cases.   The proposed draw structure and the interim commitment
amount is necessary and appropriately tailored to the Debtors' funding needs.

141.     The Debtors will require immediate access to DIP financing and the authority to
use cash collateral throughout the chapter 11 process to ensure they have additional liquidity to
operate their businesses, maintain business relationships with their customers, vendors, and
suppliers, meet their employee payroll, pay the costs of administering the Chapter 11 Cases, and
satisfy other working capital and operational needs of the Debtors.   The Debtors' Initial DIP
Budget is attached to the Interim DIP Order as **Exhibit 2**.   The Initial Approved Budget reflects
the Debtors' need for DIP financing to fund the these Chapter 11 Cases.   Based on the

assumptions used to develop the Initial Approved Budget, the DIP financing will allow the Company to maintain a positive cash balance during the period reflected in the Initial Approved Budget and through the Debtors' emergence from these Chapter 11 Cases and, in the Debtors' business judgment, will be sufficient to fund the Debtor's operations expenses and administrative needs through the Effective Date.  I do not believe it would be prudent, or even possible, to administer the Debtors' chapter 11 estates on a "collateral-only" basis.  Without access to the DIP Facility, the Debtors would have limited cash on hand and would be unable to generate sufficient cash flow from operations to cover their working capital needs and the projected administrative costs of these Chapter 11 Cases and the attendant costs of the Australian Proceedings.

142.    Without approval of the DIP Facility on an interim basis and access to the $17.5 million upon entry of the Interim DIP Order, I believe the Debtors will suffer immediate and irreparable harm, as they will be unable to continue operating their business while pursuing confirmation of their Prepackaged Plan and, instead, will likely exhaust their remaining liquidity. Delay in approving the DIP Facility will only serve to deplete the Debtors' assets to the detriment of all stakeholders.

143.    I believe the proposed DIP Facility is necessary, and essential to fund these Chapter 11 Cases and provides significant benefit to – and is fair and equitable to – the Debtors, their estates, and the Debtors' stakeholders.  Entry into the DIP Facility will provide the Debtors with additional liquidity to operate their business during these Chapter 11 Cases, providing certainty regarding the restructuring process and instilling confidence in the Debtors' vendors, customer base, employees, and counterparties that the Debtors will be able to continue operating in the ordinary course after the Petition Date.

144.    Based on the foregoing, it is my belief that the proposed DIP Facility and use of

Cash Collateral is necessary to address the Debtors' immediate liquidity needs, and that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances.

145.    Accordingly, I believe that the proposed DIP Facility should be approved on the terms and conditions described in the DIP Documents and the Interim DIP Order, and entry into the DIP Facility reflects a sound exercise of the Debtors' business judgment.

<p style="text-align:center">[<em>Remainder of page intentionally left blank</em>.]</p>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 28, 2025

<div style="margin-left:50%;">

*/s/ Brian Martin*
_____
Brian Martin

Senior Managing Partner at FTI Consulting, Inc., proposed financial advisor to the Debtors

</div>