# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

```
-------------------------------------------------------- x
                                                         :
In re:                                                   :   Chapter 11
                                                         :
JERVOIS TEXAS, LLC, et al., 1                            :   Case No. 25-90002 (CML)
                                                         :
                Debtors.                                 :   (Jointly Administered)
                                                         :
-------------------------------------------------------- x
```

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF
### [Relates to Docket No. 19]

Upon the motion (the "***Motion***")[2] of the debtors and debtors in possession (collectively,

the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), pursuant to

sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code,

11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of

the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rules 2002-1, 4001-1, and

9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local***

***Rules***") of the United States Bankruptcy Court for the Southern District of Texas (the "***Court***"),

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are:  Jervois Global Limited (N/A), Jervois Suomi Holding Oy (N/A), Jervois Finland Oy (N/A), Jervois Americas LLC (8097), Jervois Japan Inc. (N/A), Formation Holdings US, Inc. (0103), Jervois Mining USA Limited (1323), and Jervois Texas, LLC (9514).  The Debtors' service address is Suite 2.03, 1-11 Gordon Street, Cremorne Melbourne, VIC 3121 Australia.

[2]   Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the DIP Loan Agreement (as defined below).

and the Procedures for Complex Cases in the Southern District of Texas, seeking entry of an interim

order (this "***Interim Order***") and a Final Order (as defined below), among other things:

(a)    authorizing the Debtors to obtain postpetition financing on a superpriority priming senior secured basis in the aggregate principal amount of up to $49,000,000 (the "***DIP Facility***" and the loans extended thereunder, the "***DIP Loans***"), on the terms and conditions set forth in this Interim Order and that certain *Secured Revolving Credit Facility Agreement*, substantially in the form attached to this Interim Order as **<u>Exhibit 1</u>** with the supplemental deed giving effect thereto (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "***DIP Loan Agreement***", and, together with all other agreements, guarantees, pledge, collateral and security documents, mortgages, deeds, charges, accession agreements, control agreements, instruments, certificates, notes, fee letters, and other documents executed, filed and/or delivered in connection therewith, including, without limitation, the Finance Documents and the Transaction Security Documents (each as defined in the DIP Loan Agreement), each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, together with the DIP Loan Agreement, collectively, the "***DIP Loan Documents***"), by and among Jervois Suomi Holding Oy and Jervois Finland Oy, as borrowers (the "***DIP Loan Borrowers***"), each of the other Debtors as guarantors (collectively, the "***DIP Loan Guarantors***", and together with the DIP Loan Borrowers, collectively, the "***DIP Loan Parties***"), Acquiom Agency Services Ltd, as agent and security agent (in such capacities, the "***DIP Agent***"), and the lenders from time to time party thereto (collectively, the "***DIP Lenders***", and together with the DIP Agent, the "***DIP Secured Parties***"), which DIP Facility shall be comprised of the following:

    (i)    a "new money" delayed draw term loan facility in an aggregate principal amount of up to $25,000,000 (the "***New Money DIP Facility***"; the commitments thereunder, the "***New Money DIP Commitments***"; and the term loans extended thereunder, the "***New Money DIP Loans***"), pursuant to which (A) an aggregate principal amount of $17,500,000 shall be available, in one or more borrowings, on and after the Closing Date (as defined below)[3] following entry of this Interim Order but prior to entry of the Final Order, with (i) the first borrowing equal to $12,500,000 and (ii) any subsequent borrowings not to exceed $5,000,000, in each case, subject to the terms and conditions of the DIP Loan Documents and (B) the remaining amount of the DIP Facility Commitments shall be made available, in one or more borrowings, following entry of the Final Order, in each case, subject to the terms and conditions of the DIP Loan Documents; and

---

[3]    The term "***Closing Date***" means the "Effective Date" as defined in the DIP Loan Agreement.

(ii)   upon the entry of this Interim Order, a term loan facility pursuant to which $24,000,000 of the principal amount of Prepetition DDTL Facility Secured Obligations (as defined below) (together with accrued and unpaid interest thereon) shall automatically be deemed "rolled-up" and converted into DIP Loans made or advanced under the DIP Facility on a cashless dollar for dollar basis (the "***Roll-Up***", and such rolled-up loans, the "***Roll-Up DIP Loans***"), and such Roll-Up DIP Loans shall be treated as DIP Loans for all purposes hereof and the DIP Loan Documents;[4]

(b)   authorizing the Debtors to: (i) execute, deliver, and perform under the DIP Loan Agreement, and each of the other DIP Loan Documents, and implement the transactions contemplated thereunder and hereunder (including, but not limited to, the Intermediate HoldCo Transactions (as defined below)), (ii) incur all loans, advances, extensions of credit and financial accommodations, and pay all principal, interest, premiums or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts, including without limitation, the DIP Commitment Premium and all other "DIP Obligations" as defined in the DIP Loan Agreement, whether or not such obligations arose before or after the Petition Date, whenever the same shall become due, whether at stated maturity, by mandatory prepayment, declaration, acceleration or otherwise, in each case, in accordance with the DIP Loan Documents and this Interim Order (collectively, the "***DIP Obligations***"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)   authorizing the DIP Loan Borrowers to incur, and the DIP Loan Guarantors to jointly and severally, irrevocably and unconditionally, guarantee, on a super-priority basis, the payment in full in cash of all DIP Obligations, in each case, in accordance with this Interim Order and the DIP Loan Documents;

(d)   authorizing the DIP Loan Parties to grant to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, the DIP Liens (as defined below) in all DIP Collateral (as defined below), subject to the Carve-Out and subject to the relative priorities set forth herein, in each case, as set forth in this Interim Order;

(e)   authorizing the DIP Loan Parties to grant to the DIP Agent, for the benefit of itself and the other applicable DIP Secured Parties, allowed super-priority administrative expense claims against each of the DIP Loan Parties, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve-Out, as set forth in this Interim Order;

---

[4]   For the avoidance of doubt, none of the Prepetition Revolving Facility Secured Obligations (as defined below) shall be "rolled up" and converted into the DIP Facility.

-3-

(f)     authorizing the DIP Loan Parties to use the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral (including Cash Collateral) (each as defined below) in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents, including the Approved DIP Budget (as defined below), subject to any variances expressly permitted under the DIP Loan Agreement ("***Permitted Variances***");

(g)     granting adequate protection, as and to the extent set forth herein, to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined below) of their respective Prepetition Liens (as defined below) in the Prepetition Collateral (including Cash Collateral);

(h)     modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(i)     approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, (i) the DIP Secured Parties, the DIP Loan Documents, the DIP Liens, and the DIP Obligations, (ii) subject to paragraph 23 hereof, the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Liens and the Prepetition Secured Obligations (each as defined below);

(j)     approving the DIP Loan Parties' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties, and, subject to entry of the Final Order granting such relief, approving the DIP Loan Parties' waiver of the right to surcharge the Prepetition Collateral as to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth herein;

(k)     approving (i) the DIP Loan Parties' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Secured Parties and (ii) subject to entry of the Final Order granting such relief, the DIP Loan Parties' waiver of the equitable doctrine of "marshaling" and the DIP Loan Parties' waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral as to the Prepetition Secured Parties, in each case, upon the terms set forth in this Interim Order; and

(l)     scheduling a final hearing (the "***Final Hearing***") on the Motion to consider entry of a final order (the "***Final Order***") authorizing the relief requested in the Motion on a final basis and approving the form of notice with respect to such Final Hearing,

which order shall be in form and substance and on terms and conditions acceptable in all respects to the Required Lenders (as defined below).[5]

The Court, having considered the Motion, the DIP Loan Documents, the exhibits attached thereto, the *Declaration of Brian Martin in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 17] (the "**First Day Declaration**"), and the *Declaration of Adam Steinberg in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "**Steinberg Declaration**," and together with the First Day Declaration, the "**DIP Declarations**"), the evidence submitted and arguments proffered or adduced at the Interim Hearing held before this Court on January 29, 2025 (the "**Interim Hearing**"), and upon the record of the Chapter 11 Cases; and due and proper notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b)-(d) and 9014 and all applicable Bankruptcy Local Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors, represents a

---

[5]   The term "**Required Lenders**" means the "Majority Lenders" as defined in the DIP Loan Agreement.

sound exercise of the Debtors' business judgment, and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[6]**

A.      *Petition Date*. On January 28, 2025 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing the Chapter 11 Cases.

B.      *Debtors in Possession*. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.      *Committee Formation*. As of the date hereof, the Office of the United States Trustee for the Southern District of Texas, Houston Division (the "***U.S. Trustee***") has not appointed an official statutory committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "***Official Committee***").

D.      *Jurisdiction and Venue*. This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to

---

[6]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4898-4197-2240v.16

28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013 and 9014, Bankruptcy Local Rules 2002-1, 4001-1, and 9013-1, and the Procedures for Complex Cases in the Southern District of Texas.

E.    *Debtors' Stipulations, Releases and Acknowledgements Regarding DIP Secured Parties.* In requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Lenders to provide the DIP Facility, the Debtors, for themselves, their estates and all representatives of such estates, admit, stipulate, acknowledge and agree as follows:

(a)    *No Control.* None of the DIP Secured Parties control the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder.

(b)    *No Claims, Defenses, or Causes of Action.* As of the date hereof, there exist no claims, defenses or any other Cause of Action[7] of any nature or description whatsoever that may be asserted by the Debtors, their respective estates, predecessors, successors and assigns, against any of the DIP Secured Parties or any of their respective current, former and future affiliates, subsidiaries, funds or managed accounts, officers, directors, managers, members, equity holders, partners, principals, employees, representatives, agents, attorneys, advisors, consultants and other professionals, or any of the predecessors in interest, successors and assigns of each of the foregoing (collectively, the "***Representatives***"), in their capacities as such, in each case, arising from, in connection with, or related to this Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP

---

[7]    The term "***Cause of Action***" means any action, cause of action, claim, counter-claim, cross-claim, defense, account, objection, challenge, offset, setoff, demand, liability, responsibility, dispute, remedy, indebtedness, obligation, guaranty, right, interest, indemnity, assertion, allegation, suit, controversy, proceeding, loss, damage, injury, reimbursement obligation, attorneys' fees, costs, expenses or judgments of every type, whether known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, whether assertable directly or derivatively, including, without limitation, all legal and equitable theories of recovery, arising under the Bankruptcy Code or applicable non-bankruptcy law, whether local, state of federal U.S. or foreign common law, statute, law, rule, regulation, or by contract, of every nature or description whatsoever.

Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder.

(c)    *Releases.*    Effective as of the date hereof, the Debtors, on behalf of themselves and their respective estates hereby absolutely, unconditionally and irrevocably release and forever discharge and acquit the DIP Secured Parties and each of their respective Representatives (each in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors and assigns at any time had, now have or that their successors and assigns may have against any of the DIP Secured Parties and their respective Representatives for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date hereof, in each case, arising under, in connection with or related to this Interim Order, the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder, including, without limitation, (i) any Cause of Action seeking avoidance, whether under chapter 5 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute, common law or otherwise ("***Avoidance Actions***"), (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any Causes of Action arising under the Bankruptcy Code, (iv) any claims or Causes of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder, or (v) any claim or Cause of Action with respect to the validity, enforceability, extent, amount, perfection or priority of the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Loan Documents or the transactions contemplated thereunder or hereunder; provided, however, that nothing contained in this subparagraph (c) shall relieve the DIP Secured Parties from fulfilling any of their commitments under, and in accordance with, the DIP Loan Documents (subject to the terms and conditions thereof).

F.    *Debtors' Stipulations, Releases and Acknowledgements Regarding Prepetition Secured Parties.* In requesting the DIP Facility and the use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lenders to provide the DIP Facility, and in exchange for and in recognition of the priming of the Prepetition Liens and the consent (and/or deemed consent) of the Prepetition Secured Parties to the use of their Cash Collateral, the Debtors, for themselves, their estates and all representatives of such estates, admit, stipulate, acknowledge and agree as

follows (subject to paragraph 23 of this Interim Order) (collectively, the admissions, stipulations, and acknowledgments and agreements set forth in this paragraph F, the "**Stipulations**"):

(a)      *Prepetition JFO Facility.*

(i)      *Prepetition JFO Facility Agreement.* Pursuant to that certain *Secured Revolving Credit Facility Agreement*, dated as of October 28, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**Prepetition JFO Facility Agreement**", and together with all other agreements, guarantees, pledges, deeds, charges, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Finance Documents and the Transaction Security Documents (each as defined in the Prepetition JFO Facility Agreement), collectively, the "**Prepetition JFO Facility Loan Documents**"), by and among Jervois Suomi Holding Oy as company and borrower, and Jervois Finland Oy, as borrower (the "**Prepetition JFO Facility Borrowers**"), the guarantors party thereto (collectively, the "**Prepetition JFO Facility Guarantors**", and together with the Prepetition JFO Facility Borrowers, collectively, the "**Prepetition JFO Facility Loan Parties**"), Acquiom Agency Services Ltd., as agent and security agent (in such capacities, the "**Prepetition JFO Facility Agent**"), and the lenders party thereto from time to time (collectively, the "**Prepetition JFO Facility Lenders**", and together with the Prepetition JFO Facility Agent, the "**Prepetition JFO Facility Secured Parties**"), the Prepetition JFO Facility Lenders provided a revolving loan facility to the Prepetition JFO Facility Borrowers (the "**Prepetition JFO Revolving Credit Facility**").

(ii)      *DDTL Facility.* On September 6, 2024, and November 26, 2024, the Prepetition JFO Facility Agreement was amended to provide for, and then increase the commitments under, a delayed draw term loan credit facility to the Prepetition JFO Borrowers (the "**Prepetition DDTL Facility**", and together with the Prepetition JFO Revolving Credit Facility, the "**Prepetition JFO Credit Facility**").

(iii)      Pursuant to the Prepetition JFO Facility Documents, each of the Prepetition JFO Facility Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all of the Prepetition JFO Secured Obligations (as defined below).

(iv)      *Prepetition JFO Facility Obligations.* As of the Petition Date, the Prepetition JFO Facility Loan Parties were justly and lawfully indebted under the Prepetition JFO Credit Facility to the Prepetition JFO Facility Secured Parties, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, (A) in the aggregate amount of not less than $44,105,395  on account of principal amounts (including capitalized interest added thereto, if any) outstanding under the Prepetition Revolving Credit Facility, *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), all other amounts that may be due or

owing under the Prepetition JFO Facility Documents on account of the Prepetition Revolving Facility (collectively, the "***Prepetition Revolving Facility Secured Obligations***"); and (B) in the aggregate amount of not less than $24,000,000 on account of principal amounts (including capitalized interest added thereto, if any) outstanding under the Prepetition DDTL Facility, *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), all other amounts that may be due or owing under the Prepetition JFO Facility Documents on account of the Prepetition DDTL Facility (collectively, the "***Prepetition DDTL Facility Secured Obligations***" and, together with the Prepetition Revolving Facility Secured Obligations, the "***Prepetition JFO Facility Secured Obligations***").

(v)     *Prepetition JFO Facility Liens.* Pursuant to the Prepetition JFO Facility Documents, the Prepetition JFO Facility Loan Parties granted to the Prepetition JFO Facility Agent, for the benefit of itself and the other Prepetition JFO Facility Secured Parties, properly perfected continuing liens on and security interests (collectively, the "***Prepetition JFO Facility Liens***") in all "Charged Property" (as defined in the Prepetition JFO Facility Agreement) (the "***Prepetition JFO Facility Collateral***").

(b)     *Prepetition ICO Bonds.*

(i)     *Prepetition ICO Bond Agreement.* Pursuant to those certain *Bond Terms*, dated as of July 16, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "***Prepetition ICO Bond Terms***", and together with all other agreements, guarantees, pledges, collateral and security documents, control agreements, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, including, without limitation, the Finance Documents and the Transaction Security Documents (each as defined in the Prepetition ICO Bond Terms), collectively, the "***Prepetition ICO Bond Documents***", and, together with the Prepetition JFO Facility Documents the "***Prepetition Loan Documents***"), by and between Jervois Mining USA Limited, as issuer (the "***Prepetition ICO Bond Issuer***") and Nordic Trustee AS, as bond trustee (in such capacity, the "***Prepetition ICO Bonds Trustee***"), the Prepetition ICO Bond Issuer issued the 12.5% Senior Secured Bonds due 2026 in the aggregate principal amount of $100,000,000 (the "***Prepetition ICO Secured Bonds***", and the holders of the Prepetition ICO Secured Bonds, the "***Prepetition ICO Secured Bondholders***").

(ii)     Pursuant to the Guarantees (as defined in the ICO Bond Prepetition ICO Bond Documents), Formation Holdings US, Inc., Jervois Global Limited, and the other guarantors party thereto (collectively, the "***Prepetition ICO Bond Guarantors***", and together with the Bond Issuer, collectively, the "***Prepetition ICO Bond Parties***"), each of the Prepetition ICO Bond Guarantors, among other things, unconditionally and irrevocably guaranteed, on a joint and several basis, the payment in full in cash of all of the Prepetition ICO Bond Secured Obligations (as defined below).  As used herein, the "***Prepetition ICO Bond Secured Parties***" shall mean, collectively, the Prepetition ICO Bond Trustee and the Prepetition ICO Secured Bondholders, and, the "***Prepetition Secured Parties***" shall mean,

-10-

collectively, the Prepetition ICO Bond Secured Parties and the Prepetition JFO Facility Secured Parties.

(iii)     *Prepetition ICO Bond Secured Obligations*. As of the Petition Date, the Prepetition ICO Bond Parties were justly and lawfully indebted to the Prepetition ICO Bond Secured Parties pursuant to the Prepetition ICO Bond Documents, on a joint and several basis, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate principal amount of at least $100,000,000 *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements, indemnification and reimbursement obligations (contingent or otherwise), and all other amounts that may be due or owing under the Prepetition ICO Bond Documents, including, without limitation, all "Secured Obligations" (as defined in the Prepetition Bond Terms) (collectively, the "***Prepetition ICO Bond Secured Obligations***", and, together with the Prepetition JFO Facility Secured Obligations, the "***Prepetition Secured Obligations***").

(iv)     *Prepetition ICO Bond Liens.* Pursuant to the Prepetition ICO Bond Documents, the Prepetition ICO Bond Parties granted to the Prepetition ICO Bond Trustee, for the benefit of itself and the other Prepetition ICO Bond Secured Parties, properly perfected continuing liens on and security interests in (collectively, the "***Prepetition ICO Bond Liens***" and, together with the Prepetition JFO Facility Liens, the "***Prepetition Liens***") all assets and other properties subject to the Transaction Security (as defined in the Prepetition ICO Bond Terms) (the "***Prepetition ICO Bond Collateral***" and, together with the Prepetition JFO Facility Collateral, the "***Prepetition Collateral***").

(c)     *Convertible Notes*

(i)     *Prepetition Convertible Note Agreement.* Pursuant to that certain *Convertible Note Deed Poll,* dated as of July 18, 2023 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "***Prepetition Convertible Note Agreement***", and together with all other agreements, guarantees, instruments, certificates, notes, and other documents executed, recorded and/or delivered in connection therewith, collectively, the "***Prepetition Convertible Note Documents***"), by and among Jervois Global Limited, as issuer (the "***Prepetition Convertible Note Issuer***"), and the noteholders party thereto (the "***Prepetition Convertible Noteholders***"), the Prepetition Note Issuer issued senior convertible notes to the Prepetition Convertible Noteholders in the aggregate principal amount of $27,412,857.41 (the "***Prepetition Convertible Notes***").

(ii)     *Prepetition Convertible Note Obligations*. As of the Petition Date, the Prepetition Convertible Note Issuer was justly and lawfully indebted to the Prepetition Convertible Noteholders pursuant to the Prepetition Convertible Note Documents, without defense, claim, counterclaim, challenge or offset of any kind, in the aggregate principal amount of at least $27,412,857.41 *plus* accrued but unpaid interest (including default interest, if applicable) thereon, *plus* all fees, costs, expenses (including attorneys', financial advisors' and other professionals' fees and expenses), charges, disbursements,

indemnification and reimbursement obligations (contingent or otherwise), and all other amounts that may be due or owing under the Prepetition Convertible Note Documents (collectively, the "**_Prepetition Convertible Note Obligations_**").

(d)        _Validity and Enforceability of Prepetition Secured Obligations, Prepetition Liens, Prepetition Loan Documents, Prepetition Convertible Note Documents and Prepetition Convertible Note Obligations._ As of the Petition Date, (i) the Prepetition Liens in the Prepetition Collateral (A) have been properly recorded and were valid, binding, enforceable, non-avoidable and fully perfected liens and security interests in the Prepetition Collateral, (B) were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or the financial commitments and other financial accommodations or consideration secured or obtained thereby, and (C) are senior with priority over any and all other liens on or security interests in the Prepetition Collateral, subject only to (1) liens and security interests that were expressly permitted to be incurred under the Prepetition Loan Documents (solely to the extent such permitted liens and security interests were (x) in existence on the Petition Date, (y) valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), and (z) senior in priority to the Prepetition Liens (such liens described in this paragraph F(d)(i)(C)(1), the "**_Permitted Prior Liens_**"))[8], and (2) the relative rights and priorities set forth in the Prepetition Intercreditor Agreement (as defined below); (ii) the Prepetition Secured Obligations constitute legal, valid, non-avoidable and binding obligations of each of the Prepetition Loan Parties, enforceable in accordance with the terms of the Prepetition Loan Documents (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code);  (iii) the Prepetition Convertible Note Obligations constitute legal, valid, non-avoidable and binding obligations of the Prepetition Convertible Note Issuer, enforceable in accordance with the terms of the Prepetition Convertible Note Documents (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); (iv) no portion of the Prepetition Liens, the Prepetition Secured Obligations or the Prepetition Convertible Note Obligations, and no payments made at any time to any of the Prepetition Secured Parties or the Prepetition Convertible Noteholders, is subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including, without limitation, any Avoidance Action or any Cause of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery, or any other Cause of Action of any nature or description, whether arising under the

---

[8]    Nothing contained herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected or non-avoidable.  Moreover, nothing contained herein shall prejudice the rights of any party in interest, including, but not limited to the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, or any Official Committee, in each case, to the extent such party has standing to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Prior Lien (subject to the terms of this Interim Order).  For the purposes hereof, any alleged claim arising or asserted as a right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) is not a Permitted Prior Lien.

4898-4197-2240v.16

Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, in each case, that may be asserted by the Debtors, their respective estates or any other person or entity; (v) the Prepetition Secured Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code against each of the Prepetition Loan Parties and their respective estates.

(e)     *Enforceability of the Prepetition Intercreditor Agreement.*

(i)     The Prepetition JFO Facility Agent and the Prepetition ICO Bond Trustee are party to that certain *Deed of Priority*, dated as of September 6, 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "***Prepetition Intercreditor Agreement***"), which sets forth the relative payment and lien priorities and other rights and remedies of the Prepetition JFO Facility Secured Parties, on the one hand, and the Prepetition ICO Bond Secured Parties, on the other hand, with respect to "***WCF Priority Collateral***" and the "***Bond Priority Collateral***" (each as defined in the Prepetition Intercreditor Agreement). Pursuant to the Prepetition Intercreditor Agreement, the parties thereto agreed, among other things: (a) that the Prepetition JFO Facility Liens are senior to the Prepetition ICO Bond Liens on the WCF Priority Collateral, and (b) that the Prepetition ICO Bond Liens are senior to the Prepetition JFO Facility Liens on the Bond Priority Collateral.

(ii)     Pursuant to section 510(a) of the Bankruptcy Code, the Prepetition Intercreditor Agreement, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents, (A) shall remain in full force and effect, (B) continue to govern the relative obligations, priorities, rights, and remedies of the Prepetition Secured Parties with respect to any shared or common Prepetition Collateral, and (C) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order except, in each case, to the extent expressly set forth herein.

(f)     *No Claims, Defenses, or Causes of Action.* As of the date hereof, there exist no claims, defenses or any other Cause of Action of any nature or description whatsoever that may be asserted by the Debtors, their respective estates, predecessors, successors and assigns, against any of the Prepetition Secured Parties, the Prepetition Convertible Noteholders or any of their respective Representatives, in each case, arising from, in connection with, or related to this Interim Order, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents, the Prepetition Collateral, the Prepetition Convertible Note Obligations or the Prepetition Convertible Note Documents.

(g)     *Releases.* Effective as of the date hereof, the Debtors, on behalf of themselves and their respective estates hereby absolutely, unconditionally and irrevocably release and forever discharge and acquit the Prepetition Secured Parties and the Prepetition Convertible Noteholders and each of their respective Representatives (each in their capacities as such) of and from any and all Causes of Action that the Debtors, their estates, predecessors, successors and assigns at any time had, now have or that their successors and assigns may have against any of the DIP Secured Parties, the Prepetition Secured Parties, the Prepetition Convertible Noteholder and their respective Representatives (in their

-13-

capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Interim Order, in each case, arising under, in connection with or related to this Interim Order, the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations, the Adequate Protection Liens (as defined below), the Adequate Protection Claims (as defined below), the Adequate Protection Obligations (as defined below), the Prepetition Convertible Note Obligations, the Prepetition Loan Documents, the Prepetition Convertible Note Documents or the transactions contemplated under the Prepetition Loan Documents, the Prepetition Convertible Note Documents or hereunder, including, without limitation, (i) any Avoidance Actions, (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or Causes of Action arising under the Bankruptcy Code, (iv) any Causes of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to the Prepetition Liens, the Prepetition Collateral, the Prepetition Secured Obligations, the Prepetition Loan Documents, the Prepetition Convertible Note Obligations or the Prepetition Convertible Note Documents, (v) any Cause of Action with respect to the validity, enforceability, extent, amount, perfection or priority of the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Collateral or the Prepetition Loan Documents or (vi) any Cause of Action with respect to the validity, enforceability, extent or amount of the Prepetition Convertible Note Obligations or the Prepetition Convertible Note Documents.

(h)     *Cash Collateral.* Any and all of the DIP Loan Parties' cash, whether existing on the Petition Date or thereafter, wherever located (including, without limitation, all cash, cash equivalents and other amounts on deposit or maintained by the DIP Loan Parties in any accounts with any depositary institution), whether as original Prepetition Collateral, arising from the sale or other disposition of Prepetition Collateral, or proceeds of other Prepetition Collateral, or cash, rents, income, offspring, products, proceeds or profits generated from the Prepetition Collateral, constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "***Cash Collateral***").

G.     **Findings Regarding Corporate Authority.**

(a)     Each of the DIP Loan Parties has all requisite power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

H.     **Findings Regarding DIP Facility and Use of Cash Collateral.**

(a)     *Good Cause*. Good and sufficient cause has been shown for the entry of this Interim Order.

-14-

(b)     *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors have an immediate and critical need to use Cash Collateral and to obtain postpetition financing pursuant to the DIP Facility, in each case, on an interim basis, in order to, among other things, permit the orderly continuation and operation of their businesses, maintain business relationships with customers, vendors and suppliers, make payroll, pay the costs of administering the Chapter 11 Cases and the Australian Proceedings (as defined in the DIP Loan Agreement) and satisfy other working capital and operational needs of the Debtors, in the case of each of the foregoing, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved DIP Budget (subject to Permitted Variances). The Debtors' access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the DIP Facility and the use of Cash Collateral is necessary and vital to, among other things, preserve and maintain the going concern values of the Debtors. The Debtors and their estates will be immediately and irreparably harmed if the financing under the DIP Facility is not obtained pursuant to the terms of this Interim Order and the DIP Loan Documents, or if the Debtors are unable to use Cash Collateral.  Entry of this Interim Order is necessary and appropriate to avoid such harm to the Debtors, their estates and other parties in interest.

(c)     *Prepetition Secured Parties' Consent to DIP Facility*. In consideration for the protections afforded to the Prepetition Secured Parties under this Interim Order, the Prepetition Secured Parties have consented (or are deemed to have consented) to (i) the Debtors' entry into the DIP Facility and use of Cash Collateral and (ii) all rights and remedies of the DIP Lenders under the DIP Loan Documents and this Interim Order.

(d)     *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing or other financial accommodations from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility, the DIP Loan Documents and this Interim Order. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate secured credit for money borrowed under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the DIP Loan Parties granting (a) the DIP Liens on all DIP Collateral, (b) the DIP Superpriority Claims, (c) the rights, benefits and protections to the DIP Secured Parties, and (d) the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations to the Prepetition Secured Parties, in the case of each of the foregoing, upon the terms and conditions set forth in this Interim Order and in the DIP Loan Documents. After considering all available alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best source of debtor-in-possession financing available to them at this time and is in the best interests of all of their stakeholders.

(e)     *Use of Proceeds of DIP Facility and Cash Collateral.* As a condition to providing the DIP Facility and their consent to the use of Cash Collateral, each of the DIP Secured Parties and the Prepetition Secured Parties requires, and the Debtors have agreed, that all proceeds of the DIP Loans and all Cash Collateral shall be used and/or applied solely for the purposes expressly permitted in the Approved DIP Budget (subject to Permitted Variances), including, without limitation, (i) to pay the costs of administration of the Chapter 11 Cases and the Australian Proceedings, (ii) for general corporate and working capital purposes, (iii) to pay adequate protection payments to the extent set forth herein, and (iv) to pay professional fees and expenses

in accordance with this Interim Order, in each case, in accordance with and subject to this Interim Order and the DIP Loan Documents, including the Approved DIP Budget (subject to Permitted Variances).

(f)     *Adequate Protection*. Pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, the Prepetition Secured Parties are entitled, as set forth in this Interim Order, to adequate protection of the Prepetition Secured Parties' respective liens and interests in the Prepetition Collateral (including Cash Collateral) for the diminution in the value of their respective liens and interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date for any cause or reason to the maximum extent provided under the Bankruptcy Code and applicable law, including, without limitation, (i) the use, sale or lease by the Debtors of such collateral, (ii) the market value decline of such collateral, (iii) the use of Cash Collateral by each of the Debtors, (iv) the imposition of the automatic stay, (v) the subordination of the Prepetition Liens and Prepetition Secured Obligations to the Carve-Out, the DIP Liens and the DIP Obligations, in each case, as set forth in this Interim Order, and (vi) any other act or omission which causes diminution in the value of their respective liens or interests in the Prepetition Collateral (collectively, the "***Diminution in Value***"); provided, however, that nothing in this Interim Order shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral or other Prepetition Collateral other than on the terms expressly set forth in this Interim Order (including the Approved DIP Budget, subject to Permitted Variances), (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the DIP Collateral or the Prepetition Collateral (whether senior, *pari passu* or junior) other than on the terms expressly set forth in this Interim Order, or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties (subject to the Prepetition

-17-

Intercreditor Agreement) to seek new, different or additional adequate protection after the date hereof or assert the interests of any of the Prepetition Secured Parties. Based on the Motion, the DIP Declarations and the other evidence filed in support of the Motion, and the record presented to the Court in connection with the Interim Hearing, the terms of the adequate protection arrangements and the use of Prepetition Collateral (including Cash Collateral) set forth herein are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral).

(g)      *Consent*. The Prepetition Secured Parties have consented (or are deemed to have consented) to the Debtors' use of Prepetition Collateral (including Cash Collateral) solely to the extent expressly permitted under the Approved DIP Budget (subject to Permitted Variances), the DIP Loan Parties' entry into the DIP Facility, the incurrence of the DIP Liens, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, in each case, in accordance with and subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(h)      *Limitation on Charging Expenses against Collateral; Section 552(b) Waiver*. As a material inducement to the DIP Lenders' agreement to provide the DIP Facility, and in exchange for (i) the DIP Secured Parties' agreement to subordinate their DIP Liens to the Carve-Out and Permitted Prior Liens, (ii) the Prepetition Secured Parties' agreement to subordinate their Prepetition Liens and Adequate Protection Liens to the DIP Liens and the Carve-Out to the extent set forth herein, and (iii) the Prepetition Secured Parties' consent to the use of Prepetition Collateral (including Cash Collateral), (a) subject to entry of the Final Order granting such relief, the DIP Loan Parties have waived their right under section 506(c) of the Bankruptcy Code or otherwise to

-18-

surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by (x) the DIP Secured Parties upon the DIP Collateral (to the extent section 506(c) is applicable to the DIP Secured Parties or the DIP Collateral), or (y) subject to entry of the Final Order granting such relief, the Prepetition Secured Parties upon the Prepetition Collateral, (b) the DIP Secured Parties and, subject to entry of the Final Order granting such relief, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable), and (c) subject to entry of the Final Order granting such relief, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Collateral.

(i)        *Proper Exercise of Business Judgment.*   Based on the Motion, the DIP Declarations, and the record presented to the Court at the Interim Hearing, (a) the terms of the DIP Facility, (b) the terms of adequate protection granted to the Prepetition Secured Parties hereunder, and (c) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order, (i) were negotiated in good faith and at arms' length among the Debtors, the DIP Secured Parties and the Prepetition Secured Parties, (ii) are fair, reasonable, and the best available to the Debtors under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration. Absent access to the DIP Facility and the ability to continue to use Cash Collateral upon the terms set forth in this Interim Order, the DIP Loan Documents, including the Approved DIP Budget (subject to

-19-

Permitted Variances), the Debtors, their estates, their creditors and other parties-in-interest will be seriously, immediately and irreparably harmed.

(j)     *Good Faith*. The DIP Facility and the terms of the DIP Loan Documents, the terms on which the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral, and this Interim Order have been negotiated in good faith and at arms' length among the Debtors, the DIP Secured Parties, the Prepetition Secured Parties and each of their respective Representatives, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility, the DIP Loan Documents and this Interim Order, including, without limitation, all loans, advances, extensions of credit and other financial accommodations made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents and this Interim Order, shall each be deemed to have been extended by the DIP Secured Parties, the Prepetition Secured Parties (as applicable) and each of their respective affiliates, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by sections 364(e) and/or 363(m) of the Bankruptcy Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the DIP Secured Parties and the Prepetition Secured Parties (and each of their successors and assigns thereof) pursuant to this Interim Order and the DIP Loan Documents (including, without limitation, all DIP Obligations, DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Claims, Adequate Protection Obligations, and adequate protection payments provided under this Interim Order), shall be entitled to the full protection of sections 364(e) and/or 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal.

(k)     *Roll-Up.* The Roll-Up is an inextricable component of the DIP Facility, and the Prepetition Secured Parties would not have otherwise consented to the use of Prepetition Collateral (including Cash Collateral) or the subordination of their Prepetition Liens to the DIP Liens and the Carve-Out except upon the terms set forth in this Interim Order, and the DIP Secured Parties would not otherwise be willing to provide the DIP Facility or extend new credit to the Debtors thereunder, without the inclusion of the Roll-Up. The Roll-Up will enable the Debtors to obtain necessary financing in order to administer these Chapter 11 Cases and fund their operations, and thereby preserve and maximize the going concern value of the Debtors.

(l)     *Initial Budget*. The Debtors have prepared and delivered to the DIP Secured Parties: (A) the initial itemized cash flow forecast (the "***Initial Budget***"), as set forth in **Exhibit 2** attached hereto, on a line item, weekly and cumulative basis, (i) the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors, in each case, for each calendar week during the period from the calendar week ending on the Friday of the calendar week immediately preceding the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter, (ii) the sum of weekly unused availability under the DIP Facility and unrestricted cash and cash equivalents on hand during the initial thirteen-week forecast period, and (iii) the weekly balance of amounts outstanding under the DIP Facility during the initial thirteen-week forecast period; (B) a professional fee budget with respect to the anticipated fees and expenses to be incurred and/or accrued by each of the Debtors' Professional Persons (as defined below) for the period from the Petition Date through and including April 30, 2025 (the "***Professional Fee Budget***"), which Professional Fee Budget shall be in form and substance acceptable to the Required Lenders and approved in writing (which may include email) by the

-21-

Required Lenders prior to the entry for this Interim Order; and (C) the itemized cash flow forecast reflecting, on a line item, cumulative and aggregate basis, the projected necessary disbursements and expenditures expected to be incurred or made, solely by and solely on behalf of the Australian Entities[9] (and not any other Debtor or non-Debtor subsidiaries of Jervois Global Limited) for the period from and after the commencement of the Australian Proceedings through and including the Plan Effective Date (as defined in the DIP Loan Agreement) (the "***Australian VA Budget***," and together with the Professional Fee Budget, the Initial Budget, and each Budget Supplement (as defined below) that becomes an "Approved Budget" (as defined below), collectively, the "***Approved DIP Budget***").[10]  Each of the Initial Budget, the Professional Fee Budget, and the Australian VA Budget is an integral part of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties (as applicable) are relying, in part, upon the Debtors' agreement to comply (subject to Permitted Variances) with the Approved DIP Budget in determining to enter into the DIP Facility and to allow the Debtors' use of proceeds of the DIP Facility and Cash Collateral in accordance with the terms of this Interim Order and the DIP Loan Documents.

(m)     *Notice*. Notice of the Motion and the Interim Hearing constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Bankruptcy Local Rules, and no other

---

[9]     The term "***Australian Entities***" means Jervois Global Limited and each of its Debtor and non-Debtor subsidiaries that are incorporated or formed under the laws of Australia.

[10]    For the avoidance of doubt, reference to "Approved DIP Budget" herein shall refer, (a) at all times during the Chapter 11 Cases (including from and after the commencement of the Australian Proceedings through and including the Plan Effective Date (as defined in the DIP Loan Agreement)), to the Approved Budget (*i.e.*, the Initial Budget as well as each Budget Supplement that becomes an "Approved Budget" in accordance with the terms hereof and the DIP Loan Agreement), *plus* (b) for the period from and after the commencement of the Australian Proceedings through and including the Plan Effective Date, the Australian VA Budget.  Each of the Approved DIP Budget and the Australian VA Budget shall be subject to the testing and variances separately permitted under the DIP Loan Agreement.

or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

(n)      *Immediate Entry.* The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and 6003 and the Bankruptcy Local Rules. Unless the relief set forth in this Interim Order is granted, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and the use of Prepetition Collateral (including Cash Collateral) upon the terms set forth in this Interim Order and the DIP Loan Documents are in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) and the Bankruptcy Local Rules. The Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-1(b).

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the Motion, the DIP Declarations, the evidence adduced at the Interim Hearing and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      *Motion Granted.* The Motion is hereby granted on an interim basis, and the DIP Facility and the use of Cash Collateral is hereby authorized and approved, in each case, upon the terms and conditions set forth in this Interim Order and the DIP Loan Documents. Any objections or other statements with respect to any of the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights inconsistent with this Interim Order, are hereby denied and overruled. This Interim Order shall become effective and enforceable immediately upon its entry.

-23-

2.     *Authorization of DIP Facility and DIP Loan Documents.*

(a)     *Authorization of DIP Loan Documents.*  The DIP Loan Parties are hereby authorized to (i) execute, deliver and perform all of their obligations under the DIP Loan Documents and this Interim Order, (ii) execute, deliver and perform under any and all other instruments, certificates, agreements and other documents (including, without limitation, the execution and/or recordation of collateral, pledge and security documents, mortgages and deeds of trust (if applicable) and financing statements), and (iii) perform all such other and further acts that may be necessary, required or desirable for the Debtors to perform their obligations under the DIP Facility, the DIP Loan Documents and this Interim Order and to implement the transactions contemplated thereunder and hereunder (including, but not limited to, the Intermediate HoldCo Transactions described below).

(b)     *Intermediate HoldCo Transactions.* The DIP Loan Parties and the DIP Secured Parties are hereby authorized to take all actions necessary, required or desirable to implement the transactions (the "***Intermediate HoldCo Transactions***") set forth in Section 5.2(e) of Schedule 13 to the DIP Loan Agreement, including, without limitation, (a) the formation of Intermediate Holdco (as defined in the DIP Loan Agreement), which shall be directly and wholly-owned by Debtor Jervois Global Limited ("***Parent***") or such other entity agreed to by the DIP Loan Parties and the DIP Secured Parties, (b) the transfer or contribution of 100% of the equity interests in certain of the Parent's direct subsidiaries (other than the Australian Entities) designated by the Required DIP Lenders to Intermediate HoldCo, (c) the execution and delivery by newly-formed Intermediate HoldCo, any other newly-formed entity, and the applicable Debtors of (i) all documents, agreements and instruments necessary or advisable to implement such transactions, and (ii) all documents, agreements and instruments necessary or advisable for Intermediate

-24-

HoldCo to become a DIP Loan Party to the DIP Facility, in each case, as set forth in the DIP Loan Documents. Without limiting the foregoing, each of the DIP Loan Parties and the DIP Secured Parties shall be authorized to take all actions and execute such documents and agreements that may be necessary or advisable to implement the Intermediate HoldCo Transactions.  Notwithstanding anything contained herein to the contrary, the authority and approval granted in this paragraph (b) shall be on a final basis.

   (c) *Authorization to Borrow; Use of Cash Collateral.*  The DIP Loan Borrowers are hereby authorized to borrow, and the DIP Loan Guarantors are hereby authorized to guarantee, on a joint and several basis, New Money DIP Facility Loans in the aggregate principal amount of $25,000,000 (plus applicable interest, premiums (including the DIP Commitment Premium), fees (including professional fees and expenses), costs, expenses, charges and other amounts payable hereunder and under the DIP Loan Documents in connection with such borrowing), subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in the DIP Loan Documents and this Interim Order.  The Debtors are hereby authorized to use the proceeds of the DIP Facility and all Cash Collateral solely in the manner and for the purposes expressly permitted in the Approved DIP Budget (subject to Permitted Variances), this Interim Order and the DIP Loan Documents.

   (d) *Roll-Up.*  The DIP Roll-Up is hereby approved, and effective immediately upon entry of this Interim Order, $24,000,000 in principal amount outstanding under the Prepetition DDTL Facility (together with accrued and unpaid interest thereon) shall automatically be deemed "rolled up" converted into the DIP Facility, on a cashless basis, and shall automatically be deemed to be substituted and exchanged, on a dollar for dollar basis, into loans outstanding under the DIP Facility for all purposes hereunder and shall be due and payable in accordance with

the terms and conditions set forth in the DIP Loan Agreement, and shall not be subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action of any kind or nature whatsoever; *provided, however,* that the Roll-Up shall be subject to paragraph 24 hereof, and in the event of any successful Challenge (as defined below) with respect to the Prepetition JFO Secured Obligations that are being rolled-up, the Court may order relief that the Court deems appropriate.  For the avoidance of doubt, none of the Prepetition Revolving Facility Secured Obligations shall be "rolled up" and converted into the DIP Facility.  The DIP Loan Parties, the Debtors' claims agent, the DIP Secured Parties and the Prepetition JFO Facility Agent are authorized and directed to take any and all actions as may be necessary or appropriate to effectuate and implement the Roll-Up.

(e)      *DIP Fees and Expenses; Indemnification.*  The DIP Loan Parties are hereby authorized and directed to pay, as and when due, any and all (i) fees, premiums or other payments payable under the DIP Loan Documents (including, without limitation, (x) the DIP Commitment Premium, which shall be deemed fully vested and earned upon entry of this Interim Order, and shall be payable in the form of New Equity Interests (as defined in the DIP Loan Agreement), (y) the Exit Commitment Premium, which shall be deemed fully earned upon entry of the Final DIP Order, and shall be payable in the form of New Equity Interests on the effective date of the Prepackaged Plan, and (z) the DIP Unused Commitment Fee (as defined in the DIP Loan Agreement), which shall be payable on the terms and conditions as set forth in the DIP Loan Agreement), (ii) amounts due (or that may become due) under clauses 14.3 (Tax indemnity), 16 (Other Indemnities), or 19 (Guaranty and Indemnity) of the DIP Loan Agreement, which are hereby approved, and (iii) costs, expenses and disbursements of the DIP Secured Parties and any other amounts payable under the DIP Loan Documents and this Interim Order, including, without

limitation, the reasonable and documented fees and expenses of (A) Paul Hastings LLP, as counsel to the DIP Agent, the Required DIP Lenders and the Consenting Lenders (as defined in the Restructuring Support Agreement)[11], (B) GLC Advisors & Company, as financial advisor to the Required DIP Lenders and the Consenting Lenders, pursuant to the terms of the letter agreement dated as of June 7, 2024; (C) Dittmar & Indrenius Attorneys Ltd., as local Finnish counsel to the Required DIP Lenders and the Consenting Lenders; (D) Squire Patton Boggs (AU), as local Australian counsel to the Required DIP Lenders and the Consenting Lenders; (E) Mills Oakley, as local Australian counsel to the Required DIP Lenders and the Consenting Lenders; (F) KPMG International Limited, as accountant to the Required DIP Lenders and the Consenting Lenders; (G) Arntzen De Besche Advokatfirma AS, as local Norwegian counsel to the Required DIP Lenders and the Consenting Lenders; and (H) such other local counsel and professionals that may be retained by or on behalf of the Required DIP Lenders and the Consenting Lenders (the advisors listed in the foregoing subclauses (A)-(H), collectively, the "*Lender Advisors*"), in the case of each of the foregoing clauses (i)-(iii), whether or not such payments, premiums, fees, costs, expenses or other amounts arose before, on or after the Petition Date and whether or not the transactions contemplated herein or in the DIP Loan Documents are consummated, without the need to file fee or retention applications with the Court, without the need to comply with the U.S. Trustee's fee guidelines, and all such payments, premiums, fees, costs, expenses and other amounts are hereby approved (and, to the extent paid prior to the entry of this Interim Order, ratified in full), shall be non-refundable and irrevocable, and shall not be subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including any Avoidance Action, any

---

[11] The "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of December 31, 2024, by and among Jervois Global Limited, certain of its direct and indirect subsidiaries party thereto from time to time, the "Consenting Lenders" party thereto from time to time.

Cause of Action seeking the reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, surcharge, recovery, or any other Cause of Action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided, however, that the payment of the fees and expenses of the Lender Advisors under the foregoing <u>clause (iii)</u> shall be subject to the procedures set forth in paragraph 11 of this Interim Order).

3.      *DIP Obligations.*

(a)      Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and shall be fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "***Successor Cases***"), in each case, in accordance with the terms of the DIP Loan Documents and this Interim Order.

(b)      Upon execution and delivery of the DIP Loan Documents, the DIP Loan Parties shall be jointly and severally liable for all DIP Obligations, including, without limitation, all loans, advances, extensions of credit, financial accommodations, principal, interest, premiums or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts (including, without limitation, all "DIP Obligations" as defined in the DIP Loan Agreement), whether or not such

-28-

obligations arose before, on, or after the Petition Date, whenever the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, in each case, which may now or from time to time be owing by any of the DIP Loan Parties to the DIP Agent, for the benefit of itself and the applicable DIP Secured Parties, or any of the DIP Lenders under the DIP Loan Documents or this Interim Order.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease, on the DIP Termination Date (as defined below) (subject to paragraph 20 hereof).

(c)     All obligations incurred, payments made, and transfers or grants of security and liens set forth in this Interim Order and the DIP Loan Documents by the DIP Loan Parties are granted to or for the benefit of the DIP Secured Parties or Prepetition Secured Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby. Except as otherwise set forth in this Interim Order, no obligation, payment, transfer, or grant of liens and security interests under this Interim Order or the DIP Loan Documents to the DIP Secured Parties or the Prepetition Secured Parties (including, without limitation, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Adequate Protection Obligations, or any adequate protection payments provided hereunder) shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action, including any Avoidance Action or any Cause of Action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery, or any other Cause of Action of any

-29-

kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, in the case of the payment of the fees and expenses of the Lender Advisors, to the procedures set forth in paragraph 11 hereof).

4.      *No Obligation to Extend Credit.*  The DIP Secured Parties shall have no obligation to make any loan or advance available under the DIP Loan Documents unless all of the conditions precedent to the making of such loan or advance by the applicable DIP Secured Parties under the DIP Loan Documents and this Interim Order have been satisfied in full (or waived) in accordance with the terms of the DIP Loan Documents and this Interim Order, as applicable.  Notwithstanding anything contained in this Interim Order or the DIP Loan Documents to the contrary, unless otherwise consented to by the Required DIP Lenders in accordance with the DIP Loan Agreement and subject to Court approval, in no event shall the aggregate principal amount of the New Money DIP Facility Loans available or advanced under the DIP Loan Agreement at any time (after giving effect to all New Money DIP Facility Loans previously made or requested) exceed the total New Money DIP Commitments of the DIP Lenders.

5.      *No Duty to Monitor Compliance.*   None of the DIP Secured Parties or the Prepetition Secured Parties shall have any obligation or responsibility to monitor the DIP Loan Parties' use of DIP Collateral, Prepetition Collateral or Cash Collateral, and each of the DIP Secured Parties and Prepetition Secured Parties may rely upon the Debtors' representations that the use of DIP Collateral, Prepetition Collateral and Cash Collateral complies with and is in accordance with the requirements of this Interim Order and the DIP Loan Documents.

6.      *DIP Liens.*

(a)      *DIP Liens.*  Effective upon entry of this Interim Order, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents,

mortgages, deeds of trust, control agreements, financing statements, notations of certificates of title for titled goods, or other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreements or other action to take possession or control of any DIP Collateral), as security for the prompt and complete payment and performance of all DIP Obligations when due (whether at stated maturity, by required prepayment, acceleration or otherwise), the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "*DIP Liens*") in all DIP Collateral, subject and subordinate to the Carve-Out, and subject to the relative priorities and provisions set forth in paragraph 6(c) of this Interim Order and **Exhibit 3** of this Interim Order.

(b)     The term "*DIP Collateral*" means all assets and properties of each of the DIP Loan Parties and their estates, of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether owned or consigned by or to, or leased from or to, or acquired by, or arising in favor of, whether prior to or after the Petition Date, any of the DIP Loan Parties (including under any trade names, styles or derivations thereof), wherever located, including, without limitation, all of the DIP Loan Parties' rights, title and interests in (i) all "Charged Property" (as defined in the DIP Loan Agreement), (ii) all Prepetition Collateral (including Cash Collateral), (iii) all money, cash and cash equivalents, all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with any and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time), all accounts receivable and other receivables (including those generated by intercompany transactions), all rights to payment, contracts and contract rights, all instruments, documents and chattel paper, all securities (whether or not marketable), all goods, furniture,

-31-

machinery, plants, equipment, vehicles, inventory and fixtures, all real property interests, all interests in leaseholds (to the extent permitted herein), all franchise rights, all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property, all general intangibles, tax or other refunds, or insurance proceeds, all equity interests, capital stock, limited liability company interests, partnership interests and financial assets, all investment property, all supporting obligations, all letters of credit and letter of credit rights, all commercial tort claims (including, for the avoidance of doubt, any Cause of Action related thereto), all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records), (iv) all rents, products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to any of the DIP Loan Parties from time to time with respect to any of the foregoing, (v) all excess proceeds remaining after the payment of all claims and obligations required to be paid following the consummation of the Australian Proceedings and the subsequent wind down and/or liquidation of each of the Australian Entities, and (vi) subject to entry of the Final Order, all proceeds of and property recovered from or that becomes unencumbered as a result of any Avoidance Actions, whether by judgment, settlement or otherwise ("***Avoidance Action Proceeds***"); *provided, however*, that DIP Collateral shall exclude any "Excluded Assets" (as defined below)[12] for so long as any such assets or properties constitutes

---

[12]   The term "***Excluded Assets***" means: (i) any of the Debtors' rights or interest in any contract, lease, permit, license (including any governmental licenses, state or local franchises, charters and authorizations), or license agreement covering real or personal property of the Debtors if under the terms of such contract, lease, permit, license, or license agreement, or Applicable Law (as defined in the DIP Loan Agreement) with respect thereto, the grant of a security interest or lien therein is prohibited as a matter of Applicable Law or under the terms of such contract, lease, permit, license, or license agreement under Applicable Law, and any such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, permit, license, or license agreement has not been obtained (*provided, however,* that the foregoing exclusion shall in no way be construed to apply to the extent that any described prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408, or 9-409 of the UCC

Excluded Assets, but shall include any and all proceeds and products of Excluded Assets (except to the extent such proceeds and products themselves constitute Excluded Assets).

(c) *Priority of DIP Liens.* The DIP Liens shall have the following ranking and priorities (subject in all cases to the Carve-Out):

(i) *First Priority Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to any liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or that were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including, subject to entry of the Final Order, all Avoidance Action Proceeds (collectively, the "***Unencumbered Property***").

(ii) *Priming DIP Liens; Junior DIP Liens.* Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than DIP Collateral described in the immediately foregoing clause (i)), which DIP Liens shall be (A) subject and subordinate to the Carve-Out and Permitted Prior Liens, (B) senior to any and all other liens and security interests in all DIP Collateral including, without limitation, the Adequate Protection Liens (as defined below) and the Prepetition Liens;

(iii) *DIP Liens Senior to Other Liens.* Except to the extent expressly permitted hereunder, the DIP Liens and the DIP Superiority Claims shall not be made subject or subordinate to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, including any lien, security interest or claim granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, (B) any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the DIP Loan Parties or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.

---

or other similar applicable law (or to the extent that any consent or waiver has been obtained that would permit any DIP Secured Parties' security interest or lien to attach)), and (ii) any United States intent-to-use trademark applications (or other similar applicable law) to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law (*provided, however,* that upon submission and acceptance by the United States Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall be considered DIP Collateral).

(d)       Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any interest therein (including any fee or leasehold interest), any proceeds thereof or other DIP Collateral, shall be deemed inconsistent with the provisions of the Bankruptcy Code and shall have no force or effect with respect to the granting of the DIP Liens or Adequate Protection Liens in any such interest therein or other DIP collateral, or in the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Secured Parties in accordance with the DIP Loan Documents and this Interim Order.

7.       *DIP Superpriority Claims.*   Pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code, subject to the Carve-Out, the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors in each of the Chapter 11 Cases and any Successor Cases on account of the DIP Obligations, with priority over any and all other administrative expense claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, the Adequate Protection Claims and all administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "***DIP Superpriority Claims***").  The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral and

-34-

the proceeds thereof, subject only to the Carve-Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Interim Order or any provision hereof is reversed or modified, on appeal or otherwise.

8.     *Use of Proceeds of DIP Collateral and Prepetition Collateral, Including Cash Collateral.*

(a)     The DIP Loan Parties are hereby authorized to use the proceeds of DIP Loans and all Cash Collateral solely to the extent permitted under the Approved DIP Budget (subject to Permitted Variances), and subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order. Except on the terms and conditions of this Interim Order and the DIP Loan Documents, the Debtors shall not be permitted to use proceeds of DIP Loans or Cash Collateral absent further order of the Court.

(b)     Without the prior written consent of the Required DIP Lenders, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so), except as permitted by the DIP Loan Documents. All collection and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents (subject to the relative priorities set forth on **Exhibit 3** hereto. Except as may be provided in the DIP Loan Documents, and subject to the relative priorities set forth on **Exhibit 3** hereto, the Debtors are authorized and directed, upon the closing of a sale of any of the DIP Collateral, to immediately pay all proceeds of any such sale to the DIP Agent, for the benefit of itself and the DIP Secured Parties, to satisfy the DIP Obligations in accordance with this Interim Order and the DIP Loan Documents, until the DIP

Obligations are Paid in Full,[13] and any order approving the sale of such DIP Collateral shall provide that the sale is conditioned upon such payment of DIP Obligations (except to the extent otherwise agreed in writing by the Required DIP Lenders).

(c)     The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any direct or indirect subsidiary or affiliate of the Debtors that is not a Debtor in these Chapter 11 Cases, other than as expressly permitted under, and subject to the terms and conditions of, the DIP Loan Documents (including the Approved DIP Budget), without the prior written consent of the Required DIP Lenders, in their discretion.

9.     *Budget and Reporting.*

(a)     The DIP Loan Parties shall, as and when required in the DIP Loan Agreement, deliver to the DIP Secured Parties and the Lender Advisors an updated thirteen-week cash flow forecast (each, a "***Budget Supplement***"), in substantially the same form as the Initial Budget and the Australian VA Budget (as applicable), and such Budget Supplement shall become the "Approved Budget" solely upon the approval by the Required DIP Lenders, as required in the DIP Loan Agreement.  The DIP Loan Parties shall, as and when set forth in the DIP Loan Agreement, deliver to the DIP Secured Parties and the Lender Advisors such weekly variance and other financial reporting required under the DIP Loan Documents.

(b)     Not later than 7:00 p.m. New York time, two business days after the first and fifteenth of each month following the Petition Date, each Debtor Professional shall deliver to FTI Consulting, Inc., in its capacity as the Debtors' proposed financial advisor, and the DIP

---

[13]   The term "Paid in Full" or "Payment in Full" means the indefeasible payment in full in cash of all DIP Obligations or Prepetition Secured Obligations, as the case may be, other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder have been terminated or expired.

Lenders a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding bi-monthly period by such Debtor Professional.

10.     *Adequate Protection*. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e) and 507 of the Bankruptcy Code, to adequate protection of their respective Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in this paragraph 10, are collectively referred to herein as the "***Adequate Protection Obligations***"):

(a)     *Adequate Protection for Prepetition JFO Facility Secured Parties.* The Prepetition JFO Facility Secured Parties are hereby granted the following adequate protection of their Prepetition JFO Facility Liens in the Prepetition JFO Facility Collateral (including Cash Collateral):

(i)     *JFO Facility Adequate Protection Claims.*  The Prepetition JFO Facility Agent, for the benefit of itself and the Prepetition JFO Facility Lenders, is hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition JFO Facility Liens in the Prepetition JFO Facility Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the DIP Loan Parties in each of their respective Chapter 11 Cases and any Successor Cases (the "***JFO Facility Adequate Protection Claims***"), which shall be payable by each of the DIP Loan Parties, on a joint and several basis, and shall have recourse to all DIP Collateral and the proceeds thereof. The JFO Facility Adequate Protection Claims shall be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims, and (b) senior to any and all other administrative expense claims and all other claims against the DIP Loan Parties and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(ii)     *JFO Facility Adequate Protection Liens.* The Prepetition JFO Facility Agent, for the benefit of itself and the Prepetition JFO Facility Lenders, is hereby granted, effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition JFO Facility Liens in the Prepetition JFO Facility Collateral, valid, binding, enforceable and perfected post-petition liens on and security interests in all DIP Collateral (the "***JFO Facility Adequate Protection***

*Liens*"). The JFO Facility Adequate Protection Liens shall be (a) subject to the Carve-Out and the DIP Liens, (b) subject to the relative priorities set forth in **Exhibit 3** attached hereto, and (c) senior to any and all other liens and security interests in the DIP Collateral.

(b)     *Adequate Protection for Prepetition ICO Bond Secured Parties.*     The Prepetition ICO Bond Secured Parties are hereby granted the following adequate protection of their Prepetition ICO Bond Liens in the Prepetition ICO Bond Collateral (including Cash Collateral):

(i)     *ICO Bond Adequate Protection Claims.*  The Prepetition ICO Bond Trustee, for the benefit of itself and the Prepetition ICO Bond Secured Parties, is hereby granted, to the extent and in the amount of any Diminution in Value of the Prepetition ICO Bond Liens in the Prepetition ICO Bond Collateral (including Cash Collateral), superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the DIP Loan Parties in each of their respective Chapter 11 Cases and any Successor Cases (the "***ICO Bond Adequate Protection Claims***", and together with the JFO Facility Adequate Protection Claims, the "***Adequate Protection Claims***"), which shall be payable by each of the DIP Loan Parties, on a joint and several basis, and shall have recourse to all DIP Collateral and the proceeds thereof. The ICO Bond Adequate Protection Claims shall be (a) subject and subordinate to the Carve-Out and the DIP Superpriority Claims and (b) senior to any and all other administrative expense claims and all other claims against the DIP Loan Parties and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(ii)     *ICO Bond Adequate Protection Liens.* The Prepetition ICO Bond Trustee, for the benefit of itself and the Prepetition ICO Bond Secured Parties, is hereby granted, effective and automatically perfected as of the Petition Date, and without the necessity of the execution, recordation or filing of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any lockbox or deposit account control agreement or other action to take possession or control of any DIP Collateral), to the extent and in the amount of any Diminution in Value of the Prepetition ICO Bond Liens in the Prepetition ICO Bond Collateral, valid, binding, enforceable and perfected post-petition liens and security interests in all DIP Collateral (the "***ICO Bond Adequate Protection Liens***", and together with the JFO Facility Adequate Protection Liens, the "***Adequate Protection Liens***"). The ICO Bond Adequate Protection Liens shall be (a)  subject to the Carve-Out and the DIP Liens, (b)  subject the relative priorities set forth in **Exhibit 3** attached hereto, and (c)  senior to any and all other liens and security interests in the DIP Collateral.

(c)     *Additional Adequate Protection for Prepetition Secured Parties.* As additional adequate protection of the Prepetition Liens in the Prepetition Collateral (including Cash

-38-

Collateral), the Debtors are hereby authorized to provide, and the Prepetition Secured Parties are hereby granted, additional adequate protection in the form of the following:

> (i) *Fees and Expenses.* The Debtors are authorized and directed to pay, without the necessity of filing formal fee applications or compliance with the U.S. Trustee's fee guidelines, whether arising prior to or after the Petition Date, (A) the reasonable and documented out-of-pocket fees, costs and expenses of the Prepetition JFO Facility Agent, including, without limitation, the reasonable and documented fees and expenses of Paul Hastings LLP, as counsel to the Prepetition JFO Facility Agent, (B) the reasonable and documented out-of-pocket fees, costs and expenses of the Prepetition ICO Bond Trustee, including, without limitation, the reasonable and documented fees and expenses of Advokatfirmaet Thommessen AS, as counsel to the Prepetition ICO Bond Trustee, and (C) the reasonable and documented out-of-pocket fees and expenses of the Consenting Lenders, including, without limitation, the reasonable and documented fees and expenses of the Lender Advisors.

> (ii) *Reporting.* The Debtors shall provide the Prepetition Secured Parties and the Lender Advisors with all reports, documents and other information required to be delivered to the DIP Secured Parties under the DIP Loan Documents and this Interim Order contemporaneously with the delivery of such information to the DIP Secured Parties.

11. *Procedures for Payment of Professional Fees and Expenses.*

(a) The invoices with respect to the professional fees and expenses payable under paragraphs 2(e) and 10(c)(i) of this Interim Order (collectively, the "**Lender Professional Fees and Expenses**") shall not be required to comply with the U.S. Trustee guidelines, nor shall the applicable professionals be required to file retention or fee applications with the Court with respect to any fees or expenses payable hereunder, and all invoices therefor may be in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine); provided, however, that the U.S. Trustee and the Committee (if any) reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professional, and shall be provided via email to lead restructuring

-39-

counsel for the Debtors, lead counsel to any Official Committee and the U.S. Trustee (the "**Fee Notice Parties**"); provided, however, if no objection to payment of the requested fees and expenses is made in writing, email correspondence being sufficient, by any of the Fee Notice Parties within ten (10) calendar days after delivery of such invoices (the "**Fee Objection Period**"), then, upon the expiration of the Fee Objection Period, without further order of the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors (in any event, no later than three (3) Business Days after expiration of the Fee Objection Period); provided, further, however, if an objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, the undisputed portion shall promptly be paid by the Debtors (in any event, no later than three (3) Business Days after expiration of the Fee Objection Period), and the disputed portion shall only be paid upon resolution of such objection by the applicable parties or by order of the Court. Any hearing on an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice shall be limited to reasonableness of the fees, costs and expenses that are the subject of such objection.

(b)      Notwithstanding anything contained in this paragraph 11 to the contrary, the DIP Loan Parties are authorized and directed to pay the following: (i) (A) promptly following the Closing Date, the DIP Loan Parties shall pay in full in cash all Lender Professional Fees and Expenses incurred through and including the Closing Date, whether arising prior to, on or after the Petition Date, (B) following the Closing Date, the DIP Loan Parties shall pay in full in cash all Lender Professional Fees and Expenses incurred after the Closing Date in accordance with and subject to the procedures set forth above in paragraph 11(a) of this Interim Order, and (C) all accrued but unpaid Lender Professional Fees and Expenses shall be paid on the effective date of any chapter 11 plan confirmed in the Chapter 11 Cases.

(c)       Any and all Professional Fees and Expenses and other amounts paid at any time by any of the DIP Loan Parties to the DIP Secured Parties or the Prepetition Secured Parties pursuant to this Interim Order or the DIP Loan Documents, whether prior to or after the Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the Interim Order, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity (subject, solely in the case of the Lender Professional Fees and Expenses, to paragraph 11 of this Interim Order).

(d)       *Adequate Protection Reservation of Rights of Prepetition Secured Parties.* Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties pursuant to this Interim Order shall not be deemed an admission that the interests of such Prepetition Secured Parties are indeed adequately protected, and is without prejudice to the right of the Prepetition Secured Parties (subject to the Prepetition Intercreditor Agreement) to seek additional relief with respect to the use of Prepetition Collateral (including Cash Collateral), or to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification. Nothing herein shall be deemed to waive,

-41-

modify or otherwise impair the respective rights of the Prepetition Secured Parties under the Prepetition Loan Documents, the Prepetition Intercreditor Agreement, or under applicable law, and the Prepetition Secured Parties expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under the Prepetition Loan Documents and applicable law.  Without limiting the foregoing, nothing contained in this Interim Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate the Prepetition Secured Parties for any Diminution in Value during the Chapter 11 Cases.

12.     *Reservation of Rights.*  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Secured Parties or the Prepetition Secured Parties (subject to the Prepetition Intercreditor Agreement and this Interim Order) to seek any other or supplemental relief in respect of the Debtors; (b) subject to the Prepetition Intercreditor Agreement, the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents or the Prepetition Loan Documents (including the Prepetition Intercreditor Agreement), the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties (subject to the Prepetition Intercreditor Agreement).  Notwithstanding anything contained herein to the contrary, the entry of this Interim

-42-

Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors' or any party in interest's right to oppose (on an emergency basis if need be) any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order and subject to the Prepetition Intercreditor Agreement.

13.    *Amendments.*  Without the need for further notice to any party or approval of this Court, the Debtors are authorized to execute, deliver and perform under, one or more amendments, waivers, consents, or other modifications (including, for the avoidance of doubt, the payment of any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection therewith) to and under the DIP Loan Documents, in each case, in accordance with the provisions of the applicable DIP Loan Agreement governing amendments thereto; provided, however, that any amendment that (a) shortens the maturity of the extensions of credit thereunder; (b) increases the aggregate commitments thereunder; or (c) increases the rate of interest or any fee (other than any amendment fee, consent fee, waiver fee or similar fee paid or payable in connection with such amendment) payable thereunder (each, a "***Material DIP Amendment***") shall be provided (which may be by electronic mail) to counsel for any Official Committee and the U.S. Trustee and filed with the Court no later than five (5) Business Days prior to the anticipated date of effectiveness of any such Material DIP Amendment (or such shorter period if authorized by the Court following the filing of a motion to shorten notice), and if no formal objection to the Material DIP Amendment is made by the U.S. Trustee, any Official Committee, or any other party-in-interest within such five (5) Business Day period, then, without further notice to any party or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; provided, however, if a formal objection is made by the U.S. Trustee, any Official Committee, or any party-

-43-

in-interest within such five (5) Business Day period, then such Material DIP Amendment shall be subject to approval of the Court.

14.     *Modification of Automatic Stay.*  The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without further notice to or order of this Court, to permit (in each case, subject to the Prepetition Intercreditor Agreement to the extent applicable): (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may request to assure the perfection and priority of the DIP Liens; (b) the DIP Loan Parties to incur all liabilities and obligations, including all of the DIP Obligations, to the DIP Secured Parties as contemplated under this Interim Order and the DIP Loan Documents; (c) the DIP Loan Parties to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such acts as the Prepetition ICO Bond Trustee or the Prepetition JFO Facility Agent may request to assure the perfection and priority of the Adequate Protection Liens; (d) the DIP Loan Parties to incur all liabilities and obligations, including all Adequate Protection Obligations, to the Prepetition Secured Parties as contemplated under this Interim Order and the Prepetition Loan Documents; (e) the DIP Loan Parties to pay all amounts required hereunder and under the DIP Loan Documents; (f) the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of this Interim Order, the Prepetition Intercreditor Agreement, the Prepetition Loan Documents, and the DIP Loan Documents; (g) subject to paragraph 20 hereof, the DIP Secured Parties and the Prepetition Secured Parties to exercise, upon the occurrence and during the continuance of any DIP Termination Event (as defined below), all rights and remedies provided for in this Interim Order, the DIP Loan Documents or applicable law; (h) to perform under this Interim Order and the DIP Loan Documents, and to take any and all other actions that may be required, necessary, or

-44-

desirable for the performance by the Debtors under this Interim Order and the DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder; and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents.

15.     *Perfection of DIP Liens and Adequate Protection Liens*.

(a)     This Interim Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted hereunder and under the DIP Loan Documents, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein (each, a "***Perfection Act***") (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

(b)     Without in any way limiting the automatically effective perfection of the liens granted hereunder and the DIP Loan Documents (including, without limitation, the DIP Liens and the Adequate Protection Liens), the DIP Agent, at the direction of the Required DIP Lenders, the Prepetition JFO Facility Agent (acting at the direction of the requisite Prepetition Secured Parties under the Prepetition JFO Facility Documents), and the Prepetition ICO Bond Trustee (acting at the direction of the requisite Prepetition ICO Secured Bondholders under the Prepetition

ICO Bond Documents), respectively, are hereby authorized, but not required, in the case of the DIP Agent, at the direction of the Required DIP Lenders, in the case of the Prepetition JFO Facility Agent (acting at the direction of the requisite Prepetition Secured Parties under the Prepetition JFO Facility Documents), and the Prepetition ICO Bond Trustee (acting at the direction of the requisite Prepetition ICO Secured Bondholders under the Prepetition ICO Bond Documents), as they may determine for any reason, to execute, file and record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of submission, to the maximum extent permitted under applicable law) or otherwise effectuate any Perfection Act or to take any other action in order to attach, validate, perfect, preserve and enforce the liens and security interests granted to them hereunder or under the DIP Loan Documents to otherwise evidence such liens and security interests in all DIP Collateral; *provided, however*, that, whether or not the DIP Agent, at the direction of the Required DIP Lenders, the Prepetition JFO Facility Agent (acting at the direction of the requisite Prepetition Secured Parties under the Prepetition JFO Facility Documents), or the Prepetition ICO Bond Trustee (acting at the direction of the requisite Prepetition ICO Secured Bondholders under the Prepetition ICO Bond Documents), to execute, file, record or otherwise effectuate any Perfection Act with respect to any liens or security interests granted hereunder, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to objection, challenge, dispute, avoidance, recharacterization or subordination as of the entry of this Interim Order.  Without any further consent of any party, the DIP Agent (acting at the direction of the Required DIP Lenders) and the Debtors are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent, each for the benefit of itself and the applicable DIP Lenders, to further validate, perfect, preserve and enforce the

applicable DIP Liens; *provided* that the Debtors shall cooperate with respect to any such action, delivery, or filing upon the reasonable request (taking into account the relative costs and benefits of any such filings and the value of such assets as DIP Collateral) of the DIP Agent, at the direction of the applicable Required DIP Lenders.  All such documents will be deemed to have been recorded and filed as of the entry of this Interim Order.

(c)     A certified copy of this Interim Order may, as to the DIP Agent at the direction of the Required DIP Lenders, the Prepetition JFO Facility Agent (acting at the direction of the requisite Prepetition Secured Parties under the Prepetition JFO Facility Documents), or the Prepetition ICO Bond Trustee (acting at the direction of the requisite Prepetition ICO Bondholders under the Prepetition ICO Bond Documents), be (but need not be) filed with or recorded in filing or recording offices in addition to or in lieu of any security documents, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent, at the direction of the Required DIP Lenders, the Prepetition JFO Facility Agent (acting at the direction of the requisite Prepetition Secured Parties under the Prepetition JFO Facility Documents), or the Prepetition ICO Bond Trustee (acting at the direction of the requisite Prepetition ICO Bondholders under the Prepetition ICO Bond Documents) to take all actions, as applicable, referenced in this paragraph.

16.    *Protection of DIP Lenders' Rights.*

(a)     Until the DIP Obligations are Paid in Full, the Prepetition Secured Parties, subject to the terms of the Prepetition Intercreditor Agreements and the terms hereof, shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens or security interests granted to the Prepetition Secured Parties pursuant to the Prepetition Loan

Documents or this Interim Order or otherwise seek to exercise or enforce any rights or remedies against any DIP Collateral, Prepetition Collateral or Prepetition Loan Party (as applicable), including, without limitation, any exercise of setoff or recoupment; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens or claims on, such DIP Collateral or the proceeds thereof, to the extent such transfer, disposition, sale, or release is authorized hereunder or under the applicable DIP Loan Documents; (iii) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), any of the applicable DIP Secured Parties have filed financing statements or other documents in respect of the liens granted pursuant to this Interim Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or securities interests as of the Petition Date; and (iv) deliver or cause to be delivered, at the Debtors' cost and expense (for which the Prepetition JFO Facility Agent and the Prepetition ICO Bond Trustee, as applicable, shall be reimbursed upon submission to the Debtors of invoices or billing statements), any termination statements, releases and/or assignments in favor of the DIP Agent and the DIP Secured Parties or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of DIP Collateral subject to any sale or disposition authorized hereunder or under the DIP Loan Documents. No Prepetition Secured Party may, directly or indirectly, (A) contest, or support any other Person in contesting, in any proceeding, the extent, validity, attachment, priority, or enforceability of any DIP Lien held by or on behalf of any of the DIP Secured Parties in the DIP Collateral (or the extent, validity, allowability, or enforceability of any DIP Obligations secured thereby or purported to be secured thereby) or the provisions of the DIP Loan Documents or this Interim Order, (B) take any action

-48-

that would restrain, hinder, limit, delay or otherwise interfere with the exercise of any rights or remedies by any of the DIP Secured Parties, or (C) contest, object to or support any other Person in contesting or objecting to the manner in which any DIP Secured Party seeks to enforce or collect the DIP Obligations, the DIP Superpriority Claims or the DIP Liens or any amendment, waiver or modification of any DIP Loan Document (including **Exhibit 3** attached hereto).

(b)     To the extent any Prepetition Secured Party has been noted as a secured party on any security document or otherwise has possession of or control with respect to any Prepetition Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent, each for the benefit of itself and the other DIP Secured Parties, and the DIP Lenders, and such Prepetition Secured Party shall comply with the instructions of the DIP Agent, at the direction of the Required DIP Lenders, with respect to the exercise of such possession or control, subject to the priorities set forth on **Exhibit 3** attached hereto.

(c)     In the event that any person or entity that holds a lien on or security interest in DIP Collateral that is junior or otherwise subordinate to the DIP Liens receives any DIP Collateral or proceeds of DIP Collateral, or receives any payment on account of such lien or security interest in the DIP Collateral (whether in connection with the exercise of any right or remedy (including setoff), payment or distribution from the Debtors, mistake, or otherwise), prior to the Payment in Full of all DIP Obligations, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Secured Parties, and shall immediately turn over all such proceeds to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in the same form as received, with any necessary endorsements, for application in accordance with the DIP Loan Documents and this

-49-

Interim Order. The DIP Agent, at the direction of the Required DIP Lenders, is hereby authorized to make any such endorsement as agent for the Prepetition JFO Facility Agent, the Prepetition ICO Bond Trustee or any Prepetition Secured Party. This authorization is coupled with an interest and is irrevocable.

(d)       Except as expressly provided herein or in the DIP Loan Documents, no claim or lien having a priority senior to or *pari passu* with those granted to any of the DIP Secured Parties or Prepetition Secured Parties by this Interim Order shall be granted or permitted while any of the DIP Obligations, Adequate Protection Obligations or the Prepetition Secured Obligations, respectively, remain outstanding. Except as expressly provided in this Interim Order or the DIP Loan Documents, each of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Claims: (A) shall not be made junior or subordinated to or *pari passu* with (i) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, whether under section 364(d) of the Bankruptcy Code or otherwise, (ii) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (iii) any lien arising after the Petition Date including, without limitation, any lien or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (iv) any intercompany or affiliate lien or claim; and (B) shall not be subject to sections 506(c) (subject to entry of the Final Order granting such relief), 510, 549, 550 or 551 of the Bankruptcy Code.

17.       *Maintenance of DIP Collateral.* Until such time as all DIP Obligations are Paid in Full (or as otherwise agreed in writing by the Required DIP Lenders, as applicable, in respect of the applicable obligations owed to them), the Debtors shall continue to maintain all property,

operational, and other insurance as required and as specified in the DIP Loan Documents. Upon the entry of this Interim Order, the DIP Agent, for the benefit of itself and the other DIP Secured Parties, shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (including all property damage and business interruption insurance policies of the Debtors, whether expired, currently in place, or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, *first*, to the Payment in Full of all DIP Obligations, *second*, to the payment of the Adequate Protection Obligations and Prepetition Secured Obligations in accordance with the relative rights and priorities set forth in **Exhibit 3** attached hereto and the Prepetition Intercreditor Agreement. Notwithstanding the foregoing, the Debtors, the Prepetition JFO Facility Agent and the Prepetition ICO Bond Trustee shall take any actions reasonably requested by the DIP Agent to have the DIP Agent, on behalf of itself and the other DIP Secured Parties, added as an additional insured and lenders loss payee on each such insurance policy.

18.     *Cash Management.*  Until such time as all DIP Obligations and Prepetition Secured Obligations are Paid in Full, the Debtors shall maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order and any order of the Court authorizing the continued use of the cash management system that is reasonably acceptable to the Required DIP Lenders.  Except as otherwise agreed by the Debtors and the DIP Agent, the Debtors shall not open any new deposit or securities account that is not subject to the liens and security interests of the DIP Secured Parties.

19.     *Reporting; Access to Records.* Without limiting the requirements contained herein or in the DIP Loan Documents, the Debtors shall (a) provide the DIP Agent (and its advisors), the

Required DIP Lenders, the Consenting Lenders (as defined in the Restructuring Support Agreement) and any Official Committee (and each of their respective advisors) with (i) all reports, documents, and information required to be delivered under the DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder), and (ii) reasonable access, upon reasonable notice and during regular business hours, to the Debtors' books and records, assets and properties, for purposes of monitoring the Debtors' businesses and operations and the value of the DIP Collateral, and (b) provide information reasonably requested by, and reasonably cooperate and consult with the DIP Secured Parties, the Consenting Lenders and any Official Committee (and their respective advisors) concerning the Debtors' businesses, financial condition, properties, business operations and assets.

20. *DIP Termination Events; Exercise of Remedies.*

(a) *DIP Termination Events.* The occurrence of any of the following shall constitute a "DIP Termination Event" under this Interim Order (each a "***DIP Termination Event***"), unless waived in writing by the Required DIP Lenders: (i) the occurrence of an "Event of Default" under, and as defined in, the DIP Loan Agreement, unless waived in writing by the Required DIP Lenders, (ii) the occurrence of the "Maturity Date" (under, and as defined in, the DIP Loan Agreement), (iii) April 30, 2025, (iv) the effective date of a chapter 11 plan of any of the Debtors, (v) any of the Debtors seeks authorization from the Court for (or the Court enters an order authorizing or approving) any amendment, modification, extension of this Interim Order or the DIP Loan Documents without the prior written consent of the Required DIP Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Secured Parties), (vi) the failure of the Debtors to make any payment required under this Interim Order or the DIP Loan Documents to any of the DIP Secured Parties or the Prepetition Secured Parties as

and when due and payable hereunder or thereunder (after giving effect to any applicable cure periods); or (vii) the failure by any of the Debtors to timely perform or comply with any of the other terms, provisions, conditions or other obligations under this Interim Order.

(b)     *Remedies Upon DIP Termination Event.* Upon the occurrence of a DIP Termination Event that has not been waived by the Required Lenders, the requisite Prepetition ICO Bondholders, and/or the requisite Prepetition JFO Facility Lenders, as applicable, without further notice or order from the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent (acting at the direction of the Required DIP Lenders), the Prepetition ICO Bond Trustee (acting at the direction of the requisite ICO Bondholders) and/or the Prepetition JFO Facility Agent (acting at the direction of the requisite Prepetition JFO Facility Lenders), as applicable, to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) (a "***Remedies Notice***")[14] to lead restructuring counsel for the Debtors, lead counsel for any Official Committee, and the U.S. Trustee declaring the occurrence of a DIP Termination Event (the "***DIP Termination Declaration Date***") and/or deliver a Carve-Out Notice (as defined below) (ii) declare the termination, reduction or restriction of the commitments under the DIP Facility (to the extent any such commitment remains), (iii) declare all DIP Obligations to be due and immediately payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties, (iv) declare the termination of the DIP Facility and the DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the DIP Obligations, (v) declare

---

[14]     For the avoidance of doubt, the Remedies Notice, or any other notice contemplated under this paragraph may be included in the Carve-Out Trigger Notice (as defined below).

-53-

the reduction or restriction on the DIP Facility or the DIP Loan Documents, (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral, (vii) charge interest at the default rate under the DIP Facility or (viii) exercise any and all other rights and remedies available under the DIP Loan Documents and applicable law against the DIP Collateral; *provided, however,* that prior to exercising the remedies set forth in the immediately foregoing clauses (ii) through (viii), the DIP Agent (acting at the instruction of the Required DIP Lenders) shall be required to file a motion with the Court on five (5) business days' notice (subject to the Court's availability and the extension as set forth herein, the "***Remedies Notice Period***") seeking an emergency hearing (the "***Stay Relief Hearing***") to determine whether a DIP Termination Event has occurred (and the DIP Loan Parties, the Official Committee and the U.S. Trustee shall not object to the shortened notice with respect to such Stay Relief Hearing); *provided, further,* that to the extent the Court is unavailable for the Stay Relief Hearing within five (5) business days of the DIP Agent filing the motion, the Remedies Notice Period shall be continued until the Court hears and rules with respect to the Stay Relief Hearing. In the event the Court determines during the Stay Relief Hearing that a DIP Termination Event has occurred, the DIP Secured Parties and Prepetition Secured Parties may exercise any and all remedies available to them under this Interim Order, the DIP Loan Documents or applicable law against the DIP Collateral and/or the Prepetition Collateral (as applicable) or the Court may fashion any other appropriate remedy.  Nothing herewith shall have the effect of precluding the Debtors from being able to contest the existence or continuance of a DIP Termination Event.

(c)     During the Remedies Notice Period, the Debtors shall be permitted to use Cash Collateral solely to fund (i) payroll and other operating expenses critically necessary to keep the Debtors' businesses operating, and (ii) such other expenses consented by the Required DIP

Lenders. For the avoidance of doubt, the DIP Lenders shall not be obligated to provide any DIP Loans or advance any credit at any time from and after the DIP Termination Declaration Date.

(d)     Subject to funding the Carve-Out Reserve, following the expiration of the Remedies Notice Period, unless otherwise ordered by the Court during the Remedies Notice Period or at the Stay Relief Hearing, the automatic stay of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Prepetition JFO Facility Agent (acting at the direction of the requisite Prepetition JFO Facility Secured Parties under the Prepetition JFO Facility Documents) and the Prepetition ICO Bond Trustee (acting at the direction of the requisite Prepetition ICO Secured Bondholders under the Prepetition ICO Bond Documents), to exercise all rights and remedies available under the Prepetition Loan Documents or applicable law with respect to Prepetition Collateral consistent with this Interim Order, subject to the Prepetition Intercreditor Agreement.

(e)     *Leased Premises.* Following a determination <u>by the Court</u> at the Stay Relief Hearing that a DIP Termination Event has occurred and upon the expiration of the Remedies Notice Period, the DIP Secured Parties shall be entitled to enter upon any leased premises in accordance with (i) a separate agreement with the landlord by and between the DIP Agent or the Prepetition Agents (as applicable) and the applicable landlord, (ii) consent of the landlord, (iii) upon entry of an order of this Court, upon notice to the landlord and a hearing, or (iv) in accordance with the rights of the DIP Agents or the Prepetition Agents (as applicable) under applicable non-bankruptcy law.

(f)     *Cooperation.* If, at the Stay Relief Hearing, the DIP Secured Parties and/or the Prepetition Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral or the Prepetition Collateral, as applicable, the DIP Loan Parties shall

reasonably cooperate with the DIP Secured Parties (subject to paragraph 15(b) herein) and/or the Prepetition Secured Parties in their efforts to enforce their liens and security interests in the DIP Collateral or the Prepetition Collateral, as applicable, and the DIP Loan Parties shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral or the Prepetition Collateral, as applicable (other than the right to contest the existence or continuance of a DIP Termination Event.

21.    *No Waiver by Failure to Seek Relief.* The rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties specified herein, are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties or the Prepetition Secured Parties may have under the DIP Loan Documents, the Prepetition Loan Documents, applicable law or otherwise. The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise. No delay on the part of any party in the exercise of any right or remedy under this Interim Order, the DIP Loan Documents or the Prepetition Loan Documents shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. None of the rights or remedies of any party under this Interim Order, the DIP Loan Documents and the Prepetition Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the DIP Loan Documents and the requisite parties under the Prepetition Loan Documents, as applicable. No consents required hereunder by any of the DIP Secured Parties or

the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties (as applicable).

22.     *Carve-Out.*

(a)     *Carve-Out.* As used in this Interim Order, the term "***Carve-Out***" means an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below), (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below), (iii) to the extent allowed by this Court at any time, whether by interim or final order of the Court, all accrued and unpaid fees and expenses (excluding any restructuring, sale, M&A, capital raise, success or other transaction fee of any investment banker or financial advisor) incurred ("***Allowed Professional Fees***") by persons or firms retained by the Debtors pursuant to an order of the Court arising under section 327, 328, or 363 of the Bankruptcy Code (collectively, the "***Debtor Professionals***") and the Official Committee (if appointed) pursuant to an order of the Court arising under section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***", and together with the Debtor Professionals, the "***Professional Persons***") at any time on or before the first day following the date of delivery by the DIP Agent (acting at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (in an aggregate amount not to exceed the amounts set forth for the application Professional Persons in the Professional Fee Budget, including any Permitted Variances) (the amounts set forth in the immediately clauses (i), (ii) and (iii), the "***Pre-Carve-Out Trigger Notice Amount***"), and (iv) Allowed Professional Fees of Professional Persons

-57-

incurred after the first day following the date of delivery by the DIP Agent (acting at the direction of the Required DIP Lenders) of the Carve-Out Trigger Notice (the "**Carve-Out Trigger Notice Date**"), to the extent allowed at any time, whether by interim or final order of the Court, in an aggregate amount not to exceed $500,000 (subject to the Professional Fee Budget) (the amount set forth in this <u>clause (iv)</u>, the "**Post-Carve-Out Trigger Notice Amount**", and together with the Pre-Carve-Out Notice Amount, the "**Carve-Out Amount**"); *provided, however*, that nothing herein shall be construed to impair the ability of any party in interest to object to the fees, expenses, reimbursement, or compensation of any Professional Persons on any grounds.  The "**Carve-Out Trigger Notice**" means a written notice delivered by email (or other electronic means) by the DIP Agent (acting at the direction of the Required DIP Lenders) to lead restructuring counsel to the Debtors, the U.S. Trustee and lead counsel to the Official Committee (if any), which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event that is not otherwise waived, stating that the Post-Carve-Out Trigger Notice Amount has been invoked.  For the avoidance of doubt, the Carve-Out Trigger Notice may be included in the Remedies Notice.

(b)     *Professional Fee Reserve.*  The Debtors shall transfer into a segregated account (the "**Professional Fee Reserve**") not subject to the control of the DIP Agent, the Prepetition Agent or any of the DIP Secured Parties or Prepetition Secured Parties, cash on a weekly basis in an amount equal to the estimated Professional Persons fees (excluding, for the avoidance of doubt, any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors) for the next unfunded week set forth in (and subject to) the Approved Budget into the Professional Fee Reserve; *provided* that, upon entry of this Interim Order, the Debtors shall transfer an amount equal to the estimated Professional Persons fees for the pending

-58-

week as well as the next unfunded week.  Thereafter, the Debtors shall use such funds held in the Professional Fee Reserve to pay Professional Persons fees as they become allowed and payable pursuant to interim or final orders from the Court; *provided, however, that* the Debtors' obligations to pay the allowed fees and expenses of the Professional Persons shall not be limited or deemed limited to funds held in the Professional Fee Reserve; *provided, further,* that payment of any such fees and expenses to Professional Persons shall be subject to the Professional Fee Budget.

(c)    *Carve-Out Reserves*.   The Carve-Out Trigger Notice delivered in accordance this paragraph 22 shall constitute a demand to the DIP Loan Parties to utilize all Cash Collateral and all other cash on hand as of the Carve-Out Notice Trigger Date and any available cash thereafter held by the DIP Loan Parties to fund into a segregated account held by the Debtors (the "**Carve-Out Reserve**") an amount equal to the Carve-Out Amount (including the Post-Carve-Out Trigger Notice Amount), less amounts previously funded in the Professional Fee Reserve. The Carve-Out Reserve shall be used solely to satisfy Allowed Professional Fees benefitting from the Carve-Out in accordance with the terms hereof until the Carve-Out Amount is paid in full. Notwithstanding anything to the contrary in the DIP Loan Documents, the Prepetition Loan Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Secured Parties and the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserve has been fully funded, but the DIP Liens and the Adequate Protection Liens shall automatically attach to any residual interest in the Carve-Out Reserve and the Professional Fee Reserve (which liens shall be deemed automatically enforceable and fully perfected senior liens), with any excess paid to the DIP Secured Parties to satisfy the DIP Obligations in full, and thereafter, to the Prepetition Secured Parties to satisfy the Prepetition

-59-

Secured Obligation in accordance with their rights and priorities as of the Petition Date (unless the Required DIP Lenders and the requisite Prepetition Secured Parties, respectively, have otherwise agreed in respect of the applicable obligations owed to each of them).  Notwithstanding anything to the contrary in this Interim Order, (x) disbursements by the Debtors from the Carve-Out Reserve shall not constitute loans or indebtedness under the DIP Loan Documents or the Prepetition Loan Documents or otherwise increase or reduce the DIP Obligations or the Prepetition Secured Obligations, nor shall the DIP Secured Parties be required to fund or advance any amounts under the DIP Facility to fund the Carve-Out Reserve, and (y) the failure of the Carve-Out Reserve to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out.

(d)     Notwithstanding anything to the contrary herein, in no way shall the Carve-Out, the Carve-Out Reserve, or any Approved DIP Budget be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise); *provided* that incurrence of fees by Professional Persons are subject to the Professional Fee Budget (including Permitted Variances). All funds in the Carve-Out Reserve shall be used first to pay all obligations benefitting from the Pre-Carve-Out Trigger Notice Amount, until paid in full, and then the obligations benefitting from the Post-Carve-Out Trigger Notice Amounts.

(e)     Until such a time as the DIP Obligations shall have been indefeasible paid and satisfied in full in accordance with the DIP Loan Documents, any remaining unapplied retainer funds at the conclusion of a Professional Person's engagement shall be immediately returned to the DIP Agent, for itself and for the benefit of the other DIP Secured Parties.  If, after paying all amounts set forth in the definition of Carve-Out, the Carve-Out Reserve has not been reduced to zero, all remaining funds in the Carve-Out Reserve shall be distributed to the DIP Agent on account

of the DIP Loans, unless the DIP Obligations have been indefeasibly Paid in Full and the DIP Obligations have been terminated,  in which case, any remaining excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date (unless the Required DIP Lenders and the requisite Prepetition Secured Parties, respectively, have otherwise agreed in respect of the applicable obligations owed to each of them).

(f)      *Payment of Carve-Out on or After the Carve-Out Trigger Date.* Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve-Out Trigger Date shall permanently reduce the Post Carve-Out Trigger Notice Amount on a dollar-for-dollar basis.  Any payment or reimbursement made to any Professional Person in respect of any Allowed Professional Fees prior to the delivery of the Carve-Out Trigger Notice Date shall not reduce the Carve-Out.

(g)      *No Direct Obligation to Pay Allowed Professional Fees.* None of the DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(h)      *Priority of Carve-Out.* For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order, the Carve-Out shall be senior to all liens, security

interests, and superpriority claims granted hereunder, under the DIP Loan Documents, and/or the Prepetition Loan Documents.

23.     *Effect of the Debtors' Stipulations on Third Parties.*

(a)     The Debtors' Stipulations contained in paragraph F of this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes immediately upon entry of this Interim Order.

(b)     The Debtors' Stipulations contained in paragraph F of this Interim Order shall be binding upon all other parties-in, including, without limitation, any Official Committee, any statutory or non-statutory committees appointed or former in the Chapter 11 Cases, and any other creditors, and each of their respective successors and assigns, in all circumstances and for all purposes, unless:

(i)     the Official Committee or such party-in-interest: (A) obtains requisite standing (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) pursuant to an order of the Court entered prior to the Challenge Deadline (as defined below) , (B) timely and properly commences an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "**Challenge Proceeding**") by no later than the Challenge Deadline, (1) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens, the Prepetition Collateral, the Prepetition Convertible Note Documents or the Prepetition Convertible Note Obligations or otherwise objecting to or challenging any of the admissions, stipulations, findings or releases included in the Debtors' Stipulations, (2) asserting or prosecuting any so-called "lender liability" claims, Avoidance Actions or any contest, attack, objection, challenge, defense, claim, counterclaim or Cause of Action seeking reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery with respect to the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents, the Prepetition Collateral, the Prepetition Convertible Note Obligations or the Prepetition Convertible Note Documents, (C) objecting to or

-62-

alleging any basis to impair, restrict, deny or otherwise challenge the right of any of the Prepetition Secured Parties to credit bid, in whole or in part, the Prepetition Liens or the Prepetition Secured Obligations under section 363(k) of the Bankruptcy Code or otherwise, or (D) alleging or asserting any other Cause of Action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, in law or in equity, against any of the Prepetition Secured Parties, Prepetition Convertible Noteholders or their Representatives (subclauses (A)-(D), collectively, the "***Challenges***", and each, a "***Challenge***"), and

(ii)     there is entered a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such timely Challenge in any duly-filed Challenge Proceeding;

*provided, however,* that as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date; *provided, further, however,* that any pleadings filed in connection with any Challenge Proceeding, including any motion filed with the Court seeking requisite standing and authority to pursue a Challenge, shall include a draft complaint attached thereto and shall set otherwise forth with specificity the basis for each such Challenge, and any Challenge not so specified in a Challenge Proceeding timely and properly filed prior to the Challenge Deadline shall be deemed forever, waived, released and barred.  If no such Challenge Proceeding is timely and properly filed by the Challenge Deadline, or if the Court does not rule in favor of the plaintiff in any such Challenge Proceeding, then, without further notice or order of the Court, (i) each of the admissions, stipulations, findings and releases contained in the Debtors' Stipulations shall be binding on all parties-in-interest, including, without limitation, any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, and all other creditors, (ii) the Prepetition Secured Obligations shall constitute allowed claims against each of the Debtors party to the Prepetition Loan Documents, and the Prepetition Convertible Note Obligations shall constitute allowed claims against Prepetition Convertible Note Issuer, in the Chapter 11 Cases and any Successor Cases, and the Prepetition Liens shall be deemed to be legal, valid, non-avoidable, binding, continuing, perfected and enforceable, as of the Petition Date,

-63-

against each of the Debtors party to the Prepetition Loan Documents in the Chapter 11 Cases and any Successor Cases, (iii) the Prepetition Secured Obligations, the Prepetition Liens, the Prepetition Loan Documents, the Prepetition Convertible Note Obligations and the Prepetition Convertible Note Documents shall not be subject to any other or further Challenge, contest, attack, objection, challenge, defense, claim, counterclaim, reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), and (iv) all Challenges against any of the Prepetition Secured Parties, the Prepetition Convertible Noteholder or any of their Representatives (in their capacities as such) shall be deemed forever waived, released and barred.

(c)    If any such Challenge Proceeding is timely filed by the Challenge Deadline, the Debtors' Stipulations shall nonetheless remain binding and preclusive on any Official Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-in-interest, except to the extent that any of the admissions, stipulations, findings or releases contained in the Stipulations were expressly challenged in such Challenge Proceeding (and solely as to the plaintiff party that timely filed such Challenge Proceeding and not, for the avoidance of doubt, any other party-interest).

(d)    The "***Challenge Deadline***" means the date that is (i) the earlier of (A) as to any Official Committee only, the date that is sixty (60) calendar days after the appointment of such

-64-

Official Committee, and as to all other parties in interest, the date that is seventy-five (75) calendar days after the entry of this Interim Order, or (B) as to the Official Committee and all other parties in interest, the deadline to object to confirmation of any chapter 11 plan of the Debtors (the time period set forth in this clause (i), the "***Initial Challenge Deadline***"), (ii) such later date as has been agreed to, in writing, by the Required DIP Lenders and the Prepetition JFO Facility Agent and/or the Prepetition ICO Bond Trustee, as applicable, under the applicable Prepetition Loan Documents, and (iii) any such later date as has been ordered by the Court, for cause shown, upon a motion filed and served prior to the expiration of the Initial Challenge Deadline; provided that in the event that, prior to the expiration of the Challenge Deadline or entry of an order confirming a chapter 11 plan of the Debtors, (x) these Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended, solely with respect to such Trustee, so that the Trustee  shall receive the full benefit of any remaining time before expiration of the Challenge Deadline, which shall be extended for a period of sixty (60) calendar days from the date of appointment.

(e)        For the avoidance of doubt, the Debtors' stipulations, waivers, agreements and releases contained in paragraph E of this Interim Order shall not be subject to Challenge, and shall be binding upon the Debtors and their estates, and any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or selected in any of the Chapter 11 Cases or any Successor Cases), any Official Committee, all other creditors and all other parties-in-interest and each of their respective successors and assigns, in all circumstances and for all purposes, immediately upon entry of this Interim Order.

(f)       Nothing in this Interim Order vests or confers on any person or entity, including any Official Committee, standing or authority to pursue any Challenge belonging to the Debtors or their estates, and all rights to object to any request for such standing are expressly reserved.

24.       *Limitations on Use of DIP Collateral, Cash Collateral, Carve-Out or Other Funds:* Notwithstanding anything contained in this Interim Order or any other order of the Court to the contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out or any other funds may be used (nor shall any professional fees, costs, or expenses be paid or applied in connection therewith) by any of the Debtors and any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or selected in any of the Chapter 11 Cases or any Successor Cases), any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party-interest, directly or indirectly:

> (a)       to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, initiate, assert, commence, support or prosecute (or finance the initiation or prosecution of) any claim, counterclaim, cross-claim, Cause of Action, suit, arbitration, proceeding, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any nature or description (whether for monetary, injunctive, affirmative relief or otherwise) against any of the DIP Secured Parties or the Prepetition Secured Parties or their respective Representatives, including, without limitation, (i) any objection or challenge to the amount, validity, enforceability, extent, perfection or priority the DIP Loan Documents, the DIP Obligations (including, for the avoidance of doubt, the DIP Commitment Premium), the DIP Liens, the DIP Collateral, the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens, the Prepetition Collateral, the Prepetition Convertible Note Obligations or the Prepetition Convertible Note Documents (ii) any Avoidance Actions, (iii) any so-called "lender liability" claims, (iv) any claim or Cause of Action seeking the invalidation, reduction, setoff, offset, recoupment, avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery with respect to the DIP Liens, the DIP Obligations (including, for the avoidance of doubt, the DIP Commitment Premium), the DIP Loan Documents, the DIP Collateral,

-66-

the Adequate Protection Liens, the Adequate Protection Claims and the other Adequate Protection Obligations, the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents, the Prepetition Collateral, Prepetition Convertible Note Obligations or the Prepetition Convertible Note Documents, or (v) any other claim or Cause of Action of any nature and description whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, any other domestic or foreign statute, law, rule or regulation or otherwise, against any of the DIP Secured Parties or the Prepetition Secured Parties or their respective Representatives;

(b)      objecting to, appealing or otherwise challenging this Interim Order, the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Loan Documents or the transactions contemplated hereunder or thereunder;

(c)      objecting to or seeking to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the DIP Secured Parties, the Prepetition Secured Parties or the Prepetition Convertible Noteholder under this Interim Order or the DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred and is continuing);

(d)      objecting to or seeking to prevent, hinder, interfere with or otherwise delay any of the DIP Secured Parties' or Prepetition Secured Parties' assertion, enforcement, exercise of remedies or realization upon any DIP Collateral or Prepetition Collateral (as applicable) in accordance with this Interim Order, the DIP Loan Documents or the Prepetition Loan Documents (as applicable) (other than to contest whether a DIP Termination Event has occurred and is continuing);

(e)      seeking or requesting authorization to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code, or otherwise, unless such financing is sufficient to cause the Payment in Full of all DIP Obligations and Prepetition Secured Obligations contemporaneously with the closing of such financing (or as otherwise agreed in writing by the Required DIP Lenders and the requisite Prepetition Secured Parties, as applicable);

(f)      seeking or requesting authorization to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under the DIP Loan Documents) in any portion of the DIP Collateral that are senior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens or the Prepetition Secured Obligations unless all DIP Obligations and Prepetition Secured Obligations have been Paid in Full (or as otherwise agreed in writing by the Required DIP Lenders or the requisite Prepetition Secured Parties, as applicable); or

(g)      seeking or requesting to use Cash Collateral or sell or otherwise dispose of DIP Collateral (without the prior written consent of the Required DIP Lenders) other than as provided herein and in the DIP Loan Documents;

(h)      seeking to pay any amount on account of any claims arising prior to the commencement of the Chapter 11 Cases, unless such payments are agreed to in writing by the Required DIP Lenders (or are otherwise included in the Approved DIP Budget);

*provided, however,* that no more than $50,000 of the DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out or any other funds may be used for allowed fees and expenses incurred by any Official Committee prior to the Challenge Deadline to investigate (but not to litigate, contest, initiate, assert, join, commence, support or prosecute, including by way of discovery, with respect to), any Challenge with respect to the validity, enforceability, extent, perfection or priority of the Prepetition Liens, the Prepetition Secured Obligations, the Prepetition Loan Documents, the Prepetition Convertible Note Obligations and the Prepetition Convertible Note Documents or any Cause of Action against any of the Prepetition Secured Parties and their Representatives.

25.     *Limitation on Charging Expenses.* Except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to DIP Secured Parties or the Prepetition Collateral as to the Prepetition Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the Required DIP Lenders with respect to the DIP Collateral or the requisite Prepetition Secured Parties under the applicable Prepetition Loan Documents with respect to the Prepetition Collateral, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in this Interim Order (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the DIP Secured Parties or any of the

Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Secured Parties or the Prepetition Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise; *provided, however*, that with respect to the Prepetition Secured Parties and the Prepetition Collateral, the foregoing shall be subject to the entry of the Final Order.

26.     *No Marshaling; Section 552(b) Waiver.* In no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral or the Prepetition Secured Obligations, and all proceeds of the DIP Collateral and the Prepetition Collateral shall be received and applied in accordance with this Interim Order, the DIP Loan Documents and the Prepetition Loan Documents, as applicable; *provided, however,* that with respect to the Prepetition Secured Parties and the Prepetition Collateral, the foregoing shall be subject to the terms of the Final Order granting such relief. Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Collateral.

27.     *Right to Credit Bid.* Subject to the relative rights and priorities set forth herein, (a) the DIP Agent or its designee (which may be an acquisition vehicle formed by the Required DIP Lenders) (acting at the direction of the Required DIP Lenders), shall have the right to credit bid up to the full amount of the applicable DIP Obligations, including, for the avoidance of doubt, the Roll-Up DIP Loans (subject to paragraph 23), in any sale of all or any portion of DIP Collateral (including, for the avoidance of doubt, any asset for which the DIP Collateral is limited to the

-69-

proceeds thereof as a result of applicable law prohibiting encumbrances from being attached to such asset) subject to and in accordance with the DIP Loan Documents, and (b) subject to section 363(k) of the Bankruptcy Code, the Prepetition JFO Facility Agent (acting at the direction of the requisite Prepetition JFO Facility Secured Parties under the Prepetition JFO Facility Documents), the Prepetition ICO Bond Trustee (acting at the direction of the requisite Prepetition ICO Secured Bondholders under the Prepetition ICO Bond Documents) or their designee(s) (which may be an acquisition vehicle) shall have the right to credit bid up to the full amount of the applicable Prepetition Secured Obligations in any sale all or any portion of the Prepetition Collateral (including, for the avoidance of doubt, any asset for which the Prepetition Collateral is limited to the proceeds thereof as a result of applicable law prohibiting encumbrances from being attached to such asset) in accordance with the applicable Prepetition Loan Documents (including the Prepetition Intercreditor Agreement), in the case of each of foregoing clauses (a) and (b), without the need for further order of the Court authorizing same, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, a sale or disposition by a chapter 7 trustee for any of the DIP Loan Parties under section 725 of the Bankruptcy Code, or otherwise. The DIP Agent (acting at the direction of the Required DIP Lenders), the Prepetition JFO Facility Agent (acting at the direction of the requisite Prepetition JFO Facility Secured Parties under the Prepetition JFO Facility Documents) and the Prepetition ICO Bond Trustee (acting at the direction of the requisite Prepetition ICO Secured Bondholders under the Prepetition ICO Bond Documents) shall each have the absolute right to assign, transfer, sell, or otherwise dispose of their respective rights to credit bid (subject to the Prepetition Intercreditor Agreement and this Interim Order) to any acquisition vehicle formed in connection with such bid or other designee.

28.     *Binding Effect; Successors and Assigns*. Immediately upon entry of this Interim Order, subject to paragraph 23 of this Interim Order, the provisions of the DIP Loan Documents and this Interim Order, including all findings and conclusions of law herein, shall be binding upon all parties in interest in the Chapter 11 Cases and any Successor Cases, including without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Prepetition Convertible Noteholder, any Official Committee or any other committee appointed or formed in the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, the Prepetition Convertible Noteholder and their respective successors and assigns; *provided, however*, that, for the avoidance of doubt, the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to make any loan, permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

29.     *No Modification of Interim Order*. Until and unless the DIP Obligations and the Prepetition Secured Obligations have been Paid in Full, the Debtors irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the Required DIP Lenders, (i) any modification, stay, vacatur or amendment to this Interim Order, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the DIP Superiority Claims (other than the Carve-Out), (iii) the grant

-71-

of any lien or security interest on any DIP Collateral with priority equal to or superior to the DIP Liens, except as expressly permitted hereunder or under the DIP Loan Documents, (iv) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is inconsistent with this Interim Order, or (b) without the prior written consent of the Prepetition JFO Facility Agent, acting at the direction of the requisite Prepetition JFO Facility Secured Parties, and the Prepetition ICO Bond Trustee, acting at the direction of the requisite Prepetition ICO Bondholders, (i) any modification, stay, vacatur or amendment to this Interim Order that adversely affects the rights, remedies, benefits or protections of the applicable Prepetition Secured Parties, (ii) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the Adequate Protection Claims (other than the Carve-Out and the DIP Superpriority Claims), or (iii) the grant of any lien or security interest on any DIP Collateral or Prepetition Collateral with priority equal to or superior to the Adequate Protection Liens, except as expressly permitted hereunder or under the DIP Loan Documents.

30.    *Proceeds of Subsequent Financings.* Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the Payment in Full of all of the DIP Obligations, either the Debtors, the Debtors' estates, any chapter 11 trustee, chapter 7 trustee or examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents, then, unless otherwise agreed in writing by the Required DIP Lenders, all of the cash proceeds derived from such credit or debt intended to refinance the DIP Obligations shall immediately be turned over to the DIP Agent for further distribution to the DIP Secured Parties on account of their DIP Obligations pursuant to the applicable DIP Loan Documents.

31.     *Preservation of Rights Granted Under Interim Order.*

(a)     *Good Faith Under Section 364(e) of the Bankruptcy Code.* The DIP Secured Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order, the DIP Facility and the DIP Loan Documents, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and upon the record made at the Interim Hearing and during the Chapter 11 Cases, the DIP Secured Parties and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order or the DIP Loan Documents are hereafter reversed or modified on appeal by any order of this Court or any other court, any such reversal or modification shall not affect (i) the validity of any DIP Obligations incurred hereunder, (ii) the priority of the DIP Liens granted hereunder, or (iii) the validity of the DIP Liens granted hereunder to the DIP Lenders or the DIP Agent, whether or not the Prepetition Secured Parties, the DIP Lenders or the DIP Agent know of such appeal, unless the authorization to incur the DIP Obligations or the grant of the DIP Liens hereunder is stayed pending appeal. Notwithstanding any such reversal or modification, any such claim, lien, or security interest, right, privilege, remedy or benefit shall be governed in all respects by the original provisions of this Interim Order and the DIP Loan Documents.

(b)     *Survival.* Notwithstanding anything contained herein or in the DIP Loan Documents to the contrary, the terms and provisions of this Interim Order and the DIP Loan Documents (including, without limitation, all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the DIP Secured Parties and the Prepetition Secured Parties under this Interim Order and the DIP Loan Documents), and any actions taken pursuant hereto or thereto, shall survive, shall continue in full force and effect, shall

-73-

remain binding on all parties-in-interest, and shall be governed by the original provisions of this Interim Order and maintain their priorities as set forth in this Interim Order, and shall not be modified, impaired, or discharged by, entry of any order that may be entered (i) confirming any chapter 11 plan in any of the Chapter 11 Cases, (ii) converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, (iii) dismissing any or all of the Chapter 11 Cases, (iv) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases, or (v) approving the sale or disposition of any DIP Collateral (except as expressly permitted in the DIP Loan Documents), in each case, until all of the DIP Obligations, the Adequate Protection Obligations and the Prepetition Secured Obligations have been Paid in Full (unless the Required DIP Lenders and/or the requisite Prepetition Secured Parties have otherwise agreed in writing in respect of the applicable obligations owed to each of them).

(c)     *Dismissal/Conversion.* If any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that (i) all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Secured Parties and the Prepetition Secured Parties hereunder and under the DIP Loan Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations, Adequate Protection Obligations and Prepetition Secured Obligations have been Paid in Full (and that all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections, notwithstanding such dismissal or conversion, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes of enforcing this Interim Order,

-74-

the DIP Loan Documents and all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Secured Parties and the Prepetition Secured Parties hereunder or thereunder.

32.     *Loss or Damage to Collateral.* The DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the Debtors (provided that nothing contained in this paragraph shall relieve the DIP Secured Parties from their commitments under the DIP Loan Documents, subject to the terms and conditions thereof).

33.     *Proofs of Claim.* The DIP Secured Parties, the Prepetition Secured Parties, and the Prepetition Convertible Noteholder shall not be required to file proofs of claim or request for payment of administrative expenses in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment in respect of the DIP Obligations, the Adequate Protection Obligations, the Prepetition Secured Obligations, or the Prepetition Convertible Note Obligations. The Debtors' Stipulations, acknowledgments and provisions of this Interim Order are deemed sufficient to and do constitute timely filed proofs of claim or request for payment of administrative expenses in respect of such claims arising under the DIP Obligations, the Adequate Protection Obligations, the Prepetition Secured Obligations and the Prepetition Convertible Note Obligations against each of the applicable Debtors. Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Chapter 11 Cases shall not apply to the DIP Secured Parties, the Prepetition Secured Parties, the DIP Obligations, the Prepetition Secured Obligations,

the Prepetition Convertible Note Obligations or the Prepetition Convertible Noteholder; provided, however, that, notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Agent (on behalf of itself or any of the DIP Lenders), at the direction of the Required DIP Lenders, the Prepetition JFO Facility Agent (on behalf of itself and the other Prepetition JFO Facility Secured Parties), the Prepetition ICO Bond Trustee (on behalf of itself and the Prepetition ICO Secured Bondholders), and the Prepetition Convertible Noteholders, in their discretion, may (but are not required to) file (and amend and/or supplement) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any Successor Cases, and any such proof of claim may (but is not required to be) filed as one consolidated master proof of claim in the Debtors' lead Chapter 11 Case against all of the DIP Loan Parties (or, in the case of the proof of claim field by the Prepetition Convertible Noteholder, the Prepetition Convertible Note Issuer), which shall be deemed to have been filed against each and every Debtor (or, in the case of the proof of claim field by the Prepetition Convertible Noteholder, the Prepetition Convertible Note Issuer). Such consolidated or master proofs of claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable party, which instruments, agreements or other documents will be provided upon reasonable written request to the DIP Agent (which shall be through delivery to the financial or legal advisors to the DIP Agent and the DIP Lenders), the Prepetition JFO Facility Agent, the Prepetition ICO Bond Trustee or the Prepetition Convertible Noteholders, as the case may be. Any proof of claim filed by or on behalf of any of the DIP Secured Parties or the Prepetition Secured Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons. The provisions set forth in this paragraph are intended solely for the purpose of administrative

convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

34.     *Limitation of Liability.* Nothing in this Interim Order, the DIP Loan Documents or any documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties, the Prepetition Secured Parties or the Prepetition Convertible Noteholder of any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the Debtors and their respective affiliates in the operation of their businesses, their restructuring efforts or in connection with the administration of the Chapter 11 Cases. In determining to make any loan or extension of credit, or permit the use of Cash Collateral, or in exercising any rights or remedies hereunder, under the DIP Loan Documents, the Prepetition Loan Documents or the Prepetition Convertible Note Documents, neither the DIP Secured Parties, the Prepetition Secured Parties nor the Prepetition Convertible Noteholder shall (a) be deemed to be in control of the operations of the Debtors, (b) owe any fiduciary duty to the Debtors or their creditors, shareholders or estates, or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S. §§ 9601 et seq., as amended, or any similar federal or state statute).

35.     *Prepetition Intercreditor Agreement.* Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Loan Documents (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (but not, for the avoidance of doubt, those of the DIP Secured

Parties), and (iii) shall not be deemed amended, altered or modified by the terms of this Interim Order, except, in each case, to the extent expressly set forth herein.

36.     *Payments Free and Clear.* Subject to the Carve-Out, any and all payments or proceeds remitted to the DIP Secured Parties or the Prepetition Secured Parties pursuant to the DIP Loan Documents, this Interim Order, the Final Order (if and when entered) or any subsequent order of this Court shall be irrevocable (subject, solely in the case of the payment of the Lender Fees and Expenses, only the procedures set forth in paragraph 11 of this Interim Order), received free and clear of any claim, charge, assessment or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the Debtors) (subject to paragraph 25 hereof), section 552(b) of the Bankruptcy Code (subject to paragraph 26 hereof) or otherwise.

37.     *Joint and Several Liability.* Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for all obligations (including all DIP Obligations and all Adequate Protection Obligations) under this Interim Order and the DIP Loan Documents.

38.     *Third Party Beneficiary.* Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

39.     *Interim Order Controls.* In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order and any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the DIP Loan Agreement or DIP Loan Documents, the terms and provisions of this Interim Order

shall govern and control. Notwithstanding anything contained in any other order entered by this Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Loan Documents, including, without limitation, the Approved DIP Budget (subject to Permitted Variances).

40.     *Effectiveness.* This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, any Bankruptcy Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

41.     *Bankruptcy Rules.*  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

42.     *Headings.*  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order. When used in this Interim Order, the word "including" shall not imply limitation.

43.     *Necessary Action.*  The Debtors are authorized to take any and all such actions as are necessary, required or appropriate to implement and effectuate the terms of this Interim Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder.

44.     *Retention of Jurisdiction.*  The Court retains jurisdiction to hear, determine and, if applicable, enforce the terms of any and all matters arising from or related to the DIP Facility, the DIP Loan Documents and this Interim Order, and the Court's jurisdiction shall survive

-79-

confirmation and consummation of any chapter 11 plan for any of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

45.    *Final Hearing.*   The Final Hearing shall be held on March 6, 2025 at 1 p.m. (prevailing Central Time), and any objections to the final relief sought in the Motion shall be filed with the Court no later than February 27, 2025 at 4:00 p.m. (prevailing Central Time) and served upon the following: (i) proposed counsel for the Debtors, Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Anthony Grossi, Esq. (agrossi@sidley.com) and Weiru Fang, Esq. (weiru.fang@sidley.com); (ii) counsel to any official committee appointed in the Chapter 11 Cases; (iii) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn: Jana Whitworth (jana.whitworth@usdoj.gov); and (iv) counsel to the DIP Agent and the Consenting Lenders, Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn: Erez Gilad, Esq. (erezgilad@paulhastings.com) and Alex Bongartz, Esq. (alexbongartz@paulhastings.com).  In the event no objections to entry of the Final Order on the Motion are timely received, the Court may enter such Final Order without need for the Final Hearing.

46.    *Notice of Entry of Interim Order.*  The Debtors shall promptly serve copies of this Interim Order to the parties that have been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Official Committee (if appointed).


Signed: _____

_____

UNITED STATES BANKRUPTCY JUDGE

-80-

**Exhibit 1**

**Draft DIP Loan Agreement**

*Execution Version*

**DATED _____ 2025**

**JERVOIS SUOMI HOLDING OY**
as the Company

AND

**MILLSTREET CREDIT FUND LP AND QIF FUND PLC – MERCER INVESTMENT FUND 1**
as Lenders

AND

**ACQUIOM AGENCY SERVICES LTD**
as Agent and Security Agent

---

**SUPPLEMENTAL DEED**

**amending and restating a
Facility Agreement originally dated 28 October 2021, as amended and/or amended and restated on 4 August 2022, 6 September 2024, 26 November 2024, and 31 December 2024**

---



REF: 071936-30040

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 2 |
| 2. | AMENDMENTS | 3 |
| 3. | DIP FACILITY COMMITMENTS | 3 |
| 4. | GUARANTEE AND SECURITY CONFIRMATIONS | 4 |
| 5. | REPRESENTATIONS AND WARRANTIES | 5 |
| 6. | WAIVER | 5 |
| 7. | CONTINUATION | 5 |
| 8. | FURTHER ASSURANCE | 6 |
| 9. | COSTS AND EXPENSES | 6 |
| 10. | GOVERNING LAW | 6 |
| 11. | ENFORCEMENT | 6 |
| 12. | DIP ORDER | 7 |

SCHEDULE 1 THE OBLIGORS ............................................. 8

SCHEDULE 2 CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ......................... 9

SCHEDULE 3 THE COMMITMENTS ................................................. 13

SCHEDULE 4 RESTATED FACILITY AGREEMENT ....................................... 14

SCHEDULE 5 SPECIFIED BUDGET DELIVERABLES ...................................... 1

**THIS SUPPLEMENTAL DEED** is dated _____ 2025 and made between:

(1)     **JERVOIS SUOMI HOLDING OY,** a company incorporated under the laws of Finland (the "**Company**");

(2)     **THE COMPANIES** listed in Schedule 1 (*The Obligors*) as original borrowers (the "**Original Borrowers**")

(3)     **THE COMPANIES** listed in Schedule 1 (*The Obligors*) as original guarantors (the "**Original Guarantors**" and, together with the Original Borrowers, the "**Obligors**");

(4)     **JERVOIS GLOBAL LIMITED,** a company registered in Australia with Australian Company Number 007 626 575 (the "**Parent Guarantor**");

(5)     **MILLSTREET CREDIT FUND LP AND QIF FUND PLC – MERCER INVESTMENT FUND 1**, as lenders (the "**Lenders**");

(6)     **ACQUIOM AGENCY SERVICES LTD**, as agent of the other Finance Parties (the "**Agent**"); and

(7)     **ACQUIOM AGENCY SERVICES LTD**, as security agent on behalf of the other Finance Parties (the "**Security Agent**").

**BACKGROUND:**

(A)     The Company, the Agent and the Security Agent (among others) are party to a facility agreement originally dated 28 October 2021 as amended or amended and restated from time to time prior to the date of this Supplemental Deed including most recently on 31 December 2024 (the "**Facility Agreement**") made between, among others, the Company, the Security Agent and the Agent.

(B)     On _____ 2025, the Company, the Parent Guarantor, the Obligors, and certain direct and indirect subsidiaries of the Parent Guarantor (each, a "**Debtor**", and collectively, the "**Debtors**") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") initiating cases under Title 11 of the United States Code (the "**Bankruptcy Code**") (collectively, the "**Chapter 11 Cases**"), and each Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(C)     The Company and the other Debtors have asked the Lenders to provide the Company with a senior secured super-priority priming debtor-in-possession term loan credit facility (the "**DIP Facility**") consisting of (a) $25,000,000 of "new money" delayed draw term loans and (b) $24,000,000 of "roll-up" term loans pursuant to which the DDTL Facility Loans previously funded under the DDTL Facility prior to the Fourth Restatement Effective Time will be "rolled up" and substituted and exchanged for the Roll-Up DIP Facility Loans (as defined in the Restated Facility Agreement (as defined below)) and automatically be deemed to be paid-off and discharged at such time.

(D)     The Lenders are willing to make the foregoing term loans available to the Company, subject to the terms and conditions set forth in this Supplemental Deed, the Restated

Facility Agreement, and the DIP Orders (as defined in the Restated Facility Agreement).

(E)    In furtherance of the agreements set forth above, the parties to this Supplemental Deed have agreed to enter into this Supplemental Deed for the purposes of, among other things, amending and restating the Facility Agreement in the form set out in Schedule 4 (*Restated Facility Agreement*) (the "**Restated Facility Agreement**"), including with respect to establishing the DIP Facility Commitments (as defined in the Restated Facility Agreement).

**IT IS AGREED** as follows:

**1.      DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**

Terms defined in the Restated Facility Agreement shall, unless otherwise defined in this Supplemental Deed or a contrary intention appears, bear the same meaning when used in this Supplemental Deed and the following terms shall have the following meanings:

"**Effective Date**" means the date on which the Effective Time occurs.

"**Effective Time**" means the time at which the Agent (acting at the direction of the Majority Lenders) confirms to the Company that it has received, or waived receipt of, each of the documents and evidence set out in Schedule 2 (*Conditions Precedent to the Effective Date*) in form and substance satisfactory to the Agent (acting on the instructions of the Lenders).

"**Fourth Restatement Budget**" has the meaning given to that term in Schedule 2 (*Conditions Precedent to the Effective Date*).

"**Initial Australian VA Budget**" has the meaning given to that term in Schedule 2 (*Conditions Precedent to the Effective Date*).

"**Specified Budget Deliverables**" has the meaning given to that term in Schedule 2 (*Conditions Precedent to the Effective Date*).

"**Specified Professional Fee Budget**" has the meaning given to that term in Schedule 2 (*Conditions Precedent to the Effective Date*).

"**Transaction Parties**" means the Obligors and the Parent Guarantor (each, a "**Transaction Party**").

1.2    **Interpretation**

The provisions of clause 1.2 (*Construction*) of the Restated Facility Agreement shall also apply to this Supplemental Deed but references to Clauses and Schedules are to clauses and schedules of this Supplemental Deed unless otherwise specified.

1.3 **Third Party Rights**

The provisions of clause 1.5 (*Third Party Rights*) of the Restated Facility Agreement shall apply to this Supplemental Deed.

1.4 **Effect as a Deed**

This Supplemental Deed is intended to take effect as a deed notwithstanding that the Security Agent, Agent and/or Lenders may have executed it under hand only.

## 2. AMENDMENTS

2.1 The Agent (acting at the direction of the Majority Lenders) will notify the Company promptly when the Effective Time occurs.

2.2 The Facility Agreement shall be amended and restated with effect from (and including) the Effective Time so that it reads as if it were restated in the form set out in Schedule 4 (*Restated Facility Agreement*) and so that the rights and obligations of the parties to this Supplemental Deed relating to their performance under the Facility Agreement from the Effective Time shall be governed by, and construed in accordance with, the terms of the Restated Facility Agreement.

2.3 The parties to this Supplemental Deed agree that, with effect from (and including) the Effective Time they shall have the rights and take on the obligations ascribed to them under the Restated Facility Agreement.

## 3. DIP FACILITY COMMITMENTS

3.1 With effect from (and including) the Effective Time, the Lenders agree to provide the DIP Facility Commitments and DIP Facility Loans (as defined in the Restated Facility Agreement) in accordance with and subject to the terms and conditions of the Restated Facility Agreement in an aggregate principal amount of up to $49,000,000 (forty-nine million US Dollars), which shall consist of $25,000,000 of New Money DIP Facility Commitments and $24,000,000 of Roll-Up DIP Facility Loans (in each case, as defined in the Restated Facility Agreement), and which shall be available for utilisation by the Company in accordance with and subject to the terms and conditions set out in this Agreement and in the Restated Facility Agreement.  For the avoidance of doubt, on and after the Effective Time, there are no outstanding DDTL Facility Commitments, which have been funded in full prior to the date hereof in an aggregate principal amount of $24,000,000 and otherwise terminated without any further action or notice.

3.2 With effect from (and including) the Effective Time, in accordance with Clause 2.2 (*AMENDMENTS*), the Lenders agree to commit the DIP Facility Commitments and assume all the rights and obligations of a DIP Facility Lender in relation to the DIP Facility Commitments and the Roll-Up DIP Facility Loans under the Restated Facility Agreement in accordance with, and subject to, the terms and conditions of the Restated Facility Agreement.

3.3 The Commitments under the Restated Facility Agreement shall be as set out in Schedule 3 (*The Commitments*) which represents the Total Commitments as at the Effective Date.

## 4.    GUARANTEE AND SECURITY CONFIRMATIONS

4.1    Each Transaction Party acknowledges that the Company shall apply all amounts borrowed by it under the DIP Facility towards only such purposes and uses in accordance with  clause 4.1.3 of the Restated Facility Agreement (or, in the case of the Roll-Up DIP Facility Loans, the repayment, replacement, and substitution of the existing DDTL Facility Loans on the terms and conditions of the Restated Facility Agreement) and that it shall accordingly derive a benefit from the establishment of the DIP Facility and the advance of the DIP Facility Loans thereunder.

4.2    Each Transaction Party:

(a)    agrees to the amendment and restatement of the Facility Agreement as contemplated by this Supplemental Deed; and

(b)    confirms that any guarantee or indemnity created or given by it under the Finance Documents (including under the Parent Guarantee and clause 19 (*Guarantee and Indemnity*) of the Restated Facility Agreement (as applicable)) will:

(i)    continue in full force and effect notwithstanding the amendments referred to in Clause 2 (*Amendments*), the occurrence and continuance of the Chapter 11 Cases and/or the Australian Proceedings, and the provision by the Lenders of the Commitments referred to in Clause 3 (*DIP Facility Commitments*); and

(ii)    extend to all liabilities and obligations of the Transaction Parties arising under the Finance Documents, including as amended by this Supplemental Deed, including, without limitation, to the DIP Facility Loans and any new obligations and/or future advances under the Restated Facility Agreement.

4.3    Each Transaction Party confirms that the Security created by the Transaction Security Document(s) to which that Transaction Party is a party shall:

(a)    remain in full force and effect notwithstanding the amendments referred to in Clause 2 (*Amendments*), the occurrence and continuance of the Chapter 11 Cases and/or the Australian Proceedings, and the provision by the Lenders of the Commitments referred to in Clause 3 (*DIP Facility Commitments*); and

(b)    continue to secure all of its Secured Obligations (as defined in the Transaction Security Document(s) to which it is a party) under the Finance Documents, including as amended by this Supplemental Deed (including, but not limited to, the DIP Facility Loans and any and all other liabilities and obligations under the Restated Facility Agreement and any and all obligations with respect to the Loans and any future advances or other extensions of credit from time to time under the Finance Documents).

## 5.    REPRESENTATIONS AND WARRANTIES

5.1    Each Obligor makes the Repeating Representations (as defined in the Restated Facility Agreement) as at the date of this Supplemental Deed, by reference to the facts and circumstances now existing as if references to the Finance Documents included references to this Supplemental Deed.

5.2    The Parent Guarantor makes each of the representations set out in clause 13 (*Representations and warranties*) of the Parent Guarantee (as defined in the Restated Facility Agreement, and in each case subject to the DIP Orders and Article 4.2 (*Qualifications to Representations*) of Schedule 13 (Additional *Provisions Relating to the Chapter 11* Cases *and Australian Proceeding*) of the Restated Facility Agreement) as at the date of this Supplemental Deed, by reference to the facts and circumstances now existing as if references to the Finance Documents included references to this Supplemental Deed.

## 6.    WAIVER

6.1    Subject to the terms and conditions set forth in this Supplemental Deed and the Restated Facility Agreement as well as the occurrence of the Effective Time, all of the Lenders (for the avoidance of doubt, in their respective capacities as Revolving Facility Lenders, DDTL Facility Lenders, and DIP Facility Lenders) agree to waive any Defaults and/or Events of Default on account of the initiation and continuance of the Chapter 11 Cases and the proposed Australian Proceedings and any requirement for any additional notice of prepayment of the DDTL Facility Loans in the manner contemplated by this Supplemental Deed and the Restated Facility Agreement.

6.2    Except for the waivers expressly granted pursuant to Clause 6.1 above, nothing in this Supplemental Deed shall constitute or  be construed as a waiver of any other breach, Default or Event of Default (whether past, present, or future) under the Facility Agreement, the Restated Facility Agreement or any other Finance Document.  Except as expressly waived herein, the Lenders reserve all rights and remedies under the Facility Agreement, the Restated Facility Agreement (with effect from the Effective Time), the Deed of Priority, the Finance Documents, and applicable law.

## 7.    CONTINUATION

7.1    This Supplemental Deed is supplemental to, and shall be construed as one with, the Facility Agreement.

7.2    Except as varied by the terms of this Supplemental Deed, the Facility Agreement will remain in full force and effect and any reference in the Facility Agreement to the Facility Agreement or to any provision of the Facility Agreement will be construed as a reference to the Facility Agreement, or that provision, as amended and restated by this Supplemental Deed.

7.3    The Agent and the Company hereby designate this Supplemental Deed as a Finance Document.

7.4    Except as otherwise provided in this Supplemental Deed, the Finance Documents remain in full force and effect.

8.    **FURTHER ASSURANCE**

Each Transaction Party agrees that it shall promptly, upon the request of the Agent, execute and deliver at its own expense any document and do any act or thing in order to confirm or establish the validity and enforceability of this Supplemental Deed.

9.    **COSTS AND EXPENSES**

Subject to the compensation procedures set forth in the DIP Orders, the Company shall promptly pay to each of the Finance Parties the amount of all costs and expenses (including legal fees) reasonably incurred by any of them in connection with the negotiation, preparation, printing, execution and completion of this Supplemental Deed, as well as any other documents, matters, and things in connection with the DIP Facility and the Chapter 11 Cases.

Without limiting the foregoing, no later than the date (the "**Specified Deadline**") that is two (2) Business Days after the Effective Date, the Company shall have paid in full in cash the reasonable and documented fees and expenses of the Agent, the Security Agent, and the Lender Advisors (as defined in the Interim DIP Order) and other counsel, financial advisors and other professionals of the Majority Lenders, the Agent, and the Security Agent (whether incurred before or after the Petition Date through the Effective Date), in each case, to the extent incurred and invoiced prior to the Effective Date. Failure to timely make such payments as referred to in this paragraph by the Specified Deadline as required under this Clause 9 (*Costs and Expenses*) shall constitute an immediate Event of Default under clause 25.1 (*Events of Default*) of the Restated Facility Agreement.

10.   **GOVERNING LAW**

10.1  Subject to the qualifications set forth in Clause 10.2 below and clause 43 (*Governing Law*) of the Restated Facility Agreement, this Supplemental Deed and any dispute or claim arising out of or in connection with it or its subject matter, existence, negotiation, validity, termination or enforceability (including any non-contractual disputes or claims) shall be governed by and construed in accordance with English law.

10.2  To the extent required to give effect to Clause 12, Clause 9 and 12 shall be governed by and construed in accordance with the laws of the state of New York.

10.3  Jervois Texas, LLC irrevocably accepts its appointment as agent for service that may be instituted in the United States of America arising out of or based on the Finance Documents governed by the laws of New York in respect of each Obligor that is not incorporated in the United States of America.

11.   **ENFORCEMENT**

The provisions of clause 44 (*Enforcement*) of the Restated Facility Agreement shall apply to this Supplemental Deed as though that clause were set out in this Supplemental Deed, but as if references in that clause to the Restated Facility Agreement were references to this Supplemental Deed.

12.   **DIP ORDER**

To the extent any specific provision hereof is inconsistent with the then-applicable DIP Order and/or the Australian Proceedings, including the DOCA (as defined in the Restated Facility Agreement), such DIP Order, the Australian Proceedings or the DOCA (with respect to the Australian Proceedings or the DOCA, solely with respect to the Australian Entities), as applicable, shall prevail.

**IN WITNESS** whereof this Supplemental Deed has been executed and delivered as a deed on the date first above written.

## SCHEDULE 1

## THE OBLIGORS

| Name of Original Borrower | Registration number (or equivalent, if any) Original Jurisdiction |
|---|---|
| Jervois Suomi Holding Oy | 3208692-9 |
| | Finland |
| Jervois Finland Oy | 3009512-7 |
| | Finland |

| Name of Original Guarantor | Registration number (or equivalent, if any) Original Jurisdiction |
|---|---|
| Jervois Suomi Holding Oy | 3208692-9 |
| | Finland |
| Jervois Finland Oy | 3009512-7 |
| | Finland |
| Jervois Americas LLC | N/A |
| | Delaware, United States |
| Jervois Japan Inc. | N/A |
| | Japan |
| Jervois Mining USA Limited | NV19881021843 |
| | Nevada, United States |
| Formation Holdings US, Inc. | 542958 |
| | Idaho, United States |
| Jervois Texas, LLC | 805863457 |
| | Texas, United States |

## SCHEDULE 2
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

1. **The Obligors**

   (a)  A copy of the constitutional documents of each Obligor and the Parent Guarantor.

   (b)  A copy of the resolutions of the board of directors or other applicable governing (or statutory) body of each Obligor and the Parent Guarantor:

   (i)  approving the terms of, and the transactions contemplated by, this Supplemental Deed and the Finance Documents to which it is a party and resolving that it execute this Supplemental Deed and the Finance Documents to which it is a party;

   (ii)  authorising a specified person or persons to execute this Supplemental Deed and the Finance Documents to which it is a party;

   (iii)  authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with this Supplemental Deed and the Finance Documents to which it is a party; and

   (iv)  in the case of each Obligor and the Parent Guarantor, other than in the case of the Company, authorising the Company to act as its agent in connection with the Finance Documents.

   (c)  A specimen signature of each person authorised by the resolution referred to in paragraph (b) above.

   (d)  If required under applicable law or practice or by its constitutional documents or any (related) contractual documents, a copy of a resolution signed by all the holders of the issued shares in each Obligor, approving the terms or, and the transactions contemplated by, the Finance Documents to which the Obligor is party.

   (e)  A certificate of each Obligor and the Parent Guarantor (signed by a director or an authorised signatory, as the case may be) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on it to be exceeded.

   (f)  A certificate of an authorised signatory of each Obligor and the Parent Guarantor certifying that each copy document relating to it specified in this Section 1 of this Schedule 2 is correct, complete and in full force and effect as at a date no earlier than the Effective Date.

2. **Finance Documents and other documents and matters**

   (a)  This Supplemental Deed executed by all original parties to it.

(b)     A copy of the following Transaction Security Documents executed by all parties to it:

| Name of Chargor | Transaction Security Document | Governing law of documents |
|---|---|---|
| Jervois Suomi Holding Oy and Jervois Finland Oy | Supplemental security assignment in favour of the Security Agent | England |
| Jervois Suomi Holding Oy, Jervois Finland Oy, and Jervois Japan Inc. | Acknowledgement and consent to the terms of the DIP Documents for Japanese Law Purposes | Japan |

(c)     A copy of all share certificates (if any), with endorsements in blank in relation to the shares subject to or expressed to be subject to the Transaction Security Documents and other documents to be provided under the Transaction Security Documents referred to in paragraph (b) above.

(d)     No Default or Event of Default shall have occurred or be continuing.

## 3.     Legal Opinions

(a)     An enforceability legal opinion of Paul Hastings LLP, legal advisers to the Lenders as to English law addressed to the Agent, the Security Agent and the Lenders.

(b)     A capacity legal opinion of Dittmar & Indrenius, legal advisers to the Lenders as to Finnish law addressed to the Agent, the Security Agent, and the Lenders.

(c)     An enforceability and capacity legal opinion of Sidley Austin LLP, legal advisers to the Borrowers as to Japanese law addressed to the Agent, the Security Agent, and the Lenders.

(d)     A capacity legal opinion of Sidley Austin LLP, legal advisers to the Borrower as to New York law addressed to the Agent, the Security Agent and the Lenders.

(e)     A legal opinion of Holland & Hart LLP, legal advisers to the Borrower as to Nevada and Idaho law addressed to the Agent, the Security Agent and the Lenders.

(f)     A capacity legal opinion of Squire Patton Boggs (AU), legal advisers to the Lenders as to Australian law addressed to the Agent, the Security Agent and the Lenders.

## 4.     Chapter 11 Filing Matters

(a)     (i) An updated 13 week cashflow forecast (as prepared by management of the Parent and approved by the chief financial officer of the Parent Guarantor) setting forth the anticipated receipts and disbursements for the rolling thirteen week period after the date of this Supplemental Deed, which shall be consistent with the form of the Initial Budget (such cashflow forecast, the "**Fourth**

10

Restatement Budget"), (ii) a Funding Summary Table completed with respect to proposed cash expenditures and uses by category and entity group as listed thereon, in each case, as most recently required to be delivered under the Facility Agreement, (iii) a professional fee and expense budget setting forth the anticipated disbursements of out-of-pocket Company Party Advisors Expenses for the period commencing the calendar week ending December 20, 2024 and with respect to the transactions contemplated by the Restructuring Support Agreement (as defined in the Restated Facility Agreement) through and including the calendar week ending May 2, 2025 (the "**Specified Professional Fee Budget**"), and (iv) the projected cash receipts expected to be collected, and necessary disbursements and expenditures expected to be incurred or made, solely by and solely on behalf of the Australian Entities for the period from and after the commencement of the Australian Proceedings through and including the Plan Effective Date (such budget referred to in this sub-clause (iv), the "**Initial Australian VA Budget**"), in each case of the foregoing sub-clauses (i)-(iv), which shall be in form and substance acceptable to the Majority Lenders and attached hereto as Schedule 5 (*Specified Budget Deliverables*) (other than the Specified Professional Fee Budget, which shall be separately delivered to the Agent and the Lenders) (collectively, the "**Specified Budget Deliverables**").

(b)     The Petition Date shall have occurred.

(c)     The Bankruptcy Court shall have entered the Interim DIP Order no later than two (2) calendar days after the Petition Date (or such longer period agreed to by the Majority Lenders), which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Lenders.

(d)     All first day motions filed by the Obligors on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Majority Lenders and subject to the approval rights set forth in the Restructuring Support Agreement.

(e)     No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases.

(f)     The Restructuring Support Agreement shall be in full force and effect, and no default, event of default or termination event shall have occurred or be continuing thereunder.

(g)     After giving effect to the amendment and restatement of the Facility Agreement on the Effective Date, no default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Obligors', the Parent Guarantor's, or any other Debtors' or their respective subsidiaries' debt instruments and other material agreements which, in the case of the Obligors, the Parent Guarantor's, or any other Debtors' debt instruments and other

11

material agreements, shall have occurred that would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis (and such exercise of remedies would not be subject to or otherwise restrained by the automatic stay as in effect under the Chapter 11 Cases) or would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect for which the applicable consents or waivers have not been obtained as of such date.

(h)     The DIP Secured Parties shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interest in, the Prepetition Collateral (as defined in the Restated Facility Agreement) (or assets that would otherwise constitute Prepetition Collateral) (solely to the extent perfection of such security is not legally possible under applicable law or required under the terms of the relevant Transaction Security Documents but where the perfection of such security is entirely under the control of the Security Agent (acting on the instructions of the relevant Lenders) for the purposes of enforcement of such security, subject to applicable law and the relevant Transaction Security Documents), and, to the extent permitted under applicable law and to the extent provided for under the Interim DIP Order, all other DIP Collateral (as defined in the Restated Facility Agreement), in each case, as set forth in and having the priorities set forth in the Interim DIP Order.

(i)     The Effective Date shall have occurred on or before the date that is two (2) Business Days after the entry of the Interim DIP Order unless the Majority Lenders consent to a later date.

(j)     The Company shall be, immediately before giving effect to such proposed Utilisation on the Effective Date and after giving pro forma effect thereto (including any substantially concurrent applications or disbursements of the proceeds of such proposed Utilisation), in compliance with clause 23.5 (Minimum Group Liquidity) of the Restated Facility Agreement.  The Agent and the Lenders shall have received a certificate signed by two directors or senior officers of the Parent certifying as to compliance with the same, together with reasonably detailed evidence in support thereof.

(k)     With respect to any proposed Utilisation, all such proposed use of proceeds or other funding shall be in compliance with Section 6.1(c) of Schedule 13 to the Restated Facility Agreement and clause 24.25.9 (Budget Reporting, Variance Testing, and Liquidity Certificates) of the Restated Facility Agreement.

**SCHEDULE 3**
**THE COMMITMENTS**

<u>Revolving Facility Commitments</u>

| Name of Fourth Restatement Effective Time Lender | Revolving Facility Commitment |
| --- | --- |
| Millstreet Credit Fund LP | $127,500,000 |
| Mercer QIF Fund PLC – Mercer Investment Fund 1 | $22,500,000 |
| | **Total: $150,000,000** |

<u>DDTL Facility Commitments</u>: Nil.

<u>DIP Facility Commitments</u>

| Name of Fourth Restatement Effective Time Lender | DIP Facility Commitments |
| --- | --- |
| Millstreet Credit Fund LP | $41,650,000, consisting of (a) $21,250,000 in New Money DIP Facility Commitments, and (b) $20,400,000 in Roll-Up DIP Facility Commitments |
| Mercer QIF Fund PLC – Mercer Investment Fund 1 | $7,350,000, consisting of (a) $3,750,000 in New Money DIP Facility Commitments, and (b) $3,600,000 in Roll-Up DIP Facility Commitments |
| | **Total: $49,000,000** |

13

**SCHEDULE 4**
**RESTATED FACILITY AGREEMENT**

**SCHEDULE 5**
**SPECIFIED BUDGET DELIVERABLES**

## SIGNATORIES TO THE SUPPLEMENTAL DEED

**The Company**

**EXECUTED AS A DEED** by
**JERVOIS SUOMI HOLDING OY**
(as the Company) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


.............................................................

Name: Bryce Crocker

Title: Chairman

*[Signature page to the Supplemental Deed]*

**The Original Borrowers**

**EXECUTED AS A DEED** by
**JERVOIS SUOMI HOLDING OY**
(as Original Borrower) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


............................................................

Name: Bryce Crocker

Title: Chairman

*[Signature page to the Supplemental Deed]*

**EXECUTED AS A DEED** by
**JERVOIS FINLAND OY**
(as the Original Borrower) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


..............................................................

Name: Bryce Crocker

Title: Chairman

*[Signature page to the Supplemental Deed]*

**The Original Guarantors**

**EXECUTED AS A DEED** by
**JERVOIS SUOMI HOLDING OY**
(as the Original Guarantor) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


.............................................................

Name: Bryce Crocker

Title: Chairman

*[Signature page to the Supplemental Deed]*

**EXECUTED AS A DEED** by
**JERVOIS FINLAND OY**
(as the Original Guarantor) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


............................................................

Name: Bryce Crocker

Title: Chairman

*[Signature page to the Supplemental Deed]*

**EXECUTED AS A DEED** by
**JERVOIS AMERICAS LLC**
(as the Original Guarantor) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


............................................................

Name: Bryce Crocker

Title: Chief Executive Officer

*[Signature page to the Supplemental Deed]*

**EXECUTED AS A DEED** by
**JERVOIS JAPAN INC.**
(as the Original Guarantor) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


............................................................

Name: Bryce Crocker

Title: Director

*[Signature page to the Supplemental Deed]*

**EXECUTED AS A DEED** by
**JERVOIS MINING USA LIMITED**
(as the Original Guarantor) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


............................................................

Name: Bryce Crocker

Title:   Director

*[Signature page to the Supplemental Deed]*

**EXECUTED AS A DEED** by
**FORMATION HOLDINGS US, INC.**
(as the Original Guarantor) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


.............................................................

Name: Bryce Crocker

Title:   Director

*[Signature page to the Supplemental Deed]*

**EXECUTED AS A DEED** by
**JERVOIS TEXAS, LLC**
(as the Original Guarantor) acting by a person who
in accordance with the laws of its jurisdiction
of incorporation is acting under the authority
of the company


.............................................................

Name: Bryce Crocker

Title:   Chief Executive Officer

*[Signature page to the Supplemental Deed]*

**The Parent Guarantor**

Executed as a deed by **JERVOIS
GLOBAL LIMITED ACN 007 626 575** in
accordance with section 127 of the
*Corporations Act 2001* (Cth)


_____          _____
Signature of director                        Signature of director / secretary


_____          _____
Name of director (*print*)                   Name of director / secretary (*print*)


*[Signature page to the Supplemental Deed]*

**The Lenders**

| | | |
|---|---|---|
| Signed by: | ) | |
| **MERCER QIF FUND PLC** | ) | |
| **– MERCER INVESTMENT FUND 1** | ) | |
| by: Millstreet Capital Management LLC, its | ) | |
| Sub-Investment Manager | ) | |
| | ) | |
| acting by | ) | |
| Name: Craig M. Kelleher | | |
| Title: Managing Member ................... | ) | .................................................. |
| | ) | Authorised Signatory |

| | | |
|---|---|---|
| Signed by: | ) | |
| **Millstreet Credit Fund LP** | ) | |
| by: Millstreet Capital Management LLC, its | ) | |
| General Partner | ) | |
| | ) | |
| acting by | ) | |
| Name: Craig M. Kelleher | | |
| Title: Managing Member ................... | ) | .................................................. |
| | ) | Authorised Signatory |

*[Signature page to the Supplemental Deed]*

**<u>The Agent</u>**

Signed by:                                          )
**ACQUIOM AGENCY SERVICES LTD**   )
acting by                                            )
Name:
Title:   Authorised Signatory..............      )            ................................................
                                                        )            Authorised Signatory

*[Signature page to the Supplemental Deed]*

**The Security Agent**

Signed by:                                                )
**ACQUIOM AGENCY SERVICES LTD**  )
acting by                                                 )
Name:
Title:   Authorised Signatory..............        )        .................................................
                                                          )        Authorised Signatory

*Restated Facility Agreement*

**DATED 28 October 2021**

## RESTATED FACILITY AGREEMENT

**JERVOIS SUOMI HOLDING OY**
as the Company

AND

**THE FINANCIAL INSTITUTIONS listed in Part B of Schedule 1**
as 2024 Effective Time Lenders

AND

**ACQUIOM AGENCY SERVICES LTD**
as Agent and Security Agent

---

**UP TO $150,000,000 SECURED REVOLVING CREDIT
FACILITY AGREEMENT dated 28 October 2021 as
amended and restated pursuant to a supplemental deed
dated 4 August 2022, 6 September 2024, 26 November 2024,
31 December 2024 and _____ 2025**

---

# CONTENTS

**Clause**                                                                                           **Page**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | THE FACILITIES | 42 |
| 3. | ACCORDION INCREASE | 46 |
| 4. | PURPOSE | 52 |
| 5. | CONDITIONS OF UTILISATION | 53 |
| 6. | UTILISATION | 55 |
| 7. | REPAYMENT | 56 |
| 8. | PREPAYMENT AND CANCELLATION | 59 |
| 9. | [INTENTIONALLY BLANK] | 63 |
| 10. | INTEREST | 63 |
| 11. | INTEREST PERIODS | 65 |
| 12. | CHANGES TO THE CALCULATION OF INTEREST | 66 |
| 13. | FEES | 67 |
| 14. | TAX GROSS-UP AND INDEMNITIES | 69 |
| 15. | INCREASED COSTS | 74 |
| 16. | OTHER INDEMNITIES | 75 |
| 17. | MITIGATION BY THE LENDERS | 77 |
| 18. | COSTS AND EXPENSES | 78 |
| 19. | GUARANTEE AND INDEMNITY | 79 |
| 20. | REPRESENTATIONS | 82 |
| 21. | INFORMATION UNDERTAKINGS | 90 |
| 22. | COLLATERAL VALUE | 94 |
| 23. | FINANCIAL COVENANTS | 99 |
| 24. | GENERAL UNDERTAKINGS | 103 |
| 25. | EVENTS OF DEFAULT | 120 |

26. CHANGES TO THE LENDERS ................................................................. 126

27. CHANGES TO THE OBLIGORS ............................................................. 133

28. ROLE OF THE AGENT ......................................................................... 135

29. THE SECURITY AGENT ....................................................................... 145

30. CONDUCT OF BUSINESS BY THE FINANCE PARTIES ................................... 161

31. SHARING AMONG THE FINANCE PARTIES ..................................................... 161

32. PAYMENT MECHANICS ....................................................................... 162

33. SET-OFF ............................................................................................. 167

34. NOTICES ............................................................................................ 167

35. CALCULATIONS AND CERTIFICATES ............................................... 170

36. PARTIAL INVALIDITY ........................................................................ 170

37. REMEDIES AND WAIVERS .................................................................. 171

38. AMENDMENTS AND WAIVERS .......................................................... 171

39. CONFIDENTIAL INFORMATION ......................................................... 179

40. CONFIDENTIALITY OF FUNDING RATES .......................................... 183

41. BAIL-IN .............................................................................................. 185

42. COUNTERPARTS ................................................................................. 187

43. GOVERNING LAW ............................................................................... 187

44. ENFORCEMENT .................................................................................. 187

45. REFINANCING .................................................................................... 189

SCHEDULE 1 THE ORIGINAL PARTIES ........................................................ 190

PART A THE ORIGINAL OBLIGORS ............................................................. 190

PART B THE 2024 EFFECTIVE TIME LENDERS ............................................ 191

SCHEDULE 2 CONDITIONS PRECEDENT ..................................................... 192

PART A CONDITIONS PRECEDENT TO INITIAL UTILISATION ............................... 192

PART B CONDITIONS PRECEDENT REQUIRED TO BE DELIVERED BY AN
ADDITIONAL OBLIGOR ....................................................... 195

SCHEDULE 3 REQUESTS AND NOTICES ......................................................... 197

PART A UTILISATION REQUEST ................................................................... 197

PART B SELECTION NOTICE ......................................................................... 199

SCHEDULE 4 FORM OF TRANSFER CERTIFICATE ...................................... 200

SCHEDULE 5 FORM OF ASSIGNMENT AGREEMENT.................................. 203

SCHEDULE 6 FORM OF ACCESSION DEED .................................................. 206

SCHEDULE 7 FORM OF RESIGNATION LETTER ......................................... 208

SCHEDULE 8 ACCORDION INCREASE .......................................................... 209

PART A FORM OF ACCORDION INCREASE NOTICE ................................... 209

PART B FORM OF ACCORDION INCREASE LENDER CERTIFICATE ...................... 212

PART C FORM OF ACCORDION INCREASE REQUEST................................. 213

SCHEDULE 9 FORM OF COMPLIANCE CERTIFICATE................................. 214

SCHEDULE 10 TIMETABLES........................................................................... 215

SCHEDULE 11 FORM OF INCREASE CONFIRMATION ............................... 216

SCHEDULE 12 FORM OF FUNDING SUMMARY TABLE............................. 219

SCHEDULE 13 ADDITIONAL PROVISIONS RELATING TO THE CHAPTER 11 CASES AND AUSTRALIAN PROCEEDING .................................................... 220

**THIS AGREEMENT** is dated 28 October 2021 as amended and/or amended and restated pursuant to the 2022 Amendment and Restatement Agreement, the 2024 Amendment and Restatement Agreement, the Third Amendment and Restatement Agreement, the December 2024 Supplemental Deed and the Fourth Amendment and Restatement Agreement, each (as defined below) and made between:

(1)     **JERVOIS SUOMI HOLDING OY**, a company incorporated under the laws of Finland (as the **"Company"**);

(2)     **THE COMPANIES** listed in Part A of Schedule 1 (*The Original Parties*) as original borrowers (the **"Original Borrowers"**);

(3)     **THE COMPANIES** listed in Part A of Schedule 1 (*The Original Parties*) as original guarantors (the **"Original Guarantors"**);

(4)     **THE FINANCIAL INSTITUTIONS** listed in Part B of Schedule 1 (*The Original Parties*) as lender (the **"2024 Effective Time Lenders"**);

(5)     **ACQUIOM AGENCY SERVICES LTD**, as agent of the other Finance Parties (the **"Agent"**); and

(6)     **ACQUIOM AGENCY SERVICES LTD**, as security agent on behalf of the Finance Parties (the **"Security Agent"**).

**IT IS AGREED** as follows:

1.      **DEFINITIONS AND INTERPRETATION**

1.1     **Definitions**

In this Agreement:

**"2022 Amendment and Restatement Agreement"** means the amendment and restatement agreement dated 4 August 2022 relating to this Agreement between, among others, the Company and the Agent.

**"2024 Amendment and Restatement Agreement"** means the amendment and restatement agreement dated 6 September 2024 relating to this Agreement between, among others, the Company and the Agent.

**"2024 August Waiver Letter"** means that certain Waiver Letter dated 20 August 2024 between the Agent and the Company.

**"2024 Conditions Subsequent Transaction Security Documents"** has the meaning given to that term in Clause 24.24.2 (*2024 Effective Time Conditions Subsequent*).

**"2024 Effective Time"** has the meaning given to the term "Effective Time" in the 2024 Amendment and Restatement Agreement.

**"Acceptable Bank"** means a bank or financial institution which has a rating for its long-term unsecured and non-credit-enhanced debt obligations of A- or higher by Standard & Poor's Rating Services or Fitch Ratings Ltd or A3 or higher by Moody's

Investors Service Limited or a comparable rating from an internationally recognised credit rating agency.

"**Accession Deed**" means a document substantially in the form set out in Schedule 6 (*Form of Accession Deed*).

"**Accordion Increase**" means any increase in Commitments made available under this Agreement as described in Clause 3 (*Accordion Increase*).

"**Accordion Increase Commitment**" means, in relation to a Lender which is an Accordion Increase Lender, the amount set opposite its name under the heading "Accordion Increase Commitment" in the Accordion Increase Notice.

"**Accordion Increase Lender**" means, in relation to an Accordion Increase, any entity which is listed as such in the relevant Accordion Increase Notice.

"**Accordion Increase Lender Certificate**" means a document substantially in the form set out in Part B of Schedule 8 (*Form of Accordion Increase Lender Certificate*).

"**Accordion Increase Notice**" means a notice substantially in the form set out in Part A of Schedule 8 (*Form of Accordion Increase Notice*).

"**Accordion Increase Proposal**" has the meaning given to that term in Clause 3.1 (*Selection of Accordion Increase Lenders*).

"**Account Bank**" means Danske Bank (including any of its Subsidiaries and other Affiliates) in its capacity as initial account bank in relation to the Collection Accounts or any other reputable international bank that the Company and the Agent agree may act as account bank.

"**Accounting Principles**" means generally accepted accounting principles in the jurisdiction of incorporation or establishment of the relevant member of the Group, including IFRS.

"**Additional Borrower**" means a company which becomes an Additional Borrower in accordance with Clause 27 (*Changes to the Obligors*).

"**Additional Guarantor**" means a company which becomes an Additional Guarantor in accordance with Clause 27 (*Changes to the Obligors*).

"**Additional Obligor**" means an Additional Borrower or an Additional Guarantor.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Anti-Corruption Law**" means the Bribery Act 2010, the United States Foreign Corrupt Practices Act of 1977 and any similar laws or regulations in any jurisdiction relating to bribery, corruption or any similar practices.

"**Applicable Variance Periods**" has the meaning given to that term in Clause 24.25.3 (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

"**Approved Australian VA Budget**" means the Initial Australian VA Budget, at all times, until superseded by an Updated Australian VA Budget that receives all approvals required pursuant to the terms hereof.  For the avoidance of doubt, any and all Approved Australian VA Budgets must include and reflect, without limitation, the applicable budgeted payments and disbursements for such period on account of fees and expenses of legal counsel, financial and other advisors, and other professionals of the Australian Entities and the VA Administrators with respect to the Australian Proceedings.

"**Approved Budget**" means the Initial Budget (or with respect to the period on and after 28 January 2025, the thirteen week cash flow projection delivered to the Agent by the Company as part of the Specified Budget Deliverables (as defined in the Fourth Amendment and Restatement Agreement)), at all times, until superseded by an Updated Budget that receives all approvals required pursuant to the terms hereof. For the avoidance of doubt, any and all Approved Budgets must include and reflect, without limitation, the applicable budgeted payments and disbursements for such period on account of fees and expenses of legal counsel, financial and other advisors, and other professionals, as set forth in the Specified Professional Fee Budget.

"**Approved Location**" means Finland, the United States, Japan and any other location designated as an "Approved Location" by the Company and the Agent.

"**Assignment Agreement**" means an agreement substantially in the form set out in Schedule 5 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee.

"**Australian Corporations Act**" means the *Corporations Act 2001* (Cth).

"**Australian Disbursement Variance**" has the meaning given to that term in Clause 24.25.9(B) (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

"**Australian Entities**" means the Parent, Goldpride Pty Ltd, Hardrock Exploration Pty Ltd, Nico Young Pty Ltd, TZ Nico (1) Pty Ltd, and TZ Nico (2) Pty Ltd.

"**Australian Law Security Agreements**" means each of:

(a)     the Victorian law general security deed dated on or about the date of the 2024 Amendment and Restatement Agreement and made between the Parent as grantor and the Security Agent as security agent; and

(b)     the Victorian law intercompany loan security deed dated on or about the date of the 2024 Amendment and Restatement Agreement and made between the Parent as grantor, Formation Holdings US, Inc. as counterparty and the Security Agent as security agent over the Secured Contracts (defined therein).

"**Australian Proceedings**" has the meaning specified in Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means:

3

(a)    in relation to the Revolving Facility, the period from and including the date of this Agreement to and including the date falling immediately prior to the Petition Date;

(b)    in relation to the DDTL Facility, the period from and including the date of this Agreement to and including the date falling immediately prior to the Petition Date; and

(c)    in relation to the DIP Facility, the period from and including the Fourth Restatement Effective Time to the earliest of (i) 30 April 2025, (ii) the occurrence of an Event of Default, and the termination of all unfunded DIP Facility Commitments (if any) in accordance with the terms hereof, (iii) the closing of a sale of all or substantially all of the assets or equity interests of the Obligors, and (iv) the occurrence of the effective date of a chapter 11 plan for any of the Obligors.

**"Available Commitment"** means a Lender's Commitment under a Facility minus:

(a)    the amount of its participation in any outstanding Loans under that Facility; and

(b)    in relation to any proposed Utilisation under a Facility, the amount of its participation in any Loans that are due to be made on or before the proposed Utilisation Date under that Facility,

other than that Lender's participation in any Loans under the relevant Facility that are due to be repaid or prepaid on or before the proposed Utilisation Date.

**"Available Facility"** means the aggregate for the time being of each Lender's Available Commitment in respect of that applicable Facility, as the context may require.

"**Bankruptcy Court**" has the meaning specified in Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

**"Bi-Weekly Applicable Variance Periods"** has the meaning given to that term in Clause 24.25.3 (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

**"Book Value"** has the meaning given to that term in Clause 22 (*Collateral value*).

**"Borrower"** means an Original Borrower or an Additional Borrower.

**"Break Costs"** means the amount (if any) by which:

(a)    the interest excluding the Margin which a Lender should have received for the period from the date of receipt of all or any part of its participation in a Loan or Unpaid Sum in that currency to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

        exceeds:

(b)    the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a

leading bank for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

**"Business Day"** means a day (other than a Saturday or Sunday) on which banks are open for general business in Helsinki, London, New York and, in relation to the fixing of an interest rate, which is a US Government Securities Business Day.

**"Buyer"** means each person who purchases Inventory from an Obligor under a Sales Contract.

"**Chapter 11 Cases**" has the meaning given to that term in Schedule 13 (*Additional Provisions Relating to the Cases Under Chapter 11 and Australian Proceeding*).

**"Charged Property"** means all of the assets of the Obligors which from time to time are, or are expressed to be, the subject of the Transaction Security, including pursuant to this Agreement, the Interim DIP Order, and/or the Final DIP Order.

**"Code"** means the US Internal Revenue Code of 1986.

**"Collateral Value"** has the meaning given to that term in Clause 22 (*Collateral value*).

**"Collateral Value Report"** has the meaning given to that term Clause 22 (*Collateral value*).

**"Collection Account"** means each of the following accounts of the Obligors held from time to time with an Account Bank:

(a)     the account denominated in EUR with account number 843157-10015802, IBAN FI37 8431 5710 0158 02, and SWIFT DABAFIHH held with Danske Bank Ltd.;

(b)     the account denominated in USD with account number 843157-10015828, IBAN FI14 8431 5710 0158 28 and SWIFT DABAFIHH held with Danske Bank Ltd.;

(c)     the account denominated in GBP with account number 843157-10015836, IBAN FI89 8431 5710 0158 36 and SWIFT DABAFIHH held with Danske Bank Ltd.;

(d)     the account denominated in EUR with account number 843157-10012981, IBAN FI59 8431 5710 0129 81 and SWIFT DABAFIHH held with Danske Bank Ltd.;

(e)     the account denominated in USD with account number 843157-10013088, IBAN FI80 8431 5710 0130 88 and SWIFT DABAFIHH held with Danske Bank Ltd.; and

(f)     any other account of an Obligor approved by the Security Agent; and

which are, in each case, subject to the Transaction Security, as the same may be re-designated, substituted or replaced from time to time and includes any interest of any Obligor in any replacement account or any sub-division or sub-account of that account.

**"Collection Account Required Balance"** means, at any time, the aggregate of:

(a)     an amount equal to 10% of the Outstandings at that time; and

(b)     any amounts paid into the Collection Accounts in accordance with Clause 8.3 (*Mandatory Prepayment - Maximum Available Amount*), to the extent a Shortfall (as defined in Clause 8.3) would occur if any such amounts were to be withdrawn from the Collection Accounts.

"**Commitment**" means a Revolving Facility Commitment, a DDTL Facility Commitment, and/or DIP Facility Commitment.

**"Compliance Certificate"** means a certificate substantially in the form set out in Schedule 9 (*Form of Compliance Certificate*).

**"Confidential Information"** means all information relating to the Company, the Parent, any Obligor, the Group, the Transaction Documents or the Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or the Facility from either:

(a)     any member of the Parent Group or any of its advisers; or

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Parent Group or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes:

(i)     information that:

(A)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 39 (*Confidential Information*); or

(B)     is identified in writing at the time of delivery as non-confidential by any member of the Parent Group or any of its advisers; or

(C)     is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the Parent Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality; and

(ii)     any Funding Rate.

6

**"Confidentiality Undertaking"** means a confidentiality undertaking substantially in a recommended form of the LMA or in any other form agreed between the Company and the Agent.

**"Credit Adjustment Spread"** means, in respect of any Loan with an Interest Period of:

(a)     one month or less, 0.11448%;

(b)     two months or less but greater than one month, 0.18456%;

(c)     three months or less but greater than two months, 0.26161%; and

(d)     six months or less but greater than three months, 0.42826%.

**"Cumulative Applicable Australian Variance Periods"** has the meaning given to that term in Clause 24.25.9(B) (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

**"Cumulative Applicable Variance Periods"** has the meaning given to that term in Clause 24.25.3 (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

"**DDTL Facility**" means the delayed draw term loan facility originally made available pursuant to the 2024 Amendment and Restatement Agreement and previously funded in full pursuant to this Agreement prior to the Fourth Restatement Effective Time.

"**DDTL Facility Commitment**" means:

(a)     in relation to DDTL Facility Lender as at the Fourth Restatement Effective Time, the amount set opposite its name under the heading "DDTL Facility Commitment" in Schedule 3 to the Fourth Amendment and Restatement Agreement and the amount of any other DDTL Facility Commitment transferred to it under this Agreement or assumed by it in accordance with Clause 2.2 (*Increase*) or 2.3 (*Accordion Increase*);

(b)     in relation to any other Lender, the amount of any DDTL Facility Commitment transferred to it under this Agreement or assumed by it in accordance with Clause 2.2 (*Increase*) or 2.3 (*Accordion Increase*),

to the extent not cancelled, reduced or transferred by it under this Agreement.

"**DDTL Facility Lender**" means any Lender which has a DDTL Facility Loan.

"**DDTL Facility Loan**" means a loan made under the DDTL Facility or the principal amount outstanding for the time being of that loan.

"**December 2024 Supplemental Deed**" means the supplemental deed dated 31 December 2024 relating to this Agreement between, among others, the Company, the Agent and the Security Agent.

**"Declared Default"** means the giving of a notice by the Agent under Clause 25.27.2 or Clause 25.27.3.

"**Deed of Priority**" means the deed of priority entered into, among others, the Company and the Security Agent dated on or about the date of the 2024 Amendment and Restatement Agreement.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 25 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Defaulting Lender**" means any Lender:

(a)     which has failed to make its participation in a Utilisation available (or has notified the Agent or the Company (which has notified the Agent) that it will not make its participation in a Loan available) by the Utilisation Date of that Loan in accordance with Clause 6.4 (*Lenders' participation*);

(b)     which has otherwise rescinded or repudiated a Finance Document; or

(c)     with respect to which an Insolvency Event has occurred and is continuing,

unless, in the case of paragraph (a) above:

(i)     its failure to pay is caused by:

(A)     administrative or technical error; or

(B)     a Disruption Event, and

payment is made within three Business Days of its due date; or

(ii)     the Lender is disputing in good faith whether it is contractually obliged to make the payment in question.

"**Delegate**" means any delegate, agent, attorney or co-trustee appointed by the Security Agent.

"**Designated Non-Obligors**" means each of the following members of the Parent Group as at the Fourth Restatement Effective Time:

(a)     Hardrock Exploration Pty Ltd;

(b)     Goldpride Pty Ltd;

(c)     TZ Nico (1) Pty Ltd;

(d)     TZ Nico (2) Pty Ltd;

(e)     Tanzania Nickel Cobalt Ltd;

(f)     Millennial Holding Corp;

(g)     Minera Terranova S.A. de C.V.;

8

(h)     1126302 B.C. Limited;

(i)     Eurasian Capital Limited;

(j)     Jervois Europe GmbH;

(k)     Jervois Trading (Shanghai) Ltd; and

(l)     Coronation Mines Ltd.

"**DIP Commitment Premium**" has the meaning specified in Clause 13.1.6 (*Commitment and other Fees*).

"**DIP Facility**" means the senior secured super-priority priming debtor-in-possession term loan credit facility, as made available under this Agreement as described in Clause 2.1.3 (the *Facilities*) and subject to the terms and conditions of the applicable DIP Orders, and shall reflect the New Money DIP Facility  Commitments, the New Money DIP Facility  Loans, the Roll-up DIP Facility Commitments and/or Roll-up DIP Facility Loans, as the context may require.

"**DIP Facility Commitment**" means a New Money DIP Facility Commitment and/or a  Roll-up DIP Facility Commitment, as the context may require.

"**DIP Facility Lender**" means any Lender which has a DIP Facility Commitment or a DIP Facility Loan, and shall include any New Money DIP Facility Lender and/or any Roll-Up DIP Facility Lender, as the context may require.

"**DIP Facility Loan**" means a loan made or to be made under the DIP Facility or the principal amount outstanding for the time being of that loan, and shall include the New Money DIP Facility Loans and/or Roll-Up DIP Facility Loans, as the context may require.

"**DIP Orders**" means, collectively and individually as the context may require, the Interim DIP Order and the Final DIP Order.

"**DIP Secured Parties**" has the meaning specified in Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

"**DIP Unused Commitment Fee**" has the meaning specified in Clause 13.1.4 (*Commitment and other Fees*).

"**Disbursement Variance**" has the meaning given to that term in Clause 24.25.3 (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

"**Disruption Event**" means either or both of:

(a)     a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facilities (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b) the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

  (i) from performing its payment obligations under the Finance Documents; or

  (ii) from communicating with other Parties in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

"**DOCA Funds**" means the aggregate of the amounts described in Clause 4.1.3(B)(1) and (2) (*Purpose*).

"**Eligible Institution**" means any Lender or other bank, financial institution, trust, fund or other entity selected by the Company and which, in each case, is not a member of the Group or an Affiliate of any member of the Group.

"**Eligible Inventory**" has the meaning given to that term in Clause 22 (*Collateral value*).

"**Eligible Receivables**" has the meaning given to that term in Clause 22 (*Collateral value*).

"**English Security Assignment**" means the English law security assignment dated 3 November 2021 between (1) the Borrowers and (2) the Security Agent in relation to the Key Agreements, as supplemented by an English law supplemental security assignment in respect of the same assets and dated on or about the date of the 2024 Amendment and Restatement Agreement, and further supplemented by and English law supplemental security assignment in respect of the same assets and dated on or about the date of the Third Amendment and Restatement Agreement, in each case, between (1) the Borrowers and (2) the Security Agent.

"**Environment**" means humans, animals, plants and all other living organisms including the ecological systems of which they form part and the following media:

(a) air (including, without limitation, air within natural or man-made structures, whether above or below ground);

(b) water (including, without limitation, territorial, coastal and inland waters, water under or within land and water in drains and sewers); and

(c) land (including, without limitation, land under water).

"**Environmental Claim**" means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law.

"**Environmental Law**" means any applicable law or regulation binding upon a member of the Group which relates to:

(a)     the pollution or protection of the Environment;

(b)     the conditions of the workplace; or

(c)     the generation, handling, storage, use, release or spillage of any substance which, alone or in combination with any other, is capable of causing harm to the Environment, including, without limitation, any waste.

"**Environmental Permits**" means any permit and other Authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any member of the Group conducted on or from the properties owned or used by any member of the Group.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**Establishment Date**" means, in relation to the Accordion Increase, the later of:

(a)     the proposed Establishment Date specified in the Accordion Increase Notice; and

(b)     the date on which the Agent executes the Accordion Increase Notice.

"**Event of Default**" means any event or circumstance specified as such in Clause 25 (*Events of Default*) and, for purposes of clarity, Article 7 (*Events of Default and Remedies*) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

"**Exit Commitment Premium**" has the meaning specified in Clause 13.1.7 (*Commitment and other Fees*).

"**Facility**" means each of the DDTL Facility, the Revolving Facility, and/or the DIP Facility.

"**Facility Office**" means

(a)     in respect of a Lender, the office or offices notified by that Lender to the Agent in writing on or before the date it becomes a Lender (or, following that date, by not less than five Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement; or

(b)     in respect of any other Finance Party, the office in the jurisdiction in which it is resident for tax purposes.

"**FATCA**" means:

(a)     sections 1471 to 1474 of the Code or any associated regulations;

11

(b)    any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)    any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"**FATCA Application Date**" means:

(a)    in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014; or

(b)    in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraph (a) above, the first date from which such payment may become subject to a deduction or withholding required by FATCA.

"**FATCA Deduction**" means a deduction or withholding from a payment under a Finance Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**Fee Letter**" means:

(a)    any letter or letters dated on or about the date of this Agreement between the Company and any Finance Party setting out any of the fees referred to in Clause 13 (*Fees*); and

(b)    any agreement setting out fees payable to a Finance Party referred to in Clause 2.2 (*Increase*).

"**Final DIP Order**" has the meaning given to that term in Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

"**Final Maturity Date**" means:

(a)    in relation to the Revolving Facility, 30 April 2025;

(b)    in relation to the DDTL Facility, 30 April 2025; and

(c)    in relation to the DIP Facility, 30 April 2025.

"**Finance Document**" means this Agreement, the 2022 Amendment and Restatement Agreement, the 2024 Amendment and Restatement Agreement, the Third Amendment and Restatement Agreement, the December 2024 Supplemental Deed, the Fourth Amendment and Restatement Agreement, the Parent Guarantee, the Deed of Priority, the Subordination Deed, any Fee Letter, each Transaction Security Document, the DIP Orders, any Accession Deed, any VA Accession Deed, any Resignation Letter, each

Report, each Compliance Certificate, each Utilisation Request, the Accordion Increase Notice, any Accordion Increase Lender Certificate, any Accordion Increase Lender Certificate, any Selection Notice, the 2024 August Waiver Letter, and any other document designated as such by the Agent and the Company.

**"Finance Lease"** means any lease or hire purchase contract, a liability under which would, in accordance with the Accounting Principles, be treated as a balance sheet liability (other than a lease or hire purchase contract which would, in accordance with the Accounting Principles in force prior to 1 January 2019, have been treated as an operating lease).

**"Finance Party"** means the Agent, the Security Agent, or a Lender.

**"Financial Indebtedness"** means any indebtedness for or in respect of:

(a)     moneys borrowed (and debit balances at banks or other financial institutions);

(b)     any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with the Accounting Principles, be capitalised as an asset and booked as a corresponding liability in the balance sheet;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis provided that the requirements for de-recognition under the Accounting Principles are met);

(f)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that derivative transaction, that amount) shall be taken into account);

(g)     any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution;

(h)     any amount raised by the issue of redeemable shares which are redeemable (other than at the option of the issuer) before the Final Maturity Date or are otherwise classified as borrowings under the Accounting Principles;

(i)     any amount of any liability under an advance or deferred purchase agreement, if (i) the primary reason behind entering into the agreement is to raise finance or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 120 calendar days after the date of supply;

(j)     any amount raised under any other transaction (including any forward sale or purchase agreement) of a type not referred to in any other paragraph of this

13

definition having the commercial effect of a borrowing or otherwise being classified as a borrowing under the Accounting Principles;

(k)     without double-counting, the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (j) above.

**"Finnish HoldCo Share Pledge"** means the Finnish law agreement on the pledge of shares in the Company dated 3 November 2021 between (1) the Parent and (2) the Security Agent.

**"Finnish Security Agreements"** means:

(a)     the Finnish law security agreement dated 3 November 2021 between (1) the Company and (2) the Security Agent; and

(b)     the Finnish law security agreement dated 3 November 2021 between (1) Jervois Finland Oy and (2) the Security Agent; and

(c)     the Finnish law security agreement dated 19 July 2022 between (1) Jervois Americas LLC and (2) the Security Agent.

"**Fourth Amendment and Restatement Agreement**" means the amendment and restatement agreement dated _____ 2025 relating to this Agreement between, among others, the Company, the Agent and the Security Agent.

"**Fourth Restatement Budget**" has the meaning given to such term in the Fourth Amendment and Restatement Agreement.

"**Fourth Restatement Effective Time**" has the meaning given to the term "Effective Time" in the Fourth Amendment and Restatement Agreement.

**"Freeport Arrangements"** means the deferred consideration arrangement pertaining to the acquisition of Jervois Finland Oy, Jervois Japan, KK, Jervois Americas LLC, Jervois Trading (Shanghai) Co. Ltd. and Jervois Europe GmbH..

**"Funding Rate"** means any individual rate notified by a Lender to the Agent pursuant to Clause 12.2.1(B) (*Cost of funds*).

**"Funding Summary Table"** means a summary table substantially in the form set out in Schedule 12 (*Form of Funding Summary Table*) or otherwise as acceptable in form and detail to the Majority Lenders.

**"Group"** means the Company and its Subsidiaries for the time being.

**"Guarantor"** means an Original Guarantor, the Parent, or an Additional Guarantor.

**"Historic Term SOFR"** means in relation to any Loan, the most recent applicable Term SOFR for a period equal in length to the Interest Period of that Loan and which is as of a day which is no more than three US Government Securities Business Days before the relevant Quotation Day.

"**Holding Company**" means, in relation to a person, any other person in respect of which it is a Subsidiary.

"**ICO Bond Original Obligor**" means each of Formation Holdings US, Inc. and Jervois Mining USA Limited.

"**ICO Bonds**" means the 12.5 per cent. senior secured USD 100,000,000 bonds 2021/2026 issued by Jervois Mining USA Limited in accordance with the bond terms dated 6 July 2021.

"**ICO Bonds Finance Documents**" has the meaning given to the term "Finance Documents" in the bond terms constituting the ICO Bonds.

"**Idaho Security Documents**" means each of the following security agreements, collateral assignments, pledges, mortgages, and related documents and instruments, in each case, dated on or about the date of the 2024 Amendment and Restatement Agreement:

(a)     an Idaho law collateral assignment and pledge of intercompany loan made between Formation Holdings US, Inc. as pledgor and the Security Agent as security agent over the intercompany loan described therein;

(b)     an Idaho law mortgage, security agreement, assignment of rents and leases, fixture filing, financing statement, and pledge covering, among other collateral, as-extracted collateral from Jervois Mining USA Limited as mortgagor to the Security Agent as mortgagee over the property (including real property in Lehmi County) and assets described therein;

(c)     an Idaho law security agreement made between Jervois Mining USA Limited as debtor and the Security Agent as security agent over the property described therein; and

(d)     an Idaho law pledge agreement made between Formation Holdings US, Inc. as grantor and the Security Agent as security agent over the property described therein.

"**IFRS**" means the International Financial Reporting Standards and guidelines and interpretations issued by the International Accounting Standards Board (or any predecessor and successor thereof) in force from time to time to the extent applicable to the relevant financial statements.

"**Impaired Agent**" means the Agent at any time when:

(a)     it has failed to make (or has notified a Party that it will not make) a payment required to be made by it under the Finance Documents by the due date for payment;

(b)     the Agent otherwise rescinds or repudiates a Finance Document;

(c)     (if the Agent is also a Lender) it is a Defaulting Lender under paragraph (a) or (b) of the definition of "Defaulting Lender"; or

(d)      an Insolvency Event has occurred and is continuing with respect to the Agent;

unless, in the case of paragraph (a) above:

(i)      its failure to pay is caused by:

(A)      administrative or technical error; or

(B)      a Disruption Event; and

payment is made within three Business Days of its due date; or

(ii)      the Agent is disputing in good faith whether it is contractually obliged to make the payment in question.

**"Increase Confirmation"** means a confirmation substantially in the form set out in Schedule 11 (*Form of Increase Confirmation*).

**"Increase Lender"** has the meaning given to that term in Clause 2.2 (*Increase*).

**"Industrial Special Risks Policy"** means the industrial special risks policy provided by a syndicate of insurances with policy numbers PTPAC2105555, 259203, 99 0010075 EOS and P75887.01-00 made out to "Jervois Global Limited and/or subsidiary and or affiliated and/or associated and/or interrelated companies, as they now exist or may hereafter be constituted" and any replacement thereof.

"**Industry Competitor**" means:

(a)      a person or entity whose business is substantially similar to or in competition with that carried out by the Group;

(b)      an Affiliate of a person who falls within paragraph (a) above; or

(c)      a person which has the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 percent, of the maximum number of votes that might be cast at a general meeting (or equivalent) of an entity which falls within paragraphs (a) or (b) above or who holds beneficially more than 50 per cent. of the issued share capital of an entity which falls within paragraphs (a) or (b) above (any such person, a "**Competitor Shareholder**"), any Affiliate of a Competitor Shareholder, any trust of which a Competitor Shareholder or any of its Affiliates is a trustee, any partnership of which a Competitor Shareholder or any of its Affiliates is a partner and any trust, fund or other entity which is managed by, or is under the control of, a Competitor Shareholder or any of its Affiliates, provided that, notwithstanding the foregoing, a Lender which falls within paragraphs (a) or (b) above shall not be an Industry Competitor provided that such Lender is an Original Lender or its ownership of, affiliation to (or other rights in respect of) the issued share capital of any person falling within paragraph (a) above is:

(i)      administered by persons operating behind appropriate information barriers implemented or maintained as required by law, regulation or internal policy in any event to the extent required to ensure that such

16

administration is independent from such Lender's interests under the Finance Documents and any information provided under the Finance Documents is not disclosed or otherwise made available to any person(s) operating behind such information barrier; or

(ii)     administered by an affiliate of such Lender which is managed and controlled independently from that Lender and provided that in such circumstances any information made available under the Finance Documents is not disclosed or otherwise made available to any such affiliate.

"**Initial Australian VA Budget**" has the meaning given to that term in the Fourth Amendment and Restatement Agreement; provided, that such Initial Australian VA Budget shall be subject to the substitution and replacement thereof on the terms and conditions set forth in Clause 24.25.9(A) (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

"**Initial Budget**" means the most-recent thirteen-week cash flow projection delivered to the Agent by the Company prior to the Fourth Restatement Effective Time pursuant to, and as approved as an "Approved Budget".

"**Initial Collateral Value Report**" means the report referred to in paragraph 6.1 of Part A of Schedule 2 (*Conditions Precedent*) in the form approved by and delivered to the Agent under Clause 5.1 (*Initial conditions precedent*).

"**Insolvency Event**" in relation to an entity, means that the entity:

(a)     is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(b)     becomes insolvent (including but not limited to within the meaning of section 95A of the Australian Corporations Act) or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(c)     is taken to have failed to comply with a statutory demand under section 459F(1), or must be presumed by a court to be insolvent under section 459C(2), or is the subject of a circumstance specified in section 461 (whether or not an application to court has been made under that section) or, if the person is a Part 5.7 body, is taken to be unable to pay its debts under section 585, of the Australian Corporations Act;

(d)     if a registered corporation under the Australian Corporations Act, a step is taken under sections 601AA, 601AB or 601AC of the Australian Corporations Act to cancel its registration;

(e)     makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(f)     institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or

17

bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official;

(g)    has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition is instituted or presented by a person or entity not described in paragraph (f) above and:

(i)    results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

(ii)    is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof;

(h)    has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(i)    seeks or becomes subject to the appointment of an administrator, controller (as defined in section 9 of the Australian Corporations Act), provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (other than, for so long as it is required by law or regulation not to be publicly disclosed, any such appointment which is to be made, or is made, by a person or entity described in paragraph (f) above);

(j)    has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter;

(k)    causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in paragraphs (a) to (j) above;

(l)    takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(m)    it stops or suspends payment to creditors generally.

"**Insurance**" means any contract of insurance required under Clause 24.15 (*Insurance*).

"**Interest Period**" means, in relation to a Loan, each period determined in accordance with Clause 11 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 10.3 (*Default interest*).

"**Interim DIP Order**" has the meaning given to that term in Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

18

"**Interim Period Cap**" has the meaning given to that term in Clause 2.1.3(A) (*The Facilities*).

"**Interpolated Historic Term SOFR**" means, in relation to any Loan, the rate (rounded to the same number of decimal places as Term SOFR) which results from interpolating on a linear basis between:

(a)     either:

    (i)     the most recent applicable Term SOFR (as of a day which is not more than three US Government Securities Business Days before the Quotation Day) for the longest period (for which Term SOFR is available) which is less than the Interest Period of that Loan; or

    (ii)     if no such Term SOFR is available for a period which is less than the Interest Period of that Loan, SOFR for a day which is no more than three US Government Securities Business Days (and no less than two US Government Securities Business Days) before the Quotation Day; and

(b)     the most recent applicable Term SOFR (as of a day which is not more than three US Government Securities Business Days before the Quotation Day) for the shortest period (for which Term SOFR is available) which exceeds the Interest Period of that Loan.

"**Interpolated Term SOFR**" means, in relation to any Loan, the rate (rounded to the same number of decimal places as Term SOFR) which results from interpolating on a linear basis between:

(a)     the applicable Term SOFR (as of the Specified Time) for the longest period (for which Term SOFR is available) which is less than the Interest Period of that Loan; and

(b)     the applicable Term SOFR (as of the Specified Time) for the shortest period (for which Term SOFR is available) which exceeds the Interest Period of that Loan.

"**Inventory**" has the meaning given to that term in Clause 22 (*Collateral value*).

"**Japanese Security Assignments**" means:

(a)     the Japanese Security Assignment (Movables – Jervois Finland);

(b)     the Japanese Security Assignment (Movables – Jervois Japan);

(c)     the Japanese Security Assignment (Receivables – Jervois Finland); and

(d)     the Japanese Security Assignment (Receivables – Jervois Japan).

"**Japanese Security Assignment (Movables – Jervois Finland)**" means the Japanese law security assignment agreement of movables dated 19 July 2022 between (1) Jervois Finland Oy and (2) the Security Agent.

19

**"Japanese Security Assignment (Movables – Jervois Japan)"** means the Japanese law security assignment agreement of movables dated 19 July 2022 between (1) Jervois Japan Inc. and (2) the Security Agent.

**"Japanese Security Assignment (Receivables – Jervois Finland)"** means the Japanese law security assignment agreement of receivables dated 19 July 2022 between (1) Jervois Finland Oy and (2) the Security Agent.

**"Japanese Security Assignment (Receivables – Jervois Japan)"** means the Japanese law security assignment agreement of receivables dated 19 July 2022 between (1) Jervois Japan Inc. and (2) the Security Agent.

**"Japanese Share Pledges"** means:

(a)     the Japanese Share Pledge (Jervois Japan); and

(b)     the Japanese Share Pledge (Jervois Suomi).

**"Japanese Share Pledge (Jervois Japan)"** means the Japanese law share pledge agreement dated 19 July 2022 between (1) Jervois Japan Inc. and (2) the Security Agent.

**"Japanese Share Pledge (Jervois Suomi)"** means the Japanese law share pledge agreement dated 19 July 2022 between (1) the Company and (2) the Security Agent.

**"Jervois Plant"** means the cobalt chemicals and powders plant and associated facilities operated by Jervois Finland Oy located at Kokkala, Finland.

**"Key Agreements"** means

(a)     each Sales Contract; and

(b)     any other agreement designated as such by the Company and the Agent.

**"Legal Opinion"** means any legal opinion delivered to the Agent under Clause 5.1 (*Initial conditions precedent*), Clause 27 (*Changes to the Obligors*) or pursuant to the Fourth Amendment and Restatement Agreement.

**"Legal Reservations"** means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors, and subject to the DIP Orders and the terms thereof;

(b)     the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)     the limitation on enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors, defences of set-off or counterclaim and similar principles;

20

(d)     any other matters which are set out as qualifications or reservations as to matters of law in the Legal Opinions; and

(e)     similar principles, rights and defences under the laws of any Relevant Jurisdiction.

"**Lender**" means

(a)     any Original Lender;

(b)     any 2024 Effective Time Lender; and

(c)     any bank, financial institution, trust, fund or other entity which has become a Party as a "Lender" in accordance with Clause 2.2 (*Increase*), Clause 2.3 (*Accordion Increases*) or Clause 26 (*Changes to the Lenders*) or in accordance with the terms of the Fourth Amendment and Restatement Agreement,

which in each case has not ceased to be a Party as such in accordance with the terms of this Agreement.  The Lenders include the DIP Facility Lenders, the DDTL Facility Lenders, and the Revolving Facility Lenders.

"**Limitation Acts**" means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984.

"**LMA**" means the Loan Market Association.

"**Loan**" means a Revolving Facility Loan, DDTL Facility Loan, or a DIP Facility Loan (as applicable).

"**Majority Lenders**" means

(a)     in the context of a proposed amendment or waiver in relation to a proposed Utilisation of the Revolving Facility of any of the conditions in Clause 5.2 (*Further conditions precedent*), a Lender or Lenders whose Revolving Facility Commitments aggregate more than 66⅔ per cent. of the Total Revolving Facility Commitments;

(b)     in the context of a proposed amendment or waiver in relation to a proposed Utilisation of the DDTL Facility or any of the conditions in Clause 5.2 (*Further conditions precedent*), a Lender or Lenders whose DDTL Facility Commitments aggregate more than 66⅔ per cent. of the DDTL Facility Commitments;

(c)     in the context of a proposed amendment or waiver in relation to a proposed Utilisation of the DIP Facility of any of the conditions in Clause 5.2 (*Further conditions precedent*), a Lender or Lenders whose DIP Facility Commitments aggregate more than 66⅔ per cent. of the Total DIP Facility Commitments; and

(d)     otherwise a Lender or Lenders whose Commitments aggregate more than 66⅔ per cent. of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than 66⅔ per cent. of the Total Commitments immediately prior to the reduction).

**"Margin"** five per cent. per annum.

**"Marine Cargo Policy"** means the marine cargo policy provided to Jervois Finland Oy by Pohjola Insurance Ltd, Helsinki with policy number 16-689-280-0 and any replacement thereof.

**"Material Adverse Effect"** means any event or circumstance which, in each case after taking into account all mitigating factors or circumstances, has a material adverse effect on:

(a)     the consolidated business, assets or financial condition of the Group (taken as a whole) (but for this purpose, an event which is likely to affect the ability of the Group to perform its obligations in respect of a financial covenant but would not otherwise constitute a Material Adverse Effect shall not be a Material Adverse Effect);

(b)     the ability of the Obligors or the Parent to perform their payment obligations under the Finance Documents; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents.

**"Material Sales Contract"** means the top twenty Sales Contracts, ranked by 12-month rolling sales revenue.

**"Material Sales Contract Report"** has the meaning given to it in paragraph 5.2 of Part A of Schedule 2 (*Conditions Precedent*).

**"Maximum Available Amount"** means, at any time, the lower of:

(a)     the amount equal to (i) the Total Revolving Facility Commitments, minus (ii) $50,000,000; and

(b)     (i) solely at any time on or prior to the Outside Date, 90% of the then-applicable Collateral Value, and (ii) at all times other than as expressly set forth in the foregoing sub-clause (b)(i) above, 80% of the then-applicable Collateral Value.

**"Month"** means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)     (subject to paragraph (c) below) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

(b)     if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

(c)      if an Interest Period begins on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which that Interest Period is to end.

The above rules will only apply to the last Month of any period.

"**New Lender**" has the meaning given to that term in Clause 26 (*Changes to the Lenders*).

"**New Money DIP Facility Commitment**" means:

(a)      in relation to a New Money DIP Facility Lender, the corresponding amount listed opposite its name with respect to the "New Money DIP Facility Commitment" in Schedule 3 to the Fourth Amendment and Restatement Agreement and the amount of any other New Money DIP Facility Commitment transferred to it under this Agreement or assumed by it in accordance with Clause 2.2 (Increase) or 2.3 (Accordion Increase);

(b)      in relation to any other Lender, the amount of any New Money DIP Facility Commitment transferred to it under this Agreement or assumed by it in accordance with Clause 2.2 (Increase) or 2.3 (Accordion Increase),

to the extent not cancelled, reduced or transferred by it under this Agreement.  As of the Fourth Restatement Effective Time, the total New Money DIP Facility Commitments are equal to (and shall not exceed) $25,000,000.

"**New Money DIP Facility Lender**" means any Lender who makes available a New Money DIP Facility Commitment or a New Money DIP Facility Loan.

"**New Money DIP Facility Loan**" means a "new money" loan made or to be made in U.S. dollars under the DIP Facility or the principal amount outstanding for the time being of that loan.

"**New York Security Agreements**" means each of:

(a)      the New York Security Agreement (Jervois Americas); and

(b)      the New York Security Agreement (Jervois Finland).

"**New York Security Agreement (Jervois Americas)**" means the New York law security agreement dated 19 July 2022 between (1) Jervois Americas LLC and (2) the Security Agent.

"**New York Security Agreement (Jervois Finland)**" means the New York law security agreement dated 19 July 2022 between (1) Jervois Finland Oy and (2) the Security Agent.

"**New York Share Pledge**" means the New York law pledge agreement dated 19 July 2022 between (1) the Company and (2) the Security Agent.

"**Non-Obligor**" means each member of the Parent Group that is not an Obligor.

**"Obligor"** means a Borrower or a Guarantor.

**"Obligors' Agent"** means the Company, appointed to act on behalf of each Obligor in relation to the Finance Documents pursuant to Clause 2.5 (*Obligors' Agent*).

**"Original Financial Statements"** means:

(a)    the audited consolidated financial statements of the Parent for the period ended 31 December 2020; and

(b)    in relation to Jervois Finland Oy, its audited financial statements for its financial year ended 31 December 2020.

**"Original Jurisdiction"** means, in relation to an Obligor, the jurisdiction under whose laws that Obligor is incorporated as at the date of this Agreement, or in the case of an Additional Guarantor, as at the date on which that Additional Guarantor becomes Party as a Guarantor.

"**Original Lender**" means Mercuria Energy Trading SA as Lender from the date of this Agreement and until its assignment of its rights under the Finance Documents to the 2024 Effective Time Lenders.

**"Original Obligor"** means an Original Borrower or an Original Guarantor.

**"Outstandings"** means, at any time, the aggregate amount of the outstanding Revolving Facility Loans at such time.

"**Outside Date**" means 30 April 2025.

**"Parent"** means Jervois Global Limited, a company registered in Australia with Australian Company Number ACN 007 626 575.

**"Parent Group"** means the Parent and its Subsidiaries for the time being.

**"Parent Guarantee"** means the English law governed parent company guarantee dated 3 November 2021 between (1) the Parent and (2) the Security Agent.

**"Party"** means a party to this Agreement.

**"Perfection Requirements"** means the making or the procuring of the appropriate registrations, filing, endorsements, notarisation, stampings and/or notifications of the Transaction Security Documents and/or the Security created thereunder.

**"Permitted Financial Indebtedness"** means Financial Indebtedness:

(a)    incurred pursuant to the terms of the Finance Documents and (except for the ICO Bond Original Obligors, which shall be subject to clause (j) below) the ICO Bonds Finance Documents;

(b)    arising under a treasury transaction entered into for the hedging of actual or projected real exposures arising in the ordinary course of trading activities of a member of the Group and not for speculative purposes.

(c)     any Financial Indebtedness incurred by any member of the Group under any loans made to it by the Parent or any other member of the Group provided that, where such Financial Indebtedness is incurred by any Obligor, it has been subordinated to the Financial Indebtedness under the Finance Documents pursuant to the Subordination Deed or otherwise upon terms satisfactory to the Majority Lenders;

(d)     arising as a result of daylight exposures of any member of the Group in respect of banking arrangements entered into in the ordinary course of its treasury activities;

(e)     under any Permitted Guarantee;

(f)     arising under or by way of credit for goods and services arising in the ordinary course of trading of a member of the Group;

(g)     to the extent constituting Financial Indebtedness of any member of the Group consisting of (i) the financing of insurance premiums, (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and/or (iii) obligations to reacquire assets or inventory in connection with customer financing arrangements in the ordinary course of business;

(h)     arising under or by way of any earn out arrangement or other deferred consideration in relation to an acquisition not prohibited by the terms of this Agreement (to the extent that the earn out arrangement or other deferred consideration itself constitutes Financial Indebtedness), in an amount not exceeding 25 per cent. of the total consideration payable in respect of such acquisition (including the Freeport Arrangements);

(i)     not permitted by the preceding paragraphs and the outstanding principal amount of which does not exceed $15,000,000 (or its equivalent) in aggregate for the Group at any time; and

(j)     solely with respect to each ICO Bond Original Obligor (and without application to any other Obligor or member of the Group or duplication of any other basket in this definition), any Financial Indebtedness incurred by such ICO Bond Original Obligor, which is permitted to be incurred and/or outstanding under the ICO Bond Finance Documents (it being understood and acknowledged that any such Financial Indebtedness of any ICO Bond Original Obligor shall only be permitted and otherwise classified under this clause (j) and not under any other clause of this definition).

"**Permitted Guarantee**" means:

(a)     any guarantee obligation arising under or out of the Finance Documents and (except for the ICO Bond Original Obligors, which shall be subject to clause (d) below) the ICO Bonds Finance Documents;

(b)     mandatory guarantees under any applicable law or regulation;

(c)      any other guarantee;

     (i)     related to any contract or transaction entered into in the ordinary course of business; and

     (ii)    not permitted by the preceding paragraphs and the outstanding principal amount of which (when aggregated with all such other guarantees) does not exceed $15,000,000 in aggregate for the Group at any time; and

(d)      solely with respect to each ICO Bond Original Obligor (and without application to any other Obligor or member of the Group or duplication of any other basket in this definition), any guarantee granted by such ICO Bond Original Obligor, which is permitted to be granted and/or outstanding under the ICO Bond Finance Documents (it being understood and acknowledged that any such guarantee by any ICO Bond Original Obligor shall only be permitted and otherwise classified under this clause (d) and not under any other clause of this definition).

"**Permitted Parent Transfer**" means:

(a)      a distribution, dividend, or other transfer of cash by any member of the Parent Group to the Parent solely to the extent that such distribution, dividend, or other transfer is specifically disclosed and described in reasonable detail (including as to the amount, purpose, and use of proceeds thereof) in the applicable Funding Summary Table submitted to the Agent and the Lenders pursuant to Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*) and not objected to by the Majority Lenders, acting reasonably, within one full Business Day after receipt thereof (which any such objection may be made by email correspondence, and once such objection is made, the distribution, dividend, or other transfer of cash shall not constitute a "Permitted Parent Transfer"));

(b)      a distribution, dividend, or other transfer of cash by any member of the Parent Group to the Parent solely to the extent that (i) such distribution, dividend, or other transfer constitutes an extraordinary and essential intra-week distribution, dividend, or other transfer of cash to the Parent (which could not have been reasonably anticipated and specified in the last then-applicable Funding Summary Table submission pursuant to Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*) consistent with the above clause (a) of this definition), 100% of the proceeds of which are substantially concurrently contributed or otherwise transferred to one or more operating Subsidiaries of the Parent for bona fide business purposes and working capital needs, and (ii) either (A) such distribution, dividend, or other transfer, taken together with all such intra-week distributions, dividends, or other transfers for such calendar week, does not exceed $500,000 in the aggregate or (B) to the extent that any such distribution, dividend, or other transfer, taken together with all such intra-week distributions, dividends, or other transfers for such calendar week, is in excess of $500,000 in the aggregate, it is disclosed and notified to the Agent and the Lenders, including the amount thereof and a reasonably detailed summary and explanation thereof, and is approved in writing (including by email correspondence) by the Majority Lenders (provided, that such approval

26

shall be deemed to have been made by the Majority Lenders after twenty-four hours have passed after the notice required under this sub-clause (ii)(B) has been delivered and the Majority Lenders have not objected in writing (including by email correspondence) to such proposed distribution, dividend, or other transfer); and

(c)     any other distribution, dividend, payment over, disposition, assignment, or other transfer of cash or other property by any member of the Parent Group to the Parent that is approved in a prior writing (including by email correspondence) by the Majority Lenders (acting in their respective sole discretion).

**"Permitted Receivables Discounting Arrangement"** means any invoice discounting or factoring arrangement in respect of Receivables entered into by a member of the Group and a bank or financial institution which is approved by the Majority Lenders.

**"Permitted Reorganisation"** means:

(a)     a solvent reorganisation (including, without limitation, pursuant to a liquidation or winding up) involving the business or assets of, or shares of (or other interests in), any member of the Group (other than the Parent, and other than any Obligor, save where, in the case of any merger between an Obligor and any other member of the Group, an Obligor is the surviving entity) where:

    (i)     all of the business, assets and shares of (or other interests in) the relevant member of the Group continue to be owned directly or indirectly by the Parent in the same or a greater percentage as prior to such reorganisation, save for:

        (A)     the shares of (or other interests in) any member of the Group which has been merged into another member of the Group or which has otherwise ceased to exist (including, for example, by way of the collapse of a solvent partnership or solvent winding up of a corporate entity) as a result of such Permitted Reorganisation; or

        (B)     the business, assets and shares of (or other interests in) relevant members of the Group which cease to be owned:

            (1)     as a result of a disposal or merger permitted under, but subject always to the terms of, this Agreement;

            (2)     as a result of a cessation of business or solvent winding up of a member of the Group in conjunction with a distribution of all or substantially all of its assets remaining after settlement of its liabilities to its immediate shareholder(s) or other persons directly holding partnership or other ownership interests in it; or

            (3)     as a result of a disposal of shares (or partnership or other ownership interests) in a member of the Group required to comply with applicable laws, provided that any such

27

disposal is limited to the minimum amount required to comply with such applicable laws; and

(ii)     the Finance Parties (or the Security Agent on their behalf) will continue to have the same or substantially equivalent guarantees and security (ignoring for the purpose of assessing such equivalency, guarantees and security from any entity which has ceased to exist as contemplated in paragraph (i) above) over the same or substantially equivalent assets and over the shares (or other interests) in the transferee other than over any shares (or other interests) which have ceased to exist as contemplated in paragraph (i) above, in each case to the extent such assets, shares or other interests are not disposed of as permitted under, but subject always to, the terms of this Agreement;

(b)     any reorganisation involving the business or assets of, or shares of (or other interests in) any member of the Group which is implemented to comply with any applicable law or regulation or the views, guidance, approval or interpretation of any relevant regulator (including all intermediate steps or actions necessary to implement such reorganisation) (and provided that if such reorganisation involves the Parent or an Obligor, such reorganisation shall not result in the scope of the Transaction Security being changed in a manner which could reasonably be expected to be adverse to the Finance Parties); and

(c)     any other reorganisation involving one or more members of the Group approved by the Majority Lenders.

"**Permitted Security**" means:

(a)     any Security or Quasi-Security entered into or arising pursuant to any Finance Document or (except for the ICO Bond Original Obligors, which shall be subject to clause (l) below) any ICO Bonds Finance Documents;

(b)     any netting or set-off arrangement entered into by any member of the Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(c)     any lien, security interest or right of set-off arising under the general terms and conditions of banks with whom any member of the Group maintains accounts in the ordinary course of business including any which arise from the general banking conditions or any Security arising under the general terms and conditions of banks relating to the management of those accounts;

(d)     any payment or close out netting or set-off arrangement pursuant to any hedging transaction entered into by a member of the Group for the purpose of:

(i)     hedging any risk to which any member of the Group is exposed in its ordinary course of trading; or

(ii)     its interest rate or currency management operations which are carried out in the ordinary course of business and for non-speculative purposes only,

28

excluding, in each case, any Security or Quasi-Security under a credit support arrangement in relation to a hedging transaction;

(e)  any lien arising by operation of law and in the ordinary course of trading;

(f)  any Security or Quasi-Security over or affecting any asset acquired by a member of the Group after the date of this Agreement if:

  (i)  the Security or Quasi-Security was not created in contemplation of the acquisition of that asset by a member of the Group;

  (ii)  the principal amount secured has not been increased in contemplation of or since the acquisition of that asset by a member of the Group; and

  (iii)  the Security or Quasi-Security is removed or discharged within three months of the date of acquisition of such asset;

(g)  any Security or Quasi-Security over deposits to secure utilities, leases, licenses, public or statutory obligations, or to secure surety, indemnity, judgment, appeal or performance bonds, guarantees of government contracts (or other similar bonds, instruments or obligations) incurred in the ordinary course of trading;

(h)  any Security or Quasi-Security over or affecting any asset of any company which becomes a member of the Group after the date of this Agreement, where the Security or Quasi-Security is created prior to the date on which that company becomes a member of the Group, if:

  (i)  the Security or Quasi-Security was not created in contemplation of the acquisition of that company;

  (ii)  the principal amount secured has not increased in contemplation of or since the acquisition of that company; and

  (iii)  the Security or Quasi-Security is removed or discharged within three months of that company becoming a member of the Group;

(i)  any Security which does not secure any outstanding actual or contingent liability provided that all reasonable endeavours are used to procure the release or discharge of such Security;

(j)  any Security or Quasi-Security arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to a member of the Group in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by any member of the Group;

(k)  any Security or Quasi-Security arising under or in connection with any Finance Lease which constitutes "Permitted Financial Indebtedness" (and provided it is over assets comprised within or constituted by such arrangements); and

(l)  solely with respect to each ICO Bond Original Obligor (and without application to any other Obligor or member of the Group or duplication of any other basket

29

in this definition), any Security granted by such ICO Bond Original Obligor, which is permitted to be granted under the ICO Bond Finance Documents (it being understood and acknowledged that any such Security granted by any ICO Bond Original Obligor shall only be permitted and otherwise classified under this clause (l) and not under any other clause of this definition),

provided that, in each case, any Security or Quasi-Security under paragraphs (b), (d) and (f) to (k) (inclusive) is not in respect of assets subject to the Collateral Value.

"**Petition Date**" has the meaning given to that term in Schedule 13 (*Additional Provisions Relating to the Cases Under Chapter 11 and Australian Proceeding*).

"**Plan**" has the meaning given to that term in Schedule 13 (*Additional Provisions Relating to the Cases Under Chapter 11 and Australian Proceeding*).

"**Plan Effective Date**" has the meaning specified in Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

"**Quotation Day**" means, in relation to any period for which an interest rate is to be determined, two US Government Securities Business Days before the first day of that period (unless market practice differs in the relevant syndicated loan market, in which case the Quotation Day will be determined by the Agent in accordance with that market practice (and if quotations would normally be given on more than one day, the Quotation Day will be the last of those days)).

"**Receipt Variance**" has the meaning given to that term in Clause 24.25.3 (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property.

"**Refinery**" means the Kokkola cobalt refinery in Finland, operated by Umicore.

"**Related Fund**" in relation to a fund (the "**first fund**"), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

"**Relevant Jurisdiction**" means, in relation to an Obligor:

(a)     its Original Jurisdiction;

(b)     any jurisdiction where any asset subject to or intended to be subject to the Transaction Security to be created by it is situated;

(c)     any jurisdiction where it conducts its business; and

(d)     the jurisdiction whose laws govern the perfection of any of the Transaction Security Document entered into by it.

30

**"Relevant Market"** means the market for overnight cash borrowing collateralised by US government securities.

**"Repeating Representations"** means each of the representations set out in Clauses 20.1 (*Status*) to and including 20.6 (*Governing law and enforcement*), Clause 20.10 (*No default*), Clause 20.17 (*Sanctions*), Clause 20.18 (*Anti-Corruption Laws*), Clause 20.20 (*Good title to assets*), Clause 20.21 (*Legal and beneficial ownership*), Clause 20.23 (*Shares*), Clause 20.26 (*Reports*), and Article 4.1 (Additional Representations) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

**"Report"** has the meaning given to it in Clause 22 (*Collateral value*).

**"Representative"** means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

**"Resignation Letter"** means a letter substantially in the form set out in Schedule 7 (*Form of Resignation Letter*).

"**Restricted Party**" means a person that is:

(a)     listed on any Sanctions List or targeted by Sanctions;

(b)     located, organised or resident in or incorporated under the laws of a Sanctioned Country; or

directly or indirectly owned or controlled by, or acting on behalf, at the direction, or for the benefit, of a person referred to in (a) and/or (b) above.

**"Restructuring Support Agreement"** means that certain Restructuring Support Agreement, dated as of 31 December 2024, by and among the Parent, the Obligors, certain other Subsidiaries of the Parent party thereto from time to time and the "Consenting Lenders" party thereto from time to time.

"**Revolving Facility**" means the revolving loan facility made available under this Agreement as described Clause 2.1.1 (*The Facilities*).

"**Revolving Facility Commitment**" means:

(a)     in relation to any Lender as at the Fourth Restatement Effective Time, the amount set opposite its name under the heading "Revolving Facility Commitment" in Schedule 3 to the Fourth Amendment and Restatement Agreement and the amount of any other Revolving Facility Commitment transferred to it under this Agreement or assumed by it in accordance with Clause 2.2 (*Increase*) or Clause 2.3 (*Accordion Increase*);

(b)     in relation to any other Lender, the amount of any Revolving Facility Commitment transferred to it under this Agreement or assumed by it in accordance with Clause 2.2 (*Increase*) or Clause 2.3 (*Accordion Increase*),

to the extent not cancelled, reduced or transferred by it under this Agreement.  In accordance with Clause 2.1 (*The Facilities*), no Lender shall have any obligation to

fund, participate in, or otherwise extend credit on account of any Revolving Facility Commitment on and after the Petition Date.

"**Revolving Facility Lender**" means any Lender which has a Revolving Facility Commitment or a Revolving Facility Loan.

"**Revolving Facility Loan**" means a loan made or to be made under the Revolving Facility or the principal amount outstanding for the time being of that loan.

"**Rollover Loan**" means one or more Loans under the Revolving Facility:

(a)     made or to be made on the same day that a maturing Revolving Facility Loan is due to be repaid;

(b)     the aggregate amount of which is equal to or less than the amount of the maturing Revolving Facility Loan; and

(c)     made or to be made to the same Borrower for the purpose of refinancing that maturing Revolving Facility Loan.

"**Roll-up DIP Facility Commitment**" means:

(a)     in relation to a Roll-Up DIP Facility Lender, the corresponding amount listed opposite its name with respect to the "Roll-up DIP Facility Commitment" in Schedule 3 to the Fourth Amendment and Restatement Agreement as its Roll-Up DIP Facility Commitment and the amount of any other Roll-Up DIP Facility Commitment transferred to it under this Agreement or assumed by it in accordance with Clause 2.2 (Increase) or 2.3 (Accordion Increase);

(b)     in relation to any other Lender, the amount of any Roll-Up DIP Facility Commitment transferred to it under this Agreement or assumed by it in accordance with Clause 2.2 (Increase) or 2.3 (Accordion Increase),

to the extent not cancelled, reduced or transferred by it under this Agreement.  As of the Fourth Restatement Effective Time, the total Roll-Up DIP Facility Commitments are equal to (and shall not exceed) $24,000,000.  Strictly for the abundance of clarity, in no event shall any Roll-Up DIP Facility Commitment be funded in cash at any time.

"**Roll-Up DIP Facility Lender**" means any Lender which has a Roll-Up DIP Facility Loan.

"**Roll-Up DIP Facility Loan**" means the loan made by the "roll up" and cashless substitution and exchange of the existing DDTL Facility Loans on a dollar for dollar basis, into an equivalent amount under the DIP Facility.  Strictly for the abundance of clarity, in no event shall any Roll-Up DIP Facility Loans be funded in cash at any time.

"**Sales Contract**" means a contract between any Obligor and a Buyer for the sale and purchase of Inventory.

"**Sanctioned Country**" means any country or territory that is, or whose government is, subject to or the target of country-wide or territory-wide Sanctions or Sanctions prohibiting dealings with such government.

**"Sanctions"** means any applicable laws, regulations or orders concerning any trade, economic or financial sanctions or embargoes or other restrictive measures enacted, administered, imposed or enforced by any Sanctions Authority .

**"Sanctions Authority"** means the United Nations, the European Union, the Member States of the European Union, Switzerland, the United Kingdom, the United States of America and any of their respective legislative, executive, enforcement and/or regulatory authorities or bodies acting in connection with Sanctions (including the US Department of the Treasury's Office of Foreign Assets Control (OFAC), the US Department of State, the United Nations Security Council and His Majesty's Treasury) or other relevant sanctions authority.

**"Sanctions List"** means:

(a)    the lists of Sanctions designations and/or targets maintained by any Sanctions Authority and/or

(b)    any other Sanctions designation or target listed and/or adopted by a Sanctions Authority,

in all cases, as amended, supplemented or replaced from time to time.

**"Secured Obligations"** means all liabilities and obligations at any time due, owing or incurred by any Obligor to any Secured Party under the Finance Documents, including, without limitation, any and all future advances, the Loans, expenses, costs, and fees payable under any Finance Document, and the obligations set out in Clause 29.2 (*Parallel debt (covenant to pay the Security Agent)*), whether present or future, actual or contingent (and whether incurred solely or jointly and whether as principal or surety or in some other capacity).

**"Secured Parties"** means each Finance Party from time to time party to this Agreement and any Receiver or Delegate.

**"Security"** means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**"Selection Notice"** means a notice substantially in the relevant form set out in Schedule 3 (*Requests and Notices*) given in accordance with Clause 11 (*Interest Periods*).

**"Separate Loan"** has the meaning given to that term in Clause 7.3 (*Separate Loans*).

**"SOFR"** means the secured overnight financing rate (SOFR) administered by the Federal Reserve Bank of New York (or any other person which takes over the administration of that rate) published (before any correction, recalculation or republication by the administrator) by the Federal Reserve Bank of New York (or any other person which takes over the publication of that rate).

**"Specified Insurances"** means each of:

(a)    the Marine Cargo Policy;

(b)     the Industrial Special Risks Policy; and

(c)     any other Insurance designated as such by the Company and the Agent.

"**Specified Professional Fee Budget**" has the meaning given to that term in the Fourth Amendment and Restatement Agreement.

"**Specified Time**" means a day or time determined in accordance with Schedule 10 (*Timetables*).

"**Subordination Deed**" means the subordination deed dated on or about the date of this Agreement between, among others, the Company and the Security Agent.

"**Subsidiary**" means any person (referred to as the "**first person**") in respect of which another person (referred to as the "**second person**"):

(a)     has the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

    (i)     cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the first person;

    (ii)    appoint or remove the majority, of the directors or other equivalent officers of the first person; or

    (iii)   give directions with respect to the operating and financial policies of the first person with which the directors or other equivalent officers of the first person are obliged to comply; or

(b)     holds beneficially more than 50 per cent. of the issued share capital of the first person (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital).

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Term SOFR**" means the term SOFR reference rate administered by CME Group Benchmark Administration Limited (or any other person which takes over the administration of that rate) for the relevant period published (before any correction, recalculation or republication by the administrator) by CME Group Benchmark Administration Limited (or any other person which takes over the publication of that rate).

"**Term SOFR Reference Rate**" means, in relation to any Loan:

(a)     the applicable Term SOFR as of the Specified Time and for a period equal in length to the Interest Period of that Loan; or

(b)      as otherwise determined pursuant to Clause 12.1 (*Unavailability of Term SOFR*).

"**Third Amendment and Restatement Agreement**" means the amendment and restatement agreement dated 26 November 2024 relating to this Agreement between, among others, the Company, the Agent and the Security Agent.

"**Third Amendment and Restatement Agreement Effective Date**" means 26 November 2024.

"**Third Restatement Effective Time**" has the meaning given to the term "Effective Time" in the Third Amendment and Restatement Agreement.

"**Total Accordion Increase Commitments**" means, in relation to an Accordion Increase, the aggregate of the Accordion Increase Commitments relating to that Accordion Increase.

"**Total Commitments**" means at any time the aggregate of the Total Revolving Facility Commitments, the DDTL Facility Commitments, the Total DIP Facility Commitments and the Total Accordion Increase Commitments.

"**Total DIP Facility Commitments**" means the aggregate of the Total New Money DIP Facility Commitments and the Total Roll-up DIP Facility Commitments.

"**Total New Money DIP Facility Commitments**" means the aggregate of the New Money DIP Facility Commitments, being $25,000,000 as at the Fourth Restatement Effective Time.

"**Total Roll-up DIP Facility Commitments**" means the aggregate of the Roll-up DIP Facility Commitments, being $24,000,000 as at the Fourth Restatement Effective Time

"**Transaction Document**" means each Finance Document, each Key Agreement and each Specified Insurance.

"**Total Revolving Facility Commitments**" means the aggregate of the Revolving Facility Commitments, being $150,000,000 at the date of the Fourth Restatement Effective Time.

"**Transaction Security**" means the Security created or expressed to be created in favour of the Security Agent pursuant to the Transaction Security Documents.

"**Transaction Security Documents**" means each of:

(a)      the English Security Assignment;

(b)      the Finnish HoldCo Share Pledge;

(c)      the Finnish Security Agreements;

(d)      the Japanese Share Pledges;

(e)      the Japanese Security Assignments;

(f)      the New York Share Pledge;

(g)      the New York Security Agreements;

(h)      the Idaho Security Documents;

(i)      the Australian Law Security Agreements;

(j)      to the extent not already listed in this definition, the documents referred to in paragraph 2(b) of schedule 2 to each of the Third Amendment and Restatement Agreement and Fourth Amendment and Restatement Agreement;

(k)      the 2024 Conditions Subsequent Transaction Security Documents;

(l)      the DIP Orders;

(m)      Article 9 (*Additional Agreements and Acknowledgments with Respect to Priority and Securities; Grant of Security*) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceedings*);

(n)      any other document evidencing or creating Security over any asset to secure any obligation of any Obligor to a Secured Party under the Finance Documents; and

(o)      any other document designated as such by the Security Agent and the Company.

"**Transfer Certificate**" means a certificate substantially in the form set out in Schedule 4 (*Form of Transfer Certificate*) or any other form agreed between the Agent and the Company.

"**Transfer Date**" means, in relation to an assignment or a transfer, the later of:

(a)      the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)      the date on which the Agent executes the relevant Assignment Agreement or Transfer Certificate.

"**Unpaid Sum**" means any sum due and payable but unpaid by an Obligor under the Finance Documents.

"**Updated Australian VA Budget**" has the meaning given to that term in Clause 24.25.9 (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

"**Updated Budget**" has the meaning given to that term in Clause 24.25.1 (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

"**US**" means the United States of America.

"**US Government Securities Business Day**" means any day other than:

(a)      a Saturday or a Sunday; and

36

(b)     a day on which the Securities Industry and Financial Markets Association (or any successor organisation) recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in US government securities.

**"Utilisation"** means a Loan.

**"Utilisation Date"** means the date of a Utilisation, being the date on which the relevant Loan is to be made.

**"Utilisation Request"** means a notice substantially in the relevant form set out in Schedule 3 (*Requests and Notices*).

**"VA Accession Deed"** means an accession deed to be entered into by the VA Administrators, the Australian Entities, and the Agent and Security Agent in respect of the VA Administrators becoming parties to this Agreement in connection with the Australian Proceedings, which such accession deed shall be in form and substance acceptable to the VA Administrators, the Australian Entities, and the Majority Lenders and otherwise on terms and conditions consistent with this Agreement and the Restructuring Support Agreement.

**"VA Administrator"** has the meaning specified in Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

"**VA Commencement Date**" has the meaning specified in Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

**"VAT"** means

(a)     any value added tax imposed by the Value Added Tax Act 1994;

(b)     any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(c)     any other tax of a similar nature, whether imposed in the United Kingdom or in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraphs (a) or (b) above, or imposed elsewhere.

**"Weekly Applicable Variance Periods"** has the meaning given to that term in Clause 24.25.3 (*Budget Reporting, Variance Testing, and Liquidity Certificates*).

1.2     **Construction**

1.2.1   Unless a contrary indication appears, any reference in this Agreement to:

(A)     the **"Agent"**, any **"Finance Party"**, any **"Lender"**, any **"Account Bank"**, any **"Obligor"**, any **"Party"**, any **"Secured Party"**, the **"Security Agent"** or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents and, in the case of the Security Agent, any person for the time being appointed as

37

Security Agent or Security Agents in accordance with the Finance Documents;

(B)     an **"agency"** shall be construed so as to include any governmental, intergovernmental or supranational agency, authority, body, central bank, commission, department, ministry, organisation, statutory corporation or tribunal (including any political sub-division, national, regional or municipal government and any administrative, fiscal, judicial, regulatory or self-regulatory body or persons);

(C)     a document in **"agreed form"** is a document which is previously agreed in writing by or on behalf of the Company and the Agent or, if not so agreed, is in the form specified by the Agent;

(D)     **"assets"** includes present and future properties, revenues and rights of every description;

(E)     a Lender's **"cost of funds"** in relation to its participation in a Loan is a reference to the average cost (determined either on an actual or a notional basis) which that Lender would incur if it were to fund, from whatever source(s) it may reasonably select, an amount equal to the amount of that participation in that Loan for a period equal in length to the Interest Period of that Loan;

(F)     a **"Finance Document"** or a **"Transaction Document"** or any other agreement or instrument is a reference to that Finance Document or Transaction Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(G)     a **"group of Lenders"** includes all the Lenders;

(H)     **"guarantee"** means (other than in Clause 19 (*Guarantee and Indemnity*)) any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(I)     **"indebtedness"** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(J)     a **"person"** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(K)     a **"regulation"** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency,

department or of any regulatory, self-regulatory or other authority or organisation;

(L)     a provision of law is a reference to that provision as amended or re-enacted from time to time;

(M)     **"including"** means "including, without limitation";

(N)     a time of day is a reference to London time; and

(O)     any matter being **"permitted"** under the Finance Documents includes such matter not being prohibited and not otherwise requiring approval under the Finance Documents.

1.2.2   The determination of the extent to which a rate is **"for a period equal in length"** to an Interest Period shall disregard any inconsistency arising from the last day of that Interest Period being determined pursuant to the terms of this Agreement.

1.2.3   Clause and Schedule headings are for ease of reference only.

1.2.4   Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

1.2.5   A Default and an Event of Default is **"continuing"** if it has not been remedied or waived. Any Default or Event of Default for a failure to deliver any notice, certificate or other document within the prescribed period specified in this Agreement or any other Finance Document for the delivery of the same shall be deemed to be cured upon the delivery of the relevant notice, certificate or other document, as applicable, even though such delivery is not within the prescribed period specified in this Agreement or any other Finance Document.

1.2.6   A reference in this Agreement to a page or screen of an information service displaying a rate shall include:

(A)     any replacement page of that information service which displays that rate; and

(B)     the appropriate page of such other information service which displays that rate from time to time in place of that information service,

(C)     and, if such page or service ceases to be available, shall include any other page or service displaying that rate specified by the Agent after consultation with the Company.

1.2.7   Any provision of Clause 24.12 (*Compliance with Sanctions*), Clause 24.13 (*Anti-Corruption Laws*), Clauses 20.17 (*Sanctions*) or 20.18 (*Anti-Corruptions Laws*) shall not apply to, or be represented or undertaken by, any person if and to the extent that it is or would be unenforceable by or against that person by reason of breach of any applicable Blocking Law.

39

1.2.8 For the purposes of this Agreement, "**Blocking Law**" means:

(A)  any provision of Council Regulation (EC) No 2271/1996 of 22 November 1996 (or any law or regulation implementing such Regulation in any member state of the European Union or the United Kingdom);

(B)  section 7 of the German Foreign Trade Regulation (*Außenwirtschaftsverordnung*); or

(C)  any similar blocking or anti-boycott law in the United Kingdom.

1.2.9 Notwithstanding anything to the contrary in any Finance Document, nothing in the Finance Documents shall prohibit any conversion of a loan, credit or any other indebtedness issued or owing by a member of the Group to its immediate Holding Company into distributable reserves or share capital of such member of the Group or any other capitalisation, forgiveness, waiver, release or other discharge of that loan, credit or indebtedness.

## 1.3    Finnish terms

In this Agreement, or any other Finance Document where it relates to a party incorporated under the laws of Finland or a matter of Finnish law or Transaction Security governed by Finnish law, tg a reference to:

(A)  a "**bankruptcy**", "**reorganisation**", "**composition**", "**compromise**" or "**assignment**" includes a *yrityssaneeraus* or *konkurssimenettely* under the Finnish Bankruptcy Act (Fi: *konkurssilaki*, 120/2004, as amended) or the Finnish Reorganisation Act (Fi: *laki yrityksen saneerauksesta*, 47/1993, as amended) (as the case may be);

(B)  a "**liquidator**", "**compulsory manager**", "**receiver**", "**bankruptcy trustee**", "**administrative receiver**" or "**administrator**" includes a *pesänhoitaja*, *selvittäjä*, *valvoja* and *selvitysmies* under Finnish law (as applicable);

(C)  "**merger**" includes any *sulautuminen* implemented in accordance with Chapter 16 of the Finnish Companies Act (Fi: *osakeyhtiölaki*, 624/2006, as amended);

(D)  "**creditors' process**" includes t*akavarikko* and/or any other *turvaamistoimi* granted in accordance with Finnish law;

(E)  a "**winding up**", "**administration**" or "**dissolution**" includes any declaration of bankruptcy (*asetettu konkurssiin*) or dissolution (*asetettu selvitystilaan*) as well as a *selvitystila, purkaminen* or *rekisteristä poistaminen* under Chapter 20 of the Finnish Companies Act;

(F)  "**gross negligence**" means *törkeä huolimattomuus* under Finnish law; and

    (G)    "**constitutional documents**" means *kaupparekisteriote* and *yhtiöjärjestys*.

If any party to any of the Finance Documents that is incorporated in Finland is required to hold an amount on trust on behalf of another party to that Finance Document, such Finnish party shall hold such money as agent for the other party on a separate account and shall promptly pay or transfer the same to the other party or as the other party may direct.

## 1.4    Currency symbols and definitions

"**$**", "**USD**" and "**dollars**" denote the lawful currency of the United States of America.

## 1.5    Third party rights

1.5.1    Unless expressly provided to the contrary in a Finance Document a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "**Third Parties Act**") to enforce or to enjoy the benefit of any term of this Agreement.

1.5.2    Notwithstanding any term of any Finance Document the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

1.5.3    Any Receiver, Delegate or any person described in Clause 29.12.2 (*Exclusion of liability*) may, subject to this Clause 1.5 and the Third Parties Act, rely on any Clause of this Agreement which expressly confers rights on it.

## 1.6    VA Administrator

1.6.1    At any time after the appointment of a VA Administrator, the Company may and prior to borrowing any DOCA Funds, the Company must, request that each VA Administrator become a party to this Agreement in their capacity as an external administrator and officer of the Australian Entities.

1.6.2    The VA Administrator shall become a "VA Administrator" under this Agreement if the Company delivers to the Agent a duly completed and executed VA Accession Deed and any other reasonably required documents and deliverables in connection therewith.

1.6.3

    (A)    If a VA Administrator accedes to this Agreement, the VA Administrator, the Company and the Majority Lenders may, by consent (which may be provided by email correspondence), and at any time, and subject to clause 1.6.3(B), agree the VA Administrator is to cease being a party to this Agreement.

    (B)    Should the DOCA be effectuated in Australia in accordance with its terms, the Company, the Obligors and the Majority Lenders each agree the VA Administrator and the Australian Entities cease to be parties to this Agreement and are forever and irrevocably released from their obligations under this Agreement and any other Finance Document.

41

1.6.4 That VA Administrator shall cease to be a "VA Administrator" under this Agreement if the Company delivers to the Agent a duly completed and executed retirement notice.

## 2. THE FACILITIES

### 2.1 The Facilities

Subject to the terms of this Agreement:

2.1.1 the Revolving Facility Lenders make available to the Borrowers a dollar revolving loan facility in an aggregate amount equal to the Total Revolving Facility Commitments;

2.1.2 the DDTL Facility Lenders make available to the Borrowers a dollar term loan facility in an aggregate amount equal to the DDTL Facility Commitments; and

2.1.3 subject to the terms of this Agreement and the DIP Orders, the DIP Facility Lenders make available to the Company a senior secured super-priority priming debtor-in-possession term loan credit facility in an aggregate amount equal to the Total DIP Facility Commitments as follows:

(A) the New Money DIP Facility Lenders make available to the Company the New Money DIP Facility Loans in an aggregate amount equal to the New Money DIP Facility Commitments, which such New Money DIP Facility Commitments shall only be available (i) (A) in a single borrowing in an aggregate principal amount of $12,500,000 on or about the date on which the Fourth Restatement Effective Time occurs and (B) in one or more borrowings in an additional aggregate principal amount not to exceed $5,000,000 (i.e., a maximum of $17,500,000 of the New Money DIP Facility Commitments for borrowing on and after the date on which the Fourth Restatement Effective Time occurs and prior to the entry of the Final DIP Order (such maximum borrowing cap of $17,500,000 being the "**Interim Period Cap**")), and (ii) in one or more borrowings an aggregate principal amount not to exceed the then-remaining unused New Money DIP Facility Commitments on and after the entry of the Final DIP Order; and

(B) subject to entry of the Interim DIP Order, without any further action (or notice) by any party to this Agreement or the Finance Documents, the Bankruptcy Court, or any other person, upon the occurrence of the Fourth Restatement Effective Time, an aggregate principal amount of DDTL Facility Loans outstanding prior to the Fourth Restatement Effective Time equal to $24,000,000 (together with accrued and unpaid interest thereon, which such accrued and unpaid interest shall be paid in accordance with Clause 10.2.2 (*Interest*)) shall be automatically deemed to be on a cashless basis "rolled up" and converted into the DIP Facility, and shall automatically be deemed to be substituted and exchanged, on a dollar for dollar basis, into Roll-Up DIP Facility Loans provided by the Roll-Up DIP Facility Lenders under this Agreement and shall be due and payable in accordance with the terms and conditions set forth herein.

> For the avoidance of doubt, none of the Secured Obligations arising under the Revolving Facility shall be "rolled up" and converted into the DIP Facility.

Notwithstanding anything to the contrary herein, (x) in no event shall the Revolving Facility Lenders or the DDTL Facility Lenders make, or be required to be made available (or otherwise participate or extend any credit on account of), any further borrowings on account of the Revolving Facility Commitments or the DDTL Facility Commitments, respectively, on and after the Petition Date, or otherwise during the continuance of the Chapter 11 Cases, and (y) the only extensions of credit to be made hereunder on and after the Fourth Restatement Effective Time shall be on account of the DIP Facility Commitments, in each case, subject to the terms of the applicable DIP Orders and the other terms and conditions set forth herein; provided that this paragraph shall not in any way impair, affect, prejudice or waive the validity, effectiveness, or enforceability of the Revolving Facility and the DDTL Facility.

Without duplication of any of the foregoing, the Revolving Facility Lenders agree that this Agreement shall be further amended, amended and restated, or otherwise modified, in form and substance acceptable to the Revolving Facility Lenders and the Obligors, in order to give effect to the "Exit Revolver" (as defined in the Restructuring Support Agreement), in each case, subject in all respects to the documentation, terms, and conditions set forth in the Restructuring Support Agreement.

## 2.2    Increase

2.2.1    The Company may by giving prior notice to the Agent by no later than the date falling five Business Days after the effective date of a cancellation of the Commitment of a Lender in accordance with:

(A)    Clause 8.1 (*Illegality*); or

(B)    Clause 8.7 (*Right of replacement or repayment and cancellation in relation to a single Lender*),

request that the Commitments be increased (and the Commitments shall be so increased) in an aggregate amount of up to the amount of the Commitments so cancelled as follows:

(C)    the increased Commitments will be assumed by one or more Eligible Institutions (each an **"Increase Lender"**) each of which confirms in writing (whether in the relevant Increase Confirmation or otherwise) its willingness to assume and does assume all the obligations of a Lender corresponding to that part of the increased Commitments which it is to assume, as if it had been an Original Lender in respect of those Commitments;

(D)    each of the Obligors and any Increase Lender shall assume obligations towards one another and/or acquire rights against one another as the Obligors and the Increase Lender would have assumed and/or acquired had the Increase Lender been an Original Lender in respect of that part of the increased Commitments which it is to assume;

43

(E)   each Increase Lender shall become a Party as a "Lender" and any Increase Lender and each of the other Finance Parties shall assume obligations towards one another and acquire rights against one another as that Increase Lender and those Finance Parties would have assumed and/or acquired had the Increase Lender been an Original Lender in respect of that part of the increased Commitments which it is to assume;

(F)   the Commitments of the other Lenders shall continue in full force and effect; and

(G)   any increase in the Commitments shall take effect on the date specified by the Company in the notice referred to above or any later date on which the Agent executes an otherwise duly completed Increase Confirmation delivered to it by the relevant Increase Lender.

Notwithstanding anything to the contrary herein, on and after the Fourth Restatement Effective Time, none of the Commitments may be increased (whether through this Clause 2.2 (*Increase*), Clause 3 (*Accordion Increase*), or otherwise) without the prior written consent of all Lenders.

2.2.2   The Agent shall, subject to Clause 2.2.3, as soon as reasonably practicable after receipt by it of a duly completed Increase Confirmation appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Increase Confirmation.

2.2.3   The Agent shall only be obliged to execute an Increase Confirmation delivered to it by an Increase Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the assumption of the increased Commitments by that Increase Lender.

2.2.4   Each Increase Lender, by executing the Increase Confirmation, confirms that the Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the increase becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as it would have been had it been an Original Lender.

2.2.5   The Company shall promptly on demand pay the Agent and the Security Agent the amount of all costs and expenses (including legal fees) reasonably incurred by either of them and, in the case of the Security Agent, by any Receiver or Delegate in connection with any increase in Commitments under this Clause 2.2.

2.2.6   Each Increase Lender that was not a Lender before that Increase Confirmation shall, on the date upon which the increase takes effect, pay to the Agent (for its own account) a fee in an amount equal to the fee which would be payable under Clause 26.4 (*Assignment or transfer fee*) if the increase was a transfer pursuant to Clause 26.6 (*Procedure for transfer*) and if the Increase Lender was a New Lender.

2.2.7   The Company may pay to the Increase Lender a fee in the amount and at the times agreed between the Company and the Increase Lender in a letter between the Company and the Increase Lender setting out that fee. A reference in this Agreement to a Fee Letter shall include any letter referred to in this Clause 2.2.7.

2.2.8   No Finance Party shall have any obligation to find an Increase Lender and in no event shall any Lender whose Commitments is replaced by an Increase Lender be required to pay or surrender any of the fees received by such Lender pursuant to the Finance Documents.

2.2.9   Clause 26.5 (*Limitation of responsibility of Existing Lenders*) shall apply *mutatis mutandis* in this Clause 2.2 in relation to an Increase Lender as if references in that Clause to:

(A)   an **"Existing Lender"** were references to all the Lenders immediately prior to the relevant increase;

(B)   the **"New Lender"** were references to that **"Increase Lender"**; and

(C)   a **"re-transfer"** and **"re-assignment"** were references to respectively a **"transfer"** and **"assignment"**.

## 2.3   Accordion Increase

An Accordion Increase may be established and made available pursuant to Clause 3 (*Accordion Increase*).

## 2.4   Finance Parties' rights and obligations

2.4.1   The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

2.4.2   The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor is a separate and independent debt in respect of which a Finance Party shall be entitled to enforce its rights in accordance with Clause 2.4.3. The rights of each Finance Party include any debt owing to that Finance Party under the Finance Documents and, any part of a Loan or any other amount owed by an Obligor which relates to a Finance Party's participation in the Facilities or its role under a Finance Document (including any such amount payable to the Agent on its behalf) is a debt owing to that Finance Party by that Obligor.

2.4.3   A Finance Party may, except as specifically provided in the Finance Documents, separately enforce its rights under or in connection with the Finance Documents.

## 2.5   Obligors' Agent

45

2.5.1   Each Obligor (other than the Company) by the execution of this Agreement or of an Accession Deed, irrevocably appoints the Obligors' Agent to act as its agent in relation to the Finance Documents and irrevocably authorises:

    (A)   the Obligors' Agent on its behalf to supply all information concerning itself contemplated by this Agreement to the Finance Parties and to give all notices and instructions, to make such agreements and to effect any amendments, supplements and variations to the Finance Documents or any other document in connection with such Finance Documents; and

    (B)   each Finance Party to give any notice, demand or other communication for the attention of the Obligors pursuant to the Finance Documents to the Obligors' Agent,

and in each case the relevant Obligors shall be bound as though each such Obligor had itself given the notices and instructions or executed or made the agreements of effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

2.5.2   Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation (including by any increase in amounts owing or available to be utilised or any change to parties), notice or other communication given or made by the Obligors' Agent or given to the Obligors' Agent under any Finance Document or any other document on behalf of the Obligors or in connection with any Finance Document or any other document (whether or not known to any other Obligor) shall be binding for all purposes on the Obligors as if all of the Obligors had expressly made, given or concurred with it and without the need to obtain any confirmation or acknowledgement from any of the Obligors. In the event of any conflict between any notices or other communications of the Obligors' Agent and any other Obligor, those of the Obligors' Agent shall prevail.

## 3.   ACCORDION INCREASE

### 3.1   Selection of Accordion Increase Lenders

3.1.1   Definitions:

In this Agreement:

**"Accordion Increase Proportion"** means, in relation to a Proposed Increase Size, the proportion borne from time to time by a Participating Lender's proposed Accordion Increase Commitments to that Proposed Increase Size.

**"Accordion Increase Proposal"** means a notice from the Company addressed to the Agent and each Lender which invites each Lender to participate in a proposed Accordion Increase.

**"Accordion Increase Shortfall"** means, in relation to a Proposed Increase Size, any amount by which that Proposed Increase Size exceeds the aggregate of the proposed Accordion Increase Commitments offered by the Participating

Lenders pursuant to Clause 3.1.2 (as adjusted, if applicable, pursuant to Clause 3.1.5).

**"Accordion Increase Solicitation Period"** means, in relation to an Accordion Increase Proposal, the period of time starting on the date of that Accordion Increase Proposal and ending on the date which falls 15 Business Days after the date of that Accordion Increase Proposal.

**"Further Accordion Increase Shortfall"** means, in relation to a Proposed Increase Size, any amount by which that Proposed Increase Size exceeds the aggregate of the proposed Accordion Increase Commitments offered by the Participating Lenders following the operation of Clause 3.1.8.

**"Participating Lender"** means, in relation to an Accordion Increase Proposal, any Lender which makes an offer in respect of the Accordion Increase proposed in that Accordion Increase Proposal pursuant to Clause 3.1.2.

**"Proposed Increase Size"** means, in relation to an Accordion Increase Proposal, the proposed Total Accordion Increase Commitments set out in that Accordion Increase Proposal.

3.1.2   *Invitation to all Lenders*:   The Company may solicit potential Accordion Increase Lenders for a proposed Accordion Increase by delivery of an Accordion Increase Proposal to the Agent and each Lender.

3.1.3   *Lender's offer*:   Any Lender which wishes to become an Accordion Increase Lender in respect of an Accordion Increase proposed in an Accordion Increase Proposal must notify the Company and the Agent of the proposed Accordion Increase Commitments that it unconditionally offers to make available in respect of that proposed Accordion Increase in accordance with the terms of the Accordion Increase Proposal no later than 5.00 p.m. on the last day of the Accordion Increase Solicitation Period relating to that Accordion Increase Proposal.

3.1.4   *Expiry of Lender's offer*:   Each Participating Lender's offer under Clause 3.1.2 (as adjusted, if applicable, pursuant to Clause 3.1.5 or 3.1.6) in respect of an Accordion Increase proposed in an Accordion Increase Proposal shall, unless otherwise agreed by all the Participating Lenders under that Accordion Increase Proposal, expire on the earlier of:

(A)   the day falling 30 Business Days after the last day of the Accordion Increase Solicitation Period relating to that Accordion Increase Proposal; and

(B)   the date of any Accordion Increase Notice delivered in respect of that proposed Accordion Increase.

3.1.5   *Scaleback of Lenders' offers*:   If the aggregate amount of the proposed Accordion Increase Commitments offered by the Participating Lenders pursuant to Clause 3.1.2 in respect of an Accordion Increase proposed in an Accordion Increase Proposal exceeds the Proposed Increase Size set out in that Accordion

47

Increase Proposal, those proposed Accordion Increase Commitments shall on the day falling one Business Day after the last day of the Accordion Increase Solicitation Period be reduced to the extent necessary such that each such Participating Lender's Accordion Increase Proportion relating to that Proposed Increase Size is no greater than the proportion borne by the aggregate of its Commitments to the aggregate of the Commitments of all of the Lenders which are Participating Lenders in respect of that Accordion Increase Proposal.

3.1.6    *Invitation if shortfall*:  If there is an Accordion Increase Shortfall relating to a Proposed Increase Size set out in an Accordion Increase Proposal (whether resulting from the operation of Clause 3.1.5 or otherwise (including as a result of a Lender failing to respond to an Accordion Increase Proposal within the period referred to under Clause 3.1.2)), the Company shall first go back to each Participating Lender to invite them to increase their proposed Accordion Increase Commitments.

3.1.7    *Deadline for Participating Lenders to offer increase*:  Each Participating Lender under an Accordion Increase Proposal shall notify the Company and the Agent of its offer of an increased proposed Accordion Increase Commitment (if any) pursuant to Clause 3.1.6 no later than 5:00 p.m. on the day falling 10 Business Days after the last day of the Accordion Increase Solicitation Period relating to that Accordion Increase Proposal.

3.1.8    *Wider invitation if further shortfall*:  If there is a Further Accordion Increase Shortfall relating to a Proposed Increase Size set out in an Accordion Increase Proposal, the Company may, in any manner, invite any Eligible Institutions acceptable to the Agent to offer proposed Accordion Increase Commitments in respect of the Accordion Increase proposed in that Accordion Increase Proposal in a maximum aggregate amount no greater than that Further Accordion Increase Shortfall.

3.1.9    *Participating Lender's Accordion Increase Commitments*:  Each Participating Lender's Accordion Increase Commitments specified in any Accordion Increase Notice delivered in respect of an Accordion Increase proposed in an Accordion Increase Proposal shall be in an amount equal to the amount of the proposed Accordion Increase Commitments offered by that Participating Lender in response to that Accordion Increase Proposal (as adjusted, if applicable, pursuant to Clause 3.1.5 or 3.1.6) or, if that Participating Lender agrees to be allocated an Accordion Increase Commitments in a lower amount, that lower amount.

3.1.10  *Amendment and withdrawal*:  The Company may not amend any Accordion Increase Proposal but may withdraw an Accordion Increase Proposal at any time.

3.1.11  *Effect of withdrawal*:  Withdrawal of an Accordion Increase Proposal shall terminate the process set out in this Clause 3 (*Accordion Increase*) in respect of the Accordion Increase proposed in that Accordion Increase Proposal and that Accordion Increase shall not be established.

3.2    **Delivery of Accordion Increase Notice**

3.2.1   On completion of the solicitation process set out in Clause 3.1 (*Selection of Accordion Increase Lenders*), the Company and each relevant Accordion Increase Lender may request the establishment of the Accordion Increase by the Company delivering to the Agent a duly completed Accordion Increase Notice not later than five Business Days prior to the proposed Establishment Date specified in the Accordion Increase Notice.

3.2.2   No Accordion Increase Notice may be delivered after the end of the Availability Period and no more than one Accordion Increase Notice may be delivered.

3.2.3   No Finance Party shall have any obligation to find an Accordion Increase Lender.

### 3.3   Completion of the Accordion Increase Notice

3.3.1   The Accordion Increase Notice is irrevocable and will not be regarded as having been duly completed unless:

(A)   the Accordion Increase Lenders and the Accordion Increase Commitments set out in the Accordion Increase Notice have been selected and allocated in accordance with Clause 3.1 (*Selection of Accordion Increase Lenders*); and

(B)   the Total Accordion Increase Commitments do not exceed $75,000,000.

3.3.2   Only one Accordion Increase may be requested in the Accordion Increase Notice.

### 3.4   Conditions to establishment

3.4.1   The establishment of the Accordion Increase will only be effected in accordance with Clause 3.5 (*Establishment of Accordion Increase*) if:

(A)   on the date of the Accordion Increase Notice and on the Establishment Date:

(1)   no Event of Default is continuing or would result from the establishment of the proposed Accordion Increase;

(2)   the Repeating Representations to be made by the Obligors are true in all material respects;

(B)   each Accordion Increase Lender delivers an Accordion Increase Lender Certificate to the Agent and the Company;

(C)   on or prior to the Establishment Date, each Subsidiary of the Company that may reasonably be required by the Agent (taking into account any legal and practical difficulties in obtaining guarantees and security from the relevant entities, including general legal and statutory or regulatory restrictions that may limit the ability to provide guarantees and security and the cost and corresponding benefit of obtaining such guarantees and security) to accede to this Agreement to guarantee and provide

49

Transaction Security to support the increase in the Total Commitments has acceded to this Agreement as an Additional Guarantor in accordance with Clause 27.3 (*Additional Guarantors*);

(D)    the Agent (acting reasonably) has received in form and substance satisfactory to it such documents (if any) as are reasonably necessary as a result of the establishment of the Accordion Increase to maintain the effectiveness of the Security, guarantees, indemnities and other assurance against loss provided to the Finance Parties pursuant to the Finance Documents; and

(E)    all of the Lenders that are not Accordion Increase Lenders have also consented in writing to the establishment of the Accordion Increase.

There is no requirement for the Proposed Increase Size to be equal to or less than 80% of Collateral Value as at the Establishment Date.

3.4.2    The Agent shall notify the Company and the Lenders promptly upon being satisfied under Clause 3.4.1(D).

3.4.3    Other than to the extent that the Majority Lenders notify the Agent in writing to the contrary before the Agent gives the notification described in Clause 3.4.2, the Lenders authorise (but do not require) the Agent to give that notification. The Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

## 3.5    Establishment of Accordion Increase

3.5.1    If the conditions set out in this Agreement have been met the establishment of the Accordion Increase is effected in accordance with Clause 3.5.3 when the Agent executes an otherwise duly completed Accordion Increase Notice. The Agent must, subject to Clause 3.5.2, as soon as reasonably practicable after receipt by it of a duly completed Accordion Increase Notice appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Accordion Increase Notice.

3.5.2    The Agent is only obliged to execute the Accordion Increase Notice delivered to it by the Company once it is satisfied it has complied with all necessary "know your customer" checks or other similar checks under all applicable laws and regulations in relation to the establishment of the relevant Accordion Increase.

3.5.3    On the Establishment Date:

(A)    subject to the terms of this Agreement the Accordion Increase Lenders make available an increase in Commitments under a Facility;

(B)    each Accordion Increase Lender will assume all the obligations of a Lender corresponding to the Accordion Increase Commitments (the **"Assumed Accordion Increase Commitments"**) specified opposite its

name in the Accordion Increase Notice as if it had been an Original Lender in respect of that Accordion Increase Commitments;

(C)    the Company and each Accordion Increase Lender will assume obligations towards one another and/or acquire rights against one another as the Company and that Accordion Increase Lender would have assumed and/or acquired had that Accordion Increase Lender been an Original Lender in respect of the Assumed Accordion Increase Commitments;

(D)    each Accordion Increase Lender and each of the other Finance Parties will assume obligations towards one another and acquire rights against one another as that Accordion Increase Lender and those Finance Parties would have assumed and/or acquired had the Accordion Increase Lender been an Original Lender in respect of the Assumed Accordion Increase Commitments; and

(E)    each Accordion Increase Lender that was not already a Lender before the Establishment Date will become a Party as a "Lender".

## 3.6    Notification of establishment

The Agent must, as soon as reasonably practicable after the establishment of an Accordion Increase notify the Company and the Lenders of that establishment and the Establishment Date of that Accordion Increase.

## 3.7    Accordion Increase costs and expenses

3.7.1    The Company must promptly on demand pay the Agent and the Security Agent the amount of all costs and expenses (including legal fees) reasonably incurred by either of them and in the case of the Security Agent, by any Receiver or Delegate in connection with the establishment of the Accordion Increase under this Clause 3 (*Accordion Increase*).

3.7.2    Each Accordion Increase Lender that was not a Lender before the Establishment Date for the Accordion Increase must, on the Establishment Date for the Accordion Increase, pay to the Agent (for its own account) a fee in an amount equal to the fee which would be payable under Clause 26.4 (*Assignment or transfer fee*) as if the accordion increase were a transfer pursuant to Clause 26 (*Changes to the Lenders*) and if that Accordion Increase Lender were a New Lender.

## 3.8    Prior amendments binding

Each Accordion Increase Lender, by executing the Accordion Increase Notice, confirms that the Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the establishment of the Accordion Increase became effective in accordance with this Agreement and that it is bound by that decision to the same extent as it would have been had it been an Original Lender.

3.9     **Limitation of responsibility**

Clause 26.5 (*Limitation of responsibility of Existing Lenders*) shall apply *mutatis mutandis* in this Clause 3 (*Accordion Increase*) in relation to any Accordion Increase Lender as if references in that Clause to:

3.9.1   an **"Existing Lender"** were references to all the Lenders immediately prior to the Establishment Date;

3.9.2   the New Lender were references to an **"Accordion Increase Lender"**; and

3.9.3   a **"re-transfer"** and **"re-assignment"** were references respectively to a **"transfer"** and **"assignment"**.

4.      **PURPOSE**

4.1     **Purpose**

4.1.1   Each Borrower shall apply all amounts borrowed by it under the Revolving Facility towards:

(A)     fees, costs and expenses payable to the Finance Parties under the Finance Document;

(B)     the repayment of intercompany loans made by the Parent to the Company, provided that amounts applied for such purpose do not exceed $50,000,000 (or its equivalent in any other currency); and

(C)     the general corporate and working capital purposes of the Group.

4.1.2   The Company shall apply all amounts borrowed by it under the DDTL Facility towards:

(A)     fees, costs and expenses payable to the Finance Parties under the Finance Documents; and

(B)     customary working capital purposes of the Group in accordance with the applicable Approved Budget that is delivered pursuant to this Agreement and approved by the Majority Lenders (such approval not to be unreasonably withheld, delayed or conditioned), and only for such working capital needs of the Group for the rolling four-week period set forth in such then-applicable Approved Budget.

4.1.3   The Company shall (and shall cause each other Obligor and each of its and their applicable Subsidiaries to) apply all amounts borrowed by it under the DIP Facility on account of the New Money DIP Facility Loans only:

(A)     to, among other things, permit the orderly continuation and operation of the Company's businesses, maintain business relationships with customers, vendors and suppliers, make payroll, pay the costs of administering the Chapter 11 Cases, in each case of the foregoing, solely to the extent and for the purposes set forth in the then-applicable

Approved Budget (subject to any permitted Disbursement Variances applicable thereto as set forth in Clause 24.25.3 (*Budget Reporting, Variance Testing, and Liquidity Certificates*)); and

(B)     with respect to any amounts borrowed by and used, directly or indirectly, on behalf of the Parent, for the purposes set forth in Section 6.1(c)] of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*), in accordance with the amounts and borrowings as set forth in the Approved Australian VA Budget, which such amounts (collectively, the "**DOCA Funds**") shall be limited to the following:

(1)     such amount of the New Money DIP Facility Commitment as is required to be drawn in order to meet operational and working capital needs of the Australian Entities in the ordinary course of business; and

(2)     $1,500,000 of the New Money DIP Facility Commitment is only available to be provided to (and no other additional amounts shall be available or provided otherwise to) the Parent for application towards the satisfaction of the VA Administrator's fees and expenses incurred in the conduct of the Australian Proceedings, including, without limitation, the administration, deed administration and/or consequential winding up and/or deregistration of the Parent and/or the Australian Entities.

4.1.4     The Company shall (and shall cause each other Obligor and each of its and their applicable Subsidiaries to) apply all amounts deemed to be borrowed by it under the DIP Facility on account of the Roll-Up DIP Facility Loans to refinance the DDTL Facility Loans such that the DDTL Facility Loans outstanding are "rolled up" and converted into the DIP Facility on a cashless dollar for dollar basis in accordance with Clause 2.1.3(B) (*The Facilities*).

## 4.2     Monitoring

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

## 5.     CONDITIONS OF UTILISATION

## 5.1     Initial conditions precedent

5.1.1     No Borrower may deliver a Utilisation Request unless the Agent has received all of the documents and other evidence listed in Part A of Schedule 2 (*Conditions Precedent*) in form and substance satisfactory to the Agent (acting on the instructions of the Majority Lenders, acting reasonably). The Agent shall notify the Company and the Lenders promptly upon being so satisfied.

5.1.2     Other than to the extent that the Majority Lenders notify the Agent in writing to the contrary before the Agent gives the notification described in Clause 5.1.1, the Lenders authorise (but do not require) the Agent to give that notification.

The Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

## 5.2   Further conditions precedent

The Lenders will only be obliged to comply with Clause 6.4 (*Lenders' participation*) if on the date of the Utilisation Request and on the proposed Utilisation Date:

5.2.1   in the case of a Rollover Loan, no notice of a Declared Default has been given;

5.2.2   in the case of any Loan (including, for the avoidance of doubt, any New Money DIP Facility Loan) other than a Rollover Loan, no Default or Event of Default is continuing or would result from the proposed Loan;

5.2.3   the Repeating Representations to be made by each Obligor are true in all material respects;

5.2.4   in relation to any New Money DIP Facility Loan, the use of proceeds of such New Money DIP Facility Loan is:

(A)   explicitly indicated in reasonable (itemized) detail in the relevant Utilisation Request; and

(B)   consistent with the then-applicable Approved Budget delivered pursuant to this Agreement and, in each case, not in excess of the working capital needs of the Group for the rolling four-week period set forth in the then-applicable Approved Budget;

5.2.5   the aggregate amount of the Outstandings adjusted to take account of:

(A)   in relation to a Revolving Facility Loan, the amount of the requested Utilisation of the Revolving Facility;

(B)   the amount of any Utilisations under the Revolving Facility which, pursuant to any other requests are to be made on or before the date for the making of the requested Utilisation; and

(C)   the amount of any Utilisation under the Revolving Facility scheduled to be repaid on or before the date for the making of the requested Utilisation,

would be less than or equal to the Maximum Available Amount.

5.2.6   with respect to any DIP Facility Loan, the Obligors shall have complied with, and otherwise satisfied, each of the additional conditions precedent set forth in Section 3.1 of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

Notwithstanding anything to the contrary provided herein or in any other Finance Document, none of the Lenders will be obligated to fund, participate in, or otherwise make or extend any further credit on account of any Revolving Facility Loans or DDTL Facility Loans on or after the occurrence of the Fourth Restatement Effective Time.

5.3     **Maximum number of Utilisations**

5.3.1   A Borrower may not deliver a Utilisation Request in respect of the Revolving Facility if as a result of the proposed Utilisation six or more Revolving Facility Loans would be outstanding.

5.3.2   A Borrower (or the Company) may not request that a DDTL Facility Loan be divided if, as a result of the proposed division, more than six DDTL Facility Loan would be outstanding.

5.3.3   A Borrower may not deliver a Utilisation Request in respect of the DIP Facility if as a result of the proposed Utilisation six or more DIP Facility Loans would be outstanding.

5.3.4   A Borrower (or the Company) may not request that a DIP Facility Loan be divided if, as a result of the proposed division, more than six DIP Facility Loan would be outstanding.

5.3.5   Any Separate Loan shall not be taken into account in this Clause 5.3.

6.      **UTILISATION**

6.1     **Delivery of a Utilisation Request**

Subject to Clause 6.6 (*Rollover Loans*), a Borrower may utilise a Facility by delivery to the Agent of a duly completed Utilisation Request not later than the Specified Time; provided, however, that no such Utilisation Request shall be required with respect to any Roll-Up DIP Facility Loans as provided by Clause 2.1.3(B) (*The Facilities*).

6.2     **Completion of a Utilisation Request**

6.2.1   Each Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

(A)     the proposed Utilisation Date is a Business Day within the Availability Period applicable to the relevant Facility;

(B)     the currency and amount of the Utilisation comply with Clause 6.3 (*Currency and amount*);

(C)     the proposed Interest Period complies with Clause 11 (*Interest Periods*);

(D)     it has been duly signed by an authorised signatory of the relevant Borrower; and

(E)     in the case of a Revolving Facility Loan, it is accompanied by a Collateral Value Report.

6.2.2   Only one Loan may be requested in each Utilisation Request.

6.3     **Currency and amount**

6.3.1   The currency specified in a Utilisation Request must be dollars.

6.3.2   The amount of the proposed Loan must be an amount which is not more than the Available Facility and which is a minimum of $500,000 (in respect of a Revolving Facility Loan) or $2,500,000 (in respect of a DIP Facility Loan) or, if less, the Available Facility.

6.4   **Lenders' participation**

6.4.1   If the conditions set out in this Agreement have been met and subject to Clause 7.1 (*Repayment of Revolving Facility Loans*) each Lender shall make its participation in each Loan available by the Utilisation Date through its Facility Office.

6.4.2   The amount of each Lender's participation in each Loan will be equal to the proportion borne by its Available Commitment to the Available Facility immediately prior to making the relevant Loan.

6.4.3   The Agent shall notify each Lender of the amount of each Loan, the amount of its participation in that Loan, in each case by the Specified Time.

6.5   **Cancellation of Commitment**

The Commitments which, at that time, are unutilised shall be immediately cancelled at the end of the applicable Availability Period.

6.6   **Rollover Loans**

Unless the Company notifies the Agent at least three Business Days before the last day of an Interest Period for a Revolving Facility Loan that no Rollover Loan is required to be made to refinance that Revolving Facility Loan, the Company shall be deemed to have delivered a Utilisation Request for a Rollover Loan in the same amount and for the same Interest Period as the maturing Loan in compliance with Clauses 6.1 (*Delivery of a Utilisation Request*) to and including 6.3 (*Currency and amount*).

7.   **REPAYMENT**

7.1   **Repayment of Revolving Facility Loans**

7.1.1   Each Borrower which has drawn a Revolving Facility Loan shall repay that Revolving Facility Loan on the last day of its Interest Period.

7.1.2   Without prejudice to each Borrower's obligation under Clause 7.1.1, if:

(A)   one or more Revolving Facility Loans are to be made available to a Borrower:

(1)   on the same day that a maturing Revolving Facility Loan is due to be repaid by that Borrower;

(2)   in whole or in part for the purpose of refinancing the maturing Revolving Facility Loan; and

56

(B)     the proportion borne by each Lender's participation in the maturing Revolving Facility Loan to the amount of that maturing Revolving Facility Loan is the same as the proportion borne by that Lender's participation in the new Revolving Facility Loans to the aggregate amount of those new Revolving Facility Loans,

the aggregate amount of the new Revolving Facility Loans shall, unless the Company notifies the Agent to the contrary in the relevant Utilisation Request, be treated as if applied in or towards repayment of the maturing Revolving Facility Loan so that:

(1)     if the amount of the maturing Revolving Facility Loan exceeds the aggregate amount of the new Revolving Facility Loans:

(a)     the relevant Borrower will only be required to make a payment under Clause 32.1 (*Payments to the Agent*) in an amount equal to that excess; and

(b)     each Lender's participation in the new Revolving Facility Loans shall be treated as having been made available and applied by the relevant Borrower in or towards repayment of that Lender's participation in the maturing Revolving Facility Loan and that Lender will not be required to make a payment under Clause 32.1 (*Payments to the Agent*) in respect of its participation in the new Revolving Facility Loans; and

(2)     if the amount of the maturing Revolving Facility Loan is equal to or less than the aggregate amount of the new Revolving Facility Loans:

(a)     the relevant Borrower will not be required to make a payment under Clause 32.1 (*Payments to the Agent*); and

(b)     each Lender will be required to make a payment under Clause 32.1 (*Payments to the Agent*) in respect of its participation in the new Revolving Facility Loans only to the extent that its participation in the new Loans exceeds that Lender's participation in the maturing Loan and the remainder of that Lender's participation in the new Revolving Facility Loans shall be treated as having been made available and applied by the relevant Borrower in or towards repayment of that Lender's participation in the maturing Revolving Facility Loan.

## 7.2     Repayment of DDTL Facility Loans and DIP Facility Loans

7.2.1   Other than (for the avoidance of doubt) the DDTL Facility Loans deemed to be repaid pursuant to Clause 2.1.3(B) (*The Facilities*), each Borrower to which a DDTL Facility Loan has been made shall repay the aggregate DDTL Facility

Loans made to it in full on the Final Maturity Date in respect of the DDTL Facility.

7.2.2 The Borrowers may not reborrow any part of a DDTL Facility Loan which is prepaid or repaid.

7.2.3 Each Borrower to which a DIP Facility Loan has been made shall repay the aggregate DIP Facility Loans made to it in full on the Final Maturity Date in respect of the DIP Facility.

7.2.4 The Borrowers may not reborrow any part of a DIP Facility Loan which is prepaid or repaid.

7.3 **Separate Loans**

7.3.1 At any time when a Lender becomes a Defaulting Lender, the maturity date of each of the participations of that Lender in the Loans then outstanding will be automatically extended to the Final Maturity Date and will be treated as separate Loans (the **"Separate Loans"**) denominated in the currency in which the relevant participations are outstanding.

7.3.2 If a Borrower makes a prepayment of a Utilisation pursuant to Clause 8.6 (*Voluntary prepayment of Utilisations*), a Borrower to whom a Separate Loan is outstanding may prepay that Separate Loan by giving not less than five Business Days' prior notice to the Agent. The proportion borne by the amount of the prepayment of the Separate Loan to the amount of the Separate Loans shall not exceed the proportion borne by the amount of the prepayment of the Utilisation to the Utilisations. The Agent will forward a copy of a prepayment notice received in accordance with this Clause 7.3.2 to the Defaulting Lender concerned as soon as practicable on receipt.

7.3.3 Interest in respect of a Separate Loan will accrue for successive Interest Periods selected by the relevant Borrower by the time and date specified by the Agent (acting reasonably) and will be payable by that Borrower to the Agent (for the account of that Defaulting Lender) on the last day of each Interest Period of that Separate Loan.

7.3.4 The terms of this Agreement relating to Loans generally shall continue to apply to Separate Loans other than to the extent inconsistent with Clauses 7.3.1 to 7.3.3 in which case those Clauses shall prevail in respect of any Separate Loan.

7.4 **Right of cancellation in relation to a Defaulting Lender**

7.4.1 If any Lender becomes a Defaulting Lender, the Company may, at any time whilst the Lender continues to be a Defaulting Lender, give the Agent 10 Business Days' notice of cancellation of the Available Commitment of that Lender.

7.4.2 On the notice referred to in Clause 7.4.1 becoming effective, the Available Commitment of the Defaulting Lender shall immediately be reduced to zero.

7.4.3   The Agent shall as soon as practicable after receipt of a notice referred to in Clause 7.4.1, notify all the Lenders.

## 8.    PREPAYMENT AND CANCELLATION

### 8.1   Illegality

If, in any applicable jurisdiction, it becomes unlawful for any Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in any Utilisation or it becomes unlawful for any Affiliate of a Lender for that Lender to do so:

8.1.1   that Lender shall promptly notify the Agent upon becoming aware of that event;

8.1.2   upon the Agent notifying the Company, the Available Commitment of that Lender will be immediately cancelled; and

8.1.3   to the extent that the Lender's participation has not been transferred pursuant to Clause 8.7.4 (*Right of replacement or repayment and cancellation in relation to a single Lender*), each Borrower shall repay that Lender's participation in the Loans made to that Borrower on the last day of the Interest Period for each Loan occurring after the Agent has notified the Company or, if earlier, the date specified by the Lender in the notice delivered to the Agent (being no earlier than the last day of any applicable grace period permitted by law) and that Lender's corresponding Commitment shall be cancelled in the amount of the participations repaid.

### 8.2   Change of Control and breach of Sanctions

8.2.1   Upon the occurrence of a Change of Control or if any Obligor is in breach of any of its obligations under Clause 20.17 (*Sanctions*), Clause 20.18 (*Anti-Corruption Laws*), 24.12 (*Compliance with Sanctions*) or Clause 24.13 (*Anti-Corruption Laws*):

(A)     the Company shall promptly notify the Agent upon becoming aware of the event;

(B)     a Lender shall not be obliged to fund a Utilisation (except for a Rollover Loan)*;* and

(C)     if a Lender so requires and notifies the Agent within five Business Days of the Company notifying the Agent of the event, the Agent shall, to the extent that the Lender's participation has not been transferred pursuant to Clause 38.5 (*Replacement of Lender*)*,* by not less than 15 Business Days' notice to the Company, cancel the Available Commitments of that Lender and declare the participation of that Lender in all outstanding Loans, together with accrued interest, and all other amounts accrued under the Finance Documents immediately due and payable, whereupon the Available Commitments of that Lender will be cancelled and all such outstanding Loans and amounts will become immediately due and payable.

8.2.2    For the purposes of Clause 8.2.1, "Change of Control" means:

The Parent ceases directly or indirectly to:

(A)    have the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

(1)    cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Company;

(2)    appoint or remove the majority, of the directors or other equivalent officers of the Company; or

(3)    give directions with respect to the operating and financial policies of the Company with which the directors or other equivalent officers of the Company are obliged to comply; or

(B)    hold beneficially more than 50 per cent. of the issued share capital of the Company (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital).

## 8.3    Mandatory prepayment – Maximum Available Amount

If, at any time, the Agent determines (by reference to the most recent Collateral Value Report delivered to it under this Agreement) that the Outstandings at that time exceed 110% of the Maximum Available Amount (the amount by which the Outstandings exceed the applicable Maximum Available Amount being a **"Shortfall"**), the Agent shall notify the Company of the shortfall and the Company shall, within five Business Days from the date on which the Agent notifies the Company thereof, ensure that the Borrowers:

8.3.1    prepay or repay any amount of the Loans (in order of maturity) to ensure that, following such payment, such Shortfall no longer exists;

8.3.2    deliver a new Collateral Value Report to the Agent that confirms such Shortfall no longer exists; or

8.3.3    pay an amount equal to the Shortfall into the Collection Accounts,

provided that, in each case so long as the financial covenant in Clause 23.5 (*Minimum Group Liquidity*) is complied with in all respects (including testing and reporting of compliance thereof as set forth in Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*)) at all times on or prior to the Outside Date, none of the steps set out in paragraphs 8.3.1 to 8.3.3 above shall be required (and consequently no Default or Event of Default shall occur with respect to any Shortfall) at any time on or prior to the Outside Date.

## 8.4    Non-production at Refinery

60

If there has been an interruption or suspension (other than a scheduled interruption or suspension for maintenance purposes) of the production from the Refinery for a continuous period of 45 Business Days:

8.4.1   the Company shall promptly notify the Agent upon becoming aware of that event;

8.4.2   a Lender shall not be obliged to fund a Utilisation that it would otherwise have been obliged to fund; and

8.4.3   if the Majority Lenders so require, the Agent shall, on the last day of the first Interest Period to end following receipt of the notice from the Company, cancel the Available Commitments and declare the participation of each Lender in all outstanding Loans, together with accrued interest, and all other amounts accrued under the Finance Documents immediately due and payable, whereupon the Available Commitments of each Lender will be cancelled and all such outstanding Loans and amounts will become immediately due and payable.

8.5   **Voluntary cancellation**

The Company may, if it gives the Agent not less than five Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, cancel the whole or any part (being a minimum amount of $1,000,000) of any Available Facility. Any cancellation under this Clause shall reduce the Commitments of the Lenders rateably.

8.6   **Voluntary prepayment of Loans**

A Borrower to which a Loan has been made may, if it gives the Agent not less than three Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of any Loan (but, if in part, being an amount that reduces the amounts of the Loans by a minimum amount of $1,000,000).

8.7   **Right of replacement or repayment and cancellation in relation to a single Lender**

8.7.1   If:

(A)   any sum payable to any Lender by an Obligor is required to be increased under Clause 14.2.3 (*Tax gross-up*); or

(B)   any Lender claims indemnification from the Obligors under Clause 14.3 (*Tax indemnity*) or Clause 15.1 (*Increased Costs*),

the Company may, whilst the circumstance giving rise to the requirement for that increase or indemnification continues, give the Agent notice of cancellation of the Commitment(s) of that Lender and its intention to procure the repayment of that Lender's participation in the Utilisations or give the Agent notice of its intention to replace that Lender in accordance with Clause 8.7.4.

8.7.2   On receipt of a notice of cancellation referred to in Clause 8.7.1 in relation to a Lender, the Available Commitment of that Lender shall be immediately reduced to zero.

8.7.3   On the last day of each Interest Period which ends after the Company has given notice of cancellation under Clause 8.7.1 in relation to a Lender (or, if earlier, the date specified by the Company in that notice), each Borrower to which a Loan is outstanding shall repay that Lender's participation in that Loan and that Lender's corresponding Commitment shall be immediately cancelled in the amount of the repayment.

8.7.4   If:

(A)   any of the circumstances set out in 8.7.1 apply to a Lender; or

(B)   an Obligor becomes obliged to pay any amount in accordance with Clause 8.1 (*Illegality*) to any Lender,

the Company may, on 15 Business Days' prior notice to the Agent and that Lender, replace that Lender by requiring that Lender to (and, to the extent permitted by law, that Lender shall) transfer pursuant to Clause 26 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement to an Eligible Institution which confirms its willingness to assume and does assume all the obligations of the transferring Lender in accordance with Clause 26 (*Changes to the Lenders*) for a purchase price in cash payable at the time of the transfer in an amount equal to the outstanding principal amount of such Lender's participation in the outstanding Utilisations and all accrued interest (to the extent that the Agent has not given a notification under Clause 26.12.1 (*Pro rata interest settlement*)), Break Costs and other amounts payable in relation thereto under the Finance Documents.

8.7.5   The replacement of a Lender pursuant to Clause 8.7.4 shall be subject to the following conditions:

(A)   no Borrower shall have the right to replace the Agent or the Security Agent;

(B)   no Finance Party shall have any obligation to find a replacement Lender;

(C)   in no event shall the Lender replaced under Clause 8.7.4 be required to pay or surrender any of the fees received by such Lender pursuant to the Finance Documents; and

(D)   the Lender shall only be obliged to transfer its rights and obligations pursuant to Clause 8.7.4 once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer.

8.7.6   A Lender shall perform the checks described in Clause 8.7.5(D) as soon as reasonably practicable following delivery of a notice referred to in Clause 8.7.4 and shall notify the Agent and the Company when it is satisfied that it has complied with those checks.

8.8   **Restrictions**

8.8.1    Any notice of cancellation or prepayment given by any Party under this Clause 8 (*Prepayment and Cancellation*) shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

8.8.2    Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

8.8.3    Unless a contrary indication appears in this Agreement, any part of the Revolving Facility (but neither the DDTL Facility nor the DIP Facility) which is prepaid or repaid may be reborrowed in accordance with the terms of this Agreement.

8.8.4    No Borrower shall repay or prepay all or any part of the Utilisations or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

8.8.5    Subject to Clause 2.2 (*Increase*) and Clause 3 (*Accordion Increase*), no amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

8.8.6    If the Agent receives a notice under this Clause 8 (*Prepayment and Cancellation*) it shall promptly forward a copy of that notice to either the Company or the affected Lender, as appropriate.

8.8.7    If all or part of any Lender's participation in a Utilisation is repaid or prepaid and is not available for redrawing (other than by operation of Clause 5.2 (*Further conditions precedent*)), an amount of that Lender's Commitment (equal to the amount of the participation which is repaid or prepaid) will be deemed to be cancelled on the date of repayment or prepayment.

8.9    **Application of prepayments**

Any prepayment of a Utilisation pursuant to Clause 8.3 (*Mandatory prepayment – Maximum Available Amount*) or Clause 8.6 (*Voluntary prepayment of Utilisations*) shall be applied *pro rata* to each Lender's participation in that Utilisation.

9.    **[INTENTIONALLY BLANK]**

10.    **INTEREST**

10.1    **Calculation of interest**

The rate of interest on each Loan for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

10.1.1    Margin; and

10.1.2    the percentage rate per annum which is the aggregate of the Term SOFR Reference Rate and the applicable Credit Adjustment Spread, provided that if

63

such aggregated rate is less than zero, the rate for this limb of the calculation of the rate of interest shall be deemed to be zero.

**10.2** **Payment of interest**

10.2.1 Subject to clause 10.2.2 below, any Borrower to which a Loan has been made shall pay accrued interest on that Loan on the last day of each Interest Period (and, if the Interest Period is longer than six Months, on the dates falling at six-monthly intervals after the first day of the Interest Period).

10.2.2 Notwithstanding any other provision in any Finance Document, any accrued but unpaid interest on the DDTL Facility Loans as of the Fourth Restatement Effective Time ("**Accrued DDTL Interest Amount**") shall not be due and payable on the Fourth Restatement Effective Time or on the full repayment of the DDTL Facility Loans but shall instead be payable on the last day on the first Interest Period in respect of the Roll-Up DIP Facility Loans as determined in accordance with clause 11.1.8 (*Selection of Interest Periods*) (for the avoidance of doubt, no interest, fees or other amounts shall accrue on the Accrued DDTL Interest Amount); provided, that, for the avoidance of doubt, on and after the Fourth Restatement Effective Time, interest on the Roll-Up DIP Facility Loans shall separately and otherwise accrue in accordance with the terms of this Clause 10 (*Interest*).

**10.3** **Default interest**

10.3.1 If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to Clause 10.3.2, is two per cent. per annum higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan in the currency of the overdue amount for successive Interest Periods, each of a duration selected by the Agent (acting reasonably). Any interest accruing under this Clause 10.3 shall be immediately payable by the Obligor on demand by the Agent.

10.3.2 If any overdue amount consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to that Loan:

(A) the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

(B) the rate of interest applying to the overdue amount during that first Interest Period shall be two per cent. per annum higher than the rate which would have applied if the overdue amount had not become due.

10.3.3 Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

**10.4** **Notification of rates of interest**

10.4.1 The Agent shall promptly notify the relevant Lenders and the relevant Borrower of the determination of a rate of interest under this Agreement.

10.4.2 The Agent shall promptly notify the relevant Borrower of each Funding Rate relating to a Loan.

## 11. INTEREST PERIODS

### 11.1 Selection of Interest Periods

11.1.1 A Borrower may select an Interest Period for a Loan in the Utilisation Request for that Loan or (if the Loan is a DDTL Facility Loan or a DIP Facility Loan and has already been borrowed) in a Selection Notice.

11.1.2 Subject to this Clause 11 (*Interest Periods*), a Borrower may select an Interest Period of one month or three months or of any other period agreed between the Company, the Agent and all the Lenders in relation to the relevant Loan.

11.1.3 Each Selection Notice for a DDTL Facility Loan or a DIP Facility Loan is irrevocable and must be delivered to the Agent by the Borrower (or the Company on behalf of the Borrower) to which that DDTL Facility Loan or DIP Facility Loan, as applicable, was made not later than the Specified Time.

11.1.4 If a Borrower (or the Company) fails to deliver a Selection Notice to the Agent in accordance with paragraph 11.1.3 above, the relevant Interest Period will follow the term of the immediately preceding Interest Period for that DDTL Facility Loan or DIP Facility Loan.

11.1.5 An Interest Period for a Loan shall not extend beyond the Final Maturity Date.

11.1.6 Each Interest Period for a Loan shall start on the Utilisation Date or, in the case of a DDTL Facility Loan or DIP Facility Loan if such Loan has already been made, on the last day of its preceding Interest Period.

11.1.7 A Revolving Facility Loan has one Interest Period only.

11.1.8 The Roll-Up DIP Facility Loans deemed to be advanced at the Fourth Restatement Effective Time shall have an initial Interest Period equal to the then-remaining portion of the Interest Period of the DDTL Facility Loans subject to, and immediately prior to, such cashless "roll-up", substitution, and exchange as of the Fourth Restatement Effective Time.

### 11.2 Non-Business Days

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

### 11.3 Consolidation and division of DDTL Facility Loans and DIP Facility Loans

11.3.1 If two or more Interest Periods:

(A) relate to DDTL Facility Loans to be made to the same Borrower; and

(B) end on the same date,

those DDTL Facility Loans will, unless that relevant Borrower requests to the contrary in a Selection Notice for the next Interest Period or those Loans are denominated in different currencies, be consolidated into, and treated as, a single DDTL Facility Loan, as applicable, on the last day of the Interest Period.

11.3.2 Subject to Clause 5.3 (*Maximum number of Utilisations*), and Clause 6.3 (*Currency and amount*) if a Borrower (or the Parent on its behalf) requests in a Selection Notice that a DDTL Facility Loan be divided into two or more DDTL Facility Loans under the relevant Facility, that DDTL Facility Loan will, on the last day of its Interest Period, be so divided with Base Currency Amounts specified in that Selection Notice, having an aggregate Base Currency Amount equal to the amount of the relevant DDTL Facility Loan immediately before its division.

11.3.3 If two or more Interest Periods:

(A) relate to DIP Facility Loans to be made to the same Borrower; and

(B) end on the same date,

those DIP Facility Loans will, unless that relevant Borrower requests to the contrary in a Selection Notice for the next Interest Period or those Loans are denominated in different currencies, be consolidated into, and treated as, a single DIP Facility Loan, as applicable, on the last day of the Interest Period.

11.3.4 Subject to Clause 5.3 (*Maximum number of Utilisations*), and Clause 6.3 (*Currency and amount*) if a Borrower (or the Parent on its behalf) requests in a Selection Notice that a DIP Facility Loan be divided into two or more DIP Facility Loans under the relevant Facility, that DIP Facility Loan will, on the last day of its Interest Period, be so divided with Base Currency Amounts specified in that Selection Notice, having an aggregate Base Currency Amount equal to the amount of the relevant DIP Facility Loan immediately before its division.

## 12. CHANGES TO THE CALCULATION OF INTEREST

### 12.1 Unavailability of Term SOFR

12.1.1 **Interpolated Term SOFR:** If no Term SOFR is available for the Interest Period of any Loan, the applicable Term SOFR Reference Rate shall be the Interpolated Term SOFR for a period equal in length to the Interest Period of that Loan.

12.1.2 **Historic Term SOFR**: If no Term SOFR is available for the Interest Period of any Loan and it is not possible to calculate the Interpolated Term SOFR, the applicable Term SOFR Reference Rate shall be the Historic Term SOFR for that Loan.

12.1.3  *Interpolated Historic Term SOFR:* If Clause 12.1.2 applies but no Historic Term SOFR is available for the Interest Period of any Loan, the applicable Term SOFR Reference Rate shall be the Interpolated Historic Term SOFR for a period equal in length to the Interest Period of that Loan.

12.1.4  *Cost of funds:* If Clause 12.1.3 applies but it is not possible to calculate the Interpolated Historic Term SOFR, there shall be no Term SOFR Reference Rate for that Loan and Clause 12.2 (*Cost of funds*) shall apply to that Loan for that Interest Period.

## 12.2  Cost of funds

12.2.1  If this Clause 12.2 applies to a Loan for an Interest Period Clause 10.1 (*Calculation of interest)* shall not apply to that Loan for that Interest Period and the rate of interest on each Lender's share of that Loan for that Interest Period shall be the percentage rate per annum which is the sum of:

(A)  the Margin; and

(B)  the rate notified to the Agent by that Lender as soon as practicable and in any event within two Business Days of the first day of that Interest Period (or, if earlier, on the date falling two Business Days before the date on which interest is due to be paid in respect of that Interest Period), to be that which expresses as a percentage rate per annum its cost of funds relating to its participation in that Loan.

12.2.2  If this Clause 12.2 applies and the Agent or the Company so requires, the Agent and the Company shall enter into negotiations (for a period of not more than thirty days) with a view to agreeing a substitute basis for determining the rate of interest.

12.2.3  Any alternative basis agreed pursuant to Clause 12.2.2 shall, with the prior consent of all the Lenders and the Company, be binding on all Parties.

12.2.4  If this Clause 12.2 applies the Agent shall, as soon as is practicable, notify the Company.

## 12.3  Break Costs

12.3.1  Each Borrower shall, within three Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs (if any) attributable to all or any part of that Loan or Unpaid Sum being paid by that Borrower on a day prior to the last day of an Interest Period for that Loan or Unpaid Sum.

12.3.2  Each Lender shall, as soon as reasonably practicable after a demand by the Agent, provide a certificate confirming the amount of its Break Costs for any Interest Period in respect of which they become, or may become, payable.

## 13.  FEES

## 13.1  Commitment and other Fees

13.1.1   The Company shall pay to the Agent (for the account of each Revolving Facility Lender *pro rata* to their Available Commitments under the Revolving Facility) a commitment fee in relation to the Revolving Facility computed at the rate of 1.5 per cent. per annum on the Available Commitments (as adjusted for purposes of this calculation from the Third Amendment and Restatement Agreement Effective Date to reflect an aggregate reduction from the Total Revolving Facility Commitments equal to $50,000,000) under the Revolving Facility from the date of this Agreement up to and including the last day of the Availability Period in relation to the Revolving Facility (the "**Revolving Facility Commitment Fee Period**").

13.1.2   The accrued commitment fee set out in Clause 13.1.1 above is payable on the last day of each successive period of three Months which ends during or after the Revolving Facility Commitment Fee Period, on the last day of the Revolving Facility Commitment Fee Period (or such later date of the applicable three Month period ending thereafter) and, if any Revolving Facility Lender's Commitment is cancelled in full, at the time the cancellation is effective.

13.1.3   The Company shall pay to the Agent (for the account of each DDTL Facility *pro rata* to its then-applicable commitments under the DDTL Facility) any remaining commitment fee in relation to the DDTL Facility as in effect immediately prior to the Fourth Restatement Effective Time and based on the last day of the applicable availability period being the day immediately prior to the occurrence of the Fourth Restatement Effective Time, which remaining commitment fee shall be payable on the first date on which the DIP Unused Commitment Fee is payable under clause 13.1.5.

13.1.4   The Company shall pay to the Agent (for the account of each New Money DIP Facility Lender *pro rata* to their Available Commitments under the New Money DIP Facility Commitments) a commitment fee (such fee, the "**DIP Unused Commitment Fee**") in relation to the DIP Facility (on account of the New Money DIP Facility Commitments) computed at the rate of 1.5 per cent. per annum on the Available Commitments under the DIP Facility (on account of the New Money DIP Facility Commitments) from the Fourth Restatement Effective Time up to and including the last day of the Availability Period in relation to the DIP Facility (the "**DIP Commitment Fee Period**").

13.1.5   The accrued DIP Unused Commitment Fee set out in Clause 13.1.4 above is payable on the last day of each successive period of three Months which ends during or after the DIP Commitment Fee Period, on the last day of the DIP Commitment Fee Period (or such later date of the applicable three Month period ending thereafter) and, if any New Money DIP Facility Lender's Commitment is cancelled in full, at the time the cancellation is effective.

13.1.6   Upon entry of the Interim DIP Order, the DIP Facility Lenders shall be deemed to have fully earned, shall be entitled to in full, and shall receive a commitment premium (such commitment premium, the "**DIP Commitment Premium**") on account of the provision of the DIP Facility Commitments, which shall be payable upon the occurrence of the Plan Effective Date, in the form of 1.4% of the New Equity Interests (as defined in the Plan) issued and outstanding as of the Plan Effective Date.

13.1.7 Upon entry of the Final DIP Order, the Lenders providing the Exit Revolver Facility (as defined in the Restructuring Support Agreement) shall be deemed to have fully earned, shall be entitled to in full, and shall receive a commitment premium (such commitment premium, the "**Exit Commitment Premium**") on account of the provision of the Exit Revolver Facility, which shall be payable upon the occurrence of the Plan Effective Date, in the form of 1.1% of the New Equity Interests (as defined in the Plan) issued and outstanding as of the Plan Effective Date.

## 13.2 Upfront fee

The Company shall pay to the Original Lender an upfront fee in the amount and at the times agreed in a Fee Letter.

## 13.3 Agency fee

The Company shall pay to the Agent (for its own account) an agency fee in the amount and at the times agreed in a Fee Letter.

## 13.4 Security Agent fee

The Company shall pay to the Security Agent (for its own account) a security agent fee in the amount and at the times agreed in a Fee Letter.

## 13.5 Accordion fee

The Company may:

13.5.1 pay to any Accordion Increase Lender under an Accordion Increase (or the Agent on such Accordion Increase Lender's behalf) a fee in the amount and at the times agreed between the Company and that Accordion Increase Lender in a Fee Letter; and

13.5.2 pay to any arranger of the Accordion Increase a fee in the amount and at the times agreed between the Company and that arranger in a Fee Letter.

## 14. TAX GROSS-UP AND INDEMNITIES

## 14.1 Definitions

14.1.1 In this Agreement:

"**Protected Party**" means a Finance Party which is or will be subject to any liability, or required to make any payment, for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document other than a FATCA Deduction.

"**Tax Payment**" means either the increase in a payment made by an Obligor to a Finance Party under Clause 14.2 (*Tax gross-up*) or a payment under Clause 14.3 (*Tax indemnity*).

14.1.2 Unless a contrary indication appears, in this Clause 14 (*Tax Gross-up and Indemnities*) a reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination.

## 14.2 Tax gross-up

14.2.1 Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

14.2.2 The Company shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Agent accordingly. Similarly, a Lender shall notify the Agent on becoming so aware in respect of a payment payable to that Lender. If the Agent receives such notification from a Lender it shall notify the Company and that Obligor.

14.2.3 If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

14.2.4 If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

14.2.5 Within thirty days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Agent for the Finance Party entitled to the payment evidence reasonably satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

## 14.3 Tax indemnity

14.3.1 An Obligor shall (within three Business Days of demand by the Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

14.3.2 Clause 14.3.1 shall not apply:

    (A)    with respect to any Tax assessed on a Finance Party:

        (1)    under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in

which that Finance Party is treated as resident for tax purposes; or

(2)     under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

(B)     to the extent a loss, liability or cost:

(1)     is compensated for by an increased payment under Clause 14.2 (*Tax gross-up*); or

(2)     relates to a FATCA Deduction required to be made by a Party.

14.3.3  A Protected Party making, or intending to make a claim under Clause 14.3.1 shall promptly notify the Agent of the event which will give, or has given, rise to the claim, following which the Agent shall notify the Company.

14.3.4  A Protected Party shall, on receiving a payment from an Obligor under this Clause 14.3, notify the Agent.

14.4    **Tax Credit**

If an Obligor makes a Tax Payment and the relevant Finance Party determines that:

14.4.1  a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

14.4.2  that Finance Party has obtained and utilised that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

14.5    **Stamp taxes**

The Company shall pay and, within three Business Days of demand, indemnify each Secured Party against any cost, loss or liability that Secured Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document, other than where such Taxes arise in connection with the voluntary transfer or assignment by a Lender of any of its rights and/or obligations under a Finance Document (save where such transfer or assignment takes place following an Event of Default).

14.6    **VAT**

71

14.6.1 All amounts expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to Clause 14.6.2, if VAT is or becomes chargeable on any supply made by any Finance Party to any Party under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that Party).

14.6.2 If VAT is or becomes chargeable on any supply made by any Finance Party (the **"Supplier"**) to any other Finance Party (the **"Recipient"**) under a Finance Document, and any Party other than the Recipient (the **"Relevant Party"**) is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

   (A)   (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT. The Recipient must (where this paragraph (A) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

   (B)   (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

14.6.3 Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

14.6.4 Any reference in this Clause 14.6 to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term "representative member" to have the same meaning as in the Value Added Tax Act 1994).

14.6.5 In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party with details of that Party's VAT registration and such other information as is reasonably requested in connection

with such Finance Party's VAT reporting requirements in relation to such supply.

14.7    **FATCA Information**

14.7.1  Subject to Clause 14.7.3, each Party shall, within 10 Business Days of a reasonable request by another Party:

(A)    confirm to that other Party whether it is:

(1)    a FATCA Exempt Party; or

(2)    not a FATCA Exempt Party;

(B)    supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

(C)    supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

14.7.2  If a Party confirms to another Party pursuant to Clause 14.7.1(A) that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

14.7.3  Clause 14.7.1 shall not oblige any Finance Party to do anything, and Clause 14.7.1(C) shall not oblige any other Party to do anything, which would or might in its reasonable opinion constitute a breach of:

(A)    any law or regulation;

(B)    any fiduciary duty; or

(C)    any duty of confidentiality.

14.7.4  If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with Clause 14.7.1(A) or (B) above (including, for the avoidance of doubt, where Clause 14.7.3 applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

14.8    **FATCA Deduction**

14.8.1  Each Party may make any FATCA Deduction it is required to make by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes

73

such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

14.8.2 Each Party shall promptly, upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction), notify the Party to whom it is making the payment and, in addition, shall notify the Company and the Agent and the Agent shall notify the other Finance Parties.

## 15.   INCREASED COSTS

### 15.1   Increased Costs

15.1.1 Subject to Clause 15.3 (*Exceptions*) the Company shall, within three Business Days of a demand by the Agent, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of (k) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation or (ii) compliance with any law or regulation made after the date of this Agreement.

15.1.2 In this Agreement **"Increased Costs"** means:

(A)   a reduction in the rate of return from the Facilities or on a Finance Party's (or its Affiliate's) overall capital;

(B)   an additional or increased cost; or

(C)   a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document.

### 15.2   Increased cost claims

15.2.1 A Finance Party intending to make a claim pursuant to Clause 15.1 (*Increased Costs*) shall notify the Agent of the event giving rise to the claim, following which the Agent shall promptly notify the Company.

15.2.2 Each Finance Party shall, as soon as practicable after a demand by the Agent, provide a certificate confirming the amount of its Increased Costs.

### 15.3   Exceptions

15.3.1 Clause 15.1 (*Increased Costs*) does not apply to the extent any Increased Cost is:

(A)   attributable to a Tax Deduction required by law to be made by an Obligor;

      (B)      attributable to a FATCA Deduction required to be made by a Party;

      (C)      compensated for by Clause 14.3 (*Tax indemnity*) (or would have been compensated for under Clause 14.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in Clause 14.3.2 of Clause 14.3 (*Tax indemnity*) applied); or

      (D)      attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation.

15.3.2 In this Clause 15.3, a reference to a **"Tax Deduction"** has the same meaning given to that term in Clause 14.1 (*Definitions*).

## 16.    OTHER INDEMNITIES

### 16.1    Currency indemnity

16.1.1 If any sum due from an Obligor under the Finance Documents (a **"Sum"**), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the **"First Currency"**) in which that Sum is payable into another currency (the **"Second Currency"**) for the purpose of:

      (A)      making or filing a claim or proof against that Obligor; or

      (B)      obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within three Business Days of demand, indemnify each Secured Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

16.1.2 Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

### 16.2    Other indemnities

16.2.1 The Company shall (or shall procure that an Obligor will), within three Business Days of demand, indemnify each Secured Party against any cost, loss or liability incurred by that Finance Party as a result of:

      (A)      the occurrence of any Event of Default;

      (B)      a failure by an Obligor to pay any amount due under a Finance Document on its due date, including without limitation, any cost, loss or liability arising as a result of Clause 31 (*Sharing among the Finance Parties)*;

(C)     funding, or making arrangements to fund, its participation in a Utilisation requested by a Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone); or

(D)     a Utilisation (or part of a Utilisation) not being prepaid in accordance with a notice of prepayment given by a Borrower or the Company.

16.2.2  The Company shall promptly indemnify each Finance Party, each Affiliate of a Finance Party and each officer or employee of a Finance Party or its Affiliate, against any cost, loss or liability incurred by that Finance Party or its Affiliate (or officer or employee of that Finance Party or Affiliate) in connection with or arising out of the use of proceeds under any Facility or Transaction Security being taken over the Charged Property (including but not limited to those incurred in connection with any litigation, arbitration or administrative proceedings or regulatory enquiry concerning the use of proceeds under any Facility), unless such loss or liability is caused by the gross negligence or wilful misconduct of that Finance Party or its Affiliate (or employee or officer of that Finance Party or Affiliate). Any Affiliate or any officer or employee of a Finance Party or its Affiliate may rely on this Clause 16.2 subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

## 16.3    Indemnity to the Agent

The Company shall promptly indemnify the Agent against:

16.3.1  any cost, loss or liability incurred by the Agent (acting reasonably) as a result of:

(A)     investigating any event which it reasonably believes is a Default;

(B)     acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; or

(C)     instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; and

16.3.2  any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent (otherwise than by reason of the Agent's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to Clause 32.11 (*Disruption to payment systems etc.*) notwithstanding the Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent) in acting as Agent under the Finance Documents.

## 16.4    Indemnity to the Security Agent

16.4.1 Each Obligor jointly and severally shall promptly indemnify the Security Agent and every Receiver and Delegate against any cost, loss or liability incurred by any of them as a result of:

(A)     any failure by the Company to comply with its obligations under Clause 18 (*Costs and Expenses*);

(B)     acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

(C)     the taking, holding, protection or enforcement of the Transaction Security;

(D)     the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Security Agent and each Receiver and Delegate by the Finance Documents or by law;

(E)     any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents; or

(F)     acting as Security Agent, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Charged Property (otherwise, in each case, than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct).

16.4.2 Each Obligor expressly acknowledges and agrees that the continuation of its indemnity obligations under this Clause 16.4 will not be prejudiced by any release under Clause 29.26 (*Releases*) or otherwise in accordance with the terms of this Agreement.

16.4.3 The Security Agent and every Receiver and Delegate may, in priority to any payment to the Secured Parties, indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Clause 16.4 and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all moneys payable to it.

## 17.    MITIGATION BY THE LENDERS

### 17.1    Mitigation

17.1.1 Each Finance Party shall, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 8.1 (*Illegality*), Clause 14 (*Tax Gross-up and Indemnities*) or Clause 15 (*Increased Costs*) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

17.1.2 Clause 17.1.1 does not in any way limit the obligations of any Obligor under the Finance Documents.

### 17.2    Limitation of liability

17.2.1 The Company shall promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 17.1 (*Mitigation*).

17.2.2 A Finance Party is not obliged to take any steps under Clause 17.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

## 18. COSTS AND EXPENSES

### 18.1 Transaction expenses

The Company shall, subject to and in accordance with the procedures set out in the DIP Orders, subject in each case to any agreed fee arrangement, pay each of the DIP Secured Parties (and the Finance Parties) the amount of all costs and expenses (including legal fees) reasonably incurred by any of them (and, in the case of the Security Agent, by any Receiver or Delegate) in connection with the negotiation, preparation, printing, execution and perfection of, in respect of the DIP Facility (and the Revolving Facility and the DDTL Facility):

18.1.1 the Transaction Security, this Agreement and any other documents referred to in this Agreement;

18.1.2 any other Finance Documents executed after the date of this Agreement; and

18.1.3 the Finance Documents and other transactions in connection with the DIP Facility, the Chapter 11 Cases, and the Australian Proceedings.

### 18.2 Amendment costs

If:

18.2.1 an Obligor requests an amendment, waiver or consent; or

18.2.2 an amendment is required pursuant to Clause 32.10.1 (*Change of currency*) or Clause 38.8 (*Changes to reference rates*),

the Company shall, subject to and in accordance with the procedures set out in the DIP Orders, reimburse each of the Finance Parties for the amount of all costs and expenses (including legal fees) reasonably incurred by the Agent and the Security Agent (and, in the case of the Security Agent, by any Receiver or Delegate) (subject in each case to any agreed fee caps) in responding to, evaluating, negotiating or complying with that request or requirement, provided that, without limiting the foregoing, the Company shall pay those costs and expenses (including legal fees) as set forth in clause 9 of the Fourth Amendment and Restatement Agreement.

### 18.3 Enforcement costs

The Company shall pay to each Secured Party the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of, or the preservation of any rights under, any Finance Document and the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of

taking or holding the Transaction Security or enforcing these rights, including, without limitation, subject to and in accordance with the procedures set out in the DIP Orders, in connection with the Chapter 11 Cases and the Australian Proceedings.

19.    **GUARANTEE AND INDEMNITY**

19.1   **Guarantee and indemnity**

Each Guarantor irrevocably and unconditionally jointly and severally:

19.1.1   guarantees to each Finance Party punctual performance by each Borrower of all that Borrower's obligations under the Finance Documents;

19.1.2   undertakes with each Finance Party that whenever a Borrower does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

19.1.3   agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of a Borrower not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Finance Document on the date when it would have been due. The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 19 (*Guarantee and Indemnity*) if the amount claimed had been recoverable on the basis of a guarantee.

19.2   **Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

19.3   **Reinstatement**

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Finance Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of each Guarantor under this Clause 19 (*Guarantee and Indemnity*) will continue or be reinstated as if the discharge, release or arrangement had not occurred.

19.4   **Waiver of defences**

The obligations of each Guarantor under this Clause 19 (*Guarantee and Indemnity*) will not be affected by an act, omission, matter or thing which, but for this Clause, would reduce, release or prejudice any of its obligations under this Clause 19 (*Guarantee and Indemnity*) (without limitation and whether or not known to it or any Finance Party) including:

19.4.1 any time, waiver or consent granted to, or composition with, any Obligor or other person;

19.4.2 the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

19.4.3 the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

19.4.4 any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

19.4.5 any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Finance Document or any other document or security including without limitation any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

19.4.6 any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

19.4.7 any insolvency or similar proceedings.

19.5 **Guarantor intent**

Without prejudice to the generality of Clause 19.4 (*Waiver of defences*), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following: business acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

19.6 **Immediate recourse**

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause 19 (*Guarantee and Indemnity*). This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

19.7 **Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

19.7.1  refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

19.7.2  hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause 19 (*Guarantee and Indemnity*).

## 19.8    Deferral of Guarantors' rights

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Agent otherwise directs, no Guarantor will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 19 (*Guarantee and Indemnity*):

19.8.1  to be indemnified by an Obligor;

19.8.2  to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents;

19.8.3  to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party;

19.8.4  to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which any Guarantor has given a guarantee, undertaking or indemnity under Clause 19.1 (*Guarantee and indemnity*);

19.8.5  to exercise any right of set-off against any Obligor; and/or

19.8.6  to claim or prove as a creditor of any Obligor in competition with any Finance Party.

If a Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Finance Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Finance Parties and shall promptly pay or transfer the same to the Agent or as the Agent may direct for application in accordance with Clause 32 (*Payment Mechanics*).

## 19.9    Release of Guarantors' right of contribution

If any Guarantor (a **"Retiring Guarantor"**) ceases to be a Guarantor in accordance with the terms of the Finance Documents for the purpose of any sale or other disposal of that Retiring Guarantor then on the date such Retiring Guarantor ceases to be a Guarantor:

19.9.1 that Retiring Guarantor is released by each other Guarantor from any liability (whether past, present or future and whether actual or contingent) to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the Finance Documents; and

19.9.2 each other Guarantor waives any rights it may have by reason of the performance of its obligations under the Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under any Finance Document or of any other security taken pursuant to, or in connection with, any Finance Document where such rights or security are granted by or in relation to the assets of the Retiring Guarantor.

## 19.10   Additional security

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

## 19.11   Guarantee limitations

Notwithstanding anything to the contrary in this Agreement or any other Finance Document, the liabilities and obligations of any Obligor incorporated in Finland under this Clause 19 (*Guarantee and Indemnity*) shall be limited if and only to the extent that it would constitute (i) financial assistance within the meaning of Chapter 13, Section 10 of the Finnish Companies Act (Fi: *osakeyhtiölaki*, 624/2006, as amended); (ii) unlawful distribution of assets within the meaning of Chapter 13, Section 1 of the Finnish Companies Act; or (iii) a breach of any other applicable mandatory provisions of the Finnish Companies Act.

## 20.   REPRESENTATIONS

Each Obligor makes the representations and warranties set out in this Clause 20 (*Representations*) to each Finance Party on the date of this Agreement.

## 20.1   Status

20.1.1 It is a limited liability company, duly incorporated and validly existing under the law of its Original Jurisdiction.

20.1.2 Each of its Subsidiaries is a limited liability company, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

20.1.3 Subject to sub-clause (a) of Article 4.2 (*Qualifications to Representations*) of Schedule 13 (Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding) solely with respect to the DIP Facility, it and each of its Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

20.2    **Binding obligations**

Subject to the Legal Reservations and the Perfection Requirements and, solely with respect to the DIP Facility, subject to sub-clause (b) of Article 4.2 (Qualifications to Representations) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*):

20.2.1  the obligations expressed to be assumed by it in each Transaction Document to which it is a party are legal, valid, binding and enforceable obligations; and

20.2.2  (without limiting the generality of Clause 20.2.1), each Transaction Security Document to which it is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

20.3    **Non-conflict with other obligations**

Subject to sub-clause (c) of Article 4.2 (Qualifications to Representations) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*) solely with respect to the DIP Facility, the entry into and performance by it of, and the transactions contemplated by, the Transaction Documents and the granting of the Transaction Security do not and will not conflict with:

20.3.1  any material law or regulation applicable to it;

20.3.2  its or any of its Subsidiaries' constitutional documents; or

20.3.3  any agreement or instrument binding upon it or any of its Subsidiaries or any of its or any of its Subsidiaries' assets or constitute a default or termination event (however described) under any such agreement or instrument,

in the case of Clause 20.3.3 or any Key Agreement or Specified Insurance, which conflict would, or would reasonably be likely to, have a Material Adverse Effect.

20.4    **Power and authority**

Subject to sub-clause (d) of Article 4.2 (Qualifications to Representations) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*) solely with respect to the DIP Facility, it has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Transaction Documents to which it is a party and the transactions contemplated by those Transaction Documents.

20.5    **Validity and admissibility in evidence**

20.5.1  Subject to the Legal Reservations and the Perfection Requirements, all Authorisations and any other acts, conditions or things required or desirable:

(A)    to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Transaction Documents to which it is a party; and

(B)     to make the Transaction Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained, effected, done, fulfilled or performed and are in full force and effect.

20.5.2  All Authorisations necessary for the conduct of the business, trade and ordinary activities of members of the Group have been obtained or effected and are in full force and effect except if failure to obtain or effect those Authorisations would not have or be reasonably likely to have a Material Adverse Effect.

## 20.6   Governing law and enforcement

20.6.1  Subject to the Legal Reservations, the choice of the law stated to be the governing law of each Transaction Document will be recognised and enforced in its Relevant Jurisdictions.

20.6.2  Subject to the Legal Reservations and subject to Clause 20.6.3, any judgment obtained in relation to a Transaction Document in the jurisdiction of the stated governing law of that Transaction Document will be recognised and enforced in its Relevant Jurisdictions.

20.6.3  Any judgment obtained in relation to a Finance Document in the jurisdiction of the United Kingdom will be recognised and enforceable by the courts of Finland provided that (i) the Convention on Choice of Court Agreement concluded on 30 June 2015 (the **"Hague Convention"**) or (ii) any other convention having the same effect as the Hague Convention, is in force and is applicable to such judgment in respect of that Finance Document.

## 20.7   Insolvency

No:

20.7.1  corporate action, legal proceeding or other procedure or step described in Clause 25.7.1 (*Insolvency proceedings*); or

20.7.2  creditors' process described in Clause 25.9 (*Creditors' process*),

has been taken or, to the knowledge of the Company, threatened in relation to a member of the Group and none of the circumstances described in Clause 25.7 (*Insolvency*) applies to a member of the Group, in each case, subject to the thresholds and exceptions set out in such Clauses and the other provisions of such Clauses and excluding any such actions, proceedings, steps or process which have been discharged, revoked or otherwise lapsed.

## 20.8   Deduction of Tax

It is not required to make any Tax Deduction (as defined in Clause 14.1 (*Definitions*)) from any payment it may make under any Finance Document to a Lender.

## 20.9   No filing or stamp taxes

84

Under the law of its Relevant Jurisdictions it is not necessary that the Transaction Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Transaction Documents or the transactions contemplated by the Transaction Documents, except for the registration of the floating charge promissory notes under the Finnish Security Agreements and payment of the related registration fees or which is referred to in any Legal Opinion and which will be made or paid promptly after the date of the relevant Transaction Security Document and in any event within any period prescribed by applicable law.

## 20.10   No default

20.10.1 No Event of Default and, on the date of this Agreement, no Default is continuing or might reasonably be expected to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Transaction Document.

20.10.2 No other event or circumstance is outstanding which constitutes a default under any other agreement or instrument which is binding on it or any of its Subsidiaries or to which its (or any of its Subsidiaries') assets are subject which might have a Material Adverse Effect.

## 20.11   Financial statements

20.11.1 To the best of its knowledge and belief (having made due and careful enquiry), the Original Financial Statements were prepared in accordance with the Accounting Principles consistently applied.

20.11.2 The Original Financial Statements fairly present its financial condition as at the end of the relevant financial year and its results of operations during the relevant financial year (consolidated in the case of each Obligor).

## 20.12   *Pari passu* ranking

Subject, in the case of the DIP Facility to the DIP Orders and sub-clause (e) of Article 4.2 (*Qualifications to Representations*) of Schedule 13 (*Additional Provisions Relating to the Chapter 11* Cases *and Australian Proceeding*), its payment obligations under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

## 20.13   No proceedings

20.13.1 No litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency which, if adversely determined, might reasonably be expected to have a Material Adverse Effect has or have (to the best of its knowledge and belief) been started or threatened against it or any of its Subsidiaries.

20.13.2 No judgment or order of a court, arbitral body or agency which might reasonably be expected to have a Material Adverse Effect has (to the best of its

knowledge and belief (having made due and careful enquiry)) been made against it or any of its Subsidiaries.

## 20.14 No breach of laws

20.14.1 It has not (and none of its Subsidiaries has) breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

20.14.2 No labour disputes are current or, to the best of its knowledge and belief (having made due and careful enquiry), threatened against any member of the Group which have or are reasonably likely to have a Material Adverse Effect.

## 20.15 Environmental laws

20.15.1 Each member of the Group is in compliance with Clause 24.10 (*Environmental compliance*) and to the best of its knowledge and belief (having made due and careful enquiry) no circumstances have occurred which would prevent such compliance in a manner or to an extent which has or is reasonably likely to have a Material Adverse Effect.

20.15.2 No Environmental Claim has been commenced or (to the best of its knowledge and belief (having made due and careful enquiry)) is threatened against any member of the Group where that claim has or is reasonably likely, if determined against that member of the Group, to have a Material Adverse Effect.

## 20.16 Taxation

20.16.1 It is not (and none of its Subsidiaries is) materially overdue in the filing of any Tax returns and it is not (and none of its Subsidiaries is) overdue in the payment of any amount in respect of Tax, except to the extent that it is contesting payment in good faith and by appropriate means and in respect of which adequate provision for the payment of such Tax has been made and disclosed in the latest financial statements or other information delivered to the Agent under this Agreement.

20.16.2 No claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any of its Subsidiaries) with respect to Taxes, except to the extent that it is contesting such Tax liability or claim in good faith and in respect of which adequate provision has been made and disclosed in the latest financial statements or other information delivered to the Agent under this Agreement.

20.16.3 It is resident for Tax purposes only in its Original Jurisdiction.

## 20.17 Sanctions

No member of the Group is, nor, to the best of its knowledge, is any director, officer, employee, agent or Affiliate of any Obligor:

20.17.1 a Restricted Party;

20.17.2 in breach of Sanctions; or

20.17.3 to the best of its knowledge, subject to or involved in any complaint, claim, proceeding, formal notice, investigation or other action by any regulatory or enforcement authority or third party concerning any Sanctions.

## 20.18   Anti-Corruption Laws

20.18.1 Each member of the Group has conducted its businesses in compliance with Anti-Corruption Laws and has instituted and maintains as at the date of this Agreement policies and procedures designed to promote and achieve compliance with such laws.

20.18.2 No member of the Group (nor to the best of its knowledge and belief (having made due and careful enquiry) any agent, director, employee or officer of any member of the Group) has made or received, or directed or authorised any other person to make or receive, any offer, payment or promise to pay, of any money, gift or other thing of value, directly or indirectly, to or for the use or benefit of any person, where this violates or would violate, or creates or would create liability for it or any other person under, any Anti-Corruption Laws.

20.18.3 No member of the Group (nor to the best of its knowledge and belief (having made due and careful enquiry) any agent, director, employee or officer of any member of the Group) is being investigated by any agency, or party to any proceedings, in each case in relation to any Anti-Corruption Laws.

## 20.19   Security and Financial Indebtedness

20.19.1 No Security or Quasi-Security exists over all or any of the present or future assets of any member of the Group other than as permitted by this Agreement.

20.19.2 No member of the Group has any Financial Indebtedness outstanding other than as permitted by this Agreement.

## 20.20   Good title to assets

It and each of its Subsidiaries has a good, valid and marketable title to, or valid leases or licences of, or is otherwise entitled to use, all material assets necessary to carry on its business as presently conducted, where failure to do so would reasonably be expected to have a Material Adverse Effect.

## 20.21   Legal and beneficial ownership

It and each of its Subsidiaries is the sole legal and beneficial owner of the respective assets over which it purports to grant Security free from any claims, third party rights or competing interests other than Security permitted under Clause 24.3.3 (*Negative pledge*).

## 20.22   Sales Contracts

20.22.1 *Sales Contracts in effect*:  Subject to the Legal Reservations, each Sales Contract is in full force and effect and the payment obligations of the Buyer under the Sales Contract are legal, valid, binding and enforceable obligations and do not and will not conflict with any applicable law or regulation.

87

20.22.2 *No breach or repudiation*:  To the best of its knowledge and belief, no party to a Sales Contract is in breach of any payment, delivery, or other material obligation thereunder or has repudiated or done or caused to be done any act or thing evidencing an intention to repudiate that Sales Contract.

20.22.3 *No notice of inability to perform*:  No Obligor has received or given any notification (written or otherwise) of a failure or inability by any party to a Sales Contract to comply with its obligations thereunder.

20.22.4 *No force majeure or early termination event*:  To the best of its knowledge and belief, no event or circumstance has occurred that gives rise or might reasonably be expected to give rise to a right to terminate early, suspend performance under, repudiate or cancel any Sales Contract.

20.22.5 *No claims or liabilities*:  There are no claims, liabilities or obligations in existence between any Obligor and a Sales Contract counterparty or any other person that are or might reasonably be expected to be materially detrimental to the rights of any Finance Party under that Sales Contract or the Finance Documents.

20.22.6 *Arm's length terms*:  It has entered into each Sales Contract on arm's length terms.

## 20.23   Shares

20.23.1 The shares of any member of the Group which are subject to the Transaction Security are fully paid and not subject to any option to purchase or similar rights.

20.23.2 The constitutional documents of companies whose shares are subject to the Transaction Security do not and could not restrict or inhibit any transfer of those shares on creation or enforcement of the Transaction Security.

20.23.3 There are no agreements in force which provide for the issue or allotment of, or grant any person the right to call for the issue or allotment of, any share or loan capital of any member of the Group (including any option or right of pre-emption or conversion, other than by a member of the Parent Group, provided such pre-emption rights are disapplied vis-à-vis the Secured Parties in an enforcement).

## 20.24   Insurances

20.24.1 So far as it is aware, no event or circumstance has occurred and there has been no failure to disclose a fact which would entitle any insurer to materially reduce or avoid its liability under any Insurances.

20.24.2 Each member of the Group is in compliance with its obligations under each contract of Insurance in all material respects.

20.24.3 All insurance premiums which are due and payable pursuant to all and any Insurances have been paid in full and, so far as it is aware, there are no circumstances which would be reasonably likely to lead to any Insurances being revoked, vitiated or not renewed in the ordinary course.

20.25    **Key Agreements**

20.25.1 No member of the Group is in breach of its material obligations under any Key Agreement and no circumstances exist as a result of a default (however described) by any member of the Group which give rise to a right of a counterparty to terminate a Key Agreement with any member of the Group.

20.25.2 No Key Agreement is the subject of any pending or threatened dispute, suspension, withdrawal, termination (other than in the ordinary course of business), cancellation or revocation (other than in the ordinary course of business), whether in whole or in part, by any member of the Group.

20.26    **Reports**

20.26.1 All factual information included in each Report delivered by the Company pursuant to Clause 22 (*Collateral value*) and each Material Sales Contract Report is accurate and complete in all material respects at the time it was delivered.

20.26.2 Each Report delivered by the Company pursuant to Clause 22 (*Collateral value*) and each Material Sales Contract Report has been provided following careful consideration and has been prepared in good faith and with due care on the basis of most recent information and on the basis of assumptions which were reasonable as at the date they were prepared and supplied.

20.26.3 To the best of its knowledge and belief, all other written information provided by any member of the Group (including its advisers) to a Finance Party was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any respect.

20.27    **Chapter 11 Cases Representations**

20.27.1 Each Obligor makes the representations and warranties set out in Article 4.1 (Additional Representations) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*) to each Finance Party at the Fourth Restatement Effective Time and at the times set out in Clause 20.28 (*Repetition*).

20.27.2 The Chapter 11 Cases were validly commenced on the Petition Date, and (x) proper notice under the circumstances of the motion seeking approval of the Finance Documents and entry of the DIP Orders was given, and (y) the hearing for the approval of the Interim DIP Order has been held by the Bankruptcy Court.

20.28    **Repetition**

The Repeating Representations are deemed to be made by each Obligor by reference to the facts and circumstances then existing on:

20.28.1 the date of each Utilisation Request, the first day of each Interest Period and on the date of delivery of any Collateral Value Report; and

20.28.2 in the case of an Additional Obligor, the day on which it becomes (or it is proposed that it becomes) an Additional Obligor.

21. **INFORMATION UNDERTAKINGS**

The undertakings in this Clause 21 (*Information Undertakings*) remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

21.1 **Financial statements**

The Company shall supply to the Agent in sufficient copies for all the Lenders:

21.1.1 as soon as the same become available, but in any event within 120 days after the end of each of its financial years:

    (A)    the audited consolidated financial statements of the Parent for that financial year; and

    (B)    if prepared and if requested by a Lender, the audited financial statements of each Obligor for that financial year; and

21.1.2 as soon as the same become available, but in any event within 60 days after the end of each quarter of each of its financial years (on and from the first full financial quarter to end after the first Utilisation Date), the consolidated financial statements of the Parent for that financial quarter; provided, however, that the consolidated financial statements of the Parent for the financial quarter ended 30 June 2024 shall be required to be delivered under this Clause 21.1.2 no later than 13 September 2024.

21.2 **Compliance Certificate**

21.2.1 The Company shall supply to the Agent, with each set of financial statements delivered pursuant to Clause 21.1 (*Financial statements*) with respect to any such delivery to be made after the Outside Date (provided that no certification of compliance with, or calculations as to compliance with, Clause 23 (*Financial Covenants*) shall be required with respect to any period (and only such affected period) while such covenant is not required to be tested in accordance with such Clause (it being also understood and acknowledged that nothing in this Clause 21.2.1 (*Compliance Certificate*) shall limit the Company's separate and independent obligations under Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*))), a Compliance Certificate setting out (in reasonable detail) computations as to compliance with Clause 23 (*Financial Covenants*) as at the date as at which those financial statements were drawn up.

21.2.2 Each Compliance Certificate shall be signed by two directors of the Company.

21.3 **Requirements as to financial statements**

21.3.1 Each set of financial statements delivered by the Company pursuant to Clause 21.1 (*Financial statements*) shall be certified by a director of the relevant

company as fairly presenting its financial condition as at the date as at which those financial statements were drawn up.

21.3.2 The Company shall procure that each set of financial statements delivered pursuant to Clause 21.1 (*Financial statements*) is prepared using the Accounting Principles, accounting practices and financial reference periods consistent with those applied in the preparation of the relevant Original Financial Statements unless, in relation to any set of financial statements, it notifies the Agent that there has been a change in the Accounting Principles, the accounting practices or reference periods and its auditors (or, if appropriate, the auditors of the Parent or an Obligor) deliver to the Agent:

(A)  a description of any change necessary for those financial statements to reflect the Accounting Principles, accounting practices and reference periods upon which those Original Financial Statements were prepared; and

(B)  sufficient information, in form and substance as may be reasonably required by the Agent, to enable the Lenders to determine whether Clause 23 (*Financial Covenants*) has been complied with and make an accurate comparison between the financial position indicated in those financial statements and the relevant Original Financial Statements.

Any reference in this Agreement to those financial statements shall be construed as a reference to those financial statements as adjusted to reflect the basis upon which the Original Financial Statements were prepared.

## 21.4  Information: miscellaneous

The Company shall supply to the Agent (in sufficient copies for all the Lenders, if the Agent so requests):

21.4.1  to the extent the same have not already been provided to the Agent, all material documents dispatched by the Company to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched;

21.4.2  promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any member of the Group, and which might, if adversely determined, have a Material Adverse Effect;

21.4.3  promptly upon becoming aware of them, the details of any judgment or order of a court, arbitral body or agency which is made against any member of the Group and which might have a Material Adverse Effect;

21.4.4  promptly upon becoming aware of the same, details of any material scheduled or unplanned disruptions in production at any plant where Inventory is processed (subject to such disclosure not being restricted under any applicable confidentiality obligation binding on the Group);

21.4.5 promptly upon the renewal of any Specified Insurance, written evidence that the Specified Insurance contains an endorsement naming the Security Agent as additional insured;

21.4.6 promptly upon becoming aware of any change of ownership or control in respect of any Obligor or any change in the composition of the Group, details of the same;

21.4.7 promptly, such information as the Security Agent may reasonably require about the Charged Property and compliance of the Obligors with the terms of any Transaction Security Documents; and

21.4.8 promptly, such further information regarding the financial condition, business and operations of any member of the Group as any Finance Party (through the Agent) may reasonably request.

21.5 **Collateral Value Requirements**

The Company shall deliver Reports to the Agent in accordance with Clause 22 (*Collateral value*).

21.6 **Notification of default**

21.6.1 Each Obligor shall notify the Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

21.6.2 Promptly upon a request by the Agent, the Company shall supply to the Agent a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

21.7 **Other specific notification requirements**

The Company shall notify the Agent promptly if:

21.7.1 it or any other member of the Group is notified or reasonably expects that any Authorisation necessary for the Jervois Plant's ongoing production may be withdrawn, cancelled or not renewed for a period in excess of 30 days;

21.7.2 it receives an audit report pertaining to its supply chain policy or systems implemented in accordance with that policy (including its RMI certification or any modification or replacement thereof) and promptly provide such audit report to the Agent on request; or

21.7.3 a material adverse event occurs at the Jervois Plant or which is directly related to the operations of the Jervois Plant, including any fire, explosion, or other event of any type involving an emission or substance which is capable of causing harm to the Environment, serious accident or incident resulting in serious injury or death.

21.8 **Direct electronic delivery by Company**

The Company may satisfy its obligation under this Agreement to deliver any information in relation to a Lender by delivering that information directly to that Lender in accordance with Clause 34.6 (*Electronic communication*) to the extent that Lender and the Agent agree to this method of delivery.

21.9 **"Know your customer" checks**

21.9.1 If:

(A) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(B) any change in the status of an Obligor (or of a Holding Company of an Obligor) or the composition of the shareholders of an Obligor (or of a Holding Company of an Obligor) after the date of this Agreement; or

(C) a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges the Agent or any Lender (or, in the case of paragraph (C) above, any prospective New Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Obligor shall promptly upon the request of the Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender (for itself or, in the case of the event described in paragraph (C) above, on behalf of any prospective New Lender) in order for the Agent, such Lender or, in the case of the event described in paragraph (C) above, any prospective New Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

21.9.2 Each Lender shall promptly upon the request of the Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself) in order for the Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

21.9.3 The Company shall, by not less than five Business Days' prior written notice to the Agent, notify the Agent (which shall promptly notify the Lenders) of its intention to request that one of its Subsidiaries becomes an Additional Obligor pursuant to Clause 27 (*Changes to the Obligors*).

21.9.4 Following the giving of any notice pursuant to Clause 21.9.3, if the accession of such Additional Obligor obliges the Agent or any Lender to comply with

"know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender (for itself or on behalf of any prospective New Lender) in order for the Agent or such Lender or any prospective New Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Subsidiary to this Agreement as an Additional Obligor.

### 21.10   Q&A Sessions

The Company shall procure that at least one of the chief executive officer and the chief financial officer (or such substantively equivalent officers or other representatives) of the Parent Group's management team (and, without limiting the foregoing, any other member of the Parent Group's management team that is necessary to substantively discuss and answer questions with respect to the following matters) shall, on reasonable request by any Lender, make themselves available to the Lenders for a question and answer session regarding the Parent Group's business and financial performance, the then-applicable Approved Budget, and reasonably related or ancillary matters, at a time and venue reasonably agreed with the Majority Lenders which may be held by teleconference (provided that no more than one such session(s) per calendar week shall be held or required unless otherwise agreed by the Company (in its sole discretion)), and provided that such sessions shall only be required to be held in any week that an Approved Budget is required to be delivered pursuant to this Agreement.

## 22.   COLLATERAL VALUE

### 22.1   Definitions

For the purposes of this Clause 22 (*Collateral value*):

"**Book Value**" means

(a)     in respect of Eligible Receivables, the value of those receivables, as shown in the latest Report delivered under this Clause 22 (*Collateral value*); and

(b)     in respect of Eligible Inventory, the value of such Inventory, as shown in the latest Report delivered pursuant to this Clause 22 (*Collateral value*),

being based on the book value assigned to such Eligible Receivables or Eligible Inventory in the financial statements of the relevant member of the Group.

"**Collateral Value**" means the value calculated in accordance with Clause 22.2 (*Calculation of the Collateral Value*).  For purposes of clarity, all determinations of the Collateral Value and any composite term used in the calculation thereof will be based on the Group.

**"Collateral Value Report"** means a consolidated, monthly report, consisting of an Inventory Report, a Receivables Report and a Material Sales Contract Report, substantially in the form of the Initial Collateral Value Report.

**"Eligible Inventory"** means Inventory:

(a)     to which full unencumbered legal and beneficial title belongs to an Obligor and is not subject to any retention of title or conditional sale agreement or arrangements having similar effect;

(b)     which is:

     (i)     stored at an Approved Location provided that:

          (A)     no Relevant Event has occurred in respect of the relevant site where that Inventory is or will be stored, processed or delivered to; and

          (B)     all fees, including rental and any storage fees that have become due are paid in full and no event has arisen that has or would cause a breach or a termination of any rental contract or storage agreement; or

     (ii)     on board a vessel for a period of no longer than 90 days, with copies of the relevant documents of title (being the relevant bill of lading) being capable of independent audit in accordance with Clause 22.4 (*Independent Reports*);

(c)     subject to valid, first-ranking Transaction Security, free from any claims, rights of set-off and counterclaim, third party rights or competing interests (other than Permitted Security);

(d)     not commingled with any Third Party Inventory or with any Inventory or other goods over which any person other than the Secured Parties has Security;

(e)     not affected by any expropriation, attachment, sequestration, distress or execution or corporate action, legal proceedings or other procedures or step which has a reasonable likelihood of resulting in any expropriation, attachment, sequestration, distress or execution; and

(f)     insured by an Obligor under an insurance policy, provided that:

     (i)     such policy is in full force and effect; and

     (ii)     no event or circumstance has occurred or is continuing that would allow an insurer to refuse to pay a valid claim under that policy;

but excluding any Work in Progress being processed by Umicore.

**"Eligible Receivable"** means any Receivable which is owed to an Obligor under a Sales Contract and has not been sold or disposed of (or whose proceeds have not been

sold or disposed of) by the relevant Obligor and is not subject to any Security other than the Transaction Security.

**"Excess Concentration Amount"** means, as of any date of determination, without duplication, an amount equal to the aggregate Book Value of Eligible Receivables under Sales Contracts that cause the six-month rolling average of the aggregate Book Value of all Eligible Receivables under Sales Contracts which:

(a)     cannot be freely assigned;

(b)     provide for payment to be made in a currency other than USD, Euro, Japanese Yen or sterling; or

(c)     contain payment terms of longer than 60 days,

to exceed 10% of the six-month rolling average of the aggregate Book Value of all Eligible Receivables under all Sales Contracts.

**"Feed"** means ores and concentrates containing cobalt required for the purpose of producing Finished Goods.

**"Finished Goods"** means cobalt chemicals and powders including cobalt extra-fine powders, cobalt oxides, cobalt hydroxide, cobalt carbonate, cobalt sulphate and cobalt acetate.

**"Inventory"** means Feed, Work in Progress and Finished Goods.

**"Inventory Report"** means a report submitted to the Agent by the Company or any independent and qualified inspector in accordance with this Clause 22 (*Collateral value*) containing details of Inventory movements and Finished Goods by product, substantially in the same form as the inventory report comprising part of the Initial Collateral Value Report.

**"Receivable"** means each receivable payable to an Obligor under a Sales Contract.

**"Receivables Report"** means a report submitted to the Agent in accordance with this Clause 22 (*Collateral value*) containing details of invoice dates and due dates for outstanding Receivables, substantially in the same form as the receivables report comprising part of the Initial Collateral Value Report.

**"Relevant Event"** means the occurrence of any:

(a)     breakdown, failure or malfunction of any transport, telecommunications, computer services or systems, pandemics, epidemics, natural disasters or acts of God, war, terrorism, insurrection or revolution, strikes, industrial action, protest or strike that has or might result in the suspension or cessation of all or a part of the business for a period of more than 30 days; or

(b)     suspension or cessation of the carrying on (or threat to suspend or cease to carry on) any material part of the business for a period of more than 30 days,

provided that any potential or threatened suspension or cessation due to any event or circumstance caused by the COVID-19 pandemic (or any mutations thereof) shall not constitute a Relevant Event; a Relevant Event will only occur due to the COVID-19 pandemic (or any mutations thereof) if there is an actual suspension or cessation under paragraph (a) or (b) for a period of more than 30 days.

**"Report"** means a Collateral Value Report, any separate Receivables Report or Inventory Report or a Material Sales Contract Report.

**"Test Date"** means:

(a)     the tenth Business Day of each calendar month;

(b)     each date on which a Utilisation Request is delivered; and

(c)     if requested by the Agent, each date on which a Collateral Value Report that is delivered to the Agent pursuant to Clause 22.3.1(B) demonstrates a decrease by 10% or more in the total inventory volume since the previous Collateral Value Report was delivered (other than as a result of a planned decrease or shutdown in production at its relevant plant).

**"Third Party Inventory"** means goods to which legal or beneficial title belongs to any person other than an Obligor.

**"Work in Progress"** means cobalt containing solutions, chemicals and powders that are being processed in the facilities of the Group to produce Finished Goods.

22.2    **Calculation of the Collateral Value**

The Collateral Value shall be calculated on each Test Date as the sum of:

22.2.1  the aggregate (calculated in USD) of:

(A)     the Book Value of Eligible Receivables;

(B)     the Book Value of Eligible Inventory; and

(C)     any amounts paid into the Collection Accounts in accordance with Clause 8.3 (*Mandatory Prepayment - Maximum Available Amount*), to the extent the same continue to be maintained in the Collection Accounts as part of the Collection Account Required Balance,

less

22.2.2  any Excess Concentration Amount (calculated in USD),

and shall be the then-applicable Collateral Value for the purpose of this Agreement until the next Test Date.  For purposes of clarity, all determinations of the Collateral Value and any composite term used in the calculation thereof will be based on the Group.

22.3    **Collateral Value Report**

22.3.1   The Company shall supply to the Agent:

    (A)    within two Business Days of the end of each week, an Inventory Report and Receivables Report; and

    (B)    within 10 Business Days of the end of each calendar month, a Collateral Value Report.

22.3.2   Each Report shall be signed by a director of the Company (or, in the case of a Material Sales Contract Report where requested by the Agent, the Obligors' general counsel or external legal counsel), certifying the information supplied in such Report, as being true and accurate in all material respects.

22.3.3   If in the opinion of the Agent or any Lender (acting reasonably), a Report is incorrect in any material respect or the Agent or any Lender requires additional information to review a Report then the Agent may (and shall if requested by any Lender):

    (A)    notify the Company setting out in reasonable detail the reason for the request; and

    (B)    request supporting information in relation to any aspect of the Report that it reasonably requires, following which the Company shall provide such supporting information promptly and in any event not later than seven Business Days following delivery of such request or such longer period agreed between Company and the Agent.

22.3.4   If the information provided by the Company pursuant to Clause 22.3.3 or an independent inspector pursuant to Clause 22.4 (*Access*) demonstrates that any of the calculations set out in the most recent Report is incorrect, the Company shall promptly correct the calculation of the Collateral Value and notify the Agent of the same and the calculation of the Collateral Value as amended shall take effect as the then-applicable Collateral Value.

22.3.5   The Company shall bear the costs of preparing and delivering each Report in accordance with Clause 22.3.1 to the Agent.

22.4    **Independent Reports**

22.4.1   At any time, the Agent (acting on the instructions of the Majority Lenders, acting reasonably) may appoint an independent and qualified inspector to provide a weekly Inventory Report with respect to Finished Goods (on a validation basis on aggregate values with such report not to include any underlying details pertaining to the Group's trading relationships (including customer details, individual quanta or pricing)) (an **"Independent Inventory Report"**).

22.4.2   The costs of such Independent Inventory Report(s) shall be for the account of the Lenders unless an Event of Default is continuing.

22.4.3   Each Obligor shall (and shall procure that each member of the Group will) permit the independent inspector free access to visit and inspect each Approved

Location and any other premises, storage facilities, assets, books, accounts, records of any member of the Group and all control systems, documents (including, for goods in transit, copies of any relevant bill of lading) and records as it reasonably requires so as to prepare and deliver each Independent Inventory Report.

## 22.5 Access

22.5.1 The Obligors shall:

(A) ensure that representatives, nominees, advisers and independent contractors of any Finance Party are permitted free access from time to time to visit and inspect each member of the Group's premises, storage facilities, assets, books, accounts, records and, in each case, all control systems, documents and records in relation thereto; and

(B) take or refrain from taking any and all such actions as may be necessary or desirable from time to time, as requested by the Agent to enable an independent inspector to deliver to the Agent an Independent Inventory Report and/or for the purposes of preparing or verifying a Report,

in each case at any time during normal business hours and with three Business Days' prior notice and as reasonably required so as to prepare or verify a Report.

## 23. FINANCIAL COVENANTS

### 23.1 General

23.1.1 Except as provided to the contrary in this Agreement, an accounting term used in this Clause 23 (*Financial Covenants*) is to be construed in accordance with the principles applied in connection with the Original Financial Statements.

23.1.2 No item shall be credited or deducted more than once in any calculation under this Clause 23 (*Financial Covenants*).

23.1.3 The financial covenants set out in this Clause 23 (*Financial Covenants*) shall be calculated in accordance with the Accounting Principles and tested on each Financial Covenant Test Date by reference to the financial statements or, as applicable, in the case of the financial covenant set out in Clause 23.5 (*Minimum Group Liquidity*), the Approved Budget (but only in relation to the actual Liquidity set out for the immediately preceding week) delivered pursuant to Clause 21.1 (*Financial statements*) or Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*), as applicable.

23.1.4 The financial covenants shall be calculated and tested on a consolidated basis.

### 23.2 Financial definitions

For the purposes of this Clause 23 (*Financial Covenants*):

"**Book Equity**" means on any date the aggregate amount which in accordance with the Accounting Principles would be shown in the Parent Group's financial statements as the shareholders' equity in the Parent Group on a consolidated basis.

"**Book Equity to Total Assets Ratio**" means the ratio (at the level of the Parent on a consolidated basis for the Parent Group) of Book Equity to Total Assets as determined in accordance with the Accounting Principles.

"**Borrowings**" means, at any time, the aggregate outstanding principal, capital or nominal amount (and any fixed or minimum premium payable on prepayment or redemption) of any Financial Indebtedness of members of the Parent Group for or in respect of:

(a)     moneys borrowed and debit balances at banks or other financial institutions;

(b)     any acceptances under any acceptance credit or bill discount facility (or dematerialised equivalent);

(c)     any note purchase facility or the issue of bonds (but not Trade Instruments), notes, debentures, loan stock or any similar instrument;

(d)     any Finance Lease;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirements for de-recognition under the Accounting Principles);

(f)     any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument (but not, in any case, Trade Instruments) issued by a bank or financial institution in respect of (i) an underlying liability of an entity which is not a member of the Parent Group which liability would fall within one of the other paragraphs of this definition or (ii) any liabilities of any member of the Parent Group relating to any post-retirement benefit scheme;

(g)     any amount raised by the issue of shares which are redeemable (other than at the option of the issuer) before the Final Maturity Date or are otherwise classified as borrowings under the Accounting Principles;

(h)     any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind the entry into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 120 days after the date of supply;

(i)     any amount raised under any other transaction (including any forward sale or purchase agreement, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the Accounting Principles; and

(j)     the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (i) above.

"**Cash**" means, at any time (without double counting), cash at bank or in hand (including money market deposits, cash in tills and safes) or in transit, or payments made by cheques or debit cards which are yet to be received in cleared funds, or any credit balance on an account to which a member of the Parent Group (or together with other members of the Parent Group) is beneficially entitled (together, when used in this definition "**moneys**") and for so long as:

(a)     repayment of those moneys is not contingent on the prior discharge of any other indebtedness of any Parent Group member other than any indebtedness included in the calculation of Total Debt;

(b)     there is no Security over those moneys except for Security permitted under this Agreement (to the extent it relates to indebtedness that is included in the calculation of Total Debt) or standard rights of netting or set-off arrangements entered into by the members of the Parent Group in the ordinary course of their banking arrangements; and

(c)     such moneys (save for and in such circumstances, moneys securing the indebtedness referred to in parentheses in paragraphs (a) and (b) above) are capable of being applied in repayment or prepayment of indebtedness included in the calculation of Total Debt within 30 days without any condition other than the lapse of time and notice (together with any ordinary course administrative clearances if any) being given having to be fulfilled.

"**Cash Equivalent Investments**" means at any time:

(a)     certificates of deposit maturing within one year after the relevant date of calculation and issued by an Acceptable Bank;

(b)     any investment in marketable debt obligations issued or guaranteed by any government of a country which has a rating for its short-term unsecured and non credit-enhanced debt obligations of A-1 or higher by Standard & Poor's Rating Services or F1 or higher by Fitch Ratings Ltd or P-1 or higher by Moody's Investor Services Limited or by an instrumentality or agency of any such government having an equivalent credit rating, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c)     commercial paper not convertible or exchangeable to any other security:

    (i)     for which a recognised trading market exists;

    (ii)    issued by an issuer incorporated in a country, the government of which has a rating for its short-term unsecured and non credit-enhanced debt obligations of A-1 or higher by Standard & Poor's Rating Services or P-1 or higher by Moody's Investor Services Limited or F1 or higher by Fitch Ratings Ltd or by an instrumentality or agency of any such government having an equivalent credit rating;

    (iii)   which matures within one year after the relevant date of calculation; and

        (iv)     which has a credit rating of either A-1 or higher by Standard & Poor's Rating Services or F1 or higher by Fitch Ratings Ltd or P-1 or higher by Moody's Investor Services Limited, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its short-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

(d)      bills of exchange eligible for rediscount at a relevant central bank and accepted by an Acceptable Bank (or their dematerialised equivalent);

(e)      any investment in money market funds which (i) have a credit rating of either A-1 or higher by Standard & Poor's Rating Services or F1 or higher by Fitch Ratings Ltd or P-1 or higher by Moody's Investor Services Limited, (ii) which invest substantially all their assets in securities of the types described in paragraphs (a) to (d) above and (iii) can be turned into cash on not more than 30 days' notice; or

(f)      any other debt security approved by the Majority Lenders,

in each case, to which any member of the Group is alone (or together with other members of the Group) beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security (other than Permitted Security).

"**Financial Covenant Test Date**" means each 31 March, 30 June, 30 September and 31 December.

"**Liquidity**" means, as applicable:

(a)      for purposes of any calculation or other determination of compliance with the financial covenant in Clause 23.5 (*Minimum Group Liquidity*) or Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*), at any time, the aggregate of Cash held by a member of the Parent Group that, in each case, is not restricted, encumbered, or otherwise subject to any Security (except solely with respect to any Security permitted by clause (a) of the definition of Permitted Security); or

(b)      for any other purpose not specified in clause (a) of this definition, at any time the aggregate of Cash and Cash Equivalent Investments held by a member of the Parent Group or to which a member of the Parent Group is beneficially entitled.

"**Total Assets**" means the aggregate book value of the Parent Group's total assets treated as assets in accordance with the Accounting Principles.

"**Total Debt**" means, at any time, the aggregate amount of all obligations of members of the Parent Group for or in respect of Borrowings at that time but:

(a)      excluding any such obligations to any other member of the Parent Group; and

(b)      including, in the case of Finance Leases only, their capitalised value.

"**Trade Instruments**" means any performance bonds, or advance payment bonds or documentary letters of credit issued in respect of the obligations of any member of the Parent Group arising in the ordinary course of trading of that member of the Parent Group.

23.3    **Minimum Group Liquidity Ratio**

The Company shall ensure that, at all times after the Outside Date, the aggregate amount of the Liquidity of the Parent Group is not less than 10% of Total Debt.

23.4    **Book Equity to Total Assets Ratio**

The Company shall ensure that, at all times after the Outside Date, the Book Equity to Total Assets Ratio of the Parent Group is not less than 35% at any time.

23.5    **Minimum Group Liquidity**

The Company shall ensure that, at all times on or prior to the Outside Date, the aggregate amount of the Liquidity of the Parent Group is not less than $5,000,000.

24.    **GENERAL UNDERTAKINGS**

The undertakings in this Clause 24 (*General Undertakings*) remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

24.1    **Authorisations**

Each Obligor shall promptly obtain, comply with and do all that is necessary to maintain in full force and effect any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

24.1.1   enable it to perform its obligations under the Transaction Documents to which it is a party;

24.1.2   ensure, subject to the Legal Reservations and the Perfection Requirements, the legality, validity, enforceability or admissibility in evidence of any Transaction Document; and

24.1.3   carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

24.2    **Compliance with laws**

Subject, in the case of the DIP Facility, to subclause (a) of Article 5.3 of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*), each Obligor shall comply in all respects with all laws to which it may be subject, if failure so to comply would materially impair its ability to perform its obligations under the Transaction Documents to which it is a party.

24.3    **Negative pledge**

In this Clause 24.3, **"Quasi-Security"** means an arrangement or transaction described in Clause 24.3.2.

Subject, in the case of the DIP Facility, to subclause (a) of Article 6.2 (Qualifications to Negative Covenants) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*):

24.3.1　No Obligor shall (and the Company shall ensure that no other member of the Group will) create or permit to subsist any Security over any of its assets.

24.3.2　No Obligor shall (and the Company shall ensure that no other member of the Group will):

(A)　sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by an Obligor or any other member of the Group;

(B)　sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(C)　enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(D)　enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

24.3.3　Clauses 24.3.1 and 24.3.2 do not apply to any Security or (as the case may be) Quasi-Security which is Permitted Security.

**24.4　Disposals**

24.4.1　No Obligor shall (and the Company shall ensure that no other member of the Group will), enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset.　Notwithstanding anything to the contrary herein, no Obligor shall, directly or indirectly, sell, lease, transfer, or otherwise dispose of any assets or property to (i) the Parent without the prior written approval by the Majority Lenders, or (ii) any Non-Obligor (provided, however, that this paragraph shall not restrict any distribution to the Parent or payments to a Non-Obligor that are made strictly in accordance with the most recent Approved Budget (and in the case of a distribution to the Parent, the most recent Funding Summary Table for such calendar week), so long as, in each case, the amount, recipient, justification for, and a reasonably detailed description of the use of such payment proceeds are all specifically identified in such applicable Approved Budget (or otherwise are specifically identified in supporting written materials concurrently submitted with such applicable Approved Budget) (and

in the case of a distribution to the Parent, the most recent Funding Summary Table for such calendar week)).

24.4.2   Clause 24.4.1 does not apply to any sale, lease, transfer, payment, distribution or other disposal:

(A)   made in the ordinary course of trading of the disposing entity (including under any Sales Contract and including any sale, lease, transfer or other disposal of any metal, metal alloys or other smelting or mining products whether of cobalt, cobalt hydroxide or otherwise and any by-products thereof, in each case in any quantity);

(B)   of assets in exchange for other assets comparable or superior as to type, value and quality (other than an exchange of a non-cash asset for cash);

(C)   of Receivables made pursuant to a Permitted Receivables Discounting Arrangement (and, to the extent that any Receivables so sold, leased, transferred or otherwise disposed of are subject to any security interest pursuant to any Transaction Security Document, such Security shall, simultaneously with such sale, lease, transfer or other disposal, automatically be released);

(D)   any disposal of cash and cash equivalent investments in a manner not prohibited by the Finance Documents;

(E)   any distribution which constitutes a Permitted Parent Transfer;

(F)   any disposal of assets arising as a result of Permitted Security;

(G)   any disposal made by a member of the Group to another member of the Group, provided no Shortfall would arise as a result of such disposal;

(H)   any disposal of assets arising as a result of a Permitted Reorganisation;

(I)   any disposal of assets which are obsolete for the purpose for which such assets are normally utilised or which are no longer required for the purpose of the relevant person's business or operations;

(J)   where the higher of the market value or consideration receivable (when aggregated with the higher of the market value or consideration receivable for any other sale, lease, transfer or other disposal, other than any permitted under paragraphs (A) to (I) above) does not exceed $5,000,000 (or its equivalent in another currency or currencies) in any financial year; or

(K)   solely with respect to each ICO Bond Original Obligor (and without application to any other Obligor or member of the Group or duplication of any other basket in this Clause 24.4.2), any sale, lease, transfer or other disposal permitted under the ICO Bond Finance Documents (it being understood and acknowledged that any such sale, lease, transfer or other disposal by any ICO Bond Original Obligor shall only be

permitted and otherwise classified under this sub-clause (J) and not under any other sub-clause in this Clause 24.4.2).

24.5 **Arm's length basis**

24.5.1 No Obligor shall (and the Company shall ensure that no other member of the Group will) enter into any transaction with any person except on arm's length terms.

24.5.2 Clause 24.5.1 does not apply to:

(A)  loans between members of the Group; or

(B)  a Permitted Reorganisation.

24.6 **No guarantees or indemnities**

24.6.1 No Obligor shall (and the Company shall ensure that no other member of the Group will) incur or allow to remain outstanding any guarantee in respect of any obligation of any person.

24.6.2 Clause 24.6.1 does not apply to a guarantee which is a Permitted Guarantee.

24.7 **Financial Indebtedness**

24.7.1 No Obligor shall (and the Company shall ensure that no other member of the Group will) incur or allow to remain outstanding any Financial Indebtedness.

24.7.2 Clause 24.7.1  does not apply to Permitted Financial Indebtedness.

24.8 **Merger**

24.8.1 No Obligor shall (and the Company shall ensure that no other member of the Group will) enter into any amalgamation, demerger, merger or corporate reconstruction.

24.8.2 Clause 24.8.1 does not apply to any sale, lease, transfer or other disposal permitted pursuant to Clause 24.4 (*Disposals*) or a Permitted Reorganisation.

24.9 **Change of business**

The Company shall procure that no substantial change is made to the general nature of the business of the Group (taken as a whole) from that carried on at the date of this Agreement.

24.10 **Environmental compliance**

Each Obligor shall (and the Company shall ensure that each member of the Group will):

24.10.1 comply with all Environmental Laws;

24.10.2 obtain, maintain and ensure compliance with all requisite Environmental Permits;

24.10.3 implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

## 24.11 Environmental Claims

Each Obligor shall (through the Company), promptly upon becoming aware of the same, inform the Agent in writing of:

24.11.1 any Environmental Claim against any member of the Group which is current, pending or threatened; and

24.11.2 any facts or circumstances which are reasonably likely to result in any Environmental Claim being commenced or threatened against any member of the Group,

where the claim, if determined against that member of the Group, has or is reasonably likely to have a Material Adverse Effect.

## 24.12 Compliance with Sanctions

24.12.1 No Obligor shall (and the Company shall ensure that no other member of the Group will) take any action, make any omission or use (directly or indirectly) any proceeds of any Loan or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint-venture partner or any other person:

(A) to fund any activities or business of or with any person, or in any country or territory, that, at the time of such funding, is, a Restricted Party or Sanctioned Country; or

(B) in any other manner that:

(1) is a breach of Sanctions; and/or

(2) causes (or will cause) a breach of Sanctions by any person (including any Finance Party, bookrunner, advisor, investor, hedge provider or otherwise).

24.12.2 No Obligor shall (and the Company shall ensure that no other member of the Group will) take any action or make any omission that results, or is reasonably likely to result, in it or any Finance Party becoming a Restricted Party.

## 24.13 Anti-Corruption Laws

24.13.1 No Obligor shall (and the Company shall ensure that no other member of the Group will) directly or indirectly use the proceeds of any Facility for any purpose which would breach any Anti-Corruption Laws.

24.13.2 Each Obligor shall (and the Company shall ensure that each other member of the Group will):

(A)      conduct its businesses in compliance with Anti-Corruption Laws;

(B)      maintain policies and procedures designed to promote and achieve compliance with such laws; and

(C)      take all reasonable and prudent steps to ensure that each of its agents, directors, employees and officers comply with such laws.

## 24.14   Taxation

24.14.1 Each Obligor shall (and the Company shall ensure that each member of the Group will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that:

(A)      such payment is being contested in good faith;

(B)      adequate reserves are being maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the Agent under Clause 21.1 (*Financial statements*); and

(C)      such payment can be lawfully withheld and failure to pay those Taxes does not have or is not reasonably likely to have a Material Adverse Effect.

24.14.2 No member of the Group may change its residence for Tax purposes.

## 24.15   Insurance

24.15.1 Each Obligor shall (and the Company shall ensure that each other member of the Group will) maintain in full force and effect:

(A)      insurances on and in relation to its business and assets with reputable underwriters or insurance companies and to the extent usually insured against by prudent companies located in the same or a similar location and carrying on a similar business, including the Specified Insurances; and

(B)      insurances required by applicable law or pursuant to any Sale Contract;

24.15.2 Each Obligor shall procure that the Security Agent is named as additional insured under each of the Specified Insurances.

24.15.3 Each Obligor shall ensure that the aggregate amount of risk or liability that is covered by the Specified Insurances is, at all times, equal to or greater than the Outstandings.

## 24.16   Compliance with Sales Contracts

24.16.1 Each Borrower shall:

(A)    comply in all material respects with its obligations under each Sales Contract in the manner and at the times required in that Sales Contract; and

(B)    use all reasonable commercial endeavours to procure that each Buyer duly complies in all material respects with its payment and other material obligations under that Sales Contract in the manner and at the times required in that Sales Contract (and in accordance with the directions of the Agent or the Security Agent from time to time given pursuant to the terms of the Finance Documents); and

(C)    not take or omit to take any action that might result in:

(1)    any default on any of its payment, delivery and other material obligations under a Sales Contract;

(2)    any right to terminate a Sales Contract becoming exercisable by the Buyer; or

(3)    any counterclaim or right of set off arising under a Sales Contract other than any set-off under a Sales Contract that occurs prior to an Event of Default that is continuing, and in the ordinary course of trading as part of the settlement of final invoices for deliveries made thereunder.

24.16.2 Subject to any provision of the Finance Documents to the contrary, the Borrower shall diligently pursue (in a commercially reasonably manner) any remedies available to it in respect of any breach or claim arising in relation to each Sales Contract.

## 24.17   Key Agreements

24.17.1 Each Obligor shall (and the Company shall ensure that each member of the Group will):

(A)    perform and comply with its obligations under or in connection with the Key Agreements to which it is a party; and

(B)    take all reasonable steps to preserve and enforce any material claim or any material right it has under or in connection with or against any counterparty under any Key Agreement to which it is a party.

24.17.2 No Obligor shall (and the Company shall ensure that no member of the Group will) permit, consent or otherwise agree to the transfer or assignment by any counterparty to a Key Agreement of all or any of its obligations.

24.17.3 Each Obligor shall (and the Company shall ensure that each other member of the Group will) ensure that each Key Agreement is subject to Transaction Security.

24.17.4 No Obligor shall (and the Company shall ensure that no other member of the Group will) amend, vary, novate, supplement, supersede, waive, give notice to terminate or terminate any term of a Key Agreement other than:

(A)     to the extent that that amendment, variation, novation, supplement, superseding, waiver or termination is permitted by or in accordance with this Agreement; or

(B)     to the extent that such amendments, variations, supplements or waivers would not have, or are not reasonably likely to have a Material Adverse Effect.

## 24.18   Storage of the Charged Property

24.18.1 Each Obligor shall ensure that all Eligible Inventory is:

(A)     stored and transported safely and securely in accordance with usual market practices; and

(B)     clearly identifiable by means of the records kept by the relevant Obligor.

24.18.2 Each Obligor shall ensure that the Eligible Inventory is at all times kept segregated from any other assets of a similar type and, in the case of Eligible Inventories, if so required by the Security Agent while an Event of Default is continuing, remain at all times clearly labelled as being secured in favour of the Security Agent pursuant to the relevant Transaction Security Document.

## 24.19   Release from Approved Locations

No Obligor may permit or procure the release of any Eligible Inventory subject to a Transaction Security Document from an Approved Location other than as permitted in the Transaction Security Documents.

## 24.20   Collection Accounts

24.20.1 The Obligors shall maintain the Collection Accounts with an Account Bank in any jurisdiction in which an Obligor is incorporated (unless Security in form and substance satisfactory to the Agent is not able to be granted over bank accounts in such jurisdiction) or such other place as the Company and the Agent may agree.

24.20.2 Each Obligor shall have sole signing rights on each Collection Account.

24.20.3 Each Obligor shall at all times ensure that:

(A)     the Account Bank has been notified of the Transaction Security created in respect each Collection Account (and that each relevant Obligor shall have sole signing rights until the Security Agent otherwise notifies the Account Bank following the occurrence of an Event of Default);

(B)   the Collection Accounts remain free from any Security or Quasi-Security other than Transaction Security and any Security in favour of the relevant Account Bank under its general terms and conditions; and

(C)   at any time after the Outside Date (provided that the financial covenant in Clause 23.5 (*Minimum Group Liquidity*) is complied with in all respects (including testing and reporting of compliance thereof as set forth in Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*)) at all times on or prior to the Outside Date; for purposes of clarity, absent such timely compliance, the requirement set forth in this sub-clause (C) shall otherwise apply at all times before, on, and after the Outside Date), the aggregate balance of the Collection Accounts is no less than the Collection Account Required Balance.

24.20.4 Each Obligor shall ensure that all amounts due to it under each Sales Contract or pursuant to any Permitted Receivables Discounting Arrangement are paid to its Collection Account.

24.20.5 Each Obligor shall ensure that any proceeds and other amounts received by it under or in respect of any Eligible Receivable into any bank account other than a Collection Account are promptly paid into a Collection Account and, pending such payment, shall hold the same on trust for the Finance Parties.

24.20.6 The Obligors may withdraw amounts from a Collection Account at any time to pay amounts due and payable under the Finance Documents (in each case, in accordance with Clause 32.1 (*Payments to the Agent*)).

24.20.7 If:

(A)   an Event of Default is continuing; or

(B)   a Shortfall has occurred and has not been remedied or would occur as a result of that withdrawal,

no Obligor may, without the prior written consent of the Security Agent, withdraw any amount from or allow any amount to be debited from any Collection Account except (x) in accordance with Clause 24.20.6 and (y) so long as the financial covenant in Clause 23.5 (*Minimum Group Liquidity*) is complied with in all respects (including testing and reporting of compliance thereof as set forth in Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*)) at all times (and pro forma for such payment) on or prior to the Outside Date, at any time on or prior to the Outside Date for purposes set out in the then-applicable Approved Budget.

24.20.8 Each Obligor shall provide the Agent and/or the Security Agent and any of their representatives with access, on reasonable notice and during normal business hours, to review the books and records of the Collection Accounts.

24.20.9 Each Obligor shall give to each Account Bank all directions necessary to operate the Collection Accounts in accordance with the terms of the Finance Documents.

24.20.10    Each Obligor shall, within five Business Days of any request by the Agent, provide the Agent any information in relation to the Collection Accounts as the Agent may reasonably request.

24.20.11    Each Obligor undertakes to the Security Agent and the Agent that it will not at any time require any Account Bank to act in a manner inconsistent with the Finance Documents.

## 24.21 *Pari passu* ranking

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies; provided, that the DIP Facility shall be governed by the DIP Orders.

## 24.22 Supply chain policy

Each Obligor shall (and the Company shall procure that each other member of the Group will) maintain policies and procedures in relation to its supply chain which is in accordance with the OECD Guidance Model II Annex Policy (OECD Guidelines for Responsible Supply Chain of Minerals from Conflict Affected and High Risk Areas) (or any modification or replacement thereof from time to time).

## 24.23 Further assurance

24.23.1 Each Obligor shall (and the Company shall procure that each other member of the Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Security Agent may reasonably specify (and in such form as the Security Agent may reasonably require in favour of the Security Agent or its nominee(s)):

(A)    to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents or for the exercise of any rights, powers and remedies of the Security Agent or the Finance Parties provided by or pursuant to the Finance Documents or by law; and/or

(B)    to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

24.23.2 Each Obligor shall (and the Company shall procure that each other member of the Group will) take all such action reasonably requested from it by the Security Agent (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent or the Finance Parties by or pursuant to the Finance Documents, including without limitation, the DIP Orders.

24.24   **2024 Effective Time Conditions Subsequent**

Each Obligor shall (and the Company shall procure that each other member of the Parent Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Security Agent may reasonably specify (and in such form as the Security Agent may reasonably require in favour of the Security Agent or its nominee(s)) for the following (except in each case of clauses 24.24.1 through 24.24.3 for (x) the Designated Non-Obligors, and (y) such other exceptions otherwise agreed to by the Majority Lenders in their sole discretion):

24.24.1 to cause each direct or indirect Subsidiary of the Parent to become Additional Guarantors (other than, for purposes of clarity, such Subsidiaries that are already a Guarantor or Obligor), including without limitation, in compliance with the terms and conditions of Clause 27.3 (*Additional Guarantors*);

24.24.2 to create and perfect Security in (a) all or substantially all of the assets and properties of each such direct or indirect Subsidiary of the Parent referred to in the foregoing sub-clause 24.24.1, and (b) all Real Property interests owned, leased, or otherwise held by any of the Company and/or Jervois Finland Oy (and/or, with respect to any Real Property interests in Finland, any other Obligor that owns, leases, or otherwise holds Real Property interests in Finland), in each case of the foregoing sub-clauses (a) and (b), in favour of the Security Agent or its nominee(s) (such agreements, instruments, documents, and other Security under this Clause 24.24.2, collectively, the "**2024 Conditions Subsequent Transaction Security Documents**"); and

24.24.3 to deliver all legal opinions and other documents reasonably requested by the Security Agent (acting at the direction of the Majority Lenders) in connection with the Additional Guarantors and 2024 Conditions Subsequent Transaction Security Documents set out in sub-clauses 24.24.2 and 24.24.3 above,

in each case of the foregoing Clauses 24.24.1 through 24.24.3:

(A)     in the case of a member of the Parent Group that is incorporated or organized in a jurisdiction of incorporation or organisation of any existing Obligor immediately after the occurrence of the 2024 Effective Time, no later than 29 January 2025 (including, without limitation, the requirements with respect to Clause 24.24.2(b)); or

(B)     in the case of a member of the Parent Group that is not incorporated or organized in a jurisdiction of incorporation or organisation of any existing Obligor immediately after the occurrence of the 2024 Effective Time, 29 January 2025,

(or, in each case, such later date reasonably requested by the Company and agreed with the Majority Lenders (such agreement not to be unreasonably withheld, delayed or conditioned)). Notwithstanding the foregoing, except to the extent required by the Fourth Amendment and Restatement Agreement and the applicable DIP Orders, the requirements under this Clause 24.24 (*2024 Effective Time Conditions Subsequent*) shall be suspended during the pendency

of the Chapter 11 Cases and the Australian Proceedings so long as there is no Default or Event of Default hereunder and/or the Majority Lenders have not elected to require the resumption of such requirements upon reasonable prior written notice to the Obligors and the Agent.

### 24.25 Budget Reporting, Variance Testing, and Liquidity Certificates

The Obligors shall:

24.25.1 No later than 6:00 a.m. New York City, New York time on each Thursday (which deliveries, for the avoidance of doubt, commenced on 22 August 2024 under the 2024 August Waiver Letter), deliver to the Agent and the Lenders (i) an updated rolling 13 week cashflow forecast (as prepared by management of the Parent and approved by the chief financial officer of the Parent) setting forth the anticipated receipts and disbursements for the rolling thirteen week period, which shall be consistent with the form of the Initial Budget (the "**Updated Budget**"), (ii) the Liquidity of the Parent Group and the balances for the Collection Accounts as of the week-ending for the calendar week immediately preceding the week in which such report is being delivered and (iii) a Funding Summary Table completed with respect to proposed cash expenditures and uses by category and entity group as listed thereon, in each case, for the then-following calendar week;

24.25.2 The Updated Budget shall be subject to the approval of the Majority Lenders (such approval not to be unreasonably withheld); <u>provided</u> that in the event no objection to the Updated Budget is received within three (3) business days following the Lenders' receipt of the Updated Budget, the Updated Budget shall automatically be deemed to be an Approved Budget; <u>provided further</u> that until such time as the Updated Budget is approved or deemed approved, the prior Approved Budget shall remain in effect;

24.25.3 No later than 6:00 a.m. New York City, New York time on each Thursday (which deliveries, for the avoidance of doubt, commenced on 22 August 2024 under the 2024 August Waiver Letter as required thereunder), deliver to the Agent and Lenders a variance report consistent with the form attached in Exhibit B to the 2024 August Waiver Letter, showing the difference between total actual disbursements and total budgeted disbursements (the "**Disbursement Variance**") as well as the difference between total actual receipts and total budgeted receipts (the "**Receipt Variance**"), for each of the one-week period (ending on the Friday of the week), the two-week period (ending on the Friday of the week), and the period of total cumulative number of week(s) ended after the week of delivery of the Fourth Restatement Budget (starting the fourth Friday after delivery of the Fourth Restatement Budget); <u>provided</u>, that for purposes of clarification, any such Disbursement Variance determination for any Cumulative Applicable Variance Period shall be made with respect to, initially,  the Fourth Restatement Budget, and for the thirteen weeks after the final week of such Fourth Restatement Budget, the Fourth Restatement Budget as rolled forward into the then-applicable Approved Budget) (such one-week periods illustrating week-on-week variance, the "**Weekly Applicable Variance Periods**", such two-week periods illustrating bi-weekly variance, the "**Bi-Weekly Applicable Variance Periods**",  and such

cumulative period, the "**Cumulative Applicable Variance Period**", and all such variance periods taken together, the "**Applicable Variance Periods**") immediately preceding delivery of such variance report as set forth in this Clause 24.25.3, together with a reasonably detailed explanation of any such Disbursement Variance and/or Receipt Variance;

24.25.4 without the prior written consent of the Agent (acting on the instructions of the Majority Lenders acting reasonably):

(A) not permit the Disbursement Variance with respect to any Weekly Applicable Variance Period (by reference to the then-applicable Approved Budget), to exceed $750,000;

(B) beginning the fifth week after delivery of the Fourth Restatement Budget, not permit the Disbursement Variance with respect to the first Cumulative Applicable Variance Period from the date of delivery of the Fourth Restatement Budget and ending on or after the fourth Friday occurring after the date of the delivery of the Fourth Restatement Budget, and thereafter, the Cumulative Applicable Variance Period from the date of the delivery of the Fourth Restatement Budget and ending on the Friday occurring immediately prior to the delivery of the variance report, (in each case, by reference to the then-applicable Approved Budget; <u>provided</u>, that for purposes of clarification, any such Disbursement Variance determination for any Cumulative Applicable Variance Period shall be made with respect to, initially, the Fourth Restatement Budget, and for the thirteen weeks after the final week of such Fourth Restatement Budget, the Fourth Restatement Budget as rolled forward into the then-applicable Approved Budget), to exceed 15%; or

(C) suffer any the Receipt Variance with respect to any Bi-Weekly Applicable Variance Period (by reference to the then-applicable Approved Budget) to exceed 20%,

(in each case, other than in the case of total actual disbursements being less than total budgeted disbursements or total actual receipts exceeding the total budgeted receipts); <u>provided</u>, that, without limiting the foregoing, the Company shall promptly notify the Agent and the Lenders in writing of any planned or anticipated disbursements or receipts (or lack thereof) that are reasonably likely to cause the Disbursement Variance or Receipt Variance with respect to any Applicable Variance Period to be in excess of the permitted variance levels set forth above in this Clause 24.25.4; <u>provided</u>, <u>further</u>, that, without limitation and solely for purposes of clarity, any and all disbursements and payments made to legal counsel, financial and other advisors, or other professionals as set forth in the Specified Professional Fee Budget in any applicable period shall be reflected in any determination of any and all Disbursement Variances;

24.25.5 use, and procure that each Obligor shall use, all reasonable commercial endeavours that the directors of the Company (acting reasonably) believe are commercially advantageous for the Group and appropriate to use, to collect any receivables owed to it under a Sales Contract and to preserve and enforce any

rights the relevant member of the Group has against any Buyer under a Sales Contract with respect to the collection of receivables owed to the Group; provided, that, strictly for the avoidance of doubt, nothing in this clause 24.25.5 shall limit, conflict with, or otherwise qualify any other requirement or obligation of the Company under this Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*) or otherwise in this Agreement;

24.25.6 no later than 6:00 a.m. New York City, New York time on the Thursday immediately occurring after the end of each calendar week (which deliveries, for the avoidance of doubt, commenced on 22 August 2024 under the 2024 August Waiver Letter), deliver a certificate signed by two directors or senior officers of the Parent certifying as to compliance with the minimum Liquidity requirement set forth in Clause 23.5 (*Minimum Group Liquidity*) for such calendar week, together with reasonably detailed evidence in support thereof;

24.25.7 Subject to the procedures set forth in the DIP Orders (including funding into the Professional Fee Escrow (as defined in the DIP Orders) and Bankruptcy Court approval of fee applications, as applicable, without the prior written consent of the Majority Lenders in their sole discretion (which such consent may be provided by e-mail correspondence), in no event shall any of the Company, the Obligors, or any other member of the Parent Group (i) make any payment or disbursement to any legal counsel, financial and other advisor or professional (as set forth in the Specified Professional Fee Budget) in excess of the individual total amount for such counsel, advisor, or other professional as set forth in the Specified Professional Fee Budget for the entire period covered thereby, subject to, without duplication, a permitted variance per individual legal counsel, financial and other advisor or professional not to exceed 10% of the total amount budgeted to such individual legal counsel, financial and other advisor or professional, (ii) make any payment or disbursement to any legal counsel, financial and other advisor or professional (as set forth in the Specified Professional Fee Budget) in excess of the aggregate amount for all such legal counsels, financial and other advisors or professionals, taken as a whole, as specified in the Specified Professional Fee Budget for the entire period covered thereby (subject to, without duplication, the aforementioned permitted variance set forth in the immediately foregoing sub-clause (i)), or (iii) solely for the avoidance of doubt, amend, modify, or otherwise agree to any increase of amounts owed on account of or in connection with, the Specified Professional Fee Budget (after taking into account, but without duplication of, the permitted variance set forth above), and further provided that, for the avoidance of doubt, this Clause 24.25.7 shall only apply to payments and disbursements to any legal counsel, financial and other advisor or professional set forth in the Specified Professional Fee Budget;

24.25.8 [Reserved]; and

24.25.9 With respect to the Australian Entities:

(A) The Obligors shall, by no later than 6:00 a.m. New York City, New York time on each Thursday during the period commencing on the VA Commencement Date and continuing until the occurrence of the Plan Effective Date, deliver to the Agent and the Lenders updated projected

116

cash receipts expected to be collected, and necessary disbursements and expenditures expected to be incurred or made, solely by and solely on behalf of the Australian Entities for the period from and after the commencement of the Australian Proceedings through and including the Plan Effective Date, which shall be consistent with the form of the Initial Australian VA Budget (the "**Updated Australian VA Budget**"). The Updated Australian VA Budget shall be subject to the approval of the Majority Lenders (such approval not to be unreasonably withheld); provided, that in the event no objection to the Updated Australian VA Budget is received within three (3) business days following the Lenders' receipt of the Updated Australian VA Budget, the Updated Australian VA Budget shall automatically be deemed to be an Approved Australian VA Budget; provided, further, that until such time as the Updated Australian VA Budget is approved or deemed approved, the prior Approved Australian VA Budget shall remain in effect.   Without limiting the foregoing, the Obligors shall deliver to the Agent and the Lenders, no later than five (5) business days before the VA Commencement Date, (i) a proposed Updated Australian VA Budget to replace the Initial Australian VA Budget, and (ii) any other proposed reporting and testing modifications in connection therewith, including with respect to the Australian Disbursement Variance and other budget testing, which such proposed Updated Australian VA Budget and proposed modifications shall be mutually agreed to by the Majority Lenders and the Obligors prior to the commencement of the VA Commencement Date; provided, that, until such time as the Updated Australian VA Budget is mutually agreed, the Initial Australian VA Budget delivered in connection with the Fourth Amendment and Restatement Agreement shall remain in effect.

(B)     The Obligors shall, by no later than 6:00 a.m. New York City, New York time on each Thursday during the period commencing on the VA Commencement Date and continuing until the occurrence of the Plan Effective Date, deliver a variance report showing the difference between total actual disbursements and total budgeted disbursements (the "**Australian Disbursement Variance**") for the period of total cumulative number of week(s) ended after the VA Commencement Date (by reference to the then-applicable Approved Australian VA Budget; provided, that any such Australian Disbursement Variance determination for any Cumulative Applicable Australian Variance Period shall (x) be made with respect to, initially, the Initial Australian VA Budget (including, as substituted and replaced as set forth in, and subject to the terms and conditions of, the final sentence of sub-clause (A) immediately above), and for the thirteen weeks after the final week of such Initial Australian VA Budget, the Initial Australian VA Budget as rolled forward into the then-applicable latest delivered Approved Australian VA Budget, and (y) exclude from both the total actual disbursements and total budgeted disbursements, as applicable, (1) disbursements on account of the VA Administrator's fees and expenses incurred in the conduct of the Australian Proceedings, including, without limitation, the administration, deed administration

and/or consequential winding up and/or deregistration of the Parent and/or the Australian Entities (which such disbursements shall be subject to the aggregate $1,500,000 cap as set forth in the Approved Australian VA Budget), and (2) any disbursements that solely constitute transfers by and among only the Australian Entities and other members of the Parent Group for bona fide business purposes and working capital needs in the ordinary course of business and consistent with past practice) (such cumulative period, the "**Cumulative Applicable Australian Variance Period**") immediately preceding delivery of such variance report as set forth in this Clause 24.25.9(B), together with a reasonably detailed explanation of any such applicable Australian Disbursement Variance.

(C)   Without the prior written consent of the Majority Lenders in their sole discretion (which such consent may be provided by e-mail correspondence), in no event shall any of the Australian Entities, directly or indirectly, permit the Australian Disbursement Variance for the Cumulative Applicable Australian Variance Period (in each case, by reference to the then-applicable Approved Australian VA Budget; provided that, for purposes of clarification, any such Australian Disbursement Variance determination for any Cumulative Applicable Australian Variance Period shall be made with respect to, initially, the Initial Australian VA Budget, and for the thirteen weeks after the final week of such Initial Australian VA Budget, the Initial Australian VA Budget as rolled forward into the then-applicable latest delivered Approved Australian VA Budget) to exceed 15% (in each case, other than in the case of total actual disbursements being less than total budgeted disbursements); provided, that, without limiting the foregoing, the Obligors shall promptly notify the Agent and the Lenders in writing of any planned or anticipated disbursements or receipts (or lack thereof) that are reasonably likely to cause the Australian Disbursement Variance with respect to any Cumulative Applicable Australian Variance Period to be in excess of the permitted variance level set forth above in this Clause 24.25.9(C); provided, further, that, in the event the Obligors and the Majority Lenders agree in writing (including by e-mail correspondence) to modify the Australian Disbursement Variance or enter into some other testing framework pursuant to the terms and conditions of the final sentence of sub-clause (A) above, such modifications shall instead govern (it being understood and acknowledged that, absent such written mutual agreement, the provisions set forth above in this Clause 24.25.9(C) shall apply and remain in effect).

## 24.26   Process Agent condition subsequent

Within 2 Business Days of the Fourth Restatement Effective Time, the Company shall provide evidence to the Agent that any process agent referred to in clause 44.2 (*Service of process*) of the Facility Agreement has accepted its appointment in relation to any new Finance Documents set out in the Fourth Amendment and Restatement Agreement.

24.27   **Additional Specified Undertakings**

Notwithstanding anything to the contrary herein, without the prior written consent of the Majority Lenders (which may be provided by email correspondence), each Obligor shall not (and the Company shall ensure that each other member of the Parent Group shall not): (a) except in the ordinary course of business and consistent with past practice of the Parent Group, directly or indirectly, (i) incur, create, guarantee, or allow to remain outstanding any new indebtedness, Financial Indebtedness or any new Security or Quasi-Security, (ii) conduct a marketing and sale process for, or sell, lease, transfer or otherwise dispose of, any assets or property, or (iii) make any payments or transfers to any person or other party, in each case of this sub-clause (a)(iii), other than as set forth in the then-applicable Approved Budget (subject to any permitted Disbursement Variances applicable thereto as set forth in Clause 24.25.3 (Budget Reporting, Variance Testing, and Liquidity Certificates)); (b) fail to maintain the good standing and legal existence of each Obligor and other member of the Parent Group under the applicable laws, regulations, or other rules of the state, country, or other jurisdiction in which it is incorporated, organized, or otherwise formed or constituted; (c) amend, change, or otherwise modify any of the organizational, governance, constitutional, constituent, or other similar entity documents of any such Obligor or other member of the Parent Group; (d) authorize, create, issue, sell or grant any additional equity, stock, membership, or other ownership interests of the Parent, or reclassify, recapitalize, redeem, purchase, acquire, declare any distribution or dividend on, or make any distribution or dividend on any such equity, stock, membership, or other ownership interests of the Parent or any other member of the Parent Group (other than (i) solely with respect to distributions or dividends to the Parent, a Permitted Parent Transfer, and (ii) solely with respect to distributions or dividends to any Obligor other than the Parent, such distributions and dividends made ratably with respect to its equity, stock, membership, or other ownership interests (but not, in any event, made to the Parent); (e) except in the ordinary course of business and consistent with past practice of the Parent Group, enter into or amend any employee benefit, deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including offer letters, employment agreements, consulting agreements, severance arrangement, or change in control arrangements with respect to any of the Obligors or members of the Parent Group; (f) enter into any settlement or other proposed resolution of any claim held by or against the Obligors or any other member of the Parent Group on account of any pending litigation as of the date hereof or any legal proceedings brought against any of the Obligors or other members of the Parent Group, or any potential causes of action that any of the Obligors or other members of the Parent Group have or may have against any other party, whether such potential cause of action was known to exist before or discovered and determined to potentially exist in the future; or (g) directly or indirectly create, form, or otherwise acquire any new Subsidiary without such Subsidiary becoming an Additional Guarantor, creating and perfecting Security in all or substantially all of its assets or properties in favour of the Security Agent (or its nominee), satisfying the applicable requirements under the Deed of Priority (including with respect to any guarantees or security to be provided by such new Subsidiary on account of the ICO Bonds), and delivering such other reasonably requested documents, certificates, assignments, transfers, mortgages, charges, notices and instructions, in each case, subject to the timing requirements of, and any exclusions or exceptions agreed to in writing (including

by e-mail correspondence) by the Majority Lenders in their sole discretion and the reasonable requirements and specifications of the Security Agent.

24.28   **Chapter 11 Cases Undertakings**

Each Obligor shall (and the Company shall ensure that each other member of the Parent Group shall) comply with and perform the covenants and other undertakings set forth in Articles 5.1 (Additional Affirmative Covenants), 5.2 (Chapter 11 Milestones), 6.1 (Additional Negative Covenants), 9.1 (Priority), and 9.2 (Grant of Security) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

25.   **EVENTS OF DEFAULT**

Each of the events or circumstances set out in Clause 25 (*Events of Default*) is an Event of Default (save for Clause 25.27 (*Acceleration*)).

25.1   **Non-payment**

An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place and in the currency in which it is expressed to be payable unless:

25.1.1   its failure to pay is caused by:

    (A)   administrative or technical error; or

    (B)   a Disruption Event; and

25.1.2   payment is made within three Business Days of its due date.

25.2   **Financial covenants; Budget Testing, etc.**

25.2.1   Any requirement of Clause 23 (*Financial Covenants*) or Clause 24.25 (*Budget Reporting, Variance Testing, and Liquidity Certificates*) is not timely satisfied.

25.2.2   No Event of Default under Clause 25.2.1 will occur if the failure to comply is solely on account of (and not, for the avoidance of doubt, any other requirement referred to in Clause 25.2.1) an untimely delivery of the Updated Budget required under Clause 24.25.1, the variance report required under 24.25.3, or the certificate required under Clause 24.25.6, in each case, so long as such failure to timely deliver is remedied within one (1) Business Day after the applicable required date of delivery.

25.3   **Collateral Value**

25.3.1   An Obligor does not comply with any provision of Clause 22 (*Collateral value*) or Clause 24.20 (*Collection Accounts*).

25.3.2   No Event of Default under Clause 25.3.1 will occur if the failure to comply is capable of remedy and is remedied within five Business Days of the earlier of (A) the Agent giving notice to the Company and (B) the Company becoming aware of the failure to comply.

25.4   **Other obligations**

25.4.1   An Obligor or the Parent does not comply with any provision of the Finance Documents (other than, for the avoidance of doubt, those referred to in (a) Clause 25.1 (*Non-payment*), (b) Clause 25.2 (*Financial Covenants; Budget Testing, Etc.*), (c) Clause 25.3 (*Collateral Value*), (d) Clause 25.21 (*Restructuring Support Agreement*), (e) Clause 25.22 (*2024 Effective Time Conditions Subsequent*), (f) Clause 25.23 (*Prohibited Transfers to Parent*)), (g) Clause 25.24 (*Additional Specified Undertakings*), and (h) Clause 25.25 (*Chapter 11 Cases Undertakings*).

25.4.2   No Event of Default under Clause 25.4.1 will occur if the failure to comply is capable of remedy and is remedied within 20 Business Days of the earlier of (A) the Agent giving notice to the Company and (B) the Company becoming aware of the failure to comply.

25.5   **Misrepresentation**

25.5.1   Any representation or statement made or deemed to be made by an Obligor or the Parent in the Finance Documents or any other document delivered by or on behalf of any Obligor or the Parent under or in connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be made.

25.5.2   No Event of Default under Clause 25.5.1 will occur if the circumstances giving rise to the misrepresentation are capable of remedy and are remedied within 20 Business Days of the earlier of (i) the Agent giving notice to the Company and (ii) the Company becoming aware of the failure to comply.

25.6   **Cross-default**

Subject to sub-clause (a) of Article 7.2 (Qualifications to Events of Default) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*):

25.6.1   Any Financial Indebtedness of any member of the Group or the Parent is not paid when due nor within any originally applicable grace period.

25.6.2   Any Financial Indebtedness of any member of the Group or the Parent is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

25.6.3   Any commitment for any Financial Indebtedness of any member of the Group or the Parent is cancelled or suspended by a creditor of any member of the Group or the Parent as a result of an event of default (however described).

25.6.4   Any creditor of any member of the Group or the Parent becomes entitled to declare any Financial Indebtedness of any member of the Group or the Parent due and payable prior to its specified maturity as a result of an event of default (however described).

25.6.5  No Event of Default will occur under this Clause 25.6 if the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within Clauses 0 to 25.6.4 is less than $10,000,000 (or its equivalent in any other currency or currencies).

## 25.7   Insolvency

Subject to sub-clause (b) of Article 7.2 (Qualifications to Events of Default) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*):

25.7.1  A member of the Group or the Parent:

(A)     is unable or admits inability to pay its debts as they fall due in each case other than solely as a result of its balance sheet liabilities exceeding its balance sheet assets except where the same would result in or require the taking of any corporate action, legal proceedings, insolvency filing, cessation of trading and/or any other procedure or steps referred to in Clauses 25.8 (*Insolvency proceedings*) and 25.9 (*Creditors' process*);

(B)     suspends making payments on any of its debts; or

(C)     by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its indebtedness.

25.7.2  A moratorium is declared in respect of any indebtedness of any member of the Group or the Parent.

## 25.8   Insolvency proceedings

Subject to sub-clause (c) of Article 7.2 (Qualifications to Events of Default) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*),

any corporate action, legal proceedings or other procedure or step is taken in relation to:

25.8.1  the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any member of the Group or the Parent other than a solvent liquidation or reorganisation of any member of the Parent Group permitted under this Agreement;

25.8.2  a composition, compromise, assignment or arrangement with any creditor of any member of the Group or the Parent;

25.8.3  the appointment of a liquidator (other than in respect of a solvent liquidation of a member of the Parent Group permitted by this Agreement), receiver, administrative receiver, administrator, compulsory manager or other similar

officer in respect of any member of the Group or the Parent or any of their assets; or

25.8.4  enforcement of any Security over any assets of any member of the Group or the Parent,

or any analogous procedure or step is taken in any jurisdiction.

This Clause 25.8 shall not apply to:

(A)  any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 20 Business Days of commencement;

(B)  (in the case of an application to appoint an administrator or commence proceedings) any proceedings which the Agent is satisfied (acting on the instructions of the Majority Lenders) will be withdrawn before it is heard or will be unsuccessful; or

(C)  any step or procedure contemplated in relation to merger that is permitted under Clause 24.8 (*Merger*).

## 25.9   Creditors' process

Any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of $10,000,000 and is not discharged within 20 Business Days.

## 25.10   Ownership of the Obligors

Other than as a result of a Permitted Reorganisation, an Obligor (other than the Company) is not or ceases to be a wholly owned Subsidiary of the Company.

## 25.11   Unlawfulness and invalidity

25.11.1 It is or becomes unlawful for an Obligor or any Subordinated Creditor (as defined in the Subordination Deed) to perform any of its obligations under the Finance Documents or any Transaction Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective or any subordination created under the Subordination Deed is or becomes unlawful.

25.11.2 Any obligation or obligations of any Obligor or any Subordinated Creditor (as defined in the Subordination Deed) under any Finance Documents or the subordination created under the Subordination Deed is not (subject to the Legal Reservations) or ceases to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Finance Parties under the Finance Documents.

25.11.3 Any Finance Document ceases to be in full force and effect or any Transaction Security ceases to be legal, valid, binding, enforceable or effective or is alleged by a party to it (other than a Finance Party) to be ineffective.

123

25.12 **Repudiation and rescission of agreements**

An Obligor (or any other relevant party) rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Finance Document or any Transaction Security.

25.13 **Cessation of business**

The Group (taken as a whole) suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business, other than as a result of a disposal permitted by this Agreement.

25.14 **Audit qualification**

The auditors of the Parent qualify the audited annual consolidated financial statements of the Parent Group in a manner which is, or could reasonably be expected to be, materially adverse to the interests of the Finance Parties.

25.15 **Litigation**

Any litigation, arbitration, administrative, governmental, regulatory or other investigations, proceedings or disputes are commenced or threatened, or any judgment or order of a court, arbitral body or agency is made, in relation to the Finance Documents or the transactions contemplated in the Finance Documents or against any member of the Group or its assets which have or are reasonably likely to have a Material Adverse Effect.

25.16 **Expropriation**

The authority or ability of any member of the Group to conduct its business is materially limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, compulsory acquisition, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets or the shares in that member of the Group (including without limitation the displacement of all or part of the management of any member of the Group) having in the case of assets an aggregate value in excess of $10,000,000 and is not, if capable of remedy, discharged within 20 Business Days after commencement.

25.17 **Non-production**

There has been an interruption or suspension (other than a scheduled interruption or suspension for maintenance purposes) of the production from the Jervois Plant for a continuous period of 30 days (or more).

25.18 **Key Agreements**

25.18.1 Any Key Agreement is amended, varied or waived in a way that is reasonably likely to have a material adverse effect on the ability of any Obligor to perform its obligations under any Finance Document.

124

25.18.2 An event or circumstance occurs that gives rise to, or might reasonably be expected to give rise to, the termination, frustration, repudiation, rescission or cancellation of any Key Agreement, or to a right to effect or make such termination, repudiation, rescission or cancellation in a way that is likely to have a material adverse effect on the ability of any Obligor to perform its obligations under any of the Finance Documents.

## 25.19  Material adverse change

Any event or circumstance occurs which has or is reasonably likely to have a Material Adverse Effect.

## 25.20  Convertibility/Transferability

Any foreign exchange law is amended, enacted or introduced, in each case, after the original date of this Agreement in the Relevant Jurisdiction of an Obligor that has or is reasonably likely to have the effect of prohibiting, or restricting or delaying in any material respect any payment that any Obligor is required to make pursuant to the terms of any Finance Document.

## 25.21  Restructuring Support Agreement

The Restructuring Support Agreement is terminated or fails to be in full force or effect (other than by reason of the transaction (or transactions, as the case may be) contemplated thereby being completed and implemented in accordance with its terms).

## 25.22  2024 Effective Time Conditions Subsequent

Any requirement of Clause 24.24 (*2024 Effective Time Conditions Subsequent*) is not timely satisfied.

## 25.23  Prohibited Transfers to Parent

Any member of the Parent Group distributes, dividends, pays over, disposes, assigns, advances, loans, contributes or otherwise transfers, in each case of the foregoing directly or indirectly, any cash (including, without limitation, any proceeds of the Loans), assets, or other property to the Parent other than solely as a Permitted Parent Transfer.

## 25.24  Additional Specified Undertakings

Any Obligor or any other member of the Parent Group does not comply with any obligation, undertaking, requirement, or other provision of Clause 24.27 (*Additional Specified Undertakings*).

## 25.25  Chapter 11 Cases Undertakings

Any Obligor or any other member of the Parent Group does not comply with any obligation, undertaking, requirement, or other provision of Clause 24.28 (*Chapter 11 Cases Undertakings*).

25.26   **Chapter 11 Cases Events of Default**

The occurrence of any event or events specified as an "Event of Default" set forth in Article 7.1 (Additional Events of Default) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*).

25.27   **Acceleration**

Subject to Article 8 (Remedies Upon Event of Default) of Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*), on and at any time after the occurrence of an Event of Default which is continuing the Agent may, and shall if so directed by the Majority Lenders:

by notice to the Company:

25.27.1 cancel each Available Commitment of each lender at which time each such Available Commitment shall immediately be cancelled;

25.27.2 declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable;

25.27.3 declare that all or part of the Utilisations be payable on demand, whereupon they shall immediately become payable on demand by the Agent on the instructions of the Majority Lenders; and/or

25.27.4 exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

26.   **CHANGES TO THE LENDERS**

26.1   **Assignments and transfers by the Lenders**

Subject to this Clause 26 (*Changes to the Lenders*), a Lender (the **"Existing Lender"**) may:

26.1.1   assign any of its rights; or

26.1.2   transfer by novation any of its rights and obligations,

to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the **"New Lender"**).

26.2   **Company consent**

26.2.1   The consent of the Company is required for any (i) assignment, (ii) transfer or (iii) sub-participation or similar arrangement (excluding any arrangements with insurers or re-insurers), in each case, where any voting rights under the Finance Documents are transferred either at the time of entry or at a later date as a result of such assignment, transfer, or sub-participation or similar arrangement (a

**"Restricted Sub-Participation"**) by an Existing Lender, unless the assignment, transfer or Restricted Sub-Participation is:

(A)      to another Lender or an Affiliate of any Lender; or

(B)      subject to Clause 26.2.2, made at a time when an Event of Default is continuing,

and provided that the Existing Lender notifies the Company prior to the assignment, transfer or Restricted Sub-Participation.

26.2.2    The consent of the Company is required for any assignment or transfer or Restricted Sub-Participation by an Existing Lender to an Industry Competitor, unless the assignment, transfer or Restricted Sub-Participation is made at a time when an Event of Default under Clause 25.1 (*Non-payment*), Clause 25.7 (*Insolvency*), Clause 25.8 (*Insolvency proceedings*) or Clause 25.9 (*Creditors' process*) has occurred and is continuing.

26.2.3    The consent of the Company to an assignment, transfer or Restricted Sub-Participation must not be unreasonably withheld or delayed.  The Company will be deemed to have given its consent 10 Business Days after the Existing Lender has requested it unless consent is expressly refused by the Company within that time.

## 26.3    Other conditions of assignment or transfer

26.3.1    An assignment or transfer of part of a Lender's participation in Commitments or Loans must be in a minimum amount of $5,000,000.

26.3.2    An assignment will only be effective on:

(A)      receipt by the Agent (whether in the Assignment Agreement or otherwise) of written confirmation from the New Lender (in form and substance satisfactory to the Agent) that the New Lender will assume the same obligations to the other Finance Parties and the other Secured Parties as it would have been under if it had been an Original Lender; and

(B)      performance by the Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Lender, the completion of which the Agent shall promptly notify to the Existing Lender and the New Lender.

26.3.3    A transfer will only be effective if the procedure set out in Clause 26.6 (*Procedure for transfer*) is complied with.

26.3.4    If:

(A)      a Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

(B)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Lender or Lender acting through its new Facility Office under Clause 14 (*Tax Gross-up and Indemnities*) or Clause 15 (*Increased Costs*),

then the New Lender or Lender acting through its new Facility Office is only entitled to receive payment under those Clauses to the same extent as the Existing Lender or Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred. This Clause 26.3.4 shall not apply in respect of an assignment or transfer made in the ordinary course of the primary syndication of the Revolving Facility.

26.3.5   Each New Lender, by executing the relevant Transfer Certificate or Assignment Agreement, confirms, for the avoidance of doubt, that the Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the transfer or assignment becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as the Existing Lender would have been had it remained a Lender.

## 26.4   Assignment or transfer fee

The New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Agent (for its own account) any fee agreed between the Agent and that Lender in respect of the relevant assignment or transfer.

## 26.5   Limitation of responsibility of Existing Lenders

26.5.1   Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

(A)    the legality, validity, effectiveness, adequacy or enforceability of the Transaction Documents, the Transaction Security or any other documents;

(B)    the financial condition of any Obligor;

(C)    the performance and observance by any Obligor or any other member of the Group of its obligations under the Transaction Documents or any other documents; or

(D)    the accuracy of any statements (whether written or oral) made in or in connection with any Transaction Document or any other document,

and any representations or warranties implied by law are excluded.

26.5.2   Each New Lender confirms to the Existing Lender, the other Finance Parties and the Secured Parties that it:

(A)    has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and

its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender in connection with any Transaction Document or the Transaction Security; and

(B)    will continue to make its own independent appraisal of the creditworthiness of each Obligor and its related entities whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

26.5.3  Nothing in any Finance Document obliges an Existing Lender to:

(A)    accept a re-transfer or re-assignment from a New Lender of any of the rights and obligations assigned or transferred under this Clause 26 (*Changes to the Lenders*); or

(B)    support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Obligor of its obligations under the Transaction Documents or otherwise.

## 26.6   Procedure for transfer

26.6.1  A transfer is effected in accordance with Clause 26.6.3 when the Agent executes an otherwise duly completed Transfer Certificate delivered to it by the Existing Lender and the New Lender. The Agent shall, subject to Clause 26.6.2, as soon as reasonably practicable after receipt by it of a duly completed Transfer Certificate appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Certificate.

26.6.2  The Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the transfer to such New Lender.

26.6.3  Subject to Clause 26.12 (*Pro rata interest settlement*), on the Transfer Date:

(A)    to the extent that in the Transfer Certificate the Existing Lender seeks to transfer by novation its rights and obligations under the Finance Documents and in respect of the Transaction Security each of the Obligors and the Existing Lender shall be released from further obligations towards one another under the Finance Documents and in respect of the Transaction Security and their respective rights against one another under the Finance Documents and in respect of the Transaction Security shall be cancelled (being the **"Discharged Rights and Obligations"**);

(B)    each of the Obligors and the New Lender shall assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that

Obligor and the New Lender have assumed and/or acquired the same in place of that Obligor and the Existing Lender;

(C)     the Agent, the Security Agent, the New Lender, the other Lenders shall acquire the same rights and assume the same obligations between themselves and in respect of the Transaction Security as they would have acquired and assumed had the New Lender been an Original Lender with the rights and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Agent, the Security Agent and the Existing Lender shall each be released from further obligations to each other under the Finance Documents; and

(D)     the New Lender shall become a Party as a "Lender".

**26.7    Procedure for assignment**

26.7.1  An assignment may be effected in accordance with Clause 26.7.3 when the Agent executes an otherwise duly completed Assignment Agreement delivered to it by the Existing Lender and the New Lender. The Agent shall, subject to Clause 26.7.2, as soon as reasonably practicable after receipt by it of a duly completed Assignment Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Assignment Agreement.

26.7.2  The Agent shall only be obliged to execute an Assignment Agreement delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the assignment to such New Lender.

26.7.3  Subject to Clause 26.12 (*Pro rata interest settlement*), on the Transfer Date:

(A)     the Existing Lender will assign absolutely to the New Lender its rights under the Finance Documents and in respect of the Transaction Security expressed to be the subject of the assignment in the Assignment Agreement;

(B)     the Existing Lender will be released by each Obligor and the other Finance Parties from the obligations owed by it (the **"Relevant Obligations"**) and expressed to be the subject of the release in the Assignment Agreement (and any corresponding obligations by which it is bound in respect of the Transaction Security); and

(C)     the New Lender shall become a Party as a "Lender" and will be bound by obligations equivalent to the Relevant Obligations.

26.7.4  Lenders may utilise procedures other than those set out in this Clause 26.7 to assign their rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance with Clause 26.6 (*Procedure for transfer*), to obtain a release by that Obligor from the obligations owed to that

Obligor by the Lenders nor the assumption of equivalent obligations by a New Lender).

**26.8    Copy of Transfer Certificate, Assignment Agreement or Increase Confirmation to Company**

The Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate, an Assignment Agreement or an Increase Confirmation, send to the Company a copy of that Transfer Certificate, Assignment Agreement or Increase Confirmation.

**26.9    Security over Lenders' rights**

In addition to the other rights provided to Lenders under this Clause 26 (*Changes to the Lenders*), each Lender may, without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

26.9.1    any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

26.9.2    any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or Security shall:

(A)    release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security for the Lender as a party to any of the Finance Documents; or

(B)    require any payments to be made by an Obligor other than or in excess of, or grant to any person any more extensive rights than, those required to be made or granted to the relevant Lender under the Finance Documents.

**26.10    Lender Accordion Increase**

26.10.1 A Lender may increase its Commitment (as requested by the Company), for the purposes of Clause 2.3 (*Accordion Increases*) (and be entitled to share *pari passu* in all Security created by each Transaction Security Document owed to it as such) by delivering an Accordion Increase Lender Certificate in accordance with this Clause 26.10.

26.10.2 Any person specified in Clause 26.10.1 shall increase its Commitment if the Agent executes an Accordion Increase Lender Certificate duly completed and signed on behalf of that person.

26.10.3 On the date that the Agent executes each Accordion Increase Lender Certificate, the Agent, the Security Agent, the Lender party to that Accordion Increase

Lender Certificate, the other Lenders and the Obligors shall acquire the same rights and assume the same obligations between themselves as they would have acquired and assumed had that Lender been an Original Lender with the Commitment (as applicable) specified by it in that Accordion Increase Lender Certificate.

26.11   **Acceding Accordion Lenders**

26.11.1 The Company may, for the purposes of Clause 2.3 (*Accordion Increases*), request that a bank or financial institution or a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets becomes a party to this Agreement as a Lender (and be entitled to share *pari passu* in all Security created by each Transaction Security Document owed to it as such) (an **"Acceding Accordion Lender"**), **provided that**:

(A)   such Acceding Accordion Lender is agreed upon between the Agent and the Company; and

(B)   the Commitment (as applicable) assumed by such Acceding Accordion Lender shall be additional to, and not in replacement of, any Facility as at the time immediately prior to such Acceding Accordion Lender becoming a party to this Agreement.

26.11.2 Subject to Clause 26.11.1, each of the Parties hereby agrees that an Acceding Accordion Lender shall become a party to this Agreement as a "Lender" upon the execution and delivery by such Acceding Accordion Lender to the Agent of an Accordion Increase Lender Certificate and upon the countersignature by the Agent of such document. Each Party (other than the Agent) irrevocably authorises the Agent to execute an Accordion Increase Lender Certificate for this purpose.

26.11.3 The Agent shall, subject to Clause 26.11.4, promptly after receipt by it of a duly completed Accordion Increase Lender Certificate appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Accordion Increase Lender Certificate.

26.11.4 The Agent shall only be obliged to execute an Accordion Increase Lender Certificate delivered to it by an Acceding Accordion Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such Acceding Accordion Lender.

26.11.5 On the date that the Agent executes an Accordion Increase Lender Certificate:

(A)   the Agent, the Security Agent, the Acceding Accordion Lender party to that Accordion Increase Lender Certificate, the other Lenders and the Obligors shall acquire the same rights and assume the same obligations between themselves as they would have acquired and assumed had that Acceding Accordion Lender been an Original Lender with the

Commitment (as applicable) specified by it in that Accordion Increase Lender Certificate; and

(B)     that Acceding Accordion Lender shall become a Party as a "Lender".

26.12   ***Pro rata* interest settlement**

26.12.1 If the Agent has notified the Lenders that it is able to distribute interest payments on a "*pro rata* basis" to Existing Lenders and New Lenders then (in respect of any transfer pursuant to Clause 26.6 (*Procedure for transfer*) or any assignment pursuant to Clause 26.7 (*Procedure for assignment*) the Transfer Date of which, in each case, is after the date of such notification and is not on the last day of an Interest Period):

(A)     any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favour of the Existing Lender up to but excluding the Transfer Date (**"Accrued Amounts"**) and shall become due and payable to the Existing Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than six Months, on the next of the dates which falls at six-Monthly intervals after the first day of that Interest Period); and

(B)     the rights assigned or transferred by the Existing Lender will not include the right to the Accrued Amounts, so that, for the avoidance of doubt:

(1)     when the Accrued Amounts become payable, those Accrued Amounts will be payable to the Existing Lender; and

(2)     the amount payable to the New Lender on that date will be the amount which would, but for the application of this Clause 26.12, have been payable to it on that date, but after deduction of the Accrued Amounts.

26.12.2 In this Clause 26.12 references to **"Interest Period"** shall be construed to include a reference to any other period for accrual of fees.

26.12.3 An Existing Lender which retains the right to the Accrued Amounts pursuant to this Clause but which does not have a Commitment shall be deemed not to be a Lender for the purposes of ascertaining whether the agreement of any specified group of Lenders has been obtained to approve any request for a consent, waiver, amendment or other vote of Lenders under the Finance Documents.

27.     **CHANGES TO THE OBLIGORS**

27.1    **Assignments and transfer by Obligors**

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

27.2    **Additional Borrowers**

27.2.1 Subject to compliance with the provisions of Clauses 21.9.3 and 21.9.4 of Clause 21.9 (*"Know your customer" checks*), the Company may request that any of its wholly owned Subsidiaries becomes an Additional Borrower. That Subsidiary shall become an Additional Borrower if:

(A)    the Majority Lenders approve the addition of that Subsidiary;

(B)    the Company delivers to the Agent a duly completed and executed Accession Deed;

(C)    that Subsidiary is (or becomes) a Guarantor prior to or at the same time as becoming a Borrower;

(D)    the Company confirms that no Default is continuing or would occur as a result of that Subsidiary becoming an Additional Borrower; and

(E)    the Agent has received all of the documents and other evidence listed in Part B of Schedule 2 (*Conditions Precedent*) in relation to that Additional Borrower, each in form and substance satisfactory to the Agent.

27.2.2 The Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part B of Schedule 2 (*Conditions Precedent*).

27.2.3 Other than to the extent that the Majority Lenders notify the Agent in writing to the contrary before the Agent gives the notification described in Clause 27.2.2, the Lenders authorise (but do not require) the Agent to give that notification. The Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

## 27.3    Additional Guarantors

27.3.1 Subject to compliance with the provisions of Clauses 21.9.3 and 21.9.4 of Clause 21.9 ("*Know your customer" checks*), the Company may request that any of its wholly owned Subsidiaries become an Additional Guarantor. That Subsidiary shall become an Additional Guarantor if:

(A)    the Company delivers to the Agent a duly completed and executed Accession Deed; and

(B)    the Agent has received all of the documents and other evidence listed in Part B of Schedule 2 (*Conditions Precedent*) in relation to that Additional Guarantor, each in form and substance satisfactory to the Agent.

27.3.2 The Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part B of Schedule 2 (*Conditions Precedent*).

27.3.3   Other than to the extent that the Majority Lenders notify the Agent in writing to the contrary before the Agent gives the notification described in Clause 27.3.2, the Lenders authorise (but do not require) the Agent to give that notification. The Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

### 27.4   Repetition of Representations

Delivery of an Accession Deed constitutes confirmation by the relevant Subsidiary that the Repeating Representations are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

### 27.5   Resignation of a Guarantor

27.5.1   The Company may request that a Guarantor (other than the Company or a Borrower) ceases to be a Guarantor by delivering to the Agent a Resignation Letter.

27.5.2   The Agent shall accept a Resignation Letter and notify the Company and the Lenders of its acceptance if:

(A)   no Default is continuing or would result from the acceptance of the Resignation Letter (and the Company has confirmed this is the case); and

(B)

(1)   the Majority Lenders have consented to the Company's request; or

(2)   the resignation occurs or is required as a result of a Permitted Reorganisation.

## 28.   ROLE OF THE AGENT

### 28.1   Appointment of the Agent

28.1.1   The Lenders appoint the Agent to act as its agent under and in connection with the Finance Documents.

28.1.2   The Lenders authorise the Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

### 28.2   Instructions

28.2.1   The Agent shall:

> (A) unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Agent in accordance with any instructions given to it by:
>
>> (1) all Lenders if the relevant Finance Document stipulates the matter is an all Lender decision; and
>>
>> (2) in all other cases, the Majority Lenders; and
>
> (B) not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (A) above.

28.2.2 The Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or, if the relevant Finance Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion. The Agent may refrain from acting unless and until it receives any such instructions or clarification that it has requested.

28.2.3 Save in the case of decisions stipulated to be a matter for any other Lender or group of Lenders under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any instructions given to the Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties save for the Security Agent.

28.2.4 The Agent may refrain from acting in accordance with any instructions of any Lender or group of Lenders until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability which it may incur in complying with those instructions.

28.2.5 In the absence of instructions, the Agent may act (or refrain from acting) as it considers to be in the best interest of the Lenders.

28.2.6 The Agent is not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings relating to any Finance Document. This Clause 28.2.6 shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Transaction Security Documents or enforcement of the Transaction Security or Transaction Security Documents.

## 28.3 Duties of the Agent

28.3.1 The Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

28.3.2 Subject to Clause 28.3.3, the Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Agent for that Party by any other Party.

28.3.3 Without prejudice to Clause 26.8 (*Copy of Transfer Certificate, Assignment Agreement or Increase Confirmation to Company*), Clause 28.3.2 shall not apply to any Transfer Certificate, any Assignment Agreement or any Increase Confirmation.

28.3.4 Except where a Finance Document specifically provides otherwise, the Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

28.3.5 If the Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

28.3.6 If the Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Finance Party (other than the Agent or the Security Agent) under this Agreement it shall promptly notify the other Finance Parties.

28.3.7 The Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

## 28.4 No fiduciary duties

28.4.1 Nothing in any Finance Document constitutes the Agent as a trustee or fiduciary of any other person.

28.4.2 The Agent shall not be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

## 28.5 Business with the Group

The Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

## 28.6 Rights and discretions

28.6.1 The Agent may:

(A)     rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

(B)     assume that:

(1)     any instructions received by it from the Majority Lenders, any Lenders or any group of Lenders are duly given in accordance with the terms of the Finance Documents; and

(2)       unless it has received notice of revocation, that those instructions have not been revoked; and

(C)      rely on a certificate from any person:

(1)       as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

(2)       to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (1) above, may assume the truth and accuracy of that certificate.

28.6.2  The Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Lenders) that:

(A)      no Default has occurred (unless it has actual knowledge of a Default arising under Clause 25.1 (*Non-payment*));

(B)      any right, power, authority or discretion vested in any Party or any group of Lenders has not been exercised; and

(C)      any notice or request made by the Company (other than a Utilisation Request) is made on behalf of and with the consent and knowledge of all the Obligors.

28.6.3  The Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

28.6.4  Without prejudice to the generality of Clause 28.6.3 or Clause 28.6.5, the Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Agent (and so separate from any lawyers instructed by the Lenders) if the Agent in its reasonable opinion deems this to be necessary.

28.6.5  The Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

28.6.6  The Agent may act in relation to the Finance Documents through its officers, employees and agents.

28.6.7  Unless a Finance Document expressly provides otherwise the Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

28.6.8  Without prejudice to the generality of Clause 28.6.7, the Agent:

(A)      may disclose; and

(B)     on the written request of the Company or the Majority Lenders shall, as soon as reasonably practicable, disclose,

the identity of a Defaulting Lender to the Company and to the other Finance Parties.

28.6.9   Notwithstanding any other provision of any Finance Document to the contrary, the Agent is not obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

28.6.10  Notwithstanding any provision of any Finance Document to the contrary, the Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

## 28.7   Responsibility for documentation

The Agent is not responsible or liable for:

28.7.1   the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Agent, an Obligor or any other person in or in connection with any Transaction Document or the transactions contemplated in the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document;

28.7.2   the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document; or

28.7.3   any determination as to whether any information provided or to be provided to any Finance Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

## 28.8   No duty to monitor

The Agent shall not be bound to enquire:

28.8.1   whether or not any Default has occurred;

28.8.2   as to the performance, default or any breach by any Party of its obligations under any Transaction Document; or

28.8.3   whether any other event specified in any Transaction Document has occurred.

## 28.9   Exclusion of liability

28.9.1  Without limiting Clause 28.9.2 (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Agent), the Agent will not be liable for:

(A)  any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Transaction Security, unless directly caused by its gross negligence or wilful misconduct;

(B)  exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Finance Document or the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Transaction Security, other than by reason of its gross negligence or wilful misconduct; or

(C)  without prejudice to the generality of sub-paragraphs (A) and (B) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation, for negligence or any other category of liability whatsoever, but not including any claim based on the fraud of the Agent) arising as a result of:

(1)  any act, event or circumstance not reasonably within its control; or

(2)  the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

28.9.2  No Party (other than the Agent) may take any proceedings against any officer, employee or agent of the Agent in respect of any claim it might have against the Agent or in respect of any act or omission of any kind by that officer, employee or agent of the Agent in relation to any Finance Document or any Transaction Document and any officer, employee or agent of the Agent may rely on this Clause 28.9.2 subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

28.9.3  The Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by the Agent if the Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures

140

of any recognised clearing or settlement system used by the Agent for that purpose.

28.9.4 Nothing in this Agreement shall oblige the Agent to carry out:

(A)     any "know your customer" or other checks in relation to any person; or

(B)     any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Lender or for any Affiliate of any Lender,

on behalf of any Lender and each Lender confirms to the Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Agent.

28.9.5 Without prejudice to any provision of any Finance Document excluding or limiting the Agent's liability, any liability of the Agent arising under or in connection with any Finance Document shall be limited to the amount of actual loss which has been suffered (as determined by reference to the date of default of the Agent or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Agent at any time which increase the amount of that loss. In no event shall the Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Agent has been advised of the possibility of such loss or damages.

## 28.10  Lenders' indemnity to the Agent

Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Agent, within three Business Days of demand, against any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent (otherwise than by reason of the Agent's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to Clause 32.11 (*Disruption to payment systems etc.*) notwithstanding the Agent's negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent) in acting as Agent under the Finance Documents (unless the Agent has been reimbursed by an Obligor pursuant to a Finance Document).

## 28.11  Resignation of the Agent

28.11.1 The Agent may resign and appoint one of its Affiliates acting through an office in Switzerland or the United Kingdom as successor by giving notice to the Lenders and the Company.

28.11.2 Alternatively the Agent may resign by giving 30 days' notice to the Lenders and the Company, in which case the Majority Lenders (after consultation with the Company) may appoint a successor Agent.

28.11.3 If the Majority Lenders have not appointed a successor Agent in accordance with Clause 28.11.2 within 20 days after notice of resignation was given, the retiring Agent (after consultation with the Company) may appoint a successor Agent (acting through an office in Switzerland or the United Kingdom).

28.11.4 If the Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as agent and the Agent is entitled to appoint a successor Agent under Clause 28.11.3, the Agent may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Agent to become a party to this Agreement as Agent) agree with the proposed successor Agent amendments to this Clause 28 (*Role of the Agent*) and any other term of this Agreement dealing with the rights or obligations of the Agent consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonable amendments to the agency fee payable under this Agreement which are consistent with the successor Agent's normal fee rates and those amendments will bind the Parties.

28.11.5 The retiring Agent shall make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents. The Company shall, within three Business Days of demand, reimburse the retiring Agent for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

28.11.6 The Agent's resignation notice shall only take effect upon the appointment of a successor.

28.11.7 Upon the appointment of a successor, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under Clause 28.11.5) but shall remain entitled to the benefit of Clause 16.3 (*Indemnity to the Agent*) and this Clause 28 (*Role of the Agent*) (and any agency fees for the account of the retiring Agent shall cease to accrue from (and shall be payable on) that date). Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

28.11.8 After consultation with the Company, the Majority Lenders may, by notice to the Agent, require it to resign in accordance with Clause 28.11.2. In this event, the Agent shall resign in accordance with Clause 28.11.2.

28.11.9 The Agent shall resign in accordance with Clause 28.11.2 (and, to the extent applicable, shall use reasonable endeavours to appoint a successor Agent pursuant to Clause 28.11.3) if on or after the date which is three months before the earliest FATCA Application Date relating to any payment to the Agent under the Finance Documents, either:

(A) the Agent fails to respond to a request under Clause 14.7 (*FATCA Information*) and the Company or a Lender reasonably believes that the Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

142

(B)    the information supplied by the Agent pursuant to Clause 14.7 (*FATCA Information*) indicates that the Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date; or

(C)    the Agent notifies the Company and the Lenders that the Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

and (in each case) the Company or a Lender reasonably believes that a Party will be required to make a FATCA Deduction that would not be required if the Agent were a FATCA Exempt Party, and the Company or that Lender, by notice to the Agent, requires it to resign.

## 28.12   Replacement of the Agent

28.12.1 After consultation with the Company, the Majority Lenders may, by giving 30 days' notice to the Agent (or, at any time the Agent is an Impaired Agent, by giving any shorter notice determined by the Majority Lenders) replace the Agent by appointing a successor Agent (acting through an office in Switzerland or the United Kingdom).

28.12.2 The Company may, provided it gives not less than 30 days' prior notice, at any time while the Agent is an Impaired Agent replace the Agent by appointing a successor Agent (acting through an office in Switzerland or the United Kingdom).

28.12.3 The retiring Agent shall (at its own cost if it is an Impaired Agent and otherwise at the expense of the Lenders) make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents.

28.12.4 The appointment of the successor Agent shall take effect on the date specified in the notice from the Majority Lenders to the retiring Agent. As from this date, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under Clause 28.12.3) but shall remain entitled to the benefit of Clause 16.3 (*Indemnity to the Agent*) and this Clause 28.12 (and any agency fees for the account of the retiring Agent shall cease to accrue from (and, unless otherwise agreed, shall be payable on) that date).

28.12.5 Any successor Agent and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

## 28.13   Confidentiality

28.13.1 In acting as agent for the Finance Parties, the Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

143

28.13.2 If information is received by another division or department of the Agent, it may be treated as confidential to that division or department and the Agent shall not be deemed to have notice of it.

**28.14   Relationship with the Lenders**

28.14.1 Subject to Clause 26.12.1(B) (*Pro rata interest settlement*), the Agent may treat the person shown in its records as Lender at the opening of business (in the place of the Agent's principal office as notified to the Finance Parties from time to time) as the Lender acting through its Facility Office:

(A)   entitled to or liable for any payment due under any Finance Document on that day; and

(B)   entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered on that day,

unless it has received not less than five Business Days' prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

28.14.2 Any Lender may, by notice to the Agent, appoint a person to receive on its behalf all notices, communications, information and documents to be made or despatched to that Lender under the Finance Documents. Such notice shall contain the address and (where communication by electronic mail or other electronic means is permitted under Clause 34.6 (*Electronic communication*)) electronic mail address and/or any other information required to enable the transmission of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, electronic mail address (or such other information), department and officer by that Lender for the purposes of Clause 34.2 (*Addresses*) and Clause 28.14.1(B) (*Electronic communication*) and the Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

**28.15   Credit appraisal by the Lenders**

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Transaction Document, each Lender confirms to the Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Transaction Document including but not limited to:

28.15.1 the financial condition, status and nature of each member of the Group;

28.15.2 the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document, the Transaction Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document or the Transaction Security;

28.15.3 whether that Lender has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Transaction Document, the Transaction Security, the transactions contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document or the Transaction Security;

28.15.4 the adequacy, accuracy or completeness of the  information provided by the Agent, any Party or by any other person under or in connection with any Transaction Document, the transactions contemplated by any Transaction Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document; and

28.15.5 the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

## 28.16 Deduction from amounts payable by the Agent

If any Party owes an amount to the Agent under the Finance Documents the Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

## 29.    THE SECURITY AGENT

### 29.1    Security Agent as trustee

29.1.1 The Security Agent declares that it holds the Transaction Security on trust for the Secured Parties on the terms contained in this Agreement.

29.1.2 Each of the Agent and each Lender authorises the Security Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Security Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

29.1.3 For the purposes of Finnish law, the Security Agent shall be a security agent (Fi. *vakuusagentti*) within the meaning of the Finnish Act on Noteholder Representatives (Fi. *Laki joukkolainanhaltijoiden edustajasta*, 574/2017) and, subject to what may be otherwise specifically provided for in the Finance Documents, entitled to represent and exercise rights on behalf of the Secured Parties in accordance with Section 5 and 14 (excluding Section 6) of the Act on Noteholder Representatives. No other provisions of the Finnish Act on Noteholder Representatives shall apply.

### 29.2    Parallel debt (covenant to pay the Security Agent)

29.2.1   Notwithstanding any other provision of this Agreement, each Borrower hereby irrevocably and unconditionally undertakes to pay to the Security Agent, as creditor in its own right and not as representative of the other Secured Parties, sums equal to and in the currency of each amount payable by each Borrower to each of the Secured Parties under each of the Finance Documents as and when that amount falls due for payment under the relevant Finance Document or would have fallen due but for any discharge resulting from failure of another Secured Party to take appropriate steps, in insolvency proceedings affecting that Borrower, to preserve its entitlement to be paid that amount.

29.2.2   The parallel debt of each Borrower will become due and payable as and when and to the extent the relevant corresponding amount under the other provisions of the Finance Documents becomes due and payable.

29.2.3   The Security Agent shall have its own independent right to demand payment of the amounts payable by each Borrower under this Clause 29.2 irrespective of any discharge of that Borrower's obligation to pay those amounts to the other Secured Parties resulting from failure by them to take appropriate steps, in insolvency proceedings affecting that Borrower, to preserve their entitlement to be paid those amounts.

29.2.4   Any amount due and payable by a Borrower to the Security Agent under this Clause 29.2 shall be decreased to the extent that the other Secured Parties have received (and are able to retain) payment in full of the corresponding amount under the other provisions of the Finance Documents and any amount due and payable by a Borrower to the other Secured Parties under those provisions shall be decreased to the extent that the Security Agent has received (and is able to retain) payment in full of the corresponding amount under this Clause 29.2.

29.3   **Enforcement through Security Agent only**

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the Transaction Security or to exercise any right, power, authority or discretion arising under the Transaction Security Documents except through the Security Agent.

29.4   **Instructions**

29.4.1   The Security Agent shall:

(A)   subject to Clauses 29.4.4 and 29.4.5 exercise or refrain from exercising any right, power, authority or discretion vested in it as Security Agent in accordance with any instructions given to it by the Agent; and

(B)   not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (A) above (or if the relevant Finance Document stipulates the matter is a decision for any Lender or group of Lenders in accordance with instructions given to it by that Lender or group of Lenders).

29.4.2   The Security Agent shall be entitled to request instructions, or clarification of any instruction, from the Agent (or, if the relevant Finance Document stipulates the matter is a decision for any Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Security Agent may refrain from acting unless and until it receives those instructions or that clarification that it has requested.

29.4.3   Save in the case of decisions stipulated to be a matter for any other Lender or group of Lenders under the relevant Finance Document and unless a contrary intention appears in the relevant Finance Document, any instructions given to the Security Agent by the Agent shall override any conflicting instructions given by any other Parties and will be binding on all Secured Parties.

29.4.4   Clause 29.4.1 shall not apply:

   (A)   where a contrary indication appears in this Agreement;

   (B)   where a Finance Document requires the Security Agent to act in a specified manner or to take a specified action;

   (C)   in respect of any provision which protects the Security Agent's own position in its personal capacity as opposed to its role of Security Agent for the Secured Parties including, without limitation, Clauses 29.7 (*No duty to account*) to Clause 29.12 (*Exclusion of liability*), Clause 29.15 (*Confidentiality*) to Clause 29.22 (*Custodians and nominees*) and Clause 29.25 (*Acceptance of title*) to Clause 29.29 (*Disapplication of Trustee Acts*); or

   (D)   in respect of the exercise of the Security Agent's discretion to exercise a right, power or authority under any of:

      (1)   Clause 29.30 (*Order of application*); and

      (2)   Clause 29.33 (*Permitted deductions*).

29.4.5   If giving effect to instructions given by the Agent on behalf of the Majority Lenders would (in the Security Agent's opinion) have an effect equivalent to an amendment or waiver which is subject to Clause 38.2 (*All Lender matters*), the Security Agent shall not act in accordance with those instructions unless consent to it so acting is obtained from each Party (other than the Security Agent) whose consent would have been required in respect of that amendment or waiver.

29.4.6   In exercising any discretion to exercise a right, power or authority under the Finance Documents where either:

   (A)   it has not received any instructions as to the exercise of that discretion; or

   (B)   the exercise of that discretion is subject to Clause 29.4.4(D),

147

the Security Agent shall do so having regard to the interests of all the Secured Parties.

29.4.7  The Security Agent may refrain from acting in accordance with any instructions of any Lender or group of Lenders until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability (together with any applicable VAT) which it may incur in complying with those instructions.

29.4.8  Without prejudice to the provisions of the remainder of this Clause 29.4, in the absence of instructions, the Security Agent may act (or refrain from acting) as it considers in its discretion to be appropriate.

## 29.5 Duties of the Security Agent

29.5.1  The Security Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

29.5.2  The Security Agent shall promptly:

(A)  forward to the Agent a copy of any document received by the Security Agent from any Obligor under any Finance Document; and

(B)  forward to a Party the original or a copy of any document which is delivered to the Security Agent for that Party by any other Party.

29.5.3  Except where a Finance Document specifically provides otherwise, the Security Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

29.5.4  If the Security Agent receives notice from a Party referring to any Finance Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the Agent.

29.5.5  The Security Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

## 29.6 No fiduciary duties to Obligors

Nothing in any Finance Document constitutes the Security Agent as an agent, trustee or fiduciary of any Obligor.

## 29.7 No duty to account

The Security Agent shall not be bound to account to any other Secured Party for any sum or the profit element of any sum received by it for its own account.

## 29.8 Business with the Group

The Security Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

**29.9    Rights and discretions**

29.9.1  The Security Agent may:

(A)    rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

(B)    assume that:

(1)    any instructions received by it from the Agent, Majority Lenders, the Lenders or any group of Lenders are duly given in accordance with the terms of the Finance Documents;

(2)    unless it has received notice of revocation, that those instructions have not been revoked; and

(3)    if it receives any instructions to act in relation to the Transaction Security, that all applicable conditions under the Finance Documents for so acting have been satisfied; and

(C)    rely on a certificate from any person:

(1)    as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

(2)    to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (1) above, may assume the truth and accuracy of that certificate.

29.9.2  The Security Agent shall be entitled to carry out all dealings with the Lenders through the Agent and may give to the Agent any notice or other communication required to be given by the Security Agent to the Lenders.

29.9.3  The Security Agent may assume (unless it has received notice to the contrary in its capacity as Security Agent for the Secured Parties) that:

(A)    no Default has occurred;

(B)    any right, power, authority or discretion vested in any Party or any group of Lenders has not been exercised; and

(C)    any notice made by the Company is made on behalf of and with the consent and knowledge of all the Obligors.

149

29.9.4   The Security Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

29.9.5   Without prejudice to the generality of Clause 29.9.4 or Clause 29.9.6, the Security Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Security Agent (and so separate from any lawyers instructed by the Lenders and/or the Agent) if the Security Agent in its reasonable opinion deems this to be necessary.

29.9.6   The Security Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Security Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

29.9.7   The Security Agent, any Receiver and any Delegate may act in relation to the Finance Documents and the Transaction Security through its officers, employees and agents and shall not:

(A)   be liable for any error of judgment made by any such person; or

(B)   be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of any such person,

unless such error or such loss was directly caused by the Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct.

29.9.8   Unless a Finance Document expressly specifies otherwise, the Security Agent may disclose to any other Party any information it reasonably believes it has received as security trustee under this Agreement.

29.9.9   Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

29.9.10 Notwithstanding any provision of any Finance Document to the contrary, the Security Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

29.10   **Responsibility for documentation**

None of the Security Agent, any Receiver nor any Delegate is responsible or liable for:

29.10.1 the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Security Agent, an Obligor or any other person in or in connection with any Finance Document or the transactions contemplated in the

Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

29.10.2 the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security; or

29.10.3 any determination as to whether any information provided or to be provided to any Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

29.11   **No duty to monitor**

The Security Agent shall not be bound to enquire:

29.11.1 whether or not any Default has occurred;

29.11.2 as to the performance, default or any breach by any Party of its obligations under any Finance Document; or

29.11.3 whether any other event specified in any Finance Document has occurred.

29.12   **Exclusion of liability**

29.12.1 Without limiting Clause 29.12.2 (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate), none of the Security Agent, any Receiver nor any Delegate will be liable for:

(A)   any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Transaction Security unless directly caused by its gross negligence or wilful misconduct;

(B)   exercising or not exercising any right, power, authority or discretion given to it by, or in connection with, any Finance Document, the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Transaction Security, other than by reason of its gross negligence or wilful misconduct;

(C)   any shortfall which arises on the enforcement or realisation of the Transaction Security; or

(D)   without prejudice to the generality of paragraphs (A) to (C) above, any damages, costs, losses, any diminution in value or any liability whatsoever (but not including any claim based on the fraud of the Security Agent) arising as a result of:

151

(1)    any act, event or circumstance not reasonably within its control; or

(2)    the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets; breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

29.12.2 No Party (other than the Security Agent, that Receiver or that Delegate (as applicable)) may take any proceedings against any officer, employee or agent of the Security Agent, a Receiver or a Delegate in respect of any claim it might have against the Security Agent, a Receiver or a Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Transaction Security and any officer, employee or agent of the Security Agent, a Receiver or a Delegate may rely on this Clause 1.5.2 subject to Clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

29.12.3 Nothing in this Agreement shall oblige the Security Agent to carry out:

(A)    any "know your customer" or other checks in relation to any person; or

(B)    any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any other Secured Party,

on behalf of any other Secured Party and each other Secured Party confirms to the Security Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Security Agent.

29.12.4 Without prejudice to any provision of any Finance Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate, any liability of the Security Agent, any Receiver or Delegate arising under or in connection with any Finance Document or the Transaction Security shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Security Agent, Receiver or Delegate (as the case may be) or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Security Agent, Receiver or Delegate (as the case may be) at any time which increase the amount of that loss. In no event shall the Security Agent, any Receiver or Delegate be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or

not the Security Agent, Receiver or Delegate (as the case may be) has been advised of the possibility of such loss or damages.

### 29.13   Lenders' indemnity to the Security Agent

29.13.1 Each Lender shall (in the proportion that its Commitments bear to the Total Commitments for the time being (or, if the Total Commitments are zero, immediately prior to their being reduced to zero)), indemnify the Security Agent and every Receiver and every Delegate, within three Business Days of demand, against any cost, loss or liability incurred by any of them (otherwise than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct) in acting as Security Agent, Receiver or Delegate under, or exercising any authority conferred under, the Finance Documents (unless the relevant Security Agent, Receiver or Delegate has been reimbursed by an Obligor pursuant to a Finance Document).

29.13.2 Subject to Clause 29.13.3, the Company shall immediately on demand reimburse any Lender for any payment that Lender makes to the Security Agent pursuant to Clause 29.13.1.

29.13.3 Clause 29.13.2 shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Security Agent to an Obligor.

### 29.14   Resignation of the Security Agent

29.14.1 The Security Agent may resign and appoint one of its Affiliates as successor by giving notice to the Lenders and the Company.

29.14.2 Alternatively the Security Agent may resign by giving 30 days' notice to the Lenders and the Company, in which case the Majority Lenders may appoint a successor Security Agent.

29.14.3 If the Majority Lenders have not appointed a successor Security Agent in accordance with Clause 29.14.2 within 20 days after notice of resignation was given, the retiring Security Agent (after consultation with the Agent) may appoint a successor Security Agent.

29.14.4 If the Security Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as security agent and the Security Agent is entitled to appoint a successor under Clause 29.14.3, the Security Agent may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Security Agent to become a party to this Agreement as Security Agent) agree with the proposed successor Agent amendments to this Clause 29 (*The Security Agent*) and any other term of this Agreement dealing with the rights or obligations of the Security Agent consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonably amendments to the security agency fee payable under this Agreement which are consistent with the successor Security Agent's normal fee rates and those amendments will bind the Parties.

29.14.5 The retiring Security Agent shall, make available to the successor Security Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Finance Documents. The Company shall, within three Business Days of demand, reimburse the retiring Security Agent for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

29.14.6 The Security Agent's resignation notice shall only take effect upon:

(A)     the appointment of a successor; and

(B)     the transfer of all the Transaction Security to that successor.

29.14.7 Upon the appointment of a successor, the retiring Security Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under Clause 29.27.2 of Clause 29.27 (*Winding up of trust*) and Clause 29.14.5) but shall remain entitled to the benefit of this Clause 29 (*The Security Agent*) and Clause 16.4 (*Indemnity to the Security Agent*) (and any Security Agent fees for the account of the retiring Security Agent shall cease to accrue from (and shall be payable on) that date). Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if that successor had been an original Party.

29.14.8 The Majority Lenders may, by notice to the Security Agent, require it to resign in accordance with Clause 29.14.2. In this event, the Security Agent shall resign in accordance with Clause 29.14.2.

## 29.15   Replacement of the Security Agent

29.15.1 After consultation with the Company, the Majority Lenders may, by giving 30 days' notice to the Security Agent (or, at any time the Security Agent is an Impaired Agent, by giving any shorter notice determined by the Majority Lenders) replace the Security Agent by appointing a successor Security Agent (acting through an office in Switzerland or the United Kingdom).

29.15.2 The Company may, provided it gives not less than 30 days prior notice, at any time while the Security Agent is an Impaired Agent replace the Security Agent by appointing a successor Security Agent (acting through an office in Switzerland or the United Kingdom).

29.15.3 The retiring Security Agent shall (at its own cost if it is an Impaired Agent and otherwise at the expense of the Lenders) make available to the successor Security Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Finance Documents.

29.15.4 The appointment of the successor Security Agent shall take effect on the date specified in the notice from the Majority Lenders to the retiring Security Agent.

As from this date, the retiring Security Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under Clause 28.12.3) but shall remain entitled to the benefit of Clause 16.4 (*Indemnity to the Security Agent*) and this Clause 29.15 (and any agency fees for the account of the retiring Security Agent shall cease to accrue from (and, unless otherwise agreed, shall be payable on) that date).

29.15.5 Any successor Agent and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

## 29.16    Confidentiality

29.16.1 In acting as trustee for the Secured Parties, the Security Agent shall be regarded as acting through its trustee division which shall be treated as a separate entity from any other of its divisions or departments.

29.16.2 If information is received by another division or department of the Security Agent, it may be treated as confidential to that division or department and the Security Agent shall not be deemed to have notice of it.

29.16.3 Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

## 29.17    Information from the Lenders

Each Lender shall supply the Security Agent with any information that the Security Agent may reasonably specify as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent.

## 29.18    Credit appraisal by the Secured Parties

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Transaction Document, each Secured Party confirms to the Security Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Transaction Document including but not limited to:

29.18.1 the financial condition, status and nature of each member of the Group;

29.18.2 the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document, the Transaction Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document or the Transaction Security;

29.18.3 whether that Secured Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Transaction Document, the Transaction Security, the transactions

contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document or the Transaction Security;

29.18.4 the adequacy, accuracy or completeness of any information provided by the Security Agent, any Party or by any other person under or in connection with any Transaction Document, the transactions contemplated by any Transaction Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document; and

29.18.5 the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

## 29.19   Reliance and engagement letters

The Security Agent may obtain and rely on any certificate or report from any Obligor's auditor and may enter into any reliance letter or engagement letter relating to that certificate or report on such terms as it may consider appropriate (including, without limitation, restrictions on the auditor's liability and the extent to which that certificate or report may be relied on or disclosed).

## 29.20   No responsibility to perfect Transaction Security

The Security Agent shall not be liable for any failure to:

29.20.1 require the deposit with it of any deed or document certifying, representing or constituting the title of any Obligor to any of the Charged Property;

29.20.2 obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any Transaction Document or the Transaction Security;

29.20.3 register, file or record or otherwise protect any of the Transaction Security (or the priority of any of the Transaction Security) under any law or regulation or to give notice to any person of the execution of any Transaction Document or of the Transaction Security;

29.20.4 take, or to require any Obligor to take, any step to perfect its title to any of the Charged Property or to render the Transaction Security effective or to secure the creation of any ancillary Security under any law or regulation; or

29.20.5 require any further assurance in relation to any Transaction Security Document.

## 29.21   Insurance by Security Agent

29.21.1 The Security Agent shall not be obliged:

(A)     to insure any of the Charged Property;

156

(B)      to require any other person to maintain any insurance; or

(C)      to verify any obligation to arrange or maintain insurance contained in any Finance Document,

and the Security Agent shall not be liable for any damages, costs or losses to any person as a result of the lack of, or inadequacy of, any such insurance.

29.21.2 Where the Security Agent is named on any insurance policy as an insured party, it shall not be liable for any damages, costs or losses to any person as a result of its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Majority Lenders request it to do so in writing and the Security Agent fails to do so within fourteen days after receipt of that request.

## 29.22    Custodians and nominees

The Security Agent may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset of the trust as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to the trust created under this Agreement and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

## 29.23    Delegation by the Security Agent

29.23.1 Each of the Security Agent, any Receiver and any Delegate may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any right, power, authority or discretion vested in it in its capacity as such.

29.23.2 That delegation may be made upon any terms and conditions (including the power to sub-delegate) and subject to any restrictions that the Security Agent, that Receiver or that Delegate (as the case may be) may, in its discretion, think fit in the interests of the Secured Parties.

29.23.3 No Security Agent, Receiver or Delegate shall be bound to supervise, or be in any way responsible for any damages, costs or losses incurred by reason of any misconduct, omission or default on the part of, any such delegate or sub-delegate.

## 29.24    Additional Security Agents

29.24.1 The Security Agent may at any time appoint (and subsequently remove) any person to act as a separate trustee or as a co-trustee jointly with it:

(A)      if it considers that appointment to be in the interests of the Secured Parties;

(B)      for the purposes of conforming to any legal requirement, restriction or condition which the Security Agent deems to be relevant; or

(C)      for obtaining or enforcing any judgment in any jurisdiction,

and the Security Agent shall give prior notice to the Company and the Secured Parties of that appointment.

29.24.2 Any person so appointed shall have the rights, powers, authorities and discretions (not exceeding those given to the Security Agent under or in connection with the Finance Documents) and the duties, obligations and responsibilities that are given or imposed by the instrument of appointment.

29.24.3 The remuneration that the Security Agent may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Agreement, be treated as costs and expenses incurred by the Security Agent.

## 29.25  Acceptance of title

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any Obligor may have to any of the Charged Property and shall not be liable for, or bound to require any Obligor to remedy, any defect in its right or title.

## 29.26  Releases

29.26.1 Upon a disposal of any of the Charged Property pursuant to the enforcement of the Transaction Security by a Receiver or the Security Agent, the Security Agent is irrevocably authorised (at the cost of the Obligors and without any consent, sanction, authority or further confirmation from any other Secured Party) to release, without recourse or warranty, that property from the Transaction Security and to execute any release of the Transaction Security or other claim over that asset and to issue any certificates of non-crystallisation of floating charges that may be required or desirable.

## 29.27  Winding up of trust

If the Security Agent, with the approval of the Agent, determines that:

29.27.1 all of the Secured Obligations and all other obligations secured by the Transaction Security Documents have been fully and finally discharged; and

29.27.2 no Secured Party is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to any Obligor pursuant to the Finance Documents,

then:

(A)      the trusts set out in this Agreement shall be wound up and the Security Agent shall release, without recourse or warranty, all of the Transaction Security and the rights of the Security Agent under each of the Transaction Security Documents; and

158

(B)     any Security Agent which has resigned pursuant to Clause 29.14 (*Resignation of the Security Agent*) shall release, without recourse or warranty, all of its rights under each Transaction Security Document.

## 29.28    Powers supplemental to Trustee Acts

The rights, powers, authorities and discretions given to the Security Agent under or in connection with the Finance Documents shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by law or regulation or otherwise.

## 29.29    Disapplication of Trustee Acts

Section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement. Where there are any inconsistencies between the Trustee Act 1925 or the Trustee Act 2000 and the provisions of this Agreement, the provisions of this Agreement shall, to the extent permitted by law and regulation, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Agreement shall constitute a restriction or exclusion for the purposes of that Act.

## 29.30    Order of application

All amounts from time to time received or recovered by the Security Agent pursuant to the terms of any Finance Documents, under Clause 29.2 (*Parallel debt (covenant to pay the Security Agent)*), or in connection with the realisation or enforcement of all or any part of the Transaction Security shall be held by the Security Agent on trust to apply them at any time as the Security Agent (in its discretion) sees fit, to the extent permitted by applicable law, in the following order of priority:

29.30.1 in discharging any sums owing to the Security Agent (in its capacity as such), (other than pursuant to Clause 29.2 (*Parallel debt (covenant to pay the Security Agent)*), any Receiver or any Delegate;

29.30.2 in payment or distribution to the Agent, on its behalf and on behalf of the other Secured Parties, for application towards the discharge of all sums due and payable by any Obligor under any of the Finance Documents in accordance with Clause 32.6 (*Partial payments*);

29.30.3 if none of the Obligors is under any further actual or contingent liability under any Finance Document, in payment or distribution to any person to whom the Security Agent is obliged to pay or distribute in priority to any Obligor; and

29.30.4 the balance, if any, in payment or distribution to the relevant Obligor.

## 29.31    Investment of proceeds

Prior to the application of the proceeds of the Transaction Security in accordance with Clause 29.30 (*Order of application*) the Security Agent may, at its discretion, hold all or part of those proceeds in one or more interest bearing suspense or impersonal accounts in the name of the Security Agent with any financial institution (including itself) and for so long as the Security Agent thinks fit (the interest being credited to the

relevant account) pending the application from time to time of those monies at the Security Agent's discretion in accordance with the provisions of Clause 29.30 (*Order of application*).

29.32   **Currency conversion**

29.32.1 For the purpose of, or pending the discharge of, any of the Secured Obligations the Security Agent may convert any moneys received or recovered by the Security Agent from one currency to another, at the spot rate at which the Security Agent is able to purchase the currency in which the Secured Obligations are due with the amount received.

29.32.2 The obligations of any Obligor to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

29.33   **Permitted deductions**

The Security Agent shall be entitled (a) to set aside by way of reserve amounts required to meet and (b) to make and pay, any deductions and withholdings (on account of Taxes or otherwise) which it is or may be required by any law or regulation to make from any distribution or payment made by it under this Agreement, and to pay all Taxes which may be assessed against it in respect of any of the Charged Property, or as a consequence of performing its duties or exercising its rights, powers, authorities and discretions, or by virtue of its capacity as Security Agent under any of the Finance Documents or otherwise (other than in connection with its remuneration for performing its duties under this Agreement).

29.34   **Good discharge**

29.34.1 Any distribution or payment to be made in respect of the Secured Obligations by the Security Agent may be made to the Agent on behalf of the Lenders and any distribution or payment made in that way shall be a good discharge, to the extent of that payment or distribution, by the Security Agent.

29.34.2 The Security Agent is under no obligation to make payment to the Agent in the same currency as that in which any Unpaid Sum is denominated.

29.35   **Amounts received by Obligors**

If any of the Obligors receives or recovers any amount which, under the terms of any of the Finance Documents, should have been paid to the Security Agent, that Obligor will hold the amount received or recovered on trust for the Security Agent and promptly pay that amount to the Security Agent for application in accordance with the terms of this Agreement.

29.36   **Application and consideration**

In consideration for the covenants given to the Security Agent by each Obligor in relation to Clause 29.2 (*Parallel debt (covenant to pay the Security Agent)*), the Security Agent agrees with each Obligor to apply all moneys from time to time paid by such

Obligor to the Security Agent in accordance with the foregoing provisions of this Clause 29 (*The Security Agent*).

30. **CONDUCT OF BUSINESS BY THE FINANCE PARTIES**

No provision of this Agreement will:

30.1.1 interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

30.1.2 oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

30.1.3 oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

31. **SHARING AMONG THE FINANCE PARTIES**

31.1 **Payments to Finance Parties**

31.1.1 If a Finance Party (a **"Recovering Finance Party"**) receives or recovers any amount from an Obligor other than in accordance with Clause 32 (*Payment Mechanics*) or Clause 29.30 (*Order of application*) to and including Clause 29.36 (*Application and consideration*) (a **"Recovered Amount"**) and applies that amount to a payment due under the Finance Documents then:

(A) the Recovering Finance Party shall, within three Business Days, notify details of the receipt or recovery to the Agent;

(B) the Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Agent and distributed in accordance with Clause 32 (*Payment Mechanics*), without taking account of any Tax which would be imposed on the Agent in relation to the receipt, recovery or distribution; and

(C) the Recovering Finance Party shall, within three Business Days of demand by the Agent, pay to the Agent an amount (the **"Sharing Payment"**) equal to such receipt or recovery less any amount which the Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with sub-Clause 32.6.1(A) of Clause 32.6 (*Partial payments*).

31.2 **Redistribution of payments**

The Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it between the Finance Parties (other than the Recovering Finance Party) (the **"Sharing Finance Parties"**) in accordance with Clause 32.6 (*Partial payments*) towards the obligations of that Obligor to the Sharing Finance Parties.

31.3 **Recovering Finance Party's rights**

161

On a distribution by the Agent under Clause 31.2 (*Redistribution of payments*) of a payment received by a Recovering Finance Party from an Obligor, as between the relevant Obligor and the Recovering Finance Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by that Obligor.

### 31.4 Reversal of redistribution

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

31.4.1 each Sharing Finance Party shall, upon request of the Agent, pay to the Agent for the account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that Recovering Finance Party is required to pay) (the **"Redistributed Amount"**); and

31.4.2 as between the relevant Obligor and each relevant Sharing Finance Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Obligor.

### 31.5 Exceptions

31.5.1 This Clause 31 (*Sharing among the Finance Parties*) shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Clause, have a valid and enforceable claim against the relevant Obligor.

31.5.2 A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(A)   it notified that other Finance Party of the legal or arbitration proceedings; and

(B)   that other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

## 32.   PAYMENT MECHANICS

### 32.1 Payments to the Agent

32.1.1 On each date on which an Obligor or a Lender is required to make a payment under a Finance Document, that Obligor or Lender shall make the same available to the Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

32.1.2 Payment shall be made to such account in the principal financial centre of the country of that currency and with such bank as the Agent, in each case, specifies.

## 32.2 Distributions by the Agent

Each payment received by the Agent under the Finance Documents for another Party shall, subject to Clause 32.3 (*Distributions to an Obligor*) and Clause 32.4 (*Clawback and pre-funding*) be made available by the Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office), to such account as that Party may notify to the Agent by not less than five Business Days' notice with a bank specified by that Party in the principal financial centre of the country of that currency.

## 32.3 Distributions to an Obligor

The Agent may (with the consent of the Obligor or in accordance with Clause 33 (*Set-Off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

## 32.4 Clawback and pre-funding

32.4.1 Where a sum is to be paid to the Agent under the Finance Documents for another Party, the Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

32.4.2 Unless Clause 32.4.3 applies, if the Agent pays an amount to another Party and it proves to be the case that the Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Agent shall on demand refund the same to the Agent together with interest on that amount from the date of payment to the date of receipt by the Agent, calculated by the Agent to reflect its cost of funds.

32.4.3 If the Agent is willing to make available amounts for the account of a Borrower before receiving funds from the Lenders then if and to the extent that the Agent does so but it proves to be the case that it does not then receive funds from a Lender in respect of a sum which it paid to a Borrower:

(A)     the Agent shall notify the Company of that Lender's identity and the Borrower to whom that sum was made available shall on demand refund it to the Agent; and

(B)     the Lender by whom those funds should have been made available or, if that Lender fails to do so, the Borrower to whom that sum was made available, shall on demand pay to the Agent the amount (as certified by the Agent) which will indemnify the Agent against any funding cost incurred by it as a result of paying out that sum before receiving those funds from that Lender.

163

32.5    **Impaired Agent**

32.5.1  If, at any time, the Agent becomes an Impaired Agent, an Obligor or a Lender which is required to make a payment under the Finance Documents to the Agent in accordance with Clause 32.1 (*Payments to the Agent*) may instead either:

(A)    pay that amount direct to the required recipient(s); or

(B)    if in its absolute discretion it considers that it is not reasonably practicable to pay that amount direct to the required recipient(s), pay that amount or the relevant part of that amount to an interest-bearing account held with an Acceptable Bank within the meaning of the definition of "Acceptable Bank" and in relation to which no Insolvency Event has occurred and is continuing, in the name of the Obligor or the Lender making the payment (the **"Paying Party"**) and designated as a trust account for the benefit of the Party or Parties beneficially entitled to that payment under the Finance Documents (the **"Recipient Party"** or **"Recipient Parties"**).

In each case such payments must be made on the due date for payment under the Finance Documents.

32.5.2  All interest accrued on the amount standing to the credit of the trust account shall be for the benefit of the Recipient Party or the Recipient Parties *pro rata* to their respective entitlements.

32.5.3  A Party which has made a payment in accordance with this Clause 32.5 shall be discharged of the relevant payment obligation under the Finance Documents and shall not take any credit risk with respect to the amounts standing to the credit of the trust account.

32.5.4  Promptly upon the appointment of a successor Agent in accordance with Clause 28.11 (*Resignation of the Agent*), each Paying Party shall (other than to the extent that that Party has given an instruction pursuant to Clause 32.5.5) give all requisite instructions to the bank with whom the trust account is held to transfer the amount (together with any accrued interest) to the successor Agent for distribution to the relevant Recipient Party or Recipient Parties in accordance with Clause 32.2 (*Distributions by the Agent*).

32.5.5  A Paying Party shall, promptly upon request by a Recipient Party and to the extent:

(A)    that it has not given an instruction pursuant to Clause 32.5.4; and

(B)    that it has been provided with the necessary information by that Recipient Party,

give all requisite instructions to the bank with whom the trust account is held to transfer the relevant amount (together with any accrued interest) to that Recipient Party.

32.6    **Partial payments**

32.6.1 Subject to the DIP Orders, if the Agent receives a payment that is insufficient to discharge all the amounts then due and payable by an Obligor under the Finance Documents, the Agent shall apply that payment towards the obligations of that Obligor under the Finance Documents in the following order:

(A) **first**, in or towards payment pro rata of any unpaid amount owing to the Agent, the Security Agent, any Receiver or Delegate under the Finance Documents;

(B) **secondly**, in or towards payment *pro rata* of any accrued interest, fee or commission due but unpaid under this Agreement on account of the DIP Facility;

(C) **thirdly**, in or towards payment *pro rata* of any principal of the DIP Facility Loans due but unpaid under this Agreement;

(D) **fourthly**, in or towards payment *pro rata* of any other sum due but unpaid under the Finance Documents on account of the DIP Facility;

(E) **fifthly**, in or towards payment *pro rata* of any other accrued interest, fee or commission due but unpaid under this Agreement;

(F) **sixthly**, in or towards payment *pro rata* of any other principal due but unpaid under this Agreement; and

(G) **seventhly**, in or towards payment *pro rata* of any other sum due but unpaid under the Finance Documents.

32.6.2 The Agent shall, if so directed by the Majority Lenders, vary the order set out in Clauses 32.6.1(B) to 32.6.1(G).

32.6.3 Clauses 32.6.1 and 32.6.2 will override any appropriation made by an Obligor.

## 32.7 No set-off by Obligors

All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

## 32.8 Business Days

32.8.1 Any payment under the Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

32.8.2 During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

## 32.9 Currency of account

32.9.1   Subject to Clauses 32.9.2 to 32.9.5, dollars is the currency of account and payment for any sum due from an Obligor under any Finance Document.

32.9.2   A repayment of a Loan or Unpaid Sum or a part of a Loan or Unpaid Sum shall be made in the currency in which that Loan or Unpaid Sum is denominated, pursuant to this Agreement, on its due date.

32.9.3   Each payment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated, pursuant to this Agreement, when that interest accrued.

32.9.4   Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

32.9.5   Any amount expressed to be payable in a currency other than dollars shall be paid in that other currency.

## 32.10   Change of currency

32.10.1 Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(A)   any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Agent (after consultation with the Company); and

(B)   any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Agent (acting reasonably).

32.10.2 If a change in any currency of a country occurs, this Agreement will, to the extent the Agent (acting reasonably and after consultation with the Company) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Market and otherwise to reflect the change in currency.

## 32.11   Disruption to payment systems etc.

If either the Agent determines (in its discretion) that a Disruption Event has occurred or the Agent is notified by the Company that a Disruption Event has occurred:

32.11.1 the Agent may, and shall if requested to do so by the Company, consult with the Company with a view to agreeing with the Company such changes to the operation or administration of the Facilities as the Agent may deem necessary in the circumstances;

32.11.2 the Agent shall not be obliged to consult with the Company in relation to any changes mentioned in Clause 32.11.1 if, in its opinion, it is not practicable to do

so in the circumstances and, in any event, shall have no obligation to agree to such changes;

32.11.3 the Agent may consult with the Finance Parties in relation to any changes mentioned in Clause 32.11.1 but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

32.11.4 any such changes agreed upon by the Agent and the Company shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of Clause 38 (*Amendments and Waivers*);

32.11.5 the Agent shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this Clause 32.11; and

32.11.6 the Agent shall notify the Finance Parties of all changes agreed pursuant to Clause 32.11.4.

## 33.   SET-OFF

A Secured Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Secured Party) against any matured obligation owed by that Secured Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Secured Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 34.   NOTICES

### 34.1   Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by letter or electronic mail.

### 34.2   Addresses

The address and electronic mail address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

34.2.1  in the case of the Company, that identified with its name below;

34.2.2  in the case of each Lender, that notified in writing to the Agent on or prior to the date on which it becomes a Party; and

34.2.3 in the case of the Agent or the Security Agent, that identified with its name below,

or any substitute address or electronic mail address or department or officer as the Party may notify to the Agent (or the Agent may notify to the other Parties, if a change is made by the Agent) by not less than five Business Days' notice.

**The Company**

| | |
|---|---|
| Address: | PL 286 67101 Kokkola |
| Email: | adavey@jervoisglobal.com / jmay@jervoismining.com.au |
| Attention: | Alwyn Davy and James May |

**The Agent**

| | |
|---|---|
| Address: | 3rd Floor, 1 Love Lane, London, EC2V 7JN |
| Email: | dhayes@srsacquiom.com; loanagencyuk@srsacquiom.com |
| Attention: | Daniel Hayes |

**The Security Agent**

| | |
|---|---|
| Address: | 3rd Floor, 1 Love Lane, London, EC2V 7JN |
| Email: | dhayes@srsacquiom.com; loanagencyuk@srsacquiom.com |
| Attention: | Daniel Hayes |

34.3 **Delivery**

34.3.1 Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(A) if by way of electronic mail, when received in legible form; or

(B) if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 34.2 (*Addresses*), if addressed to that department or officer.

34.3.2 Any communication or document to be made or delivered to the Agent or the Security Agent will be effective only when actually received by the Agent or the Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Agent's or Security Agent's signature below (or any substitute department or officer as the Agent or Security Agent shall specify for this purpose).

34.3.3   All notices from or to an Obligor shall be sent through the Agent.

34.3.4   Any communication or document made or delivered to the Company in accordance with this Clause will be deemed to have been made or delivered to each of the Obligors.

34.3.5   Any communication or document which becomes effective, in accordance with Clauses 34.3.1 to 34.3.4, after 5:00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

## 34.4   Notification of address and electronic mail address

Promptly upon changing its address or electronic mail address, the Agent shall notify the other Parties.

## 34.5   Communication when Agent is Impaired Agent

If the Agent is an Impaired Agent the Parties may, instead of communicating with each other through the Agent, communicate with each other directly and (while the Agent is an Impaired Agent) all the provisions of the Finance Documents which require communications to be made or notices to be given to or by the Agent shall be varied so that communications may be made and notices given to or by the relevant Parties directly. This provision shall not operate after a replacement Agent has been appointed.

## 34.6   Other electronic communication

34.6.1   Any communication or document to be made or delivered by one Party to another under or in connection with the Finance Documents may be made or delivered by other electronic means (including, without limitation, by way of posting to a secure website) if those two Parties:

(A)   notify each other in writing of any information required to enable the transmission of information by that means; and

(B)   notify each other of any change to such information supplied by them by not less than five Business Days' notice.

34.6.2   Any such electronic communication or delivery as specified in Clause 34.6.1 to be made between an Obligor and a Finance Party may only be made in that way to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication or delivery.

34.6.3   Any such electronic communication or document as specified in Clause 34.6.1 made between or delivered by one Party to another will be effective only when actually received (or made available) in readable form and in the case of any electronic communication or document made or delivered by a Party to the Agent or the Security Agent only if it is addressed in such a manner as the Agent or Security Agent shall specify for this purpose.

34.6.4   Any electronic communication or document which becomes effective, in accordance with Clause 34.6.3, after 5:00 p.m. in the place in which the Party to whom the relevant communication or document is sent or made available has

169

its address for the purpose of this Agreement shall be deemed only to become effective on the following day.

34.6.5 Any reference in a Finance Document to a communication being sent or received or a document being delivered shall be construed to include that communication or document being made available in accordance with this Clause 34.6.

34.7 **English language**

34.7.1 Any notice given under or in connection with any Finance Document must be in English.

34.7.2 All other documents provided under or in connection with any Finance Document must be:

(A)   in English; or

(B)   if not in English, and if so required by the Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 35. CALCULATIONS AND CERTIFICATES

35.1 **Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

35.2 **Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

35.3 **Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days (or, in any case where the practice in the Relevant Market differs, in accordance with that market practice).

## 36. PARTIAL INVALIDITY

If, at any time, any provision of a Finance Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

37.     **REMEDIES AND WAIVERS**

No failure to exercise, nor any delay in exercising, on the part of any Finance Party or Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document. No election to affirm any Finance Document on the part of any Finance Party or Secured Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

38.     **AMENDMENTS AND WAIVERS**

38.1    **Required consents**

38.1.1  Subject to Clause 38.2 (*All Lender matters*) and Clause 38.3 (*Other exceptions*), any term of the Finance Documents (other than the Fee Letters, which may be amended in accordance with their terms) may be amended or waived only with the consent of the Majority Lenders and the Company and any such amendment or waiver will be binding on all Parties.

38.1.2  The Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 38 (*Amendments and Waivers*).

38.1.3  Each Obligor agrees to any such amendment or waiver permitted by this Clause 38 (*Amendments and Waivers*) which is agreed to by the Company. This includes any amendment or waiver which would, but for this Clause 38.1.3, require the consent of all of the Obligors.

38.1.4  Clause 26.12.3 (*Pro rata interest settlement*) shall apply to this Clause 38 (*Amendments and Waivers*).

38.2    **All Lender matters**

Subject to Clause 38.8 (*Changes to reference rates*) and Clause 38.3 (*Other exceptions*) an amendment or waiver of any term of any Finance Document that has the effect of changing or which relates to:

38.2.1  the definition of "Majority Lenders" in Clause 1.1 (*Definitions*);

38.2.2  the definitions of "Sanctioned Country", "Sanctions", "Sanctions Authority", "Sanctions List" or "Restricted Party" in Clause 1.1 (*Definitions*);

38.2.3  an extension to the date of payment of any amount under the Finance Documents;

38.2.4  a reduction in the Margin or a reduction in the amount of any payment of principal, interest, fees or commission payable;

38.2.5  a change in currency of payment of any amount under the Finance Documents;

171

38.2.6 an increase in any Commitment or the Total Commitments (other than in accordance with Clauses 2.2 (*Increase*) or 3 (*Accordion Increase*)), an extension of the Availability Period or any requirement that a cancellation of Commitments reduces the Commitments of the Lenders rateably under any Facility;

38.2.7 a change to the Borrowers or the Guarantors (other than in accordance with Clause 27 (*Changes to the Obligors*) or as a result of a Permitted Reorganisation);

38.2.8 any provision which expressly requires the consent of all the Lenders;

38.2.9 Clause 2.4 (*Finance Parties' rights and obligations*), Clause 8.1 (*Illegality*), Clause 8.3 (*Mandatory Prepayment – Maximum Available Amount*), Clause 8.9 (*Application of prepayments*), Clause 20.17 (*Sanctions*), Clause 20.18 (*Anti-Corruption Laws*), Clause 22 (*Collateral value*), Clause 24.12 (*Compliance with Sanctions*), Clause 24.13 (*Anti-Corruption Laws*), Clause 26 (*Changes to the Lenders*), Clause 31 (*Sharing among the Finance Parties*), this Clause 38, (*Amendments and Waivers*) the governing law of any Finance Document or Clause 44 (*Enforcement*);

38.2.10 the nature or scope of:

(A) the guarantee and indemnity granted under Clause 19 (*Guarantee and Indemnity*);

(B) the Charged Property; or

(C) the manner in which the proceeds of enforcement of the Transaction Security are distributed; or

38.2.11 the release of any guarantee and indemnity granted under Clause 19 (*Guarantee and Indemnity*) or of any Transaction Security,

shall not be made without the prior consent of all the Lenders, in the case of 38.2.10 and 38.2.11, unless: (1) that release is to become effective on or following the prepayment and cancellation in full of the Facilities; (2) that release is otherwise contemplated under this Agreement and/or made or permitted in accordance with another provision of the Finance Documents; (3) the relevant Obligors and/or assets are directly or indirectly the subject of a Permitted Reorganisation or merger permitted under this Agreement, in which case approval for any item referred to in such Clauses above will be automatic and the Security Agent shall be authorised to release such guarantees or Transaction Security (provided that, where applicable, any such release shall be without prejudice to any obligation to provide replacement security).

## 38.3   Other exceptions

38.3.1 An amendment or waiver which relates to the rights or obligations of the Agent may not be effected without the consent of the Agent.

38.3.2 Any amendment or waiver which relates only to the provisions governing transfers by Lenders and which makes such provisions more restrictive for any

of the Lenders shall only require the consent of each Lender who will be subject to the resulting additional restrictions.

38.3.3   Notwithstanding anything to the contrary in the Finance Documents, a Finance Party may unilaterally waive, relinquish or otherwise irrevocably give up all or any of its rights under any Finance Document (including any mandatory prepayment right) with the consent of the Company.

38.3.4   Any Declared Default, a Default or an Event of Default applicable to all Lenders may be revoked or, as the case may be, waived with the consent of the Majority Lenders. Any notice, demand, declaration or other step or action taken under or pursuant to Clause 25.27 (*Acceleration*) may be revoked with the consent of the Majority Lenders.

## 38.4   Excluded Commitments

If any Lender fails to respond to a request for a consent, waiver, amendment of or in relation to any term of any Finance Document or any other vote of Lenders under the terms of this Agreement within 10 Business Days of that request being made (unless the Company and the Agent agree to a longer time period in relation to any request):

38.4.1   its Commitment(s) shall not be included for the purpose of calculating the Total Commitments under the Facilities when ascertaining whether any relevant percentage (including, for the avoidance of doubt, unanimity) of the Total Commitments has been obtained to approve that request; and

38.4.2   its status as a Lender shall be disregarded for the purpose of ascertaining whether the agreement of any specified group of Lenders has been obtained to approve that request.

## 38.5   Replacement of Lender

38.5.1   If:

(A)   any Lender becomes a Non-Consenting Lender (as defined in Clause 38.5.4); or

(B)   an Obligor becomes obliged to repay any amount in accordance with Clause 8.1 (*Illegality*) or to pay additional amounts pursuant to Clause 14.2 (*Tax gross-up*), Clause 14.3 (*Tax Indemnity*) or Clause 15.1 (*Increased Costs*) to any Lender,

then the Company may, on 15 Business Days' prior written notice to the Agent and such Lender, replace such Lender by requiring such Lender to (and, to the extent permitted by law, such Lender shall) transfer pursuant to Clause 26 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement to an Eligible Institution (a **"Replacement Lender"**) which confirms its willingness to assume and does assume all the obligations of the transferring Lender in accordance with Clause 26 (*Changes to the Lenders*) for a purchase price in cash payable at the time of transfer in an amount equal to the outstanding principal amount of such Lender's participation in the

outstanding Utilisations and all accrued interest (to the extent that the Agent has not given a notification under Clause 26.12 (*Pro rata interest settlement*)), Break Costs and other amounts payable in relation thereto under the Finance Documents.

38.5.2  The replacement of a Lender pursuant to this Clause 38.5 shall be subject to the following conditions:

(A)  the Company shall have no right to replace the Agent or Security Agent;

(B)  no Finance Party shall have any obligation to the Company to find a Replacement Lender;

(C)  in the event of a replacement of a Non-Consenting Lender such replacement must take place no later than 60 days after the date on which that Lender is deemed a Non-Consenting Lender;

(D)  in no event shall the Lender replaced under this Clause 38.5 be required to pay or surrender to such Replacement Lender any of the fees received by such Lender pursuant to the Finance Documents; and

(E)  the Lender shall only be obliged to transfer its rights and obligations pursuant to Clause 38.5.1 once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer.

38.5.3  A Lender shall perform the checks described in Clause 38.5.2(E) as soon as reasonably practicable following delivery of a notice referred to in Clause 38.5.1 and shall notify the Agent and the Company when it is satisfied that it has complied with those checks.

38.5.4  In the event that:

(A)  the Company or the Agent (at the request of the Company) has requested the Lenders to give a consent in relation to, or to agree to a waiver or amendment of, any provisions of the Finance Documents;

(B)  the consent, waiver or amendment in question requires the approval of all the Lenders; and

(C)  the Majority Lenders have consented or agreed to such waiver or amendment,

then any Lender who does not and continues not to consent or agree to such waiver or amendment shall be deemed a **"Non-Consenting Lender"**.

38.6  **Disenfranchisement of Defaulting Lenders**

38.6.1  For so long as a Defaulting Lender has any Available Commitment, in ascertaining:

(A)  the Majority Lenders; or

(B)    whether:

(1)    any given percentage (including, for the avoidance of doubt, unanimity) of the Total Commitments; or

(2)    the agreement of any specified group of Lenders,

has been obtained to approve any request for a consent, waiver, amendment or other vote of Lenders under the Finance Documents,

that Defaulting Lender's Commitments will be reduced by the amount of its Available Commitments and, to the extent that that reduction results in that Defaulting Lender's Total Commitments being zero, that Defaulting Lender shall be deemed not to be a Lender for the purposes of paragraphs (A) and (B) above.

38.6.2   For the purposes of this Clause 38.6, the Agent may assume that the following Lenders are Defaulting Lenders:

(A)    any Lender which has notified the Agent that it has become a Defaulting Lender; and/or

(B)    any Lender in relation to which it is aware that any of the events or circumstances referred to in Clauses 38.6.1, 38.6.2, or paragraph (c) of the definition of "Defaulting Lender" has occurred,

unless it has received notice to the contrary from the Lender concerned (together with any supporting evidence reasonably requested by the Agent) or the Agent is otherwise aware that the Lender has ceased to be a Defaulting Lender.

## 38.7   Replacement of a Defaulting Lender

38.7.1   The Company may, at any time a Lender has become and continues to be a Defaulting Lender, by giving 15 Business Days' prior written notice to the Agent and such Lender:

(A)    replace such Lender by requiring such Lender to (and, to the extent permitted by law, such Lender shall) transfer pursuant to Clause 26 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement;

(B)    require such Lender to (and, to the extent permitted by law, such Lender shall) transfer pursuant to Clause 26 (*Changes to the Lenders*) all (and not part only) of the undrawn Commitment of the Lender; or

(C)    require such Lender to (and, to the extent permitted by law, such Lender shall) transfer pursuant to Clause 26 (*Changes to the Lenders*) all (and not part only) of its rights and obligations in respect of the Facilities,

to an Eligible Institution (a **"Replacement Lender"**) which confirms its willingness to assume and does assume all the obligations, or all the relevant obligations, of the transferring Lender in accordance with Clause 26 (*Changes*

175

*to the Lenders)* for a purchase price in cash payable at the time of transfer which is either:

(i)     in an amount equal to the outstanding principal amount of such Lender's participation in the outstanding Utilisations and all accrued interest (to the extent that the Agent has not given a notification under Clause 26.12 (*Pro rata interest settlement*)), Break Costs and other amounts payable in relation thereto under the Finance Documents; or

(ii)    in an amount agreed between that Defaulting Lender, the Replacement Lender and the Company and which does not exceed the amount described in paragraph (A) above.

38.7.2  Any transfer of rights and obligations of a Defaulting Lender pursuant to this Clause 38.7 shall be subject to the following conditions:

(A)     the Company shall have no right to replace the Agent or Security Agent;

(B)     no Finance Party shall have any obligation to the Company to find a Replacement Lender;

(C)     the transfer must take place no later than 90 days after the notice referred to in Clause 38.7.1;

(D)     in no event shall the Defaulting Lender be required to pay or surrender to the Replacement Lender any of the fees received by the Defaulting Lender pursuant to the Finance Documents; and

(E)     the Defaulting Lender shall only be obliged to transfer its rights and obligations pursuant to Clause 38.7.1 once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer to the Replacement Lender.

38.7.3  The Defaulting Lender shall perform the checks described in Clause 38.7.2(E) as soon as reasonably practicable following delivery of a notice referred to in Clause 38.7.1 and shall notify the Agent and the Company when it is satisfied that it has complied with those checks.

## 38.8   Changes to reference rates

38.8.1  Subject to Clause 38.3 (*Other exceptions*), if a Published Rate Replacement Event has occurred in relation to a Published Rate, any amendment or waiver which relates to:

(A)     providing for the use of a Replacement Reference Rate in place of that Published Rate; and

(B)

(1)     aligning any provision of any Finance Document to the use of that Replacement Reference Rate;

176

(2)   enabling that Replacement Reference Rate to be used for the calculation of interest under this Agreement (including, without limitation, any consequential changes required to enable that Replacement Reference Rate to be used for the purposes of this Agreement);

(3)   implementing market conventions applicable to that Replacement Reference Rate;

(4)   providing for appropriate fallback provisions for that Replacement Reference Rate; or

(5)   adjusting the pricing to reduce or eliminate, to the extent reasonably practicable, any transfer of economic value from one Party to another as a result of the application of that Replacement Reference Rate (and if any adjustment or method for calculating any adjustment has been formally designated, nominated or recommended by the Relevant Nominating Body, the adjustment shall be determined on the basis of that designation, nomination or recommendation),

may be made with the consent of the Agent (acting on the instructions of the Majority Lenders) and the Company.

38.8.2  In this Clause 38.8:

"**Published Rate**" means:

(a)   SOFR; or

(b)   Term SOFR for any Quoted Tenor.

"**Published Rate Replacement Event**" means, in relation to a Published Rate:

(a)   the methodology, formula or other means of determining that Published Rate has, in the opinion of the Majority Lenders and the Company, materially changed;

(b)

(i)

(A)   the administrator of that Published Rate or its supervisor publicly announces that such administrator is insolvent; or

(B)   information is published in any order, decree, notice, petition or filing, however described, of or filed with a court, tribunal, exchange, regulatory authority or similar administrative, regulatory or judicial body which reasonably confirms that the administrator of that Published Rate is insolvent,

177

provided that, in each case, at that time, there is no successor administrator to continue to provide that Published Rate;

(ii) the administrator of that Published Rate publicly announces that it has ceased or will cease, to provide that Published Rate permanently or indefinitely and, at that time, there is no successor administrator to continue to provide that Published Rate;

(iii) the supervisor of the administrator of that Published Rate publicly announces that such Published Rate has been or will be permanently or indefinitely discontinued; or

(iv) the administrator of that Published Rate or its supervisor announces that that Published Rate may no longer be used; or

(c) the administrator of that Published Rate (or the administrator of an interest rate which is a constituent element of that Published Rate) determines that that Published Rate should be calculated in accordance with its reduced submissions or other contingency or fallback policies or arrangements and either:

(i) the circumstance(s) or event(s) leading to such determination are not (in the opinion of the Majority Lenders and the Company) temporary; or

(ii) that Published Rate is calculated in accordance with any such policy or arrangement for a period no less than ten US Government Securities Business Days; or

(d) in the opinion of the Majority Lenders and the Company, that Published Rate is otherwise no longer appropriate for the purposes of calculating interest under this Agreement.

**"Quoted Tenor"** means, in relation to Term SOFR, any period for which that rate is customarily displayed on the relevant page or screen of an information service.

**"Relevant Nominating Body"** means any applicable central bank, regulator or other supervisory authority or a group of them, or any working group or committee sponsored or chaired by, or constituted at the request of, any of them.

**"Replacement Reference Rate"** means a reference rate which is:

(a) formally designated, nominated or recommended as the replacement for a Published Rate by:

(i) the administrator of that Published Rate (provided that the market or economic reality that such reference rate measures is the same as that measured by that Published Rate); or

(ii) any Relevant Nominating Body,

178

and if replacements have, at the relevant time, been formally designated, nominated or recommended under both paragraphs, the "Replacement Reference Rate" will be the replacement under paragraph (ii) above;

(b)     in the opinion of the Majority Lenders and the Company, generally accepted in the international or any relevant domestic syndicated loan markets as the appropriate successor to a Published Rate; or

(c)     in the opinion of the Majority Lenders and the Company, an appropriate successor to a Published Rate.

## 39.   CONFIDENTIAL INFORMATION

### 39.1   Confidentiality

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 39.2 (*Disclosure of Confidential Information*) and Clause 39.3 (*Disclosure to numbering service providers*), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

### 39.2   Disclosure of Confidential Information

Any Finance Party may disclose:

39.2.1   to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this Clause 39.2.1 is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

39.2.2   to any person:

(A)     to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Agent or Security Agent and, in each case, to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(B)     with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

179

(C)   appointed by any Finance Party or by a person to whom Clause 39.2.2(A) or 39.2.2(B) applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf (including, without limitation, any person appointed under Clause 28.14.2 of Clause 28.14 (*Relationship with the Lenders*));

(D)   who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in Clause 39.2.2(A) or 39.2.2(B);

(E)   to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(F)   to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(G)   to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to Clause 26.9 (*Security over Lenders' rights*);

(H)   who is a Party; or

(I)   with the consent of the Company,

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(1)   in relation to Clauses 39.2.2(A), 39.2.2(B) and 39.2.2(C), the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(2)   in relation to Clause 39.2.2(D), the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information; or

(3)   in relation to Clauses 39.2.2(E), 39.2.2(F) and 39.2.2(G), the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the

180

opinion of that Finance Party, it is not practicable so to do in the circumstances;

39.2.3 to any person appointed by that Finance Party or by a person to whom Clause 39.2.2(A) or 39.2.2(B) applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this Clause 39.2.3 if the service provider to whom the Confidential Information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Company and the relevant Finance Party; and

39.2.4 to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Obligors if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

## 39.3 Disclosure to numbering service providers

39.3.1 Any Finance Party may disclose to any national or international numbering service provider appointed by that Finance Party to provide identification numbering services in respect of this Agreement, the Facilities and/or one or more Obligors the following information:

(A)     names of Obligors and the Parent;

(B)     country of domicile of Obligors and the Parent;

(C)     place of incorporation of Obligors and the Parent;

(D)     date of this Agreement;

(E)     Clause 43 (*Governing Law*);

(F)     the name of the Agent;

(G)     date of each amendment and restatement of this Agreement;

(H)     amount of, and name of, the Facilities;

(I)     amount of Total Commitments;

(J)     currency of the Facilities;

(K)     type of Facilities;

181

(L)   ranking of the Facilities;

(M)   Final Maturity Date for the Facilities;

(N)   changes to any of the information previously supplied pursuant to paragraphs (A) to (M) above; and

(O)   such other information agreed between such Finance Party and the Company,

to enable such numbering service provider to provide its usual syndicated loan numbering identification services.

39.3.2  The Parties acknowledge and agree that each identification number assigned to this Agreement, the Facilities and/or one or more Obligors by a numbering service provider and the information associated with each such number may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

39.3.3  The Company represents that none of the information set out in paragraphs (A) to (O) of Clause 39.3.1 is, nor will at any time be, unpublished price-sensitive information.

39.3.4  The Agent shall notify the Company and the other Finance Parties of:

(A)   the name of any numbering service provider appointed by the Agent in respect of this Agreement, the Facilities and/or one or more Obligors; and

(B)   the number or, as the case may be, numbers assigned to this Agreement, the Facilities and/or one or more Obligors by such numbering service provider.

## 39.4   Entire agreement

This Clause 39 (*Confidential Information*) constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.  To the extent that any specific provision hereof is inconsistent with any provision of the DIP Orders, the relevant provision(s) of the Interim DIP Order or Final DIP Order (as applicable) shall prevail.

## 39.5   Inside information

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

## 39.6   Notification of disclosure

Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Company:

39.6.1 of the circumstances of any disclosure of Confidential Information made pursuant to Clause 39.2.2(E) of Clause 39.2 (*Disclosure of Confidential Information*) except where such disclosure is made to any of the persons referred to in that Clause during the ordinary course of its supervisory or regulatory function; and

39.6.2 upon becoming aware that Confidential Information has been disclosed in breach of this Clause 39 (*Confidential Information*).

39.7 **Continuing obligations**

The obligations in this Clause 39 (*Confidential Information*) are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of twelve months from the earlier of:

39.7.1 the date on which all amounts payable by the Obligors under or in connection with this Agreement have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

39.7.2 the date on which such Finance Party otherwise ceases to be a Finance Party.

40. **CONFIDENTIALITY OF FUNDING RATES**

40.1 **Confidentiality and disclosure**

40.1.1 The Agent and each Obligor agree to keep each Funding Rate confidential and not to disclose it to anyone, save to the extent permitted by Clauses 40.1.2 and 40.1.3.

40.1.2 The Agent may disclose:

(A) any Funding Rate to the relevant Borrower pursuant to Clause 10.4.2 (*Notification of rates of interest*); and

(B) any Funding Rate to any person appointed by it to provide administration services in respect of one or more of the Finance Documents to the extent necessary to enable such service provider to provide those services if the service provider to whom that information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Agent and the relevant Lender.

40.1.3 The Agent and each Obligor may disclose any Funding Rate, to:

(A) any of its Affiliates and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives if any person to whom that Funding Rate is to be given pursuant to this

paragraph (A) is informed in writing of its confidential nature and that it may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of that Funding Rate or is otherwise bound by requirements of confidentiality in relation to it;

(B)  any person to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation if the person to whom that Funding Rate is to be given is informed in writing of its confidential nature and that it may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of the Agent or the relevant Obligor, as the case may be, it is not practicable to do so in the circumstances;

(C)  any person to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes if the person to whom that Funding Rate is to be given is informed in writing of its confidential nature and that it may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of the Agent or the relevant Obligor, as the case may be, it is not practicable to do so in the circumstances; and

(D)  any person with the consent of the relevant Lender.

## 40.2 Related obligations

40.2.1 The Agent and each Obligor acknowledge that each Funding Rate is or may be price-sensitive information and that its use may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and the Agent and each Obligor undertake not to use any Funding Rate for any unlawful purpose.

40.2.2 The Agent and each Obligor agree (to the extent permitted by law and regulation) to inform the relevant Lender:

(A)  of the circumstances of any disclosure made pursuant to Clause 40.1.3(B) (*Confidentiality and disclosure*) except where such disclosure is made to any of the persons referred to in that Clause during the ordinary course of its supervisory or regulatory function; and

(B)  upon becoming aware that any information has been disclosed in breach of this Clause 40 (*Confidentiality of Funding Rates*).

## 40.3 No Event of Default

No Event of Default will occur under Clause 25.3 (*Other obligations*) by reason only of an Obligor's failure to comply with this Clause 40 (*Confidentiality of Funding Rates*).

41.     **BAIL-IN**

41.1    **Contractual recognition of bail-in**

Notwithstanding any other term of any Finance Document or any other agreement, arrangement or understanding between the Parties, each Party acknowledges and accepts that any liability of any Party to any other Party under or in connection with the Finance Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

41.1.1  any Bail-In Action in relation to any such liability, including (without limitation):

(A)     a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(B)     a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and

(C)     a cancellation of any such liability; and

41.1.2  a variation of any term of any Finance Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

41.2    **Bail-In definitions**

In this Clause 41 (*Bail-In*):

**"Article 55 BRRD"** means Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms.

**"Bail-In Action"** means the exercise of any Write-down and Conversion Powers.

**"Bail-In Legislation"** means

(a)     in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 BRRD, the relevant implementing law or regulation as described in the EU Bail-In Legislation Schedule from time to time;

(b)     in relation to any state other than such an EEA Member Country and the United Kingdom, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation; and

(c)     in relation to the United Kingdom, the UK Bail-In Legislation.

**"EEA Member Country"** means any member state of the European Union, Iceland, Liechtenstein and Norway.

**"EU Bail-In Legislation Schedule"** means the document described as such and published by the Loan Market Association (or any successor person) from time to time.

**"Resolution Authority"** means any body which has authority to exercise any Write-down and Conversion Powers.

**"UK Bail-In Legislation"** means Part I of the United Kingdom Banking Act 2009 and any other law or regulation applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (otherwise than through liquidation, administration or other insolvency proceedings).

**"Write-down and Conversion Powers"** means

(a)     in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule;

(b)     in relation to any other applicable Bail-In Legislation other than the UK Bail-In Legislation:

(i)      any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

(ii)     any similar or analogous powers under that Bail-In Legislation; and

(c)     in relation to the UK Bail-In Legislation, any powers under that UK Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that UK Bail-In Legislation that are related to or ancillary to any of those powers.

42.     **COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

43.     **GOVERNING LAW**

43.1.1   Except as set out in Clauses 43.1.2 and 43.1.3 below, this Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

43.1.2   Notwithstanding anything to the contrary herein or in any other Finance Document, Schedule 13 (*Additional Provisions Relating to the Chapter 11 Cases and Australian Proceeding*) shall be interpreted:

(A)     subject to paragraph (B) below, in accordance with the laws of the State of New York; and

(B)     on and after the VA Commencement Date, in accordance with the laws of the State of New South Wales, Australia, in respect of all matters relating to the Australian Proceedings,

in each case, without regard to conflicts of law rules that would result in the application of a different governing law, including English law.

44.     **ENFORCEMENT**

44.1    **Jurisdiction**

44.1.1   Subject to Clauses 44.1.2 and 44.1.4 below, the courts of England and Wales have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity, termination, performance, breach, interpretation, or breach of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a **"Dispute"**).

44.1.2   Notwithstanding anything to the contrary herein or in any other Finance Document, any Dispute, with respect to the DIP Facility, the Chapter 11 Cases, and other related matters, shall be referred to and finally settled by the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, by the courts of England and Wales.

44.1.3   The Parties agree that the Bankruptcy Court (or absent its lack of, or abstention from, jurisdiction, the courts of England and Wales) is the most appropriate and convenient courts to settle Disputes described in Clause 44.1.2 above and accordingly no Party will argue to the contrary.

44.1.4   On and after the VA Commencement Date, notwithstanding anything to the contrary herein or in any other Finance Document, any Dispute, with respect to the Australian Proceedings, the DOCA or in relation to the VA Administrator, and other related matters, shall be referred to and finally settled by the courts of

the State of New South Wales, Australia (and the courts of appeal from that State) and, if those courts do not have (or abstain from) jurisdiction, by the courts of England and Wales.

44.1.5   The Parties agree that the courts of the State of New South Wales, Australia (or absent its lack of, or abstention from, jurisdiction, the courts of England and Wales) is the most appropriate and convenient courts to settle Disputes described in Clause 44.1.4 above and accordingly no Party will argue to the contrary.

## 44.2   **Service of process**

44.2.1   Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

(A)   irrevocably appoints Law Debenture Corporate Services Limited, at 8th Floor, 100 Bishopsgate, London EC2N 4AG, as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document; and

(B)   agrees that failure by an agent for the service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

44.2.2   Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in the United States of America):

(A)   irrevocably appoints Jervois Texas, LLC, at c/o 1309 S Challis Street, Salmon, Idaho, 83467, as its agent for service of process in relation to any proceedings before the Bankruptcy Court in connection with any Finance Document; and

(B)   agrees that failure by an agent for the service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

44.2.3   Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in Australia):

(A)   irrevocably appoints Jervois Global Limited (ACN 007 626 575) at Suite 508, 737 Burwood Road Hawthorn East, Victoria, 2123, Australia, as its agent for service of process in relation to any proceedings before the Australian courts in connection with any Finance Document; and

(B)   agrees that failure by an agent for the service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

44.2.4   If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must promptly (and in any event within five days of such event taking

188

place) appoint another agent on terms acceptable to the Agent. Failing this, the Agent may appoint another agent for this purpose.

45.   **REFINANCING**

Upon implementation of the transactions contemplated by a Restructuring Support Agreement, the Lenders and the Company agree to act in good faith to facilitate a refinancing of this Agreement with a commercial bank or other financial institution reasonably selected by the Company.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement.

## SCHEDULE 1THE ORIGINAL PARTIES

### PART A

### THE ORIGINAL OBLIGORS

| Name of Original Borrower | Registration number (or equivalent, if any) Original Jurisdiction |
|---|---|
| Jervois Suomi Holding Oy | 3208692-9 |
| | Finland |
| Jervois Finland Oy | 3009512-7 |
| | Finland |

| Name of Original Guarantor | Registration number (or equivalent, if any) Original Jurisdiction |
|---|---|
| Jervois Suomi Holding Oy | 3208692-9 |
| | Finland |
| Jervois Finland Oy | 3009512-7 |
| | Finland |
| Jervois Americas LLC | N/A |
| | Delaware, United States |
| Jervois Japan Inc. | N/A |
| | Japan |
| Jervois Mining USA Limited | NV19881021843 |
| | Nevada, United States |
| Formation Holdings US, Inc. | 542958 |
| | Idaho, United States |
| Jervois Texas, LLC | 805863457 |
| | Texas, United States |

190

**PART B**

**THE 2024 EFFECTIVE TIME LENDERS**

| Name of 2024 Effective Time Lender | Revolving Facility Commitment |
| --- | --- |
| Millstreet Credit Fund LP | $127,500,000 |
| Mercer QIF Fund PLC – Mercer Investment Fund 1 | $22,500,000 |

## SCHEDULE 2

## CONDITIONS PRECEDENT

## PART A

## CONDITIONS PRECEDENT TO INITIAL UTILISATION

1. Original Obligors

1.1 A copy of the constitutional documents of each Original Obligor and the Parent.

1.2 A copy of a resolution of the board of directors of each Original Obligor and the Parent:

1.2.1 approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party and resolving that it execute the Transaction Documents to which it is a party;

1.2.2 authorising a specified person or persons to execute the Transaction Documents to which it is a party on its behalf;

1.2.3 authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Transaction Documents to which it is a party; and

1.2.4 in the case of each Obligor other than the Company, authorising the Company to act as its agent in connection with the Finance Documents.

1.3 A specimen of the signature of each person authorised by the resolution referred to in paragraph 1.2.

1.4 A copy of a resolution signed by all the holders of the issued shares in each Original Guarantor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Original Guarantor is a party.

1.5 A certificate of each Original Obligor and the Parent (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on it to be exceeded.

1.6 A certified copy of the register of shareholders of each Original Obligor.

1.7 A certificate of an authorised signatory of each Original Obligor and the Parent certifying that each copy document relating to it specified in this Part A of Schedule 2 (*Conditions Precedent*) is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement.

2. **FINANCE DOCUMENTS**

2.1 This Agreement duly executed by all original parties to it.

2.2     The Parent Guarantee duly executed by each party.

2.3     The Subordination Deed duly executed by all original parties to it.

2.4     The Fee Letters duly executed by all parties.

2.5     The Transaction Security Documents duly executed by each party.

2.6     A copy of all share certificates (if any), with endorsements in blank in relation to the shares subject to or expressed to be subject to the Transaction Security and other documents to be provided under the Transaction Security Documents referred to in paragraph 2.5 (subject to any grace periods under the Transaction Security Documents).

3.      **LEGAL OPINIONS**

3.1     A legal opinion of Herbert Smith Freehills LLP, legal advisers to the Agent in England, substantially in the form distributed to the Original Lenders prior to signing this Agreement.

3.2     A legal opinion of Waselius & Wist, legal advisers to the Agent in Finland, substantially in the form distributed to the Original Lenders prior to signing this Agreement.

3.3     A legal opinion of Herbert Smith Freehills, legal advisers to the Agent in Australia, substantially in the form distributed to the Original Lenders prior to signing this Agreement.

4.      **ACCOUNTS**

4.1     A copy of notice(s) executed by the relevant Obligor addressed to the Account Bank as referred to in the Finnish Security Agreements substantially in the form set out in the Finnish Security Agreements.

4.2     Confirmation from the Security Agent that the Collection Accounts have been opened.

5.      **KEY AGREEMENTS**

5.1     Copies of each Key Agreement, other than the Sales Contracts.

5.2     A report on Material Sales Contracts (as at the end of the calendar month prior to the calendar month in which the report is provided), signed by the Obligors' general counsel (or external legal counsel representing the Obligors), certifying the information supplied in such report, as being true and accurate in all material respects, containing the following information (a **"Material Sales Contract Report"**):

        5.2.1   Sales Contract reference;

        5.2.2   name of counterparty;

        5.2.3   registration number of the counterparty;

        5.2.4   registered address of the counterparty;

        5.2.5   whether the rights under the Sales Contract can be freely assigned;

      5.2.6    governing law;

      5.2.7    currency (if not USD, Euro, Japanese Yen or sterling); and

      5.2.8    payment terms (if longer than 60 days).

5.3    Written evidence that the Specified Insurances contain (in form and substance reasonably satisfactory to the Security Agent) an endorsement naming the Security Agent as additional insured.

## 6.    OTHER DOCUMENTS AND EVIDENCE

6.1    A report on Inventory and Receivables (including the Material Sales Contract Report referred to in paragraph 5.2) signed by a director of the Company.

6.2    Evidence that any process agent referred to in Clause 44.2 (*Service of process*) has accepted its appointment.

6.3    The Original Financial Statements.

6.4    Evidence that the fees, costs and expenses then due from the Company pursuant to Clause 13 (*Fees*), Clause 14.5 (*Stamp taxes*) and Clause 18 (*Costs and Expenses*) have been paid or will be paid by the first Utilisation Date.

6.5    Evidence that each Finance Party has completed all "know your customer" and similar checks that it is required to carry out and which (in each case) have been notified to the Company not later than five Business Days prior to the date of this Agreement.

## PART B

## CONDITIONS PRECEDENT REQUIRED TO BE DELIVERED BY AN ADDITIONAL OBLIGOR

1.    An Accession Deed, duly executed by the Additional Obligor and the Company.

2.    A copy of the constitutional documents of the Additional Obligor.

3.    A copy of a resolution of the board of directors of the Additional Obligor:

    3.1.1   approving the terms of, and the transactions contemplated by, the Accession Deed and the Finance Documents and resolving that it execute the Accession Deed and any other Finance Document to which it is a party;

    3.1.2   authorising a specified person or persons to execute the Accession Deed and other Finance Documents to which it is a party on its behalf;

    3.1.3   authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices (including, in relation to an Additional Borrower, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is party; and

    3.1.4   authorising the Company to act as its agent in connection with the Finance Documents.

4.    A specimen of the signature of each person authorised by the resolution referred to in paragraph 3.

5.    If requested by the Agent and customary in the relevant jurisdiction of the Additional Obligor, a copy of a resolution signed by all the holders of the issued shares of the Additional Obligor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Additional Obligor is a party.

6.    A certificate of the Additional Obligor (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on it to be exceeded.

7.    If requested by the Agent, a certified copy of the register of members/shareholders of the Additional Obligor.

8.    A certificate of an authorised signatory of the Additional Obligor certifying that each copy document listed in this Part B of Schedule 2 (*Conditions Precedent*) is correct, complete and in full force and effect as at a date no earlier than the date of the Accession Deed.

9.    A copy of any other Authorisation or other document, opinion or assurance which the Agent considers to be reasonably necessary or desirable in connection with the entry into and performance of the transactions contemplated by the Accession Deed or for the validity and enforceability of any Finance Document.

10.   If available, the latest audited financial statements of the Additional Obligor.

11.     A legal opinion of the legal advisers to the Agent in England.

12.     A legal opinion of the legal advisers to the Agent in the jurisdiction in which the Additional Obligor is incorporated.

13.     If the proposed Additional Obligor is incorporated in a jurisdiction other than England and Wales, evidence that the process agent specified in Clause 44.2 (Service of process), if not an Obligor, has accepted its appointment in relation to the proposed Additional Obligor.

14.     Any Transaction Security Documents which are required by the Agent to be executed by the proposed Additional Obligor.

15.     Any notices or other documents required to be given or executed or made under the terms of those Transaction Security Documents, including evidence that all registrations and other perfection steps as the Agent or Security Agent may reasonably specify have been made or completed.

**SCHEDULE 3**

**REQUESTS AND NOTICES**

**PART A**

**UTILISATION REQUEST**

From:  [*Borrower*]

To:      [*Agent*]


Dated:


Dear Sirs


**[Company] – [] Facility Agreement
dated [] (the "Agreement")**


1.    We refer to the Agreement. This is a Utilisation Request. Terms defined in the Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2.    We wish to borrow a Loan on the following terms:

| | |
|---|---|
| Borrower: | [  ] |
| Proposed Utilisation Date: | [  ] (or, if that is not a Business Day, the next Business Day) |
| Facility to be utilised: | [DIP Facility] |
| Amount: | [  ] or, if less, the Available Facility |
| Interest Period: | [  ] |

3.    We confirm that each condition specified in Clause 5.2 (*Further conditions precedent*) of the Agreement is satisfied on the date of this Utilisation Request.

4.    [This Loan is to be made in [whole]/[part] for the purpose of refinancing [*identify maturing Loan*]/[The proceeds of this Loan should be credited to [*account*]].

5.    This Utilisation Request is irrevocable.

Yours faithfully

_____

authorised signatory for

197

[name of [relevant] Borrower]

## PART B
## SELECTION NOTICE

From:  [*Borrower*]

To:     [*Agent*]

Dated:

Dear Sirs

### [Company] – [] Facility Agreement
### dated [] (the "Agreement")

1.      We refer to the Agreement. This is a Selection Notice. Terms defined in the Agreement have the same meaning in this Selection Notice unless given a different meaning in this Selection Notice.

2.      We refer to the following [DDTL] [DIP] Facility Loan[s] with an Interest Period ending on [●][1].

3.      [We request that the above [DDTL] [DIP] Facility Loan[s] be divided into [●] [DDTL] [DIP] Facility Loans with the following Base Currency Amounts and Interest Periods:][2]

or

[We request that the next Interest Period for the above [DDTL] [DIP] Facility Loan[s] is [●]].[3]

This Selection Notice is irrevocable.

Yours faithfully

_____

authorised signatory for

[name of [relevant] Borrower]

---

[1]      Insert details of all [DDTL] [DIP] Facility Loans for the relevant Facility which have an Interest Period ending on the same date.

[2]      Use this option if division of [DDTL] [DIP] Facility Loans is requested.

[3]      Use this option if sub-division is not required.

199

**SCHEDULE 4**

**FORM OF TRANSFER CERTIFICATE**

To:     [          ] as Agent

From: [*the Existing Lender*] (the **"Existing Lender"**) and [*the New Lender*] (the **"New Lender"**)


Dated:

**[Company] – [      ] Facility Agreement**
**dated [      ] (the "Agreement")**

1.      We refer to the Agreement. This is a Transfer Certificate. Terms defined in the Agreement have the same meaning in this Transfer Certificate unless given a different meaning in this Transfer Certificate.

2.      We refer to Clause 26.6 (*Procedure for transfer*) of the Agreement:

2.1     The Existing Lender and the New Lender agree to the Existing Lender transferring to the New Lender by novation, and in accordance with Clause 26.6 (*Procedure for transfer*) of the Agreement, all of the Existing Lender's rights and obligations under the Agreement, the other Finance Documents [and in respect of the Transaction Security] which relate to that portion of the Existing Lender's Commitment and participations in Utilisations under the Agreement as specified in the Schedule.

2.2     The proposed Transfer Date is [        ].

2.3     The Facility Office and address, electronic mail address and attention details for notices of the New Lender for the purposes of Clause 34.2 (*Addresses*) of the Agreement are set out in the Schedule.

3.      The New Lender:

3.1     expressly acknowledges the limitations on the Existing Lender's obligations set out in Clause 26.5.3 of Clause 26.5 (*Limitation of responsibility of Existing Lenders*) of the Agreement; and

3.2     confirms (for the benefit of the Obligors) that it meets all applicable regulatory requirements for lending to the Borrowers as of the date of this Transfer Certificate.

4.      This Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Transfer Certificate.

5.      This Transfer Certificate and any non-contractual obligations arising out of or in connection with it are governed by English law.

6.      This Transfer Certificate has been entered into on the date stated at the beginning of this Transfer Certificate.

200

**Note:** **The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions. It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

**THE SCHEDULE**
**Commitment/rights and obligations to be transferred**

[*Insert relevant details*]

[*Facility office address, electronic mail address and attention details for notices and account details for payments,*]

[Existing Lender]                              [New Lender]

By:                                                  By:



This Transfer Certificate is accepted by the Agent and the Transfer Date is confirmed as [        ].

[Agent]

By:

## SCHEDULE 5

## FORM OF ASSIGNMENT AGREEMENT

To:     [        ] as Agent and [            ] as Company, for and on behalf of each Obligor

From: [*the Existing Lender*] (the **"Existing Lender"**) and [*the New Lender*] (the **"New Lender"**)

Dated:

### [Company] – [] Facility Agreement
### dated [] (the "Agreement")

1.      We refer to the Agreement. This is an Assignment Agreement. Terms defined in the Agreement have the same meaning in this Assignment Agreement unless given a different meaning in this Assignment Agreement.

2.      We refer to Clause 26.7 (*Procedure for assignment*) of the Agreement:

2.1     The Existing Lender assigns absolutely to the New Lender all the rights of the Existing Lender under the Agreement and the other Finance Documents [and in respect of the Transaction Security] which correspond to that portion of the Existing Lender's Commitment and participations in Utilisations under the Agreement as specified in the Schedule.

2.2     The Existing Lender is released from all the obligations of the Existing Lender which correspond to that portion of the Existing Lender's Commitment and participations in Utilisations under the Agreement specified in the Schedule.

2.3     The New Lender becomes a Party as a Lender and is bound by obligations equivalent to those from which the Existing Lender is released under paragraph 2.2 above.

3.      The proposed Transfer Date is [      ].

4.      On the Transfer Date the New Lender becomes Party to the Finance Documents as a Lender.

5.      The Facility Office and address, electronic mail address and attention details for notices of the New Lender for the purposes of Clause 34.2 (*Addresses*) of the Agreement are set out in the Schedule.

6.      The New Lender:

6.1     expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph 26.5.3 of Clause 26.5 (*Limitation of responsibility of Existing Lenders*) of the Agreement; and

6.2     confirms (for the benefit of the Obligors) that it meets all applicable regulatory requirements for lending to the Borrowers as of the date of this Assignment Agreement.

7.      This Assignment Agreement acts as notice to the Agent (on behalf of each Finance Party) and, upon delivery in accordance with Clause 26.8 (*Copy of Transfer Certificate, Assignment Agreement or Increase Confirmation to Company*) of the Agreement, to the Company (on behalf of each Obligor) of the assignment referred to in this Assignment Agreement.

8.      This Assignment Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Assignment Agreement.

9.      This Assignment Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

10.     This Assignment Agreement has been entered into on the date stated at the beginning of this Assignment Agreement.

**Note:   The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions. It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

**THE SCHEDULE**
**Rights to be assigned and obligations to be released and undertaken**

[*Insert relevant details*]

[*Facility office address, electronic mail address and attention details for notices and account details for payments*]

[Existing Lender]                    [New Lender]

By:                                          By:


This Assignment Agreement is accepted by the Agent and the Transfer Date is confirmed as [      ].

Signature of this Assignment Agreement by the Agent constitutes confirmation by the Agent of receipt of notice of the assignment referred to herein, which notice the Agent receives on behalf of each Finance Party.

[Agent]

By:

## SCHEDULE 6

## FORM OF ACCESSION DEED

To:      [] as Agent and [        ] as Security Agent

From:  [Subsidiary] and [Company]

Dated:

Dear Sirs

### [Company] – [] Facility Agreement
### dated [] (the "Facility Agreement")

1.      We refer to the Facility Agreement and the Subordination Deed. This Accession Deed (the **"Accession Deed"**) shall take effect as an Accession Deed for the purposes of the Facility Agreement and as a Facility Accession Instrument for the purposes of the Subordination Deed. Terms defined in the Facility Agreement have the same meaning in this Accession Deed unless given a different meaning in this Accession Deed.

2.      [*Subsidiary*] agrees to become an Additional [Borrower]/[Guarantor] and to be bound by the terms of the Facility Agreement and the other Finance Documents as an Additional [Borrower]/[Guarantor] pursuant to [Clause 27.2 (*Additional Borrowers*)]/[Clause 27.3 (*Additional Guarantors*)] of the Facility Agreement. [*Subsidiary*] is a company duly incorporated under the laws of [*name of relevant jurisdiction*].

3.      [*Subsidiary*] agrees to become an Obligor and a Subordinated Creditor (in each case, as defined in and under the Subordination Deed) and to be bound by all the provisions of the Subordination Deed as an Obligor and a Subordinated Creditor pursuant to Clause [22.3] (*Additional Obligor*) of the Subordination Deed.

4.      By way of security for its obligations, [*Subsidiary*] irrevocably appoints the Security Agent as its attorney to do anything which it:

4.1     has authorised the Security Agent to do under the Subordination Deed; and

4.2     is required to do by the Subordination Deed but has failed to do within three Business Days following notice from the Security Agent or the relevant Subordinated Creditor becoming aware of the failure to comply.

5.      [The Company confirms that no Default is continuing or would occur as a result of [*Subsidiary*] becoming an Additional Borrower.][4]

6.      [*Subsidiary's*] administrative details are as follows:

---

[4]     Include in the case of an Additional Borrower.

Address:

Electronic mail address:

Attention:

7. This Accession Deed and any non-contractual obligations arising out of or in connection with it are governed by English law.

This Accession Deed is entered into by deed.

**EXECUTED AS A DEED**

By:

[Company]                                    [Subsidiary]

..................................................    ..................................................

..................................................    ..................................................


This Accession Deed is accepted as an Accession Deed for the purposes of the Facility Agreement and as a Facility Accession Instrument as defined in and for the purposes of the Subordination Deed by the Agent and the Security Agent.

**The Agent**

[*Agent*]

By:                                    By:

**The Security Agent**

[*Security Agent*]

By:                                    By:

## SCHEDULE 7

## FORM OF RESIGNATION LETTER

To:     [          ] as Agent

From:  [*resigning Guarantor*] and [*Company*]

Dated:

Dear Sir or Madam,

### [Company] – [          ] Facility Agreement
### dated [          ] (the "Agreement")

1.     We refer to the Agreement.  This is a Resignation Letter.  Terms defined in the Agreement have the same meaning in this Resignation Letter unless given a different meaning in this Resignation Letter.

2.     Pursuant to [Clause 27.5 (*Resignation of Guarantor*) )] of the Agreement, we request that [resigning Guarantor] be released from its obligations as a Guarantor under the Agreement.

3.     We confirm that:

3.1    no Default is continuing or would result from the acceptance of this request; and

3.2    [          ]*

4.     This Resignation Letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

| [Company] | [Subsidiary] |
|-----------|--------------|
| By:       | By:          |

208

## SCHEDULE 8

## ACCORDION INCREASE

## PART A

## FORM OF ACCORDION INCREASE NOTICE

To:      [            ] as Agent

From: [        ] as Company and the entities listed in the Schedule as Accordion Increase Lenders (the **"Accordion Increase Lenders"**)


Dated:

## [] – [] Facility Agreement
## dated [] (the "Agreement")

1.      We refer to the Agreement. This is an Accordion Increase Notice. This Accordion Increase Notice shall take effect as an Accordion Increase Notice for the purposes of the Agreement. Terms defined in the Agreement have the same meaning in this Accordion Increase Notice unless given a different meaning in this Accordion Increase Notice.

2.      We refer to Clause 3 (*Accordion Increase*) of the Agreement.

3.      We request the establishment of an Accordion Increase with the following Total Accordion Increase Commitments: [ ].

4.      The proposed Establishment Date is [ ].

5.      The Company confirms that:

5.1      the Accordion Increase Lenders and the Accordion Increase Commitments set out in this Accordion Increase Notice have been selected and allocated in accordance with Clause 3.1 (*Selection of Accordion Increase Lenders*) of the Agreement; and

5.2      each condition specified in Clause 3.4.1(A) (*Conditions to establishment*) of the Agreement is satisfied on the date of this Accordion Increase Notice.

6.      Each Accordion Increase Lender agrees to assume and will assume all of the obligations corresponding to the Accordion Increase Commitments set opposite its name in the Schedule as if it had been an Original Lender under the Agreement in respect of that Accordion Increase Commitments.

7.      On the Establishment Date each Accordion Increase Lender becomes party to the relevant Finance Documents as a Lender.

8.  Each Accordion Increase Lender expressly acknowledges the limitations on the Lenders' obligations referred to in Clause 3.9 (*Limitation of responsibility*) of the Agreement.

9.  This Accordion Increase Notice is irrevocable.

10. This Accordion Increase Notice may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Accordion Increase Notice.

11. This Accordion Increase Notice and any non-contractual obligations arising out of or in connection with it are governed by English law.

12. This Accordion Increase Notice has been entered into on the date stated at the beginning of this Accordion Increase Notice.

[*Company*]
By:

**[ACCORDION INCREASE LENDER(S)]**
By:

This document is accepted as an Accordion Increase Notice for the purposes of the Agreement by the Agent and the Establishment Date is confirmed as [ ].
[AGENT]
By:

## THE SCHEDULE

| Name of Accordion Increase Lender | Accordion Increase Commitment | Total Commitment of Accordion Increase Lender |
|---|---|---|

## PART B

### FORM OF ACCORDION INCREASE LENDER CERTIFICATE

To:      [              ] as Agent

From:  [              ] (the **"Accordion Increase Lender"**)


Dated:


### [] – [] Facility Agreement
### dated [] (the "Agreement")


1.      We refer to the Agreement and to the Accordion Increase Notice dated [ ]. This is an Accordion Increase Lender Certificate. Terms defined in the Agreement have the same meaning in this Accordion Increase Lender Certificate unless given a different meaning in this Accordion Increase Lender Certificate.

2.      The Facility Office and contact details for notices of the Accordion Increase Lender for the purposes of Clause [•] (*Addresses*) of the Agreement are:

   Facility Office:        [FACILITY OFFICE]

   Address:                [ADDRESS]

   Email:                  [EMAIL]

   Attention:              [ATTENTION].

Accordion Increase Lender

[**ACCORDION INCREASE LENDER**]

By:

## PART C

## FORM OF ACCORDION INCREASE REQUEST

To:      [the Agent] as Agent

From:  [the Company]

Dated:

Dear Sirs

## [] – [] **Facility Agreement**
## **dated [] (the "Agreement")**

1.      We refer to the Agreement. This is an Accordion Increase Request. Terms defined in the Agreement have the same meaning in this Accordion Increase Request unless given a different meaning in this Accordion Increase Request.

2.      We wish to increase the maximum amount that may be made available to us by the Lenders by [              ] (the **"Accordion Increase Amount"**).

3.      The Accordion Increase Effective Date is proposed to be at least [   ] Business Days after the date of this request.

4.      This Accordion Increase Request and any non-contractual obligations arising out of or in connection with it are governed by English law.

5.      This Accordion Increase Request is a Finance Document.

[The Company]
By:

This Agreement is accepted as an Accordion Increase Request for the purposes of the Agreement by the Agent.
[Agent]

## SCHEDULE 9

## FORM OF COMPLIANCE CERTIFICATE

To:      [      ] as Agent

From:  [*Company*]


Dated:


Dear Sirs


**[Company] – [        ] Facility Agreement
dated [        ] (the "Agreement")**

1.      We refer to the Agreement. This is a Compliance Certificate. Terms defined in the Agreement have the same meaning when used in this Compliance Certificate unless given a different meaning in this Compliance Certificate.

2.      We confirm that:  [Insert details of covenants to be certified]

3.      [We confirm that no Default is continuing.][*]

Signed:      _____        _____
                    Director of                                Director of

                    [*Company*]                                [*Company*]


_____        _____

for and on behalf of

[*Company*]

---

[*]      If this statement cannot be made, the Compliance Certificate should identify any Default that is continuing and the steps, if any, being taken to remedy it.

**SCHEDULE 10**

**TIMETABLES**

| | |
|---|---|
| Delivery of a duly completed Utilisation Request (Clause 6.1 (*Delivery of a Utilisation Request*)) or a Selection Notice (Clause 11.1 (*Selection of Interest Periods*) | U-3<br><br>9:30 am (or, in relation to the first Utilisation under the New Money DIP Facility, U 4:00 pm) |
| Agent notifies the Lenders of the Loan in accordance with Clause 6.4 (*Lenders' participation*) | U-3<br><br>5:00 pm (or, in relation to the first Utilisation under the New Money DIP Facility, U 6:00 pm) |
| Term SOFR Reference Rate is fixed | Quotation Day<br><br>11:00 am |

| | | |
|---|---|---|
| "U" | = | date of utilisation. |
| "U-X" | = | Business Days prior to date of utilisation. |

**SCHEDULE 11**

**FORM OF INCREASE CONFIRMATION**

To:     [        ] as Agent and [        ] as Company, for and on behalf of each Obligor

From:  [*the Increase Lender*] (the **"Increase Lender"**)


Dated:


**[Company] – [            ] Facility Agreement
dated [            ] (the "Agreement")**

1.      We refer to the Agreement. This is an Increase Confirmation. Terms defined in the Agreement have the same meaning in this Increase Confirmation unless given a different meaning in this Increase Confirmation.

2.      We refer to Clause 2.2 (*Increase*) of the Agreement.

3.      The Increase Lender agrees to assume and will assume all of the obligations corresponding to the Commitment specified in the Schedule (the **"Relevant Commitment"**) as if it had been an Original Lender under the Agreement in respect of the Relevant Commitment.

4.      The proposed date on which the increase in relation to the Increase Lender and the Relevant Commitment is to take effect (the **"Increase Date"**) is [        ].

5.      On the Increase Date, the Increase Lender becomes party to the Finance Documents as a Lender.

6.      The Facility Office and address, electronic mail address and attention details for notices to the Increase Lender for the purposes of Clause 34.2 (*Addresses*) of the Agreement are set out in the Schedule.

7.      The Increase Lender expressly acknowledges the limitations on the Lenders' obligations referred to in Clause 2.2.9 of Clause 2.2 (*Increase*) of the Agreement.

8.      This Increase Confirmation may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Increase Confirmation.

9.      This Increase Confirmation and any non-contractual obligations arising out of or in connection with it are governed by English law.

10.     This Increase Confirmation has been entered into on the date stated at the beginning of this Increase Confirmation.

**Note:  The execution of this Increase Confirmation may not be sufficient for the Increase Lender to obtain the benefit of the Transaction Security in all jurisdictions. It is the responsibility of the Increase Lender to ascertain whether any other**

216

**documents or other formalities are required to obtain the benefit of the Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

**THE SCHEDULE**

**Relevant Commitment/rights and obligations to be assumed by the Increase Lender**

[*Insert relevant details*]

[*Facility office address, electronic mail address and attention details for notices and account details for payments*]

[Increase Lender]

By:

This Increase Confirmation is accepted by the Agent and the Increase Date is confirmed as [      ].

Agent

By:

## SCHEDULE 12

## FORM OF FUNDING SUMMARY TABLE

| Funding Request - Uses of Proceeds | | | | | | |
|---|---|---|---|---|---|---|
| ($US mm) | JFO Subsidiaries | ICO Subsidiaries | SMP Subsidiaries | Jervois Global Limited | Other Subsidiaries | Total |
| Raw Materials / AP | | | | | | |
| Payroll & Other SG&A Payments | | | | | | |
| Capex / Contractors Payments | | | | | | |
| Taxes | | | | | | |
| Other | | | | | | |
| **Total** | | | | | | |

## SCHEDULE 13

## ADDITIONAL PROVISIONS RELATING TO THE CHAPTER 11 CASES AND AUSTRALIAN PROCEEDINGS

**ARTICLE 1. Incorporation by Reference**.

This Schedule 13 (this "**Schedule**") is attached to that certain RESTATED FACILITY AGREEMENT (as the same may be amended, modified, refinanced and/or restated from time to time and inclusive of this Schedule and all other schedules and exhibits attached thereto, the "**DIP Facility Agreement**"), dated as of _____ 2025, among JERVOIS SUOMI HOLDING OY, a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, as the Company, the other Obligors party thereto from time to time, ACQUIOM AGENCY SERVICES LTD, as Agent and Security Agent, MILLSTEET CREDIT FUND LP as a lender ("**Millstreet**"), MERCER QIF FUND PLC – MERCER INVESTMENT FUND 1 as a lender ("**Mercer**" and together with Millstreet, the "**New Money DIP Facility Lenders**").

**ARTICLE 2. Defined Terms**.

**Section 2.1.** Unless otherwise specified, capitalized terms used in this Schedule shall, if not otherwise defined in this Schedule, have the respective meanings given to them in Clause 1.1 (Definitions) of the DIP Facility Agreement. Unless otherwise specified, a reference in this Schedule to a "Section" (or similar) is a reference to a Section (or similar) of this Schedule.

"**Australian Proceedings**" has the meaning specified in the Restructuring Support Agreement and includes voluntary administrations to be concurrently commenced by the boards of the Australian Entities with respect to those entities.

"**Avoidance Action**" means any claim or cause of action seeking avoidance, whether under chapter 5 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute, common law or otherwise.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Carve-Out**" has the meaning specified in the Interim DIP Order or the Final DIP Order, as applicable.

"**Cash Collateral**" has the meaning specified in the Interim DIP Order or the Final DIP Order, as applicable.

"**Chapter 11 Cases**" shall mean the Debtors' cases that are pending under Chapter 11 of the Bankruptcy Code (the cases of each Debtor, each a "**Chapter 11 Case**", and, collectively, the "**Chapter 11 Cases**").

"**Confirmation Order**" has the meaning specified in the Restructuring Support Agreement.

"**Convertible Note Obligations**" has the meaning set forth in the Interim DIP Order and the Final DIP Order, as applicable.

"**Debtors**" shall mean the Parent, the Obligors and certain of their Subsidiaries (each a "**Debtor**", and, collectively, the "**Debtors**") that filed voluntary petitions with the Bankruptcy Court on the Petition Date initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code.

"**DIP Collateral**" has the meaning specified in Section 9.2(a) herein.

"**DIP Liens**" has the meaning specified in the Interim DIP Order or the Final DIP Order, as applicable.

"**DIP Obligations**" means all present and future Secured Obligations and any other liabilities and obligations, in each case, on account of or in relation to the DIP Facility, at any time of any Obligor to any DIP Secured Party under the Finance Documents.

"**DIP Secured Parties**" means each Finance Party from time to time party to the DIP Facility Agreement in respect of the DIP Facility.

"**DIP Superpriority Claims**" has the meaning specified in the Interim DIP Order or the Final DIP Order, as applicable.

"**Disclosure Statement Order**" has the meaning specified in the Restructuring Support Agreement.

"**DOCA**" has the meaning specified in the Restructuring Support Agreement and which shall be implemented in respect of Australian Entities.

"**Excluded Assets**" means: (i) any of the Obligors' rights or interest in any contract, lease, permit, license (including any governmental licenses, state or local franchises, charters and authorizations), or license agreement covering real or personal property of the Obligors if under the terms of such contract, lease, permit, license, or license agreement, or applicable law with respect thereto, the grant of a security interest or lien therein is prohibited as a matter of law or under the terms of such contract, lease, permit, license, or license agreement, and any such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, permit, license, or license agreement has not been obtained (provided, however, that the foregoing exclusion shall in no way be construed to apply to the extent that any described prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408, or 9-409 of the UCC or other similar applicable law (or to the extent that any consent or waiver has been obtained that would permit any DIP Secured Parties' security interest or lien to attach)), and (ii) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law (provided, however, that upon submission and acceptance by the United States Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall be considered DIP Collateral).

"**Final DIP Order**" means an order of the Bankruptcy Court, satisfactory in form and substance to the Majority Lenders, as to which no stay has been entered and which has not been reversed, vacated or overturned, except as the Majority Lenders (or the Agent with the prior written consent of the Majority Lenders) may otherwise specifically agree in writing.

"**First Day Pleadings**" has the meaning specified in the Restructuring Support Agreement.

"**Interim DIP Order**" means an interim order of the Bankruptcy Court, in form and substance satisfactory to the Majority Lenders, (i) authorizing the DIP Facility in the amount and on the terms set forth herein, (ii) granting the liens and superpriority expense claims hereunder and thereunder, (iii) authorizing the use of the proceeds of the DIP Facility in accordance with the terms hereof and thereof, (iv) granting adequate protection, (v) modifying the automatic stay, and (vi) granting related relief, in each case, in form and substance satisfactory to the Majority Lenders.

"**Petition Date**" shall mean the date of commencement of the Chapter 11 Cases.

"**Plan**" has the meaning specified in the Restructuring Support Agreement.

"**Plan Effective Date**" means the date on which all conditions to the effectiveness of the Plan have been satisfied or waived according to its terms.

"**Plan Supplement**" has the meaning specified in the Restructuring Support Agreement.

"**Prepetition Collateral**" has the meaning specified in the Interim DIP Order or the Final DIP Order, as applicable.

"**Prepetition Liens**" has the meaning specified in the Interim DIP Order or the Final DIP Order, as applicable.

"**Prepetition Loan Documents**" has the meaning specified in the Interim DIP Order or the Final DIP Order, as applicable.

"**Prepetition Payment**" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Financial Indebtedness of any Debtor outstanding and unpaid on the date on which such person becomes a Debtor, (ii) "critical or foreign vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims) or other prepetition general unsecured claims against any Debtor.

"**Prepetition Secured Parties**" has the meaning specified in the DIP Orders.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Solicitation**" has the meaning specified in the Restructuring Support Agreement.

"**VA Administrator**" has the meaning specified in the Restructuring Support Agreement and as relevant includes a deed administrator acceptable to the Requisite Consenting Lender (as defined in the Restructuring Support Agreement).

**Section 2.2.** Notwithstanding the definition of "Material Adverse Effect" in Clause 1.1 (Definitions) of the DIP Facility Agreement, a Material Adverse Effect shall not occur as a

222

result of the commencement of the Chapter 11 Cases, the Australian Proceedings, or their reasonably anticipated consequences.

## ARTICLE 3. Conditions Precedent to Utilisation of the DIP Facility

**Section 3.1. Additional Conditions Precedent to New Money DIP Facility Utilisations.** In addition to the conditions precedent for any Utilisation with respect to the DIP Facility otherwise set forth in Clause 5.2 (Further conditions precedent) of the DIP Facility Agreement, the Obligors must also comply with, and otherwise satisfy, each of the following additional conditions precedent for any Utilisation of any New Money DIP Facility Loans after the date of the Fourth Restatement Effective Time:

(a) The Bankruptcy Court shall have entered the Final DIP Order, which shall have been entered no later than forty (40) calendar days after the Petition Date and which shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Lenders; provided that such condition precedent in this sub-clause (a) shall not be required to be satisfied for any proposed Utilisation of the New Money DIP Facility Loans prior to the date that is no later than forty (40) calendar days after the Petition Date (but this sub-clause (a) shall apply if such Final DIP Order has been entered by the Bankruptcy Court prior to such proposed Utilisation date), that is not in excess of the Interim Period Cap.

(b) The DIP Secured Parties shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interest in, the Prepetition Collateral (or assets that would otherwise constitute Prepetition Collateral) (solely to the extent perfection of such security is not legally possible under applicable law or required under the terms of the relevant Transaction Security Documents but where the perfection of such security is entirely under the control of the Security Agent (acting on the instructions of the relevant Lenders) for the purposes of enforcement of such security, subject to applicable law and the relevant Transaction Security Documents)), and, to the extent permitted under applicable law and to the extent provided for under the DIP Orders, all other DIP Collateral, in each case, as set forth in and having the priorities set forth in the Interim DIP Order or Final DIP Order, as applicable;

(c) the Company shall be, immediately before giving effect to such proposed Utilisation and after giving pro forma effect thereto (including any substantially concurrent applications or disbursements of the proceeds of such proposed Utilisation), in compliance with Clause 23.5 (Minimum Group Liquidity). The Agent and the Lenders shall have received a certificate signed by two directors or senior officers of the Parent certifying as to compliance with the same, together with reasonably detailed evidence in support thereof;

(d) with respect to any proposed Utilisation all or a portion of which is to be used or funded, directly or indirectly, to the Parent and/or any of the Australian Entities, such proposed use of proceeds or other funding shall be in compliance with Section 6.1(c) of this Schedule and Clause 24.25.9 (Budget Reporting, Variance Testing, and Liquidity Certificates) of the DIP Facility Agreement;

(e) the Bankruptcy Court shall have entered all Orders approving the First Day Pleadings, which shall have been entered no later than five (5) calendar days after the Petition Date

and which shall have been entered by the Bankruptcy Court, shall not have been modified, stayed, or vacated (except with the prior written consent of the Majority Lenders) and shall be satisfactory in form and substance to the Majority Lenders; it being understood that the draft forms of such First Day Pleadings approved by counsel to the Majority Lenders prior to the Petition Date are satisfactory in such form;

(f) no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases;

(g) if either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, neither the making of the DIP Facility Loans nor the performance by any Obligor of any of their respective obligations under any of the Finance Documents shall be the subject of a presently effective stay pending appeal;

(h) the Restructuring Support Agreement shall be in full force and effect, and no default, event of default or termination event shall have occurred or be continuing thereunder;

(i) at the time of and immediately after giving effect to such Utilisation, no Default or Event of Default shall have occurred and be continuing hereunder; and

(j) The representations and warranties of each Obligor set forth in the Finance Documents shall be true and correct in all material respects on and as of the date of such Utilisation; *provided* that, in each case, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that, in each case, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the date of such credit extension or on such earlier date, as the case may be.

## ARTICLE 4. Representations and Warranties

**Section 4.1. Additional Representations.** In addition to the representations set forth in Clause 20 (Representations) of the DIP Facility Agreement, each Obligor represents and warrants to each Finance Party that:

(a) **Budget Reporting.** Each Updated Budget delivered pursuant to Section 24.25 (Budget Reporting, Variance Testing, and Liquidity Certificates) of the DIP Facility Agreement has been prepared in good faith on the basis of the material assumptions stated therein, which such assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and are subject to material contingencies and assumptions, many of which are beyond the control of the Obligors, and actual results may vary materially from such forecasts.

(b) **Status of Obligations**. Subject to entry of the Interim DIP Order (and the Final DIP Order, as applicable), the DIP Obligations shall have the status and priority set forth in Section 9.1 (Priority) herein, including, with respect to priority of Liens on, and security interests in, the Prepetition Collateral (or assets that would otherwise constitute Prepetition Collateral) (solely to the extent perfection of such security is not legally possible under applicable law or required under the terms of the relevant Transaction Security Documents but where the perfection of such security is entirely under the

control of the Security Agent (acting on the instructions of the relevant Lenders) for the purposes of enforcement of such security, subject to applicable law and the relevant Transaction Security Documents), and, to the extent permitted under applicable law and to the extent provided for under the Interim DIP Order (and the Final DIP Order, as applicable), all other DIP Collateral.

(c) **Valid Securities.** The Interim DIP Order is (and the Final DIP Order when entered will be), together with the Finance Documents and in accordance with applicable law, effective to create in favor of the Security Agent, for the benefit of the DIP Secured Parties, a legal, valid, binding and perfected Lien on, and security interest in, the Prepetition Collateral (or assets that would otherwise constitute Prepetition Collateral) (solely to the extent perfection of such security is not legally possible under applicable law or required under the terms of the relevant Transaction Security Documents but where the perfection of such security is entirely under the control of the Security Agent (acting on the instructions of the relevant Lenders) for the purposes of enforcement of such security, subject to applicable law and the relevant Transaction Security Documents), and, to the extent permitted under applicable law and to the extent provided for under the Interim DIP Order (and the Final DIP Order, as applicable), all other DIP Collateral.

**Section 4.2. Qualifications to Representations.** Notwithstanding Clause 20 (Representations) of the DIP Facility Agreement and the representations and warranties set out in any other Finance Document, each Obligor's representations and warranties to each Finance Party shall be modified as follows:

(a) The representation in Clause 20.1.3 (*Status*) of the DIP Facility Agreement and clause 13.2.1 (*Representations and Warranties*) of the Parent Guarantee is subject to entry of the DIP Orders and the terms thereof, and subject to any restrictions arising on account of any party's status as a "debtor" under the Bankruptcy Court.

(b) The representation in Clause 20.2 (*Binding Obligations*) of the DIP Facility Agreement and clause 13.2.3 (*Representations and Warranties*) of the Parent Guarantee is subject to the entry of the DIP Orders and the terms thereof with respect to the DIP Facility.

(c) The representation in Clause 20.3 (*Non-conflict with other obligations*) of the DIP Facility Agreement and clause 13.2.4 (*Representations and Warranties*) of the Parent Guarantee with respect to the DIP Facility shall not apply to any laws or regulations as to which any non-compliance, as a matter of law, is excused by the commencement of the Chapter 11 Cases or is otherwise excused by order of the Bankruptcy Court.

(d) The representation in Clause 20.4 (*Power and authority*) of the DIP Facility Agreement and clause 13.2.2 (*Representations and Warranties*) of the Parent Guarantee with respect to the DIP Facility is subject to the entry of the DIP Orders and the terms thereof.

(e) The representation in Clause 20.12 (*Pari passu ranking*) of the DIP Facility Agreement is subject to entry of the DIP Orders and the terms thereof with respect to the DIP Facility.

**ARTICLE 5. Affirmative Covenants.**

**Section 5.1. Additional Affirmative Covenants.** In addition to the covenants set forth in Clauses 21 (Information Undertakings) and 24 (General Undertakings) of the DIP Facility Agreement, each Obligor shall or shall cause the following:

(a) **Budget Reporting, etc..** Without limiting any of the provisions of this Schedule or the DIP Facility Agreement, during the Chapter 11 Cases, the Company and each other Obligor shall continue to timely comply with all of their respective reporting and other obligations under Clause 23.5 (Minimum Group Liquidity) and Clause 24.25 (Budget Reporting, Variance Testing, and Liquidity Certificates) of the DIP Facility Agreement.

(b) **Chapter 11 Case Information.** The Obligors shall deliver to the Lenders (i) as soon as reasonably practicable in advance of filing with the Bankruptcy Court the form of Final DIP Order, all other proposed orders and pleadings related to the Loans and the Finance Documents, any other financing or use of cash collateral, any sale or other disposition of Charged Property outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto and any other reports, other written information or other written material delivered to the Prepetition Secured Parties and (ii) by the earlier of (A) two Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than promptly after being filed) on behalf of any of the Debtors with the Bankruptcy Court or (B) at the same time as such documents are provided by any of the Debtors to any statutory committee appointed in the Chapter 11 Cases or the US trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of any parent or any of its Subsidiaries or other Financial Indebtedness of the Obligors or any request for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure.

(c) **First and Second Day Orders.** The Obligors shall cause all proposed "first day" orders, "second day" orders and all other orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions (including cash management or any critical vendor or supplier motions) submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of the DIP Facility Agreement, including this Schedule, and reasonably acceptable to the Majority Lenders in all respects; it being understood that the draft forms of such First Day Pleadings approved by counsel to the Majority Lenders prior to the Petition Date are satisfactory in such form.

(d) **Certain Bankruptcy Matters.** The Obligors shall, and shall cause the other Debtors, to comply in a timely manner in all material respects with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the DIP Orders and any other order of the Bankruptcy Court.

(e) **Advisor Access; Information; Conference Calls.** The Obligors shall (i) cause the Debtors' advisers to be available to the Lenders and the Lenders' advisers, including Paul Hastings, LLP, Squire Patton Boggs (AU), Mills Oakley, and GLC Advisors & Co., LLC, in each case as commercially reasonable, (ii) at the request of the Lenders, hold conference calls at least once a week with its advisers, the Lenders and the Lenders' advisers, and (iii) in respect of the Australian Proceedings, consult with the Lenders and its advisors before taking any of the following actions:

i. making an application to the court for an order under Part 5.3A of the *Corporations Act 2001* (Cth) (Corporations Act) extending the convening period for a meeting of creditors of the Parent/ Australian Entities;

ii. making an application to the court for an order under section 447A of the Corporations Act as to how the provisions under Part 5.3A of the Corporations Act will operate in relation to the Parent/ Australian Entities; or

iii. make a recommendation to creditors of the Parent and Australian Entities in the Administrators report pursuant to section 75-225 *Insolvency Practice Rules (Corporations)* 2016.

**Section 5.2. Chapter 11 Case Milestones.** In addition to the covenants set forth in Clause 24 (General Undertakings) of the DIP Facility Agreement, unless waived or extended by the Majority Lenders in a prior writing (including by email correspondence), the Obligors further shall or shall cause the following milestones to occur:

(a) within five (5) calendar days of the Petition Date, in any event no later than 11:59 p.m. New York City time on February 3, 2025, the Bankruptcy Court shall have entered on the docket for the Chapter 11 Cases the Interim DIP Order and the orders granting the relief sought by the First Day Pleadings;

(b) within 22 calendar days of the Petition Date, in any event no later than 11:59 p.m. New York City time on February 20, 2025, the Debtors shall have (i) filed the Plan Supplement with the Bankruptcy Court, and (ii) provided to the Majority Lenders (A) a copy of all known contracts to which they or any of their affiliates are a party and (B) a list of contracts to which the Debtors or any of their affiliates are a party which individually involve liabilities, indebtedness, or guarantees of payment of more than $1,000,000 in the aggregate over the term of the relevant contract, and (C) delivered a written certification to the Majority Lenders that the Debtors have satisfied these requirements and that no other contracts are known by the Debtors or any of their affiliates to exist;

(c) within 29 calendar days of the Petition Date, in any event no later than 11:59 p.m. New York City time on February 27, 2025, Solicitation shall have been completed, the requisite votes of impaired creditors in support of the Plan as required under the U.S. Bankruptcy Code shall have been obtained, and the deadline to object to the Plan shall have occurred;

(d) within 33 calendar days of the Petition Date, in any event no later than 11:59 p.m. New York City time on March 3, 2025, the deadline to object to the Plan shall have occurred;

(e) within 40 calendar days of the Petition Date, but in any event no later than 11:59 p.m. New York City time on March 10, 2025, the Bankruptcy Court shall have entered on the docket for the Chapter 11 Cases the Confirmation Order, the Disclosure Statement Order, the Final DIP Order, and final orders granting the relief sought by the First Day Pleadings;

(f) within 40 calendar days of the Petition Date, but in any event no later than 11:59 p.m. New York City time on March 10, 2025, the Obligors shall cause the following to have

occurred on the terms, conditions, structure, and documentation acceptable to, and as directed by, the Majority Lenders:

    i. The Parent shall contribute and otherwise transfer 100% of the Equity Interests in each of Jervois Brasil Participacoes LTDA and Jervois Brasil Metalurgia LDTA to Jervois Holdings SA;

    ii. The Obligors shall transfer 100% of the Equity Interests of certain of the Designated Non-Obligors as designated by the Majority Lenders to an Australian Entity acceptable to the Majority Lenders;

    iii. If and as directed by the Majority Lenders, the Parent shall create, incorporate, or otherwise form a new Subsidiary (such Subsidiary, the "**Intermediate Holdco**") in a jurisdiction acceptable to the Majority Lenders or otherwise assist, as applicable, in the formation of a newly-formed entity ("**NewCo**"), resulting in Intermediate Holdco being a direct and wholly-owned subsidiary of either Parent or NewCo, in each case as selected and directed by the Majority Lenders;

    iv. The Parent shall contribute and otherwise transfer 100% of the Equity Interests of all of its direct Subsidiaries (other than certain designated entities, including the Australian Entities and such Designated Non-Obligors transferred to the Australian Entities in accordance with sub-clause (ii) above) to the Intermediate Holdco; and

    v. The Intermediate Holdco shall become an Additional Guarantor, create and perfect Security in all or substantially all of its assets or properties in favour of the Security Agent (or its nominee) (and Parent or NewCo shall pledge, create, and perfect Security on 100% of the Equity Interests in such Intermediate Holdco), and deliver such other reasonably requested documents, certificates, assignments, transfers, mortgages, charges, notices and instructions, in each case, subject to the timing requirements of, and any exclusions or exceptions agreed to in writing (including by e-mail correspondence) by the Majority Lenders in their sole discretion and the reasonable requirements and specifications of the Security Agent.

(g) within two (2) business days of the issuance of the Confirmation Order, the Australian Proceedings shall have been duly commenced and the VA Administrator shall have been appointed (the "**VA Commencement Date**");

(h) in connection with the Australian Proceedings:

    i. within three (3) business days of the VA Commencement Date, (A) the Plan Sponsor (as defined in the Plan), shall submit a DOCA Proposal (as defined in the Plan) to the VA Administrator, and (B) the VA Administrator shall agree in writing with the Majority Lenders on the terms of any funding arrangement for Parent (and any other of the Australian Entities) to fund the Australian Proceedings, on terms acceptable to the Majority Lenders;

    ii. within eight (8) business days of the VA Commencement Date, the first meeting of creditors shall have occurred;

    iii.  within seventeen (17) business days of the VA Commencement Date, the VA Administrator shall have sent its report to creditors and notice of second meeting of creditors, each in form and substance acceptable to the Majority Lenders;

    iv.  no later than twenty-five (25) business days of the VA Commencement Date, the second meeting of creditors shall have occurred and a binding resolution authorizing and approving the DOCA shall have been passed or entered; and

    v.  no later than April 30, 2025 (or as otherwise agreed to in writing by the Majority Lenders), the DOCA shall have been implemented and all conditions to the effectiveness thereof shall have been satisfied or waived in accordance with its terms.

(i)  no later than 11:59 p.m. New York City time on April 30, 2025, the Plan Effective Date shall have occurred.

**Section 5.3. Qualifications to Affirmative Covenants.** Notwithstanding Clause 24 (General Undertakings) of the DIP Facility Agreement, the Obligors' general undertakings shall be modified as follows:

(a)  Clause 24.2 (Compliance with laws) of the DIP Facility Agreement shall not apply to any laws or regulations as to which any non-compliance is excused by the commencement of the Chapter 11 Cases, or is otherwise excused by order of the Bankruptcy Court.

**ARTICLE 6. Negative Covenants**.

**Section 6.1. Additional Negative Covenants.** In addition to the covenants set forth in Clause 24 (General Undertakings) of the DIP Facility Agreement, each Obligor shall not, nor will it cause or permit the following:

(a)  **Compliance with DIP Budget, Etc.**  Without limiting any of the provisions of this Schedule or the DIP Facility Agreement, during the Chapter 11 Cases, the Company and each other Obligor shall not permit any variance with respect to (i) Disbursement Variances and Receipt Variances under the then-applicable Approved Budget or (ii) payments and disbursements to counsel, advisors, and other professionals set forth in the Specified Professional Fee Budget, in each case of the foregoing sub-clauses (i) and (ii), in excess of the applicable permitted variances explicitly permitted under Clause 24.25 (Budget Reporting, Variance Testing, and Liquidity Certificates) of the DIP Facility Agreement.

(b)  **Payments of Financial Indebtedness.** The Obligors shall not, and it will not cause or permit any Debtor to, make any payment in violation of any subordination terms of, any post-petition Financial Indebtedness or any Financial Indebtedness existing on the Petition Date, except, in the case of such Financial Indebtedness in existence on the Petition Date, as expressly provided for in any order entered by the Bankruptcy Court or in the case of an Australian Proceedings, an Australian court that is reasonably acceptable to the Majority Lenders.

229

(c) **Australian Proceedings.** The Obligors shall not, directly or indirectly, distribute or otherwise transfer any cash or funding (either from the DIP Facility, cash on hand, or otherwise) to the Australian Entities other than in accordance with the Approved Budget and the Approved Australian VA Budget, and the Australian Entities shall not pursue or support, directly or indirectly, any Australian Proceedings other than in accordance with the terms required by this Agreement and the Restructuring Support Agreement. On and after the commencement of the Australian Proceedings, neither the Australian Entities nor the VA Administrator appointed on account of the Australian Proceedings shall, directly or indirectly, receive (or permit the Obligors, directly or indirectly, to transfer to the Australian Entities or such VA Administrator) any cash or cash equivalents (including, without limitation, proceeds of the DIP Facility Loans) unless (x) such VA Administrator for the Australian Proceedings has agreed to enter into the DIP Facility Agreement or (y) otherwise with the prior written consent of the Majority Lenders.

## Section 6.2.  Qualifications to Negative Covenants.

(a) Clause 24.3 (Negative pledge) shall be modified to permit the Security created pursuant to the DIP Orders.

## ARTICLE 7. Events of Default and Remedies.

**Section 7.1. Additional Events of Default.** In addition to those Events of Default provided in Clause 25 (Events of Default) of the DIP Facility Agreement, any of the following from and after the date hereof shall constitute an Event of Default:

(a) the Fourth Restatement Effective Time shall not have occurred within three Business Days after the date of entry of the Interim DIP Order (or such later date as the Majority Lenders may agree in their sole discretion); or

(b) any act or occurrence that would, upon the delivery of notice, permit the Restructuring Support Agreement to be terminated (unless such act or occurrence was waived, cured or extended in accordance with the terms of the Restructuring Support Agreement); or

(c) the Obligors shall conduct a marketing and sale process for any portion of the Obligors' assets without the prior written consent of the Majority Lenders; or

(d) (i) the Debtors withdraw or revoke the Plan, (ii) the filing by any Debtor of any chapter 11 plan or any amendment thereof or supplement thereto (other than the Plan) that is inconsistent in any respect with the Plan or the Restructuring Support Agreement to which the Majority Lenders do not consent in advance in writing, (iii) any Debtor or any of their direct or indirect subsidiaries determines to proceed with an Alternative Restructuring (as defined in the Restructuring Support Agreement), including, for the avoidance of doubt, in the case of the Australian Proceedings, the VA Administrator recommends a competing deed of company arrangement proposal, or (iv) any Debtors takes any action that is materially inconsistent with the Plan or the Restructuring Support Agreement; or

(e) the Interim DIP Order (i) at any time ceases to be in full force and effect (other than through the entry of the Final DIP Order) or (ii) shall be vacated, reversed, stayed,

amended, supplemented or modified, without the prior written consent of the Majority Lenders; or

(f)  except with the prior written consent of the Majority Lenders, the entry of an order in any of Chapter 11 Cases (i) staying, reversing, amending, supplementing, vacating or otherwise modifying any of the Finance Documents, the Interim DIP Order or the Final DIP Order (as applicable), or (ii) impairing or modifying any of the liens, security interests, claims, rights, remedies, privileges, benefits or protections granted under the Finance Documents or under the DIP Orders to the DIP Secured Parties or the Prepetition Secured Parties; or

(g)  the failure of any of the Chapter 11 Debtors to comply with any of the terms or conditions of the Interim DIP Order or the Final DIP Order; or

(h)  the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a Chapter 7 case; or

(i)  the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in the Chapter 11 Cases  (other than as a result of a motion filed by or on behalf of the Majority Lenders); or

(j)  the entry of an order in any of the Chapter 11 Cases authorizing any of the Debtors (i) to obtain additional financing under sections 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full in cash of all DIP Obligations under the DIP Facility Agreement (other than contingent indemnity obligations not then due) (without the prior written consent of the Majority Lenders); or (ii) to grant any lien, other than liens expressly permitted under the DIP Facility Agreement and the DIP Orders, upon or affecting any Security; or

(k)  (i) the consensual use of prepetition cash collateral is terminated or modified, or (ii) the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of cash collateral other than as provided in the DIP Facility Agreement and the DIP Orders, in each case, without the prior written consent of the Majority Lenders; or

(l)  except for the Carve-Out, and except as expressly permitted hereunder or in the DIP Orders, the entry of an order in any of the Chapter 11 Cases granting any claim against any Debtor entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is *pari passu* with or senior to the claims of the DIP Secured Parties or the Adequate Protection Claims (as defined in the DIP Orders) granted to the Prepetition Secured Parties (without the prior written consent of the Majority Lenders); or

(m) except for the Carve-Out or as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any lien in Security that is *pari passu* with or senior to any lien granted to the DIP Secured Parties, or any Adequate Protection Lien (as defined in the DIP Orders) granted to the Prepetition Secured Parties (without the prior written consent of the Majority Lenders); or

231

(n) except as provided in the DIP Orders, the making of any adequate protection payment or the granting of any adequate protection (including, without limitation, the granting of any liens on the Security, superpriority claims, the right to receive cash payments or otherwise), without the prior written consent of the Majority Lenders and the requisite Prepetition Secured Parties; or

(o) any of the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing and/or solicitation of a chapter 11 plan is terminated or modified for any reason; or

(p) the payment of, or any Debtors file a motion or application seeking authority to pay, any Prepetition Payment, other than (A) as provided in any of the Interim DIP Orders or the DIP Orders, (B) to the extent such payment is expressly permitted pursuant to the DIP Facility Agreement and the Approved Budget, or (C) with the prior written consent of the Majority Lenders; or

(q) the entry of an order in any of the Chapter 11 Cases granting relief from or otherwise modifying any stay of proceeding (including the automatic stay) to allow a third party to execute upon or enforce a lien against any assets of the Debtors that have an aggregate value in excess of $250,000 or with respect to any lien of or the granting of any lien on any assets with an aggregate fair market value in excess of $250,000 of the Debtors to any state or local environmental or regulatory agency or authority having priority over the liens in favor of the DIP Secured Parties, in each case, without the prior written consent of the Majority Lenders; or

(r)  (A) any Debtor shall (i) challenge or contest the validity or enforceability of the DIP Orders or any Finance Document or deny that it has further liability thereunder, (ii) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the Secured Obligations, the DIP Liens, the DIP Superpriority Claims, Finance Documents, Adequate Protection Liens, Adequate Protection Claims, the Prepetition Liens, the Prepetition Loan Documents, or the Convertible Note Obligations, (iii) assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset all or any portion of the Secured Obligations, the DIP Liens, the DIP Superpriority Claims, Finance Documents, Adequate Protection Liens, Adequate Protection Claims, the Prepetition Liens, the Prepetition Loan Documents or the Convertible Note Obligations, (iv) investigate, join or file any motion, application or other pleading in support of, or publicly support any other person that has asserted any of the claims, challenges or other requested relief contemplated in clauses (i) - (iii) above, or fails to timely contest such claims, challenges or other requested relief in good faith (provided, that responding to any investigation conducted by an official committee or other party with respect to the nature, extent, amount, enforceability, validity, priority or perfection of the Prepetition Liens, the Prepetition Loan Documents or the Convertible Note Obligations, subject in each case to the DIP Orders, shall not, in and of itself, constitute an Event of Default hereunder); or (B) the entry of a judgment or an order in any of the Chapter 11 Cases sustaining any of the claims, challenges, causes of action or other relief contemplated in clauses (i) - (iii) above; or

(s) the entry of an order in any of the Chapter 11 Cases, avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments

made to the Secured Parties on account of the Secured Obligations owing under the DIP Orders, the DIP Facility Agreement, the other Finance Documents; or

(t) subject to entry of the DIP Orders, the entry of any order in any of the Chapter 11 Cases (i) charging any of the Security with respect to the DIP Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise or (ii) charging any of the Prepetition Collateral with respect to the Prepetition Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise; or

(u) any Debtor shall consummate or seek to obtain Bankruptcy Court approval of any sale or other disposition of all or any portion of the Security pursuant to Section 363 of the Bankruptcy Code or otherwise (other than in ordinary course of business and that is expressly permitted by the Approved Budget and not prohibited by the DIP Facility Agreement), without the prior written consent of the Majority Lenders; or

(v) if any Debtor is enjoined, restrained, or in any way prevented by court order or a governmental authority from continuing to conduct all or any material part of the business affairs of the Debtors and their Subsidiaries; or

(w) any VA Administrator appointed for the Parent and the Australian Entities in the Australian Proceedings (or any other party acting on their behalf) takes any action materially inconsistent with any Obligor's obligations under the Restructuring Support Agreement, the DIP Facility Agreement, or any other Finance Document; or

(x) any of the Obligors commence any insolvency or other similar proceeding, corporate action, or other procedure with respect to the Parent and/or the other Australian Entities (other than the Australian Proceedings or the Chapter 11 Cases, in each case, consistent with the terms of the Restructuring Support Agreement); or

(y) any Debtor initiates, commences, joins, publicly supports, pursues, files any motion, application or other pleading in support of, or fails to contest in good faith, the actions or relief described in clauses (e), (f), (h) through (o), (q), (s) and (t) of this Section 7.1; or

(z) The creditors of the Parent and the Australian Entities do not approve the DOCA Proposal at the second meeting(s) of creditors of the Parent and the Australian Entities convened in accordance with the Corporations Act (including any adjourned meeting of creditors) to execute a deed of company arrangement pursuant to section 439C of the Corporations Act.

**Section 7.2. Qualifications to Events of Default.** Notwithstanding any contrary provisions in Clause 25 (Events of Default) of the DIP Facility Agreement, the Events of Default shall be modified as follows:

(a) **Cross Default.** Clause 25.6 (Cross default) of the DIP Facility Agreement shall not apply to any Financial Indebtedness of any Debtor that was incurred prior to the Petition Date unless (i) such Financial Indebtedness has been accelerated and the enforcement of remedies with respect to such Financial Indebtedness shall not have been stayed by the commencement of the Chapter 11 Cases or (ii) if the holders of any such Financial Indebtedness commence enforcement of remedies or provide notice to any Debtor or announce publicly the intention to commence enforcement of remedies with respect to

any such Financial Indebtedness, and the enforcement of such remedies shall not have been stayed in the jurisdiction in which such holders are enforcing or intending to enforce such remedies.

(b) **Insolvency.** Clause 25.7 (Insolvency) of the DIP Facility Agreement shall not apply to the Debtors.

(c) **Insolvency Proceedings**. Clause 25.8 (Insolvency proceedings) of the DIP Facility Agreement shall not apply to the Chapter 11 Cases or, solely with respect to the Parent and the Australian Entities, the Australian Proceedings.

## ARTICLE 8. Remedies Upon Event of Default

Notwithstanding Clause 25.27 (Acceleration) of the DIP Facility Agreement, if any Event of Default occurs and is continuing, then, and in every such event, and at any time thereafter during the continuance of such event, the Agent may, and at the request of the Majority Lenders shall, by notice to the Borrowers, take any of the following actions, at the same or different times, in each case, subject to the provisions of the DIP Orders: (A) deliver to the Borrowers a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the DIP Facility Commitments, (C) declare the DIP Facility Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Obligors to use any cash collateral, except as permitted under the DIP Orders, (E) terminate the DIP Facility Agreement, (F) charge the default rate of interest under the DIP Facility Agreement, (G) freeze all monies in any deposit accounts of the Obligors, (H) exercise any and all rights of setoff, (I) exercise any right or remedy with respect to the DIP Collateral or the liens created under the Finance Documents, or (J) take any other action or exercise any other right or remedy permitted under the Finance Documents, the DIP Orders or applicable law.

## ARTICLE 9. Additional Agreements and Acknowledgements with Respect to Priority and Securities; Grant of Security.

**Section 9.1. Priority.** Each of the Obligors hereby covenants and agrees that upon the entry of an Interim DIP Order (and when applicable, the Final DIP Order) its DIP Obligations, including its obligations hereunder and under the Finance Documents and under the Transaction Security Documents, in each case, with respect to the DIP Facility and the DIP Obligations thereunder, shall be entitled to the relative rights and priorities set forth in the Interim DIP Order (and when applicable, the Final DIP Order).

**Section 9.2. Grant of Security and DIP Collateral.**

(a) Further to the Interim DIP Order (and, when entered, the Final DIP Order), to secure the prompt and complete payment and performance of all DIP Obligations when due (whether at stated maturity, by required prepayment, acceleration or otherwise), each Obligor hereby GRANTS, ASSIGNS, CONVEYS, PLEDGES, HYPOTHECATES, TRANSFERS, MORTGAGES, and CONFIRMS, to the Security Agent, for the ratable benefit of the DIP Secured Parties, all of its right, title and interest in (collectively, the "***DIP Collateral***") all assets and properties of each of the Obligors and their estates, of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether owned or consigned by or to, or leased from or to, or acquired by, or arising in favor of, whether prior to or after the Petition Date, any of the Obligors (including under

234

any trade names, styles or derivations thereof), wherever located, including, without limitation, all of the Obligors' rights, title and interests in (i) all "Charged Property" (as defined in the DIP Facility Agreement), (ii) all Prepetition Collateral (including Cash Collateral), (iii) all money, cash and cash equivalents, all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with any and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time), all accounts receivable and other receivables (including those generated by intercompany transactions), all rights to payment, contracts and contract rights, all instruments, documents and chattel paper, all securities (whether or not marketable), all goods, furniture, machinery, plants, equipment, vehicles, inventory and fixtures, all Real Property interests, all interests in leaseholds (to the extent permitted herein), all franchise rights, all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property, all general intangibles, tax or other refunds, or insurance proceeds, all equity interests, capital stock, limited liability company interests, partnership interests and financial assets, all investment property, all supporting obligations, all letters of credit and letter of credit rights, all commercial tort claims (including, for the avoidance of doubt, any cause of action related thereto), all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records), (iv) all rents, products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to any of the Obligors from time to time with respect to any of the foregoing, and (iv) subject to entry of the Final DIP Order, all proceeds of and property recovered from or that becomes unencumbered as a result of any Avoidance Actions, whether by judgment, settlement or otherwise; provided, however, that DIP Collateral shall exclude any Excluded Assets for so long as any such assets or properties constitutes Excluded Assets, but shall include any and all proceeds and products of Excluded Assets (except to the extent such proceeds and products themselves constitute Excluded Assets); to HAVE AND TO HOLD to the Security Agent on behalf of the DIP Secured Parties, and each Obligor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets, and interests unto the Security Agent on behalf of the DIP Secured Parties.

(b) All of the liens described in this Section 9.2 shall attach, validate and perfect upon entry of the Interim DIP Order without the necessity of the execution, recordation of filings by the Debtors of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral) or the possession or control by the Security Agent of, or over, any Charged Property in which a security interest can be created by the Interim DIP Order (and the Final DIP Order when entered), as set forth in the Interim DIP Order.

(c) The relative priorities of the Securities described in this Section 9.2 with respect to the Charged Property of the Debtors shall be as set forth in the Interim DIP Order (and, when entered, the Final DIP Order). All of the liens described in this Section 9.2 in which a security interest can be created and perfected by the Interim DIP Order (and

the Final DIP Order when entered) shall be effective and perfected upon entry of the Interim DIP Order.

(d) The Obligors agree that to the extent that the DIP Obligations (other than contingent indemnification obligations not yet due) have not been satisfied in full in cash and until no Secured Party shall have any obligation (actual or contingent) to make any advance or provide any financial accommodation under the Finance Document, its obligations under the Finance Documents shall not be discharged by the entry of an order confirming a plan of reorganization, and the Debtors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge and the DIP Superpriority Claims granted to the Agent, the Security Agent and the Lenders pursuant to the DIP Orders and the Security and liens granted to the any of the Secured Parties pursuant to the DIP Orders shall not be affected in any manner by the entry of an order confirming a plan of reorganization.

(e) Except as otherwise expressed provided herein, terms used in Section 9.2(b) but not otherwise defined herein that are defined in the Uniform Commercial Code as in effect in the State of New York (the "UCC") shall have the respective meanings given to such terms in the UCC; provided if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

**<u>Exhibit 2</u>**

**Initial DIP Budget**

**Jervois Global Limited - Consolidated**
*Initial DIP Budget*
*As of 28 Jan 2025*
*($ thousands)*

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Period:* | Jan | Jan | Feb | Feb | Feb | Feb | Mar | Mar | Mar | Mar | Apr | Apr | Apr | Total |
| *Period Ended (Fri):* | 1/24/25 | 1/31/25 | 2/7/25 | 2/14/25 | 2/21/25 | 2/28/25 | 3/7/25 | 3/14/25 | 3/21/25 | 3/28/25 | 4/4/25 | 4/11/25 | 4/18/25 | 4/18/25 |
| *Act/Fcst:* | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
| **Operating Cash Flow** | | | | | | | | | | | | | | |
| (1) Operating Receipts | 137 | 2,117 | 786 | 2,584 | 2,533 | 4,150 | 1,591 | 4,289 | 2,466 | 4,700 | 1,531 | 3,250 | 4,874 | $ 35,008 |
| (2) VAT and Other Receipts | 849 | - | 810 | (0) | 979 | - | 500 | - | 979 | - | - | 500 | - | 4,616 |
| (3) **Total Receipts** | **986** | **2,117** | **1,595** | **2,584** | **3,512** | **4,150** | **2,091** | **4,289** | **3,445** | **4,700** | **1,531** | **3,750** | **4,874** | **39,624** |
| (4) AP and Raw Materials | (3,383) | (1,510) | (5,022) | (5,488) | (4,580) | (3,523) | (2,765) | (5,719) | (2,462) | (3,549) | (1,794) | (6,549) | (3,593) | (49,936) |
| (5) Payroll & other SGA payments | (136) | (129) | (403) | (269) | (294) | (137) | (365) | (224) | (335) | (228) | (5) | (509) | (314) | (3,345) |
| (6) **Total Operating Disbursements** | **(3,520)** | **(1,639)** | **(5,426)** | **(5,756)** | **(4,874)** | **(3,659)** | **(3,130)** | **(5,942)** | **(2,797)** | **(3,777)** | **(1,798)** | **(7,057)** | **(3,907)** | **(53,282)** |
| (7) **Total Operating Cash Flow** | **(2,534)** | **478** | **(3,830)** | **(3,172)** | **(1,362)** | **491** | **(1,039)** | **(1,653)** | **648** | **923** | **(267)** | **(3,307)** | **967** | **(13,658)** |
| (8) **Non-Operating / Restructuring** | | | | | | | | | | | | | | |
| (9) Restructuring Professional Fees | (400) | (3,988) | (385) | (385) | (1,317) | (468) | (1,757) | (94) | (880) | (259) | (176) | (72) | (281) | (10,460) |
| (10) Other Restructuring | - | (400) | - | - | - | - | - | - | - | - | - | - | - | (400) |
| (11) **Total Non-Operating Receipts/Disbursements** | **(400)** | **(4,388)** | **(385)** | **(385)** | **(1,317)** | **(468)** | **(1,757)** | **(94)** | **(880)** | **(259)** | **(176)** | **(72)** | **(281)** | **(10,860)** |
| **Financing** | | | | | | | | | | | | | | |
| (12) DDTL/DIP Borrowings | - | 12,500 | - | - | - | - | 12,500 | - | - | - | - | - | - | 25,000 |
| (13) Debt Service & Fees | - | - | (179) | - | - | (200) | (274) | - | - | (230) | (1,654) | - | - | (2,536) |
| (14) Foreign Exchange Gains / (Losses) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (15) **Total Financing** | **-** | **12,500** | **(179)** | **-** | **-** | **(200)** | **12,226** | **-** | **-** | **(230)** | **(1,654)** | **-** | **-** | **22,464** |
| (16) **Total Net Cash Flow** | **$ (2,934)** | **$ 8,590** | **$ (4,394)** | **$ (3,557)** | **$ (2,679)** | **$ (177)** | **$ 9,430** | **$ (1,747)** | **$ (232)** | **$ 435** | **$ (2,097)** | **$ (3,379)** | **$ 687** | **$ (2,053)** |
| (17) **Cash Balance** | | | | | | | | | | | | | | |
| (18) Beginning Consolidated Cash Balance | 13,055 | 10,121 | 18,712 | 14,318 | 10,760 | 8,081 | 7,905 | 17,335 | 15,588 | 15,356 | 15,790 | 13,694 | 10,315 | 13,055 |
| (19) Net Cash Flow | (2,934) | 8,590 | (4,394) | (3,557) | (2,679) | (177) | 9,430 | (1,747) | (232) | 435 | (2,097) | (3,379) | 687 | (2,053) |
| (20) **Ending Consolidated Cash Balance** | **$ 10,121** | **$ 18,712** | **$ 14,318** | **$ 10,760** | **$ 8,081** | **$ 7,905** | **$ 17,335** | **$ 15,588** | **$ 15,356** | **$ 15,790** | **$ 13,694** | **$ 10,315** | **$ 11,002** | **$ 11,002** |
| (21) **DIP Balance** | | | | | | | | | | | | | | |
| (22) Beginning DDTL/DIP Rollup | 24,000 | 24,000 | 36,500 | 36,500 | 36,500 | 36,500 | 36,500 | 49,000 | 49,000 | 49,000 | 49,000 | 49,000 | 49,000 | 24,000 |
| (23) DDTL/DIP Borrowings | - | 12,500 | - | - | - | - | 12,500 | - | - | - | - | - | - | 25,000 |
| (24) **Ending DIP Balance** | **24,000** | **36,500** | **36,500** | **36,500** | **36,500** | **36,500** | **49,000** | **49,000** | **49,000** | **49,000** | **49,000** | **49,000** | **49,000** | **$ 49,000** |

Filing Week

**Jervois Global Limited - Australia**
*Initial VA Outlook*
*As of 28 Jan 2025*
*($ thousands)*

| | | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13-Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Period: | Jan | Jan | Feb | Feb | Feb | Feb | Mar | Mar | Mar | Mar | Apr | Apr | Apr | Total |
| | Period Ended (Fri): | 1/24/25 | 1/31/25 | 2/7/25 | 2/14/25 | 2/21/25 | 2/28/25 | 3/7/25 | 3/14/25 | 3/21/25 | 3/28/25 | 4/4/25 | 4/11/25 | 4/18/25 | 4/18/25 |
| | Act/Fcst: | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
| (1) | **Total Receipts** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| (2) | Non Lender / Non Specified Prof Fees | - | (129) | (100) | (45) | - | (10) | (20) | - | - | (40) | - | - | (15) | (358) |
| (3) | Payroll Related | - | - | (5) | (97) | - | - | (5) | (97) | - | - | (5) | (78) | - | (285) |
| (4) | Compliance Costs | (862) | (404) | - | - | (506) | (3) | - | (400) | (39) | (4) | - | - | (39) | (2,258) |
| (5) | Other SG&A | - | (281) | - | - | (91) | (152) | - | - | (1) | (55) | - | - | (0) | (580) |
| (6) | **Total Operating Disbursements** | **(862)** | **(814)** | **(105)** | **(142)** | **(597)** | **(165)** | **(25)** | **(497)** | **(40)** | **(99)** | **(5)** | **(78)** | **(54)** | **(3,481)** |
| (7) | **Total Operating Cash Flow (AUS)** | **(862)** | **(814)** | **(105)** | **(142)** | **(597)** | **(165)** | **(25)** | **(497)** | **(40)** | **(99)** | **(5)** | **(78)** | **(54)** | **(3,481)** |
| (8) | **Non-Operating / Restructuring (Paid by AUS)** | | | | | | | | | | | | | | |
| (9) | Restructuring Professional Fees | (400) | (3,988) | (385) | (385) | (1,317) | (468) | (1,757) | (94) | (880) | (259) | (176) | (72) | (281) | (10,460) |
| (10) | Other Restructuring | - | (400) | - | - | - | - | - | - | - | - | - | - | - | (400) |
| (11) | **Total Non-Operating Receipts/Disbursements** | **(400)** | **(4,388)** | **(385)** | **(385)** | **(1,317)** | **(468)** | **(1,757)** | **(94)** | **(880)** | **(259)** | **(176)** | **(72)** | **(281)** | **(10,860)** |
| | **Intercompany (Brazil and US Funding)** | | | | | | | | | | | | | | |
| (12) | I/C Entity Funding | (320) | - | (400) | - | (400) | (254) | (450) | (507) | (515) | (262) | (540) | (200) | (4) | (3,852) |
| (13) | **Total Net Cash Flow** | **$ (1,582)** | **$ (5,202)** | **$ (890)** | **$ (527)** | **$ (2,314)** | **$ (887)** | **$ (2,232)** | **$ (1,097)** | **$ (1,435)** | **$ (619)** | **$ (721)** | **$ (349)** | **$ (339)** | **$ (18,193)** |

**Exhibit 3**

**Lien Priorities**

| Priority | DIP Collateral that constitutes WCF Priority Collateral or that would otherwise constitute WCF Priority Collateral | DIP Collateral that constitutes Bond Priority Collateral or that would otherwise constitute Bond Priority Collateral | Unencumbered Property |
|---|---|---|---|
| *First* | Permitted Prior Liens | Permitted Prior Liens | N/A |
| *Second* | DIP Liens | DIP Liens | DIP Liens |
| *Third* | JFO Facility Adequate Protection Liens | JFO Facility Adequate Protection Liens | JFO Facility Adequate Protection Liens |
| *Fourth* | Prepetition JFO Facility Liens | ICO Bond Adequate Protection Liens | ICO Bond Adequate Protection Liens |
| *Fifth* | ICO Bond Adequate Protection Liens | Prepetition ICO Bond Liens | N/A |
| *Sixth* | Prepetition ICO Bond Liens | Prepetition JFO Facility Liens | N/A |